```
 1              MR. STEINBERG:  Thank you.
 2                      DIRECT EXAMINATION
 3     BY MR. STEINBERG:
 4     Q.        Can you tell us your name?
 5     A.        Officer Karen Blair.
 6     Q.        Officer Blair, I'm going to ask you to speak much
 7     more loudly.  Your speed is all right, but much more loudly
 8     so we can hear you back here, okay?
 9               Spell your last name for our record, please.
10     A.        B-L-A-I-R.
11     Q.        And what do you do for a living?
12     A.        I'm a police officer.
13     Q.        For whom do you work?
14     A.        Columbus police.
15     Q.        And how long you have been employed with Columbus
16     police?
17     A.        Six and a half years.
18     Q.        Before that, any police experience?
19     A.        No, sir.
20     Q.        And you're not in uniform today?
21     A.        Correct.
22     Q.        Explain why you're not wearing your uniform.
23     A.        I'm on temporary assignment because I'm pregnant.
24     I'm restricted duty.
25     Q.        What does restricted duty mean?
```

△ π EXHIBIT 25
Deponent Blair
Date 9/21/17 Rptr. DM
WWW.DEPOBOOK.COM

GB000169

1    A.        Means I can't wear my uniform right now.

2    Q.        Why is it you can't wear your uniform when you're

3    on restricted duty?  Explain that to us in ten seconds.

4    A.        I can't fit in it.

5    Q.        Okay.  All right.

6              When you wear your uniform, whether you're

7    actually on your shift or not, are there certain

8    requirements that you have?

9    A.        Yes, sir.

10   Q.        Okay.  What are those requirements?  Whenever you

11   put that uniform on, even if you're not at work, what are

12   those requirements?

13   A.        As far as what?

14   Q.        Well, like, if you're not at work but you're

15   wearing a uniform and somebody needs help?

16   A.        I have a requirement to take action if necessary.

17   Q.        When you are at work, you're on restricted duty,

18   right?

19   A.        Right now currently, yes.

20   Q.        Is that why you're not allowed to wear your

21   uniform right now?

22   A.        Correct.

23   Q.        Okay.  So September 15th, 2014, you were working

24   for Columbus police then?

25   A.        Yes, sir.

1    Q.      And what shift were you working?

2    A.      Evening midwatch.

3    Q.      What are the hours of evening midwatch?

4    A.      7 p.m. to 5 a.m.

5    Q.      And does that mean your shift would start

6    September 15th, at 7 p.m., and then end at 5 a.m. the next

7    day, the 16th?

8    A.      Yes, sir.

9    Q.      And what was your geographic assignment, what

10   precinct were you assigned to?

11   A.      19 Precinct on Zone 3.

12   Q.      And tell us where that is, in what part of the

13   world is that?

14   A.      West side of Columbus, Hilltop area.

15   Q.      Okay.  Do you know the boundaries of it, roughly?

16   A.      Yes, sir.

17   Q.      What are they?

18   A.      We go north of Broad Street, up to Valley View on

19   the north side; south side goes about down to Mound Street;

20   and then east goes to Central; and west goes to, roughly,

21   Demorest.

22   Q.      Okay.  So how long had you been assigned to that

23   area?

24   A.      Almost two months.

25   Q.      And before that area, where were you assigned?

1     A.        East side on 9 Precinct.

2     Q.        So were you relatively familiar with the streets

3     by September 15th in that area?

4     A.        Yes, sir.  I'd also coached out there.

5     Q.        Okay.  What does that mean, coach?

6     A.        When you're new, you take a coaching period and

7     you spend five weeks on a precinct at a time.  I spent five

8     weeks there.  That's when you, you know, you really learn an

9     area because you're being graded on where you are.

10    Q.        And how were you dressed during your shift on

11    September 15th?

12    A.        I was wearing the uniform of the day, which was

13    short sleeves, white shirt, my badge, duty pants, the belt.

14    Q.        Okay.  And were you assigned to a vehicle?

15    A.        Yes, sir.

16    Q.        What type of vehicle?

17    A.        It was a Ford Taurus cruiser, Car 9191.

18    Q.        Did it have working Visibar lights?

19    A.        Yes, sir.

20    Q.        And was it marked as a Columbus police cruiser?

21    A.        Yes.

22    Q.        Okay.  So were you assigned by yourself in that

23    cruiser?

24    A.        Yes.  I was alone, by myself, yes.

25    Q.        Okay.  Now, do you remember getting a dispatch

1    about a potential burglary at 2756 Sullivant Avenue?

2    A.        Yes, sir.

3    Q.        And do you remember the details of that dispatch?

4    A.        Yes, sir.

5    Q.        If you could tell us them.

6    A.        The dispatch run said there was a burglary going

7    on in-progress, said there was a male and two females, I

8    believe is what it said, were taking property out of a

9    building.  One thing that stuck in my mind at the time, one

10   of the females was wearing, I believe the run said an orange

11   shirt.  So I know it was a brightly colored shirt involved

12   with one of the females.  And it said they were loading

13   property into a vehicle, but there was no vehicle

14   description.

15   Q.        Okay.  About what time of day did you get that

16   dispatch?

17   A.        After ten p.m., roughly.  I don't remember the

18   times.

19   Q.        Okay.  Was it after dark already?

20   A.        Yes, sir, it was dark outside.

21   Q.        And so what did you do when you got that dispatch?

22   A.        Well, I was really close.  I asked the dispatcher

23   to verify what the cross streets were of the dispatch run

24   because I was in the alley north of Sullivant Avenue just

25   east of Hague Avenue.  And I know the buildings, how they

1    layout. On Sullivant -- there's the UDF on the corner of

2    Sullivant and Hague, then there's a little row of buildings.

3    So I asked the dispatcher what the crosses were. She said

4    Hague and Harris, which would mean it would be the building

5    next to UDF. I was behind the UDF, so I continued eastbound

6    in the alley north of Sullivant towards Harris.

7    Q.      Okay. With or without lights and sirens?

8    A.      Without because I was close. I didn't want to --

9    That's typically how we respond to a burglary, when you get

10    close to the location, you turn off your lights and sirens

11    because it alerts the burglars, or whatever is going on,

12    that we're pulling up.

13    Q.      On a burglary run, you want to sneak up on people?

14    A.      When you get close, yes.

15    Q.      Okay. So did you ever run lights and sirens then

16    in this run?

17    A.      On this run, no, sir.

18    Q.      Okay. So tell us what happened. You get to --

19    you get to dispatch and what do you do?

20    A.      After it was dispatched, I got there -- Like I

21    said, I was already in the alley. I got there moments after

22    it was dispatched. When I came toward Harris, I knew Harris

23    was a northbound street only. So when I came around the

24    corner, knowing it's a Sullivant address, I knew it would be

25    south of me, so I would have to go the wrong way on a

1    one-way to get to the address. So I stopped in the alley,

2    my car was partially on Harris Avenue. When I got there, I

3    saw a truck parked on the west side of the street facing

4    northbound.

5    Q.       Okay. You said west side of the street facing

6    northbound?

7    A.       Yes, sir.

8    Q.       Tell us, is that off your passenger side or off

9    your driver's side?

10    A.       I would have seen it through my passenger -- on my

11    passenger side. Would have been on my right from where I

12    was coming because I was north of the location.

13    Q.       So off your passenger side?

14    A.       Yes, sir.

15    Q.       Okay. And what did you do?

16    A.       Well, I knew the run said there were people

17    loading property into a vehicle. When I came up, I knew it

18    would have been that building. I saw a door directly next

19    to where this truck was parked on the building, and when I

20    looked at the vehicle, I saw two occupants, a male driver

21    and female in the passenger seat. I could see a bright --

22    it was pink or orange shirt on her, so it immediately caught

23    my attention that that was one of the descriptors in the

24    dispatch run. I knew immediately I wanted to get this

25    vehicle stopped because it looked like it was, you know, at

GB000175

1    the location of the dispatched run, as it was described.

2    Q.        And what happened next?

3    A.        So I was in the alley. I pulled up, and I stopped

4    my car because I didn't want to go southbound in the

5    northbound only lane, so I stopped half in the alley and got

6    out of my vehicle. And as soon as that truck saw my cruiser

7    and me get out of the car, it started to pull off into the

8    street.

9    Q.        And were you already outside of your vehicle when

10   you saw that truck move?

11   A.        It was fairly simultaneous. As soon as I pulled

12   up and saw what was going on, where it was, the location, I

13   got out of my car. I didn't want to be in -- I have to get

14   out and investigate. I don't want to be trapped in my car.

15   Q.        At this point any other CPD officers there?

16   A.        At that moment, no, sir.

17   Q.        Okay. What city were you in now?

18   A.        Columbus, sir.

19   Q.        What state?

20   A.        Ohio.

21   Q.        And what county?

22   A.        Franklin.

23   Q.        When you get out of your vehicle, what do you do?

24   A.        When I get out of my vehicle, I see the truck as

25   it's starting to pull away. I'm not directly in front of

1    the truck because I don't want to get run over. I'm kind of

2    off to the side and make it very clearly visible, Hey, stop.

3    I want you to stop, and I'm going to talk to you, so please

4    stop. I'm going to investigate this.

5         And the truck still pulled forward slowly, not

6    quickly like it was going to peel out or anything, but it

7    started to roll forward as if it didn't want to stop, but he

8    was debating whether he was going to stop. So I was in the

9    road, Hey, stop. Stop. And I walked towards the truck, and

10   as it was still rolling a little bit, I tapped on the hood

11   of the truck like, Hey, I said stop (indicating). And the

12   truck did stop.

13   Q.        How many times did you ask?

14   A.        I was in the roadway, I was like, Hey, stop.

15   Stop. I said stop. And I, you know, tapped on the hood

16   that last time like, I'm sorry, you're going to stop. I

17   need to talk to you.

18   Q.        Were you able to see who was driving the truck at

19   that point?

20   A.        Yes, sir.

21   Q.        Okay. And do you see the driver of that truck in

22   this courtroom today?

23   A.        Yes, sir.

24   Q         Can you point to that person and tell us what that

25   person is wearing, please?

1    A.      Sir, he's right there (indicating), wearing a gray

2    suit and blue tie.

3    Q.      Okay.  And let's see.  I see sort of two grayish

4    suits.  So --

5    A.      Bright blue tie, light blue.

6    Q.      Bright blue.

7            Nearest or farthest from the orange binder?

8    A.      Nearest to the orange binder.

9    Q.      Okay.

10           MR. STEINBERG:  Your Honor, I would ask that the

11    record reflect that the witness has identified the

12    defendant.

13           THE COURT:  It will so reflect.

14           MR. STEINBERG:  Thank you.

15    BY MR. STEINBERG:

16    Q.      When did you first observe this person's face, the

17    defendant's face?

18    A.      I saw his face when I pulled around the corner and

19    saw the truck.

20    Q.      Okay.

21    A.      That's when I saw the female passenger with the

22    bright colored shirt.  I saw both of them.  The way the

23    lights hit, I could see them in the truck.

24    Q.      Okay.  So when -- when the truck stopped, what did

25    you do?

1    A.        Knowing that I was still alone and I knew that

2    more officers were responding, for officer safety reasons,

3    you don't jump in and, you know, do anything too crazy, so I

4    walked up to the passenger door and started talking with --

5    not the passenger, I'm sorry. Driver door and started

6    talking with the driver in an attempt, I guess, to stall,

7    you know, start the investigation, figure out what was going

8    on while I'm waiting for more officers to respond to assist.

9    Q.        While you're waiting for more officers to come, I

10   just want to talk to you really quickly. You said for

11   officer safety reasons. Have you been trained?

12   A.        Yes, sir.

13   Q.        Okay. Tell us about -- very quickly about your

14   training, just generally, in terms of what you had to do to

15   become a police officer.

16   A.        For Columbus you go through the Columbus Police

17   Academy. They have their own training academy. That's

18   approximately a seven month long process, takes you through

19   learning the ORC, officer safety, grounding techniques,

20   firearms, you know, everything involved in being a police

21   officer.

22   Q.        Okay. ORC means what?

23   A.        Ohio Revised Code.

24   Q.        And you use the term officer safety. How

25   extensive has your training been in officer safety? Just

GB000179

1    describe that for us.

2    A.        I believe it's very extensive.  We take

3    training -- we have training throughout the year, continuing

4    training, that's probably one of the biggest things that is

5    impressed upon us in the academy is how to be safe.  We go

6    home safe, citizens are safe, other officers are safe.

7    Q.        Okay.  And when you are trained to deal with

8    specific situations, is there always an officer safety

9    component?  Is that -- is that always a topic?

10   A.        Yes, sir.

11   Q.        Okay.  All right.

12             So let's go back to -- we're waiting, you're

13   waiting for other officers to get there.  How long did it

14   take for other officers to get there?

15   A.        Not very long.

16   Q.        What did you do while you're waiting for other

17   officers to get there?

18   A.        I talked to the driver of the vehicle.

19   Q.        Okay.  The defendant?

20   A.        Yes, sir.

21   Q.        What were you talking to him about?

22   A.        At that point I was trying to ask for

23   identification.  I asked for his -- I asked if he had his

24   I.D. on him.  He said, No.  Then I asked, would you have a

25   license.  Because often people tell you they don't have an

1    I.D. when they know they don't have a valid driver's

2    license. He said, Yes, I have a valid license. I said,

3    okay. Where is the actual I.D. because it's -- particularly

4    men who have, you know, pockets for wallets they almost

5    always have an I.D. on them somewhere. It's not typical

6    that people don't have some form of I.D., whether it be Ohio

7    Identification Card or whatnot. So I said, You don't have

8    your I.D. on you? He kept tell me no. So I asked one more

9    time, You don't have your physical I.D. card on you? And

10   then he paused and said, Well, maybe I do. And he reached

11   in the backseat and produced his I.D.

12   Q.       And did you get his I.D. then?

13   A.       I did at that time, yes, sir.

14   Q.       Was it a valid Ohio license?

15   A.       Yes, sir.

16   Q.       Okay. So then what did you do?

17   A.       Well, I was still waiting for officers to come

18   because at that time I believe Jean, Officer Jean Byrne, had

19   pulled up and went to the passenger side of the vehicle.

20   She was talking to the female, the female passenger, so I

21   was still waiting for another officer to come to my side,

22   because, knowing the circumstances, the defendant here is

23   much larger than I am, officer safety reasons I want -- you

24   know, plus one theory, I want another officer with me to

25   remove him from the vehicle. So at that time I'm still

1    waiting and I asked him more questions, where are you coming

2    from, you know, just typical things you would ask in a

3    normal traffic stop. We're trying to figure out if he

4    belonged in that place.

5         And he kept asking me, Why are you stopping me,

6    you know, what's going on. And I told him I was here --

7    We're investigating a possible burglary, and he immediately

8    said, I have nothing to do with the burglary. I said, Okay,

9    that's fine. Once we figure that out, you'll be on your

10   way, sir.

11   Q.      So what are you doing? You talked about asking

12   questions about a traffic stop. Was this a traffic stop?

13   A.      A traditional traffic stop, no, but in a sense, he

14   was being stopped in a vehicle and being detained, so by

15   definition, technically.

16   Q.      And why were you detaining him? What was your

17   purpose?

18   A.      My purpose?

19   Q.      What were you trying to do?

20   A.      Based on what I already had at that moment, I

21   believed he was involved in a possible burglary. There was

22   a vehicle parked next to the building I knew was involved.

23   There was a door right there as described. The female in

24   the passenger seat with the brightly colored shirt. It

25   was -- there was a male in the dispatch run, the timing of

1    it because I knew I was so close, you know, it wasn't like

2    we had a suspect with that description that was dispatched

3    would have had time, much time to get away. I believed he

4    was involved in the burglary in some way at that time.

5    Q.      And what did you want to do at that point?

6    A.      I wanted to remove him from the vehicle and remove

7    him from the passenger to separate, you know, possible

8    suspects, witnesses, separate him so I could interview him

9    separately from the female and she would be interviewed

10    separately and we could investigate.

11          One of the things the run said is they were

12    removing property from the building. I wanted to figure out

13    is there some large piece of property in this truck, you

14    know, the bed of the truck that would have been related,

15    that would have tied it together, just something that would

16    have confirmed it. And you get ahold of the witness and

17    say, Hey, is this the suspect you saw come out of the

18    building.

19    Q.      And did you then -- Officer Byrne gets there,

20    right?

21    A.      Yes, sir.

22    Q.      How long after you got there, would you say did

23    Officer Byrne get there?

24    A.      I wouldn't say it was even a minute. It was

25    fairly short. It was pretty quick.

1    Q.       What's Officer Byrne's first name?

2    A.       Jean Byrne.

3    Q.       Jean Byrne, okay.  So she gets there.  And do you

4    ask the defendant to get out of the vehicle when she gets

5    there or do you wait?

6    A.       I wait.

7    Q.       Okay.  Why is that?

8    A.       Because she was on the passenger side dealing with

9    the passenger.  And so we had two possible suspects with two

10   officers, and knowing, like I said, Officer Phillips -- the

11   defendant's side here, I was waiting to have another officer

12   with me to remove him from the car.

13   Q.       And did somebody else come?

14   A.       Yes, sir.

15   Q.       How long after Officer Byrne got there did another

16   officer get there?

17   A.       It wasn't very long.  Again, maybe an additional

18   minute at most, maybe, fairly quick.

19   Q.       What were you doing while you're waiting for that

20   officer?

21   A.       Just talking with the defendant.

22   Q.       So can you represent what the nature of the

23   conversation was?

24   A.       That was just a part where I was asking him for

25   identification and he asked me why we were there.  I told

1  him we were investigating a possible burglary.  That was

2  about the extent of our conversation.

3  Q.      You didn't ask him any questions about the

4  burglary at that time, right?

5  A.      No, sir.

6  Q.      Why wouldn't you ask him questions about the

7  burglary while he's sitting next to this other woman?

8  A.      We have a possible suspect/witness next to him,

9  and the more information I gave him, then he can produce,

10  you know, tailor-made answers based on what he's going to be

11  asked later, you know, giving up too much information that

12  can taint his answers later or the person next to him.

13  Q.      And have you had experience in doing this kind of

14  street-side investigation?

15  A.      Yes.

16  Q.      And have you had training in doing it?

17  A.      Yes, sir.

18  Q.      What does your training and experience tell you to

19  do when you have two possible suspects?

20  A.      You immediately separate them.  You don't allow

21  them to talk to each other.  You know, I certainly didn't

22  want him to turn around and say something pertinent to the

23  burglary or, you know, you know, give up some kind of

24  information where their stories would be skewed, you know, a

25  chance to be dishonest or whatnot.

1    Q.        Is separation, in your experience, a reliable

2    truth detection device?

3    A.        It can be.  I mean, it certainly can be because

4    you want to separate them from the scene or separate them

5    from that situation, and get them into a position where

6    they're more likely to be honest with you because they don't

7    know what you know.  You know, they're in a different

8    environment.  They're not, you know -- For example, he was

9    sitting on a curb or in the backseat of my car versus inside

10   of his truck where it was his, his place.  I would be able

11   to get more honest answers out of him.

12   Q.        And so who was the next officer after

13   Officer Byrne came?

14   A.        Officer Adam Groves.

15   Q.        Okay.  And tell us what happened then.

16   A.        He walked up to the driver's side where I was

17   standing and I told Officer Groves, We need to remove him

18   from the car.

19   Q.        When you say "him" you're talking about --

20   A.        The defendant, yes, sir, because

21   Officer Jean Byrne had removed the female from the truck on

22   the passenger side, and I could see that.  So I wanted to

23   remove him from the truck on our side.

24            And in the procedure to remove him from the

25   vehicle, pat him down, separate him from the vehicle, and

GB000186

1    then be able to, you know, question from there.

2    Q.       Pat down, what does that mean?

3    A.       A pat down is just quick search on the outside --

4    search, I guess is -- more in depth word of it, but on the

5    outside of clothing searching for weapons only, you know, a

6    gun, a giant knife, something that could hurt me or him or

7    another officer.

8    Q.       And have you been trained to do this?

9    A.       Yes, sir.

10   Q.       Okay.  And why do you do this?

11   A.       Well, in this situation, it's, you know, I'm

12   looking at a possible felony.  It's known that when people

13   commit felonies, they typically carry weapons on them.

14   There's a chance if he is involved in the burglary, he

15   didn't want to go to jail, and he's going to, you know,

16   possibly he's going to do whatever means necessary to, you

17   know, keep that from happening if he has a weapon.  It could

18   mean hurting me or one of my fellow officers or another

19   citizen, himself.

20   Q.       Are you trained in how to take someone out of a

21   vehicle?

22   A.       Yes, sir.

23   Q.       Okay.  And in that training, how often did you

24   hear the term "officer safety"?

25   A.       That is the basis of removing someone from the

1    vehicle, especially in -- typically in Columbus police we

2    have techniques to remove someone that makes it the safest

3    way possible for them and us.

4    Q.        And how many times did you have to do that in

5    training?  Did you have to be told, Hey, remember to pat

6    down.  Remember to pat down.  Remember to pat down?

7    A.        All the time.

8    Q.        All right.  Is it fair to say that gets drilled?

9    A.        Yes, sir.

10   Q.        Okay.  So you have Officer Groves there, what do

11   you do?

12   A.        It's Officer Groves, and we need to get him out of

13   the car.  We tell the defendant, We need you to step out of

14   the car.  He was hesitant, just as he was when I asked for

15   his I.D.  You could tell he was debating whether he was

16   going to or not.  So...

17   Q.        How do you tell that?

18   A.        Huh?

19   Q.        How could you tell that?

20   A.        The way he was kind of looking away from me, you

21   could tell in his face he was thinking about his answers.

22              MR. HEMMINGER:  Objection.

23              THE COURT:  You know what, let's leave it at that

24   and go on to another subject.  I think I understand the

25   nature of the objection.

GB000188

1           MR. STEINBERG: Okay.

2     BY MR. STEINBERG:

3     Q.     What did you see the defendant doing?

4     A.     He kept looking forward. You know, typically when

5     you're asked to get out of the vehicle and you have no

6     problems with it, you would step out of the vehicle. But he

7     was hesitant. He didn't want to immediately get out. So I

8     physically opened the truck door for him and said, Go ahead

9     and step out. And, again, he was still hesitant but he did

10    seem to put his left leg out of the truck and partially

11    stood where he was, still leaning against the truck and, you

12    know, truck seat.

13    Q.     Okay.

14    A.     And kind of stood there. And Officer Groves said,

15    No, come out of the truck, and grabbed his left arm in the

16    escort position to guide him out of the car. When we,

17    Columbus police, pulls somebody out of the car, we guide

18    them out. You know, there's no force to it. You just guide

19    them because typically people don't know, you know, typical

20    person steps out of the vehicle, they step and want to face

21    you. We want them to face away from us. We kind of guide

22    them in a position towards the doorjamb to be able to put

23    their hands behind their back. Officer Groves grabbed his

24    left arm and attempted to do that.

25    Q.     Let me ask you a question: Somebody is perfectly

1    willing to walk out of their vehicle, and you want to pat

2    them down.

3    A.        Uh-huh.

4    Q.        Put hands on them automatically to guide them?

5    A.        Typically, yes, in some fashion.  You know, it

6    doesn't mean you're, you know, grabbing them.  It could just

7    mean, you know, Go ahead and turn around for me because

8    I'm -- you know, if I'm going to pat them down, I'm going to

9    be touching them regardless, so it's more guiding them,

10   facing them away from me.

11   Q.        Who was touching the defendant at that point?

12   A.        Officer Groves was.

13   Q.        Where were you?

14   A.        I was right next to him.

15   Q.        Okay.  Were you able to see everyone, everything

16   that was going on?

17   A.        Yes, sir.

18   Q.        Okay.  So what happened next?

19   A.        As soon as Officer Groves touched his -- the

20   defendant's left arm, the defendant immediately pulled his

21   left arm towards his chest and grabbed the support handle on

22   the truck, the one that is up on the door frame.  He grabbed

23   that with his right hand and held on with a really tight

24   grip.

25   Q.        And were you still giving the defendant verbal

1    commands at this point?

2    A.        Yes, sir, absolutely.

3    Q.        And what were you telling the defendant?

4    A.        Telling him to step out of the vehicle.  At that

5    point, I realized when he was holding onto the handle he

6    wasn't going to let go.  And I was telling him, Let go.  Let

7    go.  Let go.  Let go.  And Officer Groves was doing the same

8    thing.

9    Q.        And what was the defendant doing?

10   A.        He was, like, tightening his grip and trying to

11   pull himself towards his truck.  He was trying to get back

12   in the truck.

13   Q.        So what happened?

14   A.        So at that point, I believe it was Officer Cazan

15   came up, and he assisted Officer Groves with the defendant's

16   left side.  And I was still in the doorjamb trying to get

17   the defendant's right hand off of the handle.

18   Q.        Were you actually touching the defendant?

19   A.        Yes, sir.  Yes, sir.

20   Q.        And Officer Cazan, where was he?

21   A.        He was on with Groves, Officer Groves, on the left

22   arm.

23   Q.        What were Officer Groves and Cazan doing?

24   A.        Trying to pull him out of the truck.

25   Q.        What were you doing?

1    A.      I was -- when I realized the defendant had, what I

2    believe was the tightest grip possible, on the handle, I

3    realized I wasn't going to be able to pull his hand off.  I

4    was trying to pry his fingers off of the handle.

5    Q.      Were you telling him to do anything at that point?

6    A.      We were telling him to let go and get out of the

7    truck.

8    Q.      Was he complying?

9    A.      No, sir.

10   Q.      Was the defendant saying anything?

11   A.      At that point, I believe is when he started to

12   say, he kept saying, I'm a state trooper.  I'm a state

13   trooper is what I remember, and that was when, during this

14   we were, you know -- I was thinking, If you're a state

15   trooper, you know not to do this.  You know the procedure,

16   you know, let go, come out.

17   Q.      That's just what you were thinking?

18   A.      Yes.

19   Q.      You didn't say that to him?

20   A.      No, sir.

21   Q.      Did you respond to him -- Anything the defendant

22   is saying, did you respond to it that point?

23   A.      At that point we were only giving him verbal

24   instructions of what we wanted him to do.

25   Q.      So what happened?

1    A.        So at that point, after, I mean, several moments

2    went by where we were in this position with Officer Cazan

3    and Groves were pulling the defendant away from the vehicle

4    and he still had a hold of that handle, eventually I was

5    able to get all his fingers off at once.  He let go of his

6    grip on the handle.  From there, a few moments went by and

7    the defendant was taken to the ground by Officer Cazan and

8    Groves.

9    Q.        Okay.  Can you describe how that happened?

10   A.        I believe Officer Cazan -- When they're trying to

11   get him to the ground, he still wouldn't go, so

12   Officer Cazan, I believe, picked him up by his legs and put

13   him on the ground.

14   Q.        Is there a term the Columbus police use for that

15   or that you use or not?

16   A.        Double leg takedown is often what you would call

17   it when you pick someone up by both of their legs and take

18   the ground stability off and get them placed to the ground.

19   There was -- both of them -- it took both of them to make

20   that happen.  Officer Groves, I believe, you know, was still

21   on the arm, and Cazan grabbed his legs and they placed him

22   on the ground.

23   Q.        Now, the defendant, why is it you wanted to have

24   the defendant exit the vehicle again?

25   A.        I was still investigating the burglary.  And, like

GB000193

1    I said, at this point, I still did not have the opportunity

2    to investigate the building, check the building to see if it

3    was secured.  So this was kind of a fast-evolving situation.

4              MR. STEINBERG:  I'm going to ask you to slow down

5    and speak a little more loudly.

6    A.        I was still trying to figure out, I need to get

7    him detained, possible suspects detained so other officers

8    and myself could, you know, search the building, you know,

9    check to see if that door was unlocked, the other doors.  So

10   at that point, we were still trying to get him detained to

11   separate him from the witness, find out if he had any, you

12   know, weapons on him.  I still believed he was involved in

13   the burglary.

14   Q.        And give me the order of necessity of what you

15   need to do, that is, you need to get him out of the vehicle,

16   right?

17   A.        Yes, sir.

18   Q.        And then what do you need to do immediately after

19   he gets out of the vehicle, in your mind?

20   A.        I need to check him for weapons and detain him

21   somewhere with -- either with another officer on a curb

22   maybe or in the back of a cruiser, just somewhere he can't

23   flee, where he'll be spoken to later.

24   Q.        Okay.  And detain him to do what with him?

25   A.        To investigate the burglary.

1    Q.      Okay.  And specifically, the method of

2    investigating the burglary with him would be to what,

3    interview him?

4    A.      Interview him.

5    Q.      Okay.  And how did your larger purpose of securing

6    the building, investigating the burglary, how did the

7    defendant's behavior at the side of his truck affect that

8    larger purpose?

9    A.      Well, initially when I, you know, approached, he

10    kept doing everything he could do to delay my response.  You

11    know, if this had been a smooth operation here, I would have

12    been able to go up, detain him, check the building.

13                 MR. HEMMINGER:  Objection.

14                 MR. STEINBERG:  Can we approach?

15                 THE COURT:  Sure.

16                       - - -

17            The following discussion was held at the bench out

18    of the hearing of the jury:

19                 MR. STEINBERG:  It's pure speculation.

20                 THE COURT:  I got that, but I don't remember what

21    the question -- I mean you're concerned about her answer.

22                 MR. HEMMINGER:  Yeah.

23                 MR. STEINBERG:  I don't think it's an objection to

24    the question, though.

25                 MR. HEMMINGER:  No.  Right.

1          MR. STEINBERG:  Okay.  Let me redirect.

2              THE COURT:  Yeah.

3          MR. STEINBERG:  I don't remember exactly the

4    question, but I know where I wanted to go.  I'll redirect

5    the question.

6              THE COURT:  Yeah.  Thank you.

7                          - - -

8              THE COURT:  Mr. Steinberg has agreed to rephrase.

9          MR. STEINBERG:  Thank you.

10   BY MR. STEINBERG:

11   Q.        Officer Blair, specifically, you had a purpose of

12   investigating the burglary, correct?

13   A.        Yes, sir.

14   Q.        The defendant's behavior at his truck, when he

15   wouldn't come out of his truck, how -- what affect did that

16   have on your overall purpose, your overall investigation?

17   A.        Most importantly, it delayed my response,

18   investigating -- to be able to investigate the burglary,

19   because instead of being able to secure the building, I was

20   busy tied up struggling with him, basically.

21   Q.        And what about other officers at the scene, were

22   they able to continue the investigation immediately or what

23   did they have to do?

24   A.        Due to struggling with the defendant, they were

25   coming to assist us to detain the defendant instead of being

1    able to respond to the building.

2    Q.      And were you present when the defendant had to be

3    taken to the ground?

4    A.      Yes, sir.

5    Q.      Okay.  So how long was he on the ground?

6    A.      It was -- I mean, when there's a struggle, it's

7    hard to tell time.  The time, it always seems like it lasts

8    forever.  I would say, realistically, probably a minute,

9    which is a fairly long time.

10    Q.      Were you part of that struggle?

11    A.      Yes, sir.

12    Q.      What were you doing?

13    A.      I was trying to handcuff the defendant.

14    Q.      Okay.  And who else was with you Columbus police

15    wise?

16    A.      There was Officer Groves and Officer Cazan,

17    Jean Byrne came around the side of the truck where we were

18    at some point.  I believe Officer McClain came up and was

19    part of that at some point.

20    Q.      And what was the defendant doing while you were

21    trying to handcuff him?

22    A.      He was struggling.  He was pulling his hands

23    underneath of him so we couldn't handcuff him and it -- I'm

24    not sure if he was still trying to get back in the truck,

25    but he was not complying with our commands to -- You know,

1    we kept saying, Give us your hands. Give us your hands. He
2    would not. He would still not let go of his arms.
3    Q.        And what did you do then at that point?
4    A.        I was trying to help the other officers. I was
5    trying to grab, you know, get both of his arms together
6    behind his back.
7    Q.        Were you finally able to do that?
8    A.        While we were on the ground, the defendant was
9    still not complying. Officer Groves, he deployed his Mace
10   in the face of the defendant. That assisted with pain
11   compliance. With all of us together, we were able to bring
12   the defendant's hands behind his back and handcuff him.
13   Q.        Okay. And then what happened?
14   A.        From there, once he was handcuffed, he was placed
15   in the rear of the cruiser.
16            MR. STEINBERG: Your Honor, may I approach the
17   witness?
18            THE COURT: Yes, you may.
19   BY MR. STEINBERG:
20   Q.        I'm going to show you what I've marked as
21   State's Exhibit A. You have State's Exhibit A sitting in
22   front of you at the table, right?
23   A.        Yeah.
24   Q.        What is State's Exhibit A?
25   A.        It's a CD.

1    Q.        And have you had a chance to see what that CD

2    contains?

3    A.        Yes, sir.

4    Q.        And what does State's Exhibit A contain?

5    A.        It contains video footage from CPD wagon 198 from

6    the point where they responded.  It shows Officer

7    Jean Byrne's cruiser, and then it shows the defendant's

8    truck.  And you can't see my cruiser because of the

9    lighting.  And then it shows Officer Groves' car next to

10   Jean Byrne's car.

11   Q.        Okay.  If I could see that.

12             So I'm going to put State's Exhibit A in our video

13   player.  Are you able to see our video player?

14   A.        Yes.

15   Q.        Okay.  I'm going to play for you

16   State's Exhibit A, part of it.

17             Before I do, I have a couple of questions,

18   generally.  How long have you been with the Columbus Police

19   Department?

20   A.        Approximately six and a half years.

21   Q.        And have you learned about what the cruiser video

22   system is?

23   A.        Yes, sir.

24   Q.        Okay.  What is the cruiser video system?

25   A.        Our system is called Arbitrator.  It's a camera in

1 the cruiser, and it activates with certain things and

2 records where the camera is facing along with the audio from

3 a body mike.

4 Q. Can you speak a little more loudly?

5 A. Huh?

6 Q. I was going to ask you to speak more loudly.

7 A. Yes, sir.  Sorry.

8 Q. So your assignment was what on the 15th of

9 December -- September last year?

10 A. I was cruiser 9191.

11 Q. Okay.  Other officers who responded, were they

12 from your precinct?

13 A. No, sir.

14 Q. Where were they from?

15 A. This were from the community response team, CRT.

16 Q. Okay.  Did your cruiser have cruiser video?

17 A. It had a camera system on it, yes.

18 Q. Okay.  What we're going to look at is not from

19 your cruiser?

20 A. No, sir.

21 Q. When does cruiser video activate?  When does it

22 activate itself?

23 A. It comes on if you're involved in an accident, if

24 you turn on -- most of the time it comes on when you turn on

25 the lights, the beacon.

1    Q.    Did you turn on your beacons that night?

2    A.    No, sir.

3    Q.    Okay.  Are you able to see State's Exhibit A in

4    our video player?

5    A.    Yes, sir.

6    Q.    Is that what you observed previously?

7    A.    Yes, sir.

8    Q.    Okay.  All right.  Officer Blair, I've stopped it

9    at 22:47:21.  What are we looking at in the 22:47:21 view?

10   A.    What you see here is you see Officer Jean Byrne's

11   car right near to the left, 7314.

12   Q.    If you could approach our screen and just show us

13   what you're talking about.

14   A.    That right here is Officer Jean Byrne's car, 7314.

15   I believe this is Officer Groves, 7315.  This right here is

16   the defendant's vehicle.

17   Q.    Where is the defendant's vehicle?

18   A.    The black truck right here (indicating).

19   Q.    Okay.

20   A.    My cruiser is out of the shot here.  I would be

21   facing about right here (indicating) --

22   Q.    Okay.

23   A.    -- from the alley.

24   Q.    Okay.  If you could, I'm going to play some more.

25   So 22:47:52, where is Officer Byrne?

1    A.        Right there, sir (indicating).

2    Q.        Okay.  And is there another person next to her?

3    A.        The female is the female passenger from the truck.

4    Q.        Okay.  That was the person who was doing -- where

5    was that person?

6    A.        At what point?

7    Q.        When you first arrived.

8    A.        When I first arrived she was the front passenger

9    of the vehicle.

10   Q.        Okay.  And there's somebody sort of right in the

11   middle of the screen.  Who is that?

12   A.        I believe this would be Officer Cazan.

13   Q.        Okay.

14             (Video played.)

15   Q.        22:48:12, what did we just see from the female

16   passenger?

17   A.        The female passenger runs away from the scene.

18   Q.        Okay.  And what's going on, sort of in the far

19   left-hand side of the screen?

20   A.        Right here is the struggle with the defendant.

21   Q.        Okay.

22             (Video played.)

23   Q.        22:49:20, I've stopped it.  Do you see the

24   defendant here?

25   A.        Yes, sir.

1  Q.   Okay.  And who is with him?

2  A.   It would be Officer Cazan or Officer Groves.

3  Q.   And what's going on here?

4  A.   They're about to place him in the rear of 7214.

5  Q.   22:51:08, what just happened?

6  A.   Defendant was placed in the rear of 7214.

7  Q.   Okay.  Do you see the burglary location here?

8  A.   You can't tell in the video, but it's this

9 building right here (indicating).

10  Q.   Okay.  If you want to grab your seat now.  When

11 you took the defendant's license from him, did you have a

12 chance to actually run it?

13  A.   At that moment, no.

14  Q.   Okay.  When did you end up running the license?

15  A.   I believe Officer Jean Byrne did.  I handed it to

16 her, who sat in the 7314.  An officer sat in that driver

17 seat, and I handed it to them and it was run on that

18 computer initially.

19  Q.   Was that after the defendant had been placed into

20 a cruiser?

21  A.   Yes, sir.

22  Q.   Did you ever run the defendant's license plate?

23  A.   Yes, sir.  It would have been ran.

24  Q.   When did you do that, do you know?

25  A.   It would have been this same time with the

GB000203

1   license.

2   Q.      Okay.  Was it after the defendant was in the

3   cruiser?

4   A.      Yes, sir.

5   Q.      So did you have a chance to see the defendant

6   after he had been through -- after he had fought with

7   Columbus police?

8   A.      Yes, sir.

9   Q.      Okay.  And I'm going to show you several exhibits.

10          MR. STEINBERG:  Your Honor, may I approach the

11  witness?

12          THE COURT:  Yes, you may.

13          MR. STEINBERG:  Thanks.  Thank you.

14  BY MR. STEINBERG:

15  Q.      What would you say -- How would you describe the

16  defendant's condition after he had fought with the police?

17  A.      He had some scratches and the dirt on his face and

18  Mace from where he had been Maced.  I believe he had

19  scratches on his knee.

20  Q.      When somebody is Maced, is there a procedure you

21  have to follow afterwards?

22  A.      Yes, sir.  You call a medic to respond to scene

23  and they pour saline on the face to wash away the Mace.

24  Q.      Did that happen?

25  A.      Yes, sir.

1   Q.      Okay.  So I'm going to show you State's Exhibits B

2   through I.  If you could go through B through I, and just

3   look up at me when you're done.  What are State's Exhibits B

4   through I?

5   A.      They're photographs of the injuries sustained by

6   the defendant.

7   Q.      Okay.  Are they true and accurate as you recall

8   them?

9   A.      Yes, sir.

10  Q.      Okay.  I want to go back to one thing on the

11  video.

12          All right.  We're at 22:48:05.  If you could come

13  up here.  Now, do you see Officer Byrne?

14  A.      Yes, sir.

15  Q.      Show us where Officer Byrne is here.

16  A.      (Pointing.)

17  Q.      And who is with Officer Byrne right there?

18  A.      That's the suspect, female.

19  Q.      Okay.  And it looks like her clothes are dark?

20  A.      Yes.  It was a jacket.

21  Q.      Underneath that jacket, what was she wearing?

22  A.      It was a pink or orange shirt.  I don't remember

23  the color, but I remember the dispatch run said it was pink

24  and it was orange or vice versa.  I just remember it being a

25  bright color and it was nighttime.

1    Q.    That's what you saw underneath that jacket?

2    A.    Yes, sir.

3    Q.    Was that person wearing the jacket inside the

4    vehicle?

5    A.    Yes, sir.  It was -- but it was open.

6    Q.    Okay.  You can take your seat again.

7          So you ended up arresting the defendant, correct?

8    A.    Yes, sir.

9    Q.    Okay.  What did you arrest the defendant for?

10   A.    Obstructing official business.

11   Q.    And did you learn about whether he was involved in

12   the burglary?

13   A.    We were never able to tie him to the burglary.

14   Q.    Okay.  If I can have one minute.

15         I want to just clarify something regarding the

16   license plate.  Did you run it when you first arrived?

17   A.    No, sir.

18   Q.    When did you actually run the plate?

19   A.    After the defendant was placed in the rear of the

20   cruiser we were able to slow things down and run his

21   identification and the license plate on the truck.

22   Q.    Okay.

23         MR. STEINBERG:  Your Honor, I don't have any other

24   questions for this witness at this time.  Thank you.

25         THE COURT:  I've got a question for our jury.  Are

1    you okay to proceed to cross?

2              JUROR WARKENTIN:  Yes.

3              THE COURT:  Is that okay?

4              JUROR WARKENTIN:  Yes.

5              THE COURT:  I'm ready for cross-examination.

6    Thank you very much.

7                         - - -

8                    CROSS-EXAMINATION

9    BY MR. HEMMINGER:

10   Q.       Officer Blair, I'm going to start back in the

11   beginning here.  You responded to this location because you

12   had received a call about an alleged burglary; is that

13   correct?

14   A.       Yes, sir.

15   Q.       That's at 3756 Sullivant Avenue?

16   A.       Yes, sir.

17   Q.       Okay.  Do you know how the police found out, or

18   how they received a call about this burglary?

19   A.       There was a caller who called in and said they

20   were watching this go on.

21   Q.       Through the course of your preparations, have you

22   listened at all to the call from the caller?

23   A.       No.  But I have a -- I read the -- we use Patrol

24   View, which provides the shorthand which the dispatchers

25   provide.

1    Q.      So you have read over, kind of, the transcript of

2    the call --

3    A.      Yes.

4    Q.      -- for lack of a better term, I guess.

5            Now, when you arrived, you arrived off of -- bear

6    with me for one minute here.  I've actually got a picture, I

7    believe, I'm going to use.

8            MR. HEMMINGER:  Your Honor, may I approach the

9    witness?

10          THE COURT:  Yes, you may.

11    BY MR. HEMMINGER:

12    Q.      Officer Blair, do you recognize what would be

13    depicted in this photograph?

14          MR. STEINBERG:  Counsel, can I see that?

15          MR. HEMMINGER:  I'm sorry.  Yes.  Absolutely.

16    BY MR. HEMMINGER:

17    Q.      What do you recognize the contents of this

18    photograph to be?

19    A.      This looks like here to be about the parking lot

20    of UDF.  I would have been coming from the alley.  I would

21    have been right on the other side of this tree line.  I

22    believe this would have been the dispatch location.

23    Q.      Okay.  So the building -- Can you describe for us

24    what you mean is the dispatch location?

25    A.      This right here would have been the door to the --

1    the front door to the dispatch location.

2    Q.     The location of the alleged burglary; is that what

3    you mean?

4    A.     The front door, yes.

5    Q.     Does this picture fairly and accurately represent

6    the scene as it appeared to you on September 15th --

7    A.     It was --

8    Q.     -- 2014?

9    A.     It was nighttime and I was coming from here, yes,

10    I believe so.

11    Q.     Other than the daylight hours?

12    A.     Yes.

13          MR. HEMMINGER:  Your Honor, request to publish

14    this so the jury can see it?

15          THE COURT:  Sure.

16    BY MR. HEMMINGER:

17    Q.     Officer, are you able to see this photograph from

18    that location?

19    A.     Yes, sir.

20    Q.     Okay.  My hope is that the jury can see it as

21    well.  Okay.

22          Officer Blair, when you approached the location of

23    the alleged burglary, the 756, I believe you were just

24    describing to me how you approached.  Can you explain that

25    for us again?

1    A.        Yes, sir.  I was coming from the alley just north

2    of Sullivant.  Right where that tree line is on the north

3    side of that building, there's an alley that comes --

4              THE COURT:  Would you like her to approach the

5    photo?

6              MR. HEMMINGER:  Sure.  Maybe we can do that.  That

7    would be the best way.

8              THE COURT:  I think so.

9    A.        I believe this right here is about where the alley

10   is.  I would have been coming from this vicinity and I came

11   this way, and where I turned here, I knew Harris was

12   northbound only, so I stopped right about here (indicating).

13   Q.        Do you see the alley actually depicted in this

14   photograph?

15   A.        No because of a tree.  That might be it on the

16   other side, the daylight, and angle.  I think the trees were

17   there.  It's really close to the building.  It's fairly

18   close.

19   Q.        Okay.  Are you testifying that the alley is

20   between that -- the building at 2756 and the house, or that

21   the alley is behind the house?

22   A.        I'm pretty sure it's right here.  I believe this

23   is the next road up.

24   Q.        Okay.  Bear with me one moment there,

25   Officer Blair.

1       Officer Blair, I'm going to show you now what I've

2   marked as Exhibit B.  Do you recognize the contents of

3   Exhibit B?

4   A.      Yes, sir.  This -- I believe this right here is

5   still the alley that comes from UDF.  There's a small road

6   that goes right next to these buildings, and that's where I

7   came from.

8   Q.      So you believe you drove your vehicle out between

9   this building and that house?

10  A.      I believe so, because I -- I know there's a

11  loading area for the building, the businesses.  Right next

12  to the UDF there's -- there's another -- I believe there's

13  another street there that comes from directly behind the

14  UDF.

15  Q.      Okay.  The alleyway depicted in Exhibit B is the

16  alleyway you pulled out of onto Harris Avenue?

17  A.      You saying from here?  I don't remember -- I

18  honestly don't recall this building, this house here.  I

19  remember being close to the building here because when I

20  came, I could see the truck parked here.

21  Q.      Okay.  I think you can go back to the witness

22  stand, actually, for right now.

23          Do you still patrol this area of town?

24  A.      Yes, sir.  Not currently, but, yes, sir.

25  Q.      How long did you patrol this area?

1    A.      I took that assignment in July.

2    Q.      When you pulled off the alley onto Harris, did

3    you -- did you stop or did you pull straight out onto

4    Harris Avenue?

5    A.      I stopped and I canted my car so I was half in the

6    alley, half in the street.

7    Q.      And when you're responding to this call, are you

8    listening to dispatch?

9    A.      Yes, sir.  It's always going on in my ear.

10    Q.      Always going on in your ear?  What is -- what was

11    dispatch telling you as you were approaching the location?

12    A.      I had asked the dispatch what the cross streets

13    were, and they told me Hague and Harris.  And not much was

14    going on from then until when I pulled up.

15    Q.      Officer Blair, dispatch also gave you a

16    description of the suspects, did they not?

17    A.      I believe it said a male and a couple females.

18    And, like I said, one of the females was described as

19    wearing a pink or orange shirt.

20    Q.      Okay.

21           MR. HEMMINGER:  Your Honor, at this time, I'd like

22    to play the recording of the call about the burglary, which

23    was provided in discovery to the defense from the

24    prosecution.

25           (Audio recording played.)

1          MR. HEMMINGER:  For the record, the audio CD

2    containing the burglary call has been marked for purpose of

3    identification as Defendant's Exhibit C.

4          MR. STEINBERG:  Your Honor, I'd just ask if we

5    could allow the defendant to rename his exhibits with

6    numbers corresponding --

7          THE COURT:  Do you mind doing that?

8          MR. HEMMINGER:  No.  I have no problem with that.

9    I apologize, I'm used to beings letters.

10         So the first exhibit would be Exhibit 1, and then

11   what I identified as Exhibit B previously will be Exhibit 2.

12   The audio tape of the burglary, which was just played, is

13   Exhibit 3.

14         Next, Your Honor, identified as Exhibit 4 is the

15   audio recording of the dispatch, which Officer Blair has

16   testified she listened to and was provided in discovery from

17   the prosecution.

18         Permission to play, Your Honor?

19         THE COURT:  Yes.

20   BY MR. HEMMINGER:

21         There are four recordings on this disk marked as

22   Exhibit 4.  First is 22:44:22, that being the time.  I'm

23   going to pause this for just a minute.

24         Officer Blair, earlier you testified that in your

25   conversation with dispatch, you asked what the cross roads

1    were, correct?

2    A.      Yes, sir.

3    Q.      Did we just hear your voice on this?

4    A.      Yes, sir.

5    Q.      That was a conversation then between you and the

6    dispatch operator, correct?

7    A.      Yes, sir.

8    Q.      That was the second recording on this tape.  It is

9    identified as 22:45:16.  Third recording of audio dispatch

10   22:45:32, goes in numeric sequence.

11           Officer Blair, did you just hear that audiotape?

12   A.      Yes, sir.

13   Q.      Beginning of the section I just played, dispatch

14   advised they are all back inside.  You recall hearing that

15   from dispatch?

16   A.      On the video here, yes, but not at the time.

17   Q.      Okay.  Just a few minutes ago, you also testified

18   that you never ran defendant's plates until after he had

19   been arrested and when you were running his I.D.

20   A.      I didn't run the plate on the computer; that was

21   me telling dispatch what I had.

22   Q.      Okay.  So you had already reported his plates to

23   dispatch?

24   A.      Yes, sir.

25   Q.      What's the point of that?

1    A.       When I walk towards the vehicle, I identify the

2    vehicle as much as I can with a plate, just in case the

3    vehicle fled, or something happened, it would be recorded

4    what the plate was.

5    Q.       Okay.  So law enforcement knows the plates, the

6    identity of the vehicle, the identity of who the vehicle is

7    registered to, correct?

8    A.       Yes, sir.

9    Q.       And the fourth recording marked at 22:46:15.  That

10   was, again, Edward John Young.  What is that in reference

11   to, Officer Blair?

12   A.       Be the alphabet letters at the beginning of the

13   license plate, EJY.

14   Q.       So at this point in time, as you're responding to

15   the call and you arrived on-scene, you first noticed

16   defendant's vehicle.  You already obtained his license plate

17   information, correct?

18   A.       I have -- I've aired it, but don't have the

19   information behind the license plate.  At that moment it's

20   just letters and numbers.

21   Q.       Fair enough.  But dispatch would then have his

22   information, so would law enforcement, as you just

23   testified, so they're able to identify the individual,

24   correct?

25   A.       Correct.

1    Q.      When you arrived on-scene, is it important to

2    listen to dispatch in order to stay advised of the

3    situation?

4    A.      Yes, sir, as much as possible.

5    Q.      Okay.  Earlier you testified that the suspects

6    were a -- I'm sorry.  What was your testimony earlier about

7    the suspects?

8    A.      I believe at the time I had -- what I translated

9    as I was pulling up.  Like I said, this went really quick.

10   I was looking for a male and two females.

11   Q.      So you would agree, listening to the conversation

12   between you and the dispatch operator, that the suspects

13   were identified to you as two white males, one with a gray

14   coat, one black female with an orange wrap on her head?

15   A.      Yes, sir.  And that is often incorrect when we get

16   information.  Often when we are given information and

17   descriptions, it's often incorrect.  You know, when they say

18   male and female, could be a group of people, could be more

19   than that, but yes, that is what they said on the radio.

20   Q.      It's often incorrect.  Did you not just testify

21   that what legitimized your stop and detention of the

22   defendant is that he matched the description of the

23   suspects?

24   A.      There was a male and female in the vehicle that

25   had on the orange, that was what -- what was in my head is

1    there was orange. And here, yes, they say it was a head

2    wrap, but at that moment, when it was evolving, I heard

3    orange and I saw in the vehicle, a bright orange or pink

4    shirt. And I definitely believe that could be involved with

5    the burglary.

6    Q.        Female passenger was wearing a pink shirt; isn't

7    that correct?

8    A.        Yes, sir, ended up being pink, but it was

9    nighttime.

10   Q.        Do you remember the color of the shirt that you

11   wrote in your report regarding this incident?

12   A.        I believe the dispatch run said she was wearing

13   orange, and she ended up wearing a pink shirt when she was

14   pulled from the vehicle.

15   Q.        And your summary of this incident, you confirmed

16   it's a pink shirt that the female passenger of Dale's truck

17   was wearing, correct?

18   A.        Yes, sir, at nighttime pink and orange are very

19   similar.

20   Q.        Okay. But your testimony here today is that she

21   was either wearing a pink shirt or orange shirt, and the

22   reality is she had a pink shirt on?

23   A.        Yes, sir, she had a pink shirt on.

24   Q.        The female passenger was white, correct?

25   A.        Yes, sir.

1    Q.      Okay.  So in the truck there's a white female

2    wearing a pink shirt and the suspect is a black female with

3    an orange wrap on her head, correct?

4    A.      Yes, sir.  Upon hearing the details, description

5    slowed down, yes, sir.

6    Q.      And the male suspect, according to the

7    conversation with you in dispatch, is a white male or two

8    white males.  Defendant is a black male; is that correct?

9    A.      Looking at him I would not necessarily call him

10    black.

11    Q.      When you arrested him that night, what was -- what

12    was he identified as?

13    A.      Whatever it would have said on his license.

14    Q.      Officer Blair, I'm now going to show you what's

15    been marked for purpose of identification as

16    Defendant's Exhibit 5.  You recognize the individual

17    depicted in this photograph?

18    A.      Yes, sir.

19    Q.      Can you see the marks, scars or scrapes on his

20    face?

21    A.      On the left side, yes.

22    Q.      Earlier you testified about how Mace scraped his

23    face or he had scrapes when you described his injuries, do

24    the marks in that photograph reflect the marks that you saw

25    on that day?

1    A.      They look more prominent there.

2    Q.      They look more prominent there, okay.  Is that

3    photograph how the defendant appeared to you on

4    September 15th, perhaps without the marks on his face?

5    A.      Yes, sir.

6    Q.      Okay.  So it's your testimony to all of us here in

7    court today that you cannot tell that is a black male?

8    A.      He's fairly light-skinned.

9    Q.      Officer Blair, earlier you saw some exhibits that

10   were offered to you by the prosecution, photographs of the

11   defendant on the night --

12          MR. HEMMINGER:  Permission to approach the

13   witness, Your Honor?

14          THE COURT:  Yes.

15   BY MR. HEMMINGER:

16   Q.      I'm going to hand you what I've just marked as

17   Defendant's Exhibit 6.  Do you recognize

18   Defendant's Exhibit 6?

19   A.      Yes, sir.

20   Q.      Okay.  What do you recognize the contents of that

21   photograph to be?

22   A.      It is the defendant standing next to the cruiser.

23   Q.      Okay.  What article of clothing is he wearing?

24   A.      A white t-shirt.

25   Q.      Okay.  He's wearing a white t-shirt?

1    A.       Okay.

2    Q.       What other article of clothing is he wearing?

3    A.       Gray sweat pants.

4    Q.       Are they pants?

5    A.       In the picture it's hard to tell.  If I do recall,
6    they are shorts.

7    Q.       You do recall that they are shorts?

8    A.       Yes, sir.

9    Q.       Okay.  I'll go ahead and hand this back to you.

10            Once again, I want to be clear, your testimony is

11    that, as depicted in Defendant's Exhibit 5 and

12    Defendant's Exhibit 6, you do not believe this to be a black

13    male?

14    A.       I don't recognize the race.  He could be mixed.

15    He's -- he is fairly light-skinned.

16    Q.       What do you mean you don't recognize the race?

17    A.       He could be mixed with anything.  I mean, doesn't

18    necessarily mean he's black.

19    Q.       Is the person identified in Exhibit 5 and

20    Exhibit 6, would you categorize them as a white male?

21    A.       He could be, depending on what he identified

22    himself as.

23    Q.       You, Officer Blair, with your observations when

24    you approached the defendant in his vehicle on

25    September 15th on Harris Avenue, did you identify him as a

1   white male?

2   A.      Yes, sir.

3   Q.      Is it your testimony that you did not hear, as

4   dispatch reported on the audio we listened to, that the

5   suspects were back inside the building?

6   A.      I do not recall hearing that at the time, sir.  At

7   that time I would have been pulling up.  When this was

8   dispatched, I was moments away from the location.  So I

9   would have been exiting my vehicle and telling the defendant

10  to stop his vehicle at that time.

11  Q.      When did you report the letters and numbers of

12  defendant's license plate?

13  A.      As I was walking towards the vehicle.  It was

14  fairly simultaneous with what's going on.

15  Q.      And when you -- when you approach the location,

16  you approached in the alley behind, did you notice a loading

17  area behind the building, a parking lot of some sort?

18  A.      Yes, sir.

19  Q.      Okay.  Did you stop in that parking lot?

20  A.      What do you mean?

21  Q.      Did you stop your cruiser?  Did you just continue

22  to go to Harris?

23  A.      No.  I was half -- I was still half in the alley

24  where I was coming from because Harris was northbound only.

25  Q.      When you ran his license plate or informed

1    dispatch what the letters and numbers of his license plate

2    were, were you still inside of your cruiser?

3    A.       No.  I would have been walking towards the

4    vehicle.

5    Q.       Okay.  When you pulled out of the alley, you

6    pulled out in front of defendant's vehicle, correct?

7    A.       Yes, sir.

8    Q.       You cut him off.  He was moving at the time,

9    correct?

10   A.       Initially, no.  When I pulled up, was still

11   parked, and when I exited my cruiser, that's what he started

12   to pull away slowly.  I did not pull my cruiser all the way

13   to the street because it was northbound only.  I did not

14   want to pull past where a parked car would have been so I

15   did not block the street.

16   Q.       And your testimony is that you did not activate

17   your beacons or overhead lights, correct?

18   A.       Correct.

19   Q.       You also stated earlier it was technically a

20   traffic stop, correct?

21   A.       Not a traditional traffic stop, no, sir.

22   Q.       But you said it was technically a traffic stop,

23   correct?

24   A.       Based on the fact that I was detaining him and he

25   was in the vehicle, in a way.

1    Q.      You did not witness the defendant commit a traffic

2    violation, though, correct?

3    A.      Not that I was looking for at that time.  I was

4    not focused on that.

5    Q.      Okay.  So you don't activate your overhead lights.

6    You pull out the wrong way onto a one-way street, you exit

7    your car, and you verbally tell the defendant to stop and

8    you tap on his hood, correct?

9    A.      Yes, sir.

10   Q.      And the defendant stops, correct?

11   A.      Yes, sir.

12   Q.      And you approach the driver's side of defendant's

13   vehicle, correct?

14   A.      Yes, sir.

15   Q.      And you engage in a conversation with the

16   defendant, correct?

17   A.      Yes, sir.

18   Q.      And you tell him why you've stopped his vehicle?

19   A.      Yes, sir.

20   Q.      What do you tell him?

21   A.      He had asked why he was stopped.  I told him I was

22   investigating a possible burglary.

23   Q.      Your testimony is that you told him immediately?

24   A.      No, sir.  He didn't ask me --

25   Q.      At what point --

1    A.      Where? You asked when I told him. When he asked

2    me, I said I was there to investigate a possible burglary.

3    Q.      When you approached the defendant you asked him

4    for his I.D.; isn't that correct?

5    A.      Yes, sir.

6    Q.      And the defendant asked you why you stopped his

7    vehicle; isn't that correct?

8    A.      Yes, sir.

9    Q.      And you told the defendant, I don't know, but

10    we're about to find out; isn't that correct?

11    A.      I don't know if that is supposed to be a quote.

12    Are you quoting me? I'm not sure what --

13    Q.      I believe I am, but it's something close to that

14    effect, correct?

15    A.      I told him I was investigating a possible

16    burglary.

17    Q.      Now wait a minute. Earlier you said the purpose

18    of this stop is you wanted to delay the defendant, you

19    wanted other officers to arrive on-scene.

20    A.      Yes, sir.

21    Q.      You testified that the purpose was to delay,

22    correct?

23    A.      Yes, sir.

24    Q.      And now you are telling us that you immediately

25    told him you're investigating a burglary?

1   A.      I never said I immediately told him, sir.

2   Q.      The defendant provided you with his name, correct?

3   A.      I don't recall if he said his name when I asked

4   for his identification.

5   Q.      You asked the defendant for his identification,

6   and he did not immediately give you his license, correct?

7   A.      Correct.

8   Q.      He instead wanted to know the reason you had

9   stopped him, correct?

10  A.      Correct.

11  Q.      He eventually did give you his license, correct?

12  A.      Eventually, yes.

13  Q.      Eventually, yes.

14          And you ordered the defendant to turn off his

15  vehicle, correct?

16  A.      I do not recall if I did or not, to be honest.

17  Q.      Did the defendant turn off his vehicle?

18  A.      I do not recall.

19  Q.      You don't recall if the truck was running?

20  A.      I was up by the passenger door, I don't remember

21  if it was still running or not, if the engine was on or not.

22  Q.      Isn't that something that would be brought to your

23  attention, is the vehicle running?

24  A.      I knew he wasn't driving away.

25  Q.      Well, you're so concerned about officer safety,

GB000225

1    wouldn't you want him not to drive away?

2    A.      I was not in front of his vehicle. I was in no

3    danger of being run over.

4    Q.      Is his vehicle parked?

5    A.      It is stopped. I believe it was in park.

6    Q.      Other officers arrived on-scene, and you asked the

7    defendant to exit his vehicle, correct?

8    A.      Yes, sir.

9    Q.      I believe your testimony earlier was you opened

10   the door and said, Do you want to step out?

11   A.      I never asked him if he wanted to step out.

12   Q.      I'll have the court reporter read back your

13   testimony earlier.

14   A.      I don't recall saying that. I told -- He was

15   ordered to step out. He was being detained.

16   Q.      He was being detained. Was he under arrest?

17   A.      No, sir.

18   Q.      You wrote him a traffic ticket?

19   A.      No, sir.

20   Q.      You had no evidence that the defendant was related

21   to this burglary, and he was being detained, correct?

22   A.      I was trying to get the evidence I needed.

23   Q.      But you had no evidence?

24   A.      I needed to get him separated from the front seat

25   passenger to do that.

1   Q.      What evidence did you believe you were going to

2   get?

3   A.      I speak with him, see if there was property in the

4   vehicle that belonged to the building. I have a witness

5   come and identify him.

6   Q.      All of which you were never able to obtain,

7   correct?

8   A.      At what point?

9   Q.      You were never able to obtain any evidence that he

10  was related to the burglary, correct?

11  A.      No, sir.

12  Q.      Okay. Earlier, I believe your testimony was you

13  were never able to tie him to the burglary.

14  A.      Correct.

15  Q.      Okay. Do you recall in your report that the

16  report stated you were able to determine he was unrelated to

17  the burglary?

18  A.      For what we had at that time, yes.

19  Q.      Okay. When you told the defendant that you were

20  investigating a burglary, the defendant said, Well, I'm not

21  a burglar, run my information, correct?

22  A.      I don't -- Again, the quotes, I don't know. But I

23  don't remember him -- he never said, Run my information.

24  Q.      Okay. I'm recalling your testimony earlier. The

25  defendant said, I'm not a burglar?

1    A.      He said he wasn't involved in a burglary.

2    Q.      Wasn't involved in a burglary. You remember that

3 detail, don't you?

4    A.      It's -- I'm not sure where you're going with --

5    Q.      You just testified when the prosecutor was asking

6 you at the end of your testimony that your intention was to

7 have a smooth investigation and that defendant delayed your

8 response?

9    A.      Yes, sir. I was still unable to secure the

10 building because I was busy with him.

11    Q.      But earlier you testified that the purpose in

12 detaining the defendant was to delay him until other

13 officers would arrive?

14    A.      Delay him in the way of I didn't immediately pull

15 him out of the vehicle. I still wanted him detained because

16 I still believed he could have some part in the burglary.

17 So the delaying was waiting for other officers to come up

18 and help me detain him.

19    Q.      In the video that we watched, your cruiser was

20 parked head to head with defendant's truck, correct?

21    A.      I was north of his location, but not head to head.

22    Q.      Okay. It's in front of it?

23    A.      Yes, sir.

24    Q.      And there are two more cruisers parked immediately

25 behind the defendant?

1    A.        Yes, sir.

2    Q.        And another vehicle, the wagon, which had the

3    video in it pulled up on scene, correct?

4    A.        Correct.

5    Q.        Isn't it true that the defendant wasn't going

6    anywhere at this point in time?

7    A.        He still had the ability to drive around to

8    keep -- continue northbound if he had been driving.

9    Q.        So he's surrounded by police.  And you believe,

10   although he's never made an effort to take off, that he

11   might go around your cruiser and take off?

12   A.        Initially when I pulled up, he saw my cruiser and

13   began to pull away.

14   Q.        Okay.  You didn't have your overheads on.  You

15   didn't activate your beacon lights?

16   A.        I was staying in the roadway.

17   Q.        Well, and the defendant did stop?

18   A.        Then when I was standing next to him and asked for

19   his identification, he was not truthful about not having it.

20   Q.        Truth is, if the defendant stayed in his vehicle,

21   it would not have impeded or hampered your investigation of

22   the burglary, correct?

23   A.        I needed to separate him from the witness and from

24   the vehicle to see if there was, you know, any large items

25   from the building in his truck.

GB000229

1   Q.      Well, he already was separated from the witness,

2   correct?

3   A.      The witness was pulled from the vehicle.  I needed

4   to separate him from his vehicle.

5   Q.      Why would you need to separate him from his

6   vehicle?

7   A.      Well, to -- there was a witness, which I hadn't

8   been able to find yet, but I would have had to have the

9   witness identify him outside of his vehicle.

10  Q.      A witness could have identified him while he was

11  sitting in his vehicle?

12  A.      The witness never saw him in a vehicle, so I would

13  need him out of the vehicle.

14  Q.      To identify him as white male, correct?

15  A.      Whatever, possibly.

16  Q.      Truth is, you had no information that matched the

17  physical description of the defendant to the physical

18  description of the suspects, correct?

19  A.      At the time I believed I did.  I had a -- Like I

20  said, I had a male driver, I had the female.  I believed I

21  had possible suspects at the time, yes.

22  Q.      Male/female, that's it.

23  A.      The color of the shirt.  Like I said, the

24  descriptions are often wrong.  I have them directly next to

25  the building where they said they were unloading property

1    from to a vehicle.  They were right there at the exact same

2    time.  I was in the alley when this was going on.  I

3    absolutely believed they were -- had potential involvement

4    in the burglary.

5    Q.    Although the defendant told you he had nothing to

6    do with the burglary, right?

7    A.    Yes, sir.

8    Q.    And at the end of your investigation, you have

9    absolutely no evidence that you're able to relate the

10   defendant to this burglary, correct?

11   A.    Correct.

12   Q.    And in hindsight, you have no evidence that the

13   defendant purposefully interfered with your investigation of

14   a burglary, correct?

15   A.    I do believe he did interfere with my

16   investigation.

17   Q.    You believe he interfered with the investigation

18   of your burglary?

19   A.    Yes, sir.  He absolutely delayed my response to

20   investigating the burglary.

21   Q.    He delayed the response to you stopping his

22   vehicle without cause to do so, correct?

23   A.    I believed I had cause to stop his vehicle.

24   Q.    But it was a traffic stop, correct?

25   A.    Not necessarily.  It was -- I was detaining him,

1   and he was in his vehicle.

2   Q.      So it's not a traffic stop, that's your testimony

3   now?

4   A.      It's not a traditional traffic stop, like I said

5   earlier.

6   Q.      Okay.  If you approach somebody on the street,

7   what information are they required to provide you?

8   A.      That depends.

9   Q.      Are you familiar with the Revised Code Section

10  292.129, failure to disclose personal information?

11          MR. STEINBERG:  Can we approach?

12          THE COURT:  Yes.

13                      -  -  -

14          The following discussion was held at the bench,

15  out of the hearing of the jury:

16          MR. STEINBERG:  So at this point, I believe that

17  defense counsel is asking questions that are ultimately

18  irrelevant, but there is also no foundation.

19          THE COURT:  Foundation issues.

20          MR. HEMMINGER:  I just asked her what information

21  is an individual on the street required to provide you.  Her

22  answer was, Depends.

23          THE COURT:  And it does, doesn't it?  I mean, it

24  truly does.  All lawyers know that.  My suggestion would be,

25  if you want to, this is an optional question, And you've

1    been dispatched to a burglary run, and you believe there may

2    be some connection with a person you identified on-scene,

3    what information do they have to disclose to you. You could

4    ask that, but you're stuck with the answer.

5                MR. HEMMINGER: Yeah.

6                THE COURT: So I agree that there's not enough

7    foundation. It is a complex area of law, and you may not

8    want, you know, a police officer, especially this police

9    officer who is the prosecution's key witness, to provide

10   that information about what the law is in that circumstance.

11               MR. HEMMINGER: Okay.

12                            - - -

13               THE COURT: Ladies and gentlemen, I struck part of

14   the question that referred to such and such section of the

15   revised code, and Mr. Hemminger, I think is going to proceed

16   with another -- with some other questions.

17               Go ahead.

18   BY MR. HEMMINGER:

19   Q.          Once the other officers arrived on-scene,

20   defendant eventually began to exit his vehicle, correct?

21   A.          Partially, yes.

22   Q.          Defendant began to exit his vehicle, correct?

23   A.          When we requested him to step out of his vehicle,

24   he put one leg out of his vehicle, and then when he

25   hesitated, he would not come any further.

1    Q.    You testified earlier that defendant was wearing a

2    white t-shirt and shorts, correct?

3    A.    Yes, sir.

4    Q.    You've seen photographs of the defendant wearing

5    those clothes, correct?

6    A.    Yes, sir.

7    Q.    Were you able to tell at that time if the

8    defendant had any weapons on him?

9    A.    No, sir.

10   Q.    Did you see any guns or large knives on the

11   defendant?

12   A.    From what I could see -- from what I could see,

13   no, but I could not see all of them.

14   Q.    It wasn't necessary to pry his hand off the bar,

15   was it?

16   A.    Yes, sir, he would not let go.

17   Q.    But he's got one foot off the ground?

18   A.    Yes, sir.

19   Q.    Well, he wasn't going anywhere, correct?

20   A.    He was trying to get back into his vehicle.

21   Q.    While you detained the defendant, you did not go

22   inside and check the building for the suspects, correct?

23   A.    I had not had the opportunity yet, no, sir.

24   Q.    Okay.  However, eventually the burglary

25   investigation was concluded, correct?

GB000234

1    A.        Yes, sir.

2    Q.        And it was concluded that, in fact, there was no

3    burglary, correct?

4    A.        There was a breaking and entering in the building.

5    It ended up being vacant.  There was a female that we did

6    pull out of the building, yes.  She exited the door that was

7    directly next to the defendant's truck.

8             MR. HEMMINGER:  One moment, Your Honor.

9             THE COURT:  Uh-huh.

10   BY MR. HEMMINGER:

11   Q.        You testified earlier that the safest way for them

12   and us is to remove the defendant from the vehicle, correct?

13   A.        Yes, sir.

14   Q.        Wouldn't it be safer for the defendant to stay

15   inside of his vehicle?

16   A.        No, sir.

17   Q.        No?  It would not be safer for the defendant to

18   remain inside his vehicle, the defendant?

19   A.        I believe the potential that there would be

20   weapons in the vehicle --

21   Q.        You stated earlier that you and the other officers

22   grabbed his arms and tried to guide him out of the vehicle,

23   correct?

24   A.        Officer Groves, yes.

25   Q.        Officer Groves grabbed his arm and tried to --

1    A.        Guide him out of the vehicle.

2    Q.        -- guide him out of the vehicle.  Okay.

3            Does Officer Groves reach into the cab of the

4    truck?

5    A.        He didn't have to reach into the cab.  We were in

6    the doorjamb.  It was the defendant's left arm.

7    Q.        He reaches in and he pulls the defendant out of

8    the vehicle?

9    A.        No, sir.  When he first made contact with him, he

10   merely touched his left arm.

11   Q.        The defendant is pulled out, you pried his hands

12   off the door.  You have got one arm, Groves has got another,

13   correct?

14   A.        No.  The defendant -- Officer Groves had a hold of

15   his left arm.  When the defendant pulled back and grabbed on

16   the handle, that's when Officer Groves began pulling on the

17   defendant's arm to pull him out.  That's when I began

18   pulling on Mr. -- the defendant's fingers to get his right

19   hand off of the handle to separate him from the truck.

20   Q.        So he's separated from the truck and then

21   there's -- I believe you said a double leg takedown was the

22   move?

23   A.        Yes, sir.

24   Q.        Okay.  And defendant is on the ground?

25   A.        Yes, sir.

1    Q.      Okay.  And defendant was Maced?

2    A.      Yes, sir.

3    Q.      Correct?

4    A.      Yes, sir.

5    Q.      Defendant was handcuffed?

6    A.      Yes, sir.

7    Q.      Defendant was bleeding?

8    A.      He did have some abrasions on his face and his

9    knee.

10   Q.      And it was Officer Groves who deployed the Mace,

11   correct?

12   A.      Yes, sir.

13   Q.      And this was the safest way for the defendant to

14   exit the vehicle, correct?

15   A.      Yes, sir.

16   Q.      Safe for who?

17   A.      We used the least amount of force possible to

18   detain him.

19   Q.      That was a small amount of force?

20   A.      I believe so, yes, sir.  He was not complying with

21   any verbal commands.  He was, at the time, overpowering both

22   of us.  And he was warned that he would be Maced if he

23   didn't comply.  And he didn't comply, and he was Maced.

24   Q.      So let's go back.  He didn't comply with any

25   verbal commands?  You told him to stop his vehicle, and he

1    stopped his vehicle, correct?

2    A.       After hesitation, yes.

3    Q.       Sure, after hesitation.  You didn't activate your

4    overhead lights.  You eventually have to get out of your

5    vehicle.  You actually flag him down, tap on his hood, tell

6    him to stop, and he stops his vehicle, correct?

7    A.       Yes, sir.  After rolling forward a few feet, yes,

8    he did stop.

9    Q.       Correct?

10   A.       Yes, sir.

11   Q.       Okay.  Once his vehicle is stopped, you engage in

12   a conversation with him, correct?

13   A.       Yes, sir.

14   Q.       And perhaps he's reluctant at first because he

15   wants answers, but eventually he gives you his I.D.,

16   correct?

17   A.       Yes, sir.  He told me he didn't have it, then he

18   did produce it.

19   Q.       Okay.  So he eventually did produce you with his

20   I.D., correct?

21   A.       Yes, sir.

22   Q.       And his vehicle was -- Well, we know it was parked

23   because when he was pulled outside of his vehicle, the

24   vehicle didn't exactly take off, did it?

25   A.       No, sir.

1  Q.      So his vehicle was parked, correct?

2  A.      It was in park, yes.

3  Q.      The engine may or may not be running, according to

4  your recollection, correct?

5  A.      Correct.

6  Q.      He is ordered out of his vehicle, and although he

7  may be reluctant at first, he eventually begins to exit his

8  vehicle, correct?

9  A.      Yes, sir.

10  Q.      Truth is, the defendant has complied with your

11  verbal requests, correct?

12  A.      With coaxing, yes.

13  Q.      You were able to complete your burglary

14  investigation, correct?

15  A.      Yes, sir.

16          MR. HEMMINGER:  No further questions.

17          THE COURT:  Counsel, approach just a moment.

18                    - - -

19          The following discussion was held at the bench out

20  of the hearing of the jury:

21          THE COURT:  I want to know whether we should take

22  our break now or whether redirect and recross can be real

23  quick.

24          MR. STEINBERG:  There's a limited set of further

25  questions with our witness, but I think we all need a break.

1

2          THE COURT:  So Ms. McCool is going to take you

3     out.  We will be out until, like, five after 4:00.  Okay.

4     So you can use the bathroom.  You can stretch a bit.  And --

5     Please go out with her.

6          We're in the middle of a witness' testimony, so no

7     discussing the case among yourselves, allowing anyone to

8     discuss it with you.

9               - - -

10              Thereupon, court was in recess.

11              - - -

12         THE COURT:  Welcome back.  Please be seated.  Nice

13    little break.  Seems appropriate that I tell you another one

14    of my jokes, then we'll get back and finish the testimony of

15    Officer Blair.

16         This is a true story about a trial, robbery trial.

17    Gun, hold-up guy trying to steal somebody's money, and it

18    was a robbery trial.  And about day two, three in the trial,

19    and the defendant turned to his attorney and says, I want a

20    new judge.  That judge is prejudice against me.  I want this

21    to end right now.  I want a new judge.  And the defense

22    attorney thinks things are going well, kind of goes, Well,

23    why do you think the judge is prejudice against you?  He

24    said, Well, I don't know if you know this, but every time

25    that jury takes a break, the judge looks at them and says,

1    Remember ammunition, remember the ammunition in the gun.

2    And so, I think he's trying to tell them, you know, that I

3    had the ammunition. Well, the admonition of, don't discuss

4    this case among yourselves and keep an open mind free of

5    bias or prejudice, I feel very bad that I didn't say that as

6    soon as you stood up to take your break because it's so

7    important. We're not even finished with testimony of our

8    first witness, and we're going to go back and finish that up

9    with redirect.

10            Mr. Steinberg.

11            MR. STEINBERG:   Thank you.

12                       - - -

13                  REDIRECT EXAMINATION

14   BY MR. STEINBERG:

15   Q.        So Officer Blair, do you remember on cross you

16   made a statement about the fact that the dispatch and all

17   this is going on in your ear?

18   A.        Yes, sir.

19   Q.        Okay. How is that?

20   A.        In what way?

21   Q.        How is it -- Physically, how does that work? How

22   is the dispatch always --

23   A.        I had a walkie mike on my shoulder, and it is

24   always -- there's always noise, but, you know, if things

25   around me are louder than my radio, I may not hear it at

1    all, may not hear it clearly. We're trying to get important

2    information, obviously, and that's what you use to

3    communicate with the dispatcher.

4    Q.    The dispatcher's job is to do what?

5    A.    Relay information to me.

6    Q.    Okay. And also, do what?

7    A.    And give it -- take the information that I give

8    her.

9    Q.    What else? How do you decide where to go?

10   A.    She provided the dispatch location. She gave me

11   all the -- she was reading -- translating from what the

12   original caller gave to what that dispatcher wrote up to

13   what she is now providing me.

14   Q.    And how fast is she doing this?

15   A.    She does it quickly.

16   Q.    And what are you doing while this person's

17   chirping in your ear?

18   A.    I'm driving to the location. You know, I'm trying

19   to figure out exactly where I am, make sure I'm in the right

20   area, that's why I asked the cross streets. Then I pull up

21   and I see potential suspects and try to detain them at the

22   same time.

23   Q.    When you got to that scene, who were the human

24   beings that you saw?

25   A.    I saw the defendant in the driver's seat and the

GB000242

1    female charge in the truck.

2    Q.       Any other human beings that you saw immediately at

3    that point?

4    A.       At that point, no.

5    Q.       Okay.  And had you heard the 9-1-1 call

6    specifically?

7    A.       No, sir.

8    Q.       Okay.  When you heard it today, was that the first

9    time you heard it?

10   A.       Yes, sir.

11   Q.       You called in the plates, correct?

12   A.       Yes, sir.

13   Q.       And do you remember defense counsel asking you why

14   you called in the plates?

15   A.       Yes, sir.

16   Q.       Do you remember defense counsel asking what the

17   plates tell you?

18   A.       Yes, sir.

19   Q.       Okay.  What is it that plates tell you?

20   A.       The plate tells me the registered owner of the

21   vehicle.

22   Q.       Does it tell you the registered owner of the

23   vehicle or registered owner of the plate?

24   A.       Of the plate.

25   Q.       Have you ever come across a situation where the

1    plates are registered to one person and the vehicle is

2    registered to somebody else?

3    A.       Yes.

4    Q.       How often in your job does that happen?

5    A.       That happens often.

6    Q.       Okay.  Did the plates tell you who is in the

7    vehicle?

8    A.       Absolutely not.

9    Q.       Defense counsel asked you about whether you saw a

10   male and female who matched the description you were

11   getting.

12   A.       Yes, sir.

13   Q.       Did you?

14   A.       To my knowledge, at the time, yes.

15   Q.       Okay.  And that male and female, the defendant and

16   this woman, were they right at the scene?

17   A.       Yes, sir.

18   Q.       Okay.  Anybody else at that scene?

19   A.       Not that I saw.

20   Q.       Defense counsel asked you about whether this was a

21   traffic stop.  You've never contended that this is a traffic

22   stop, right?

23   A.       No, sir.

24   Q.       Okay.  And defense counsel told you, Hey, my

25   client stopped.  You remember him saying it like that?

1    A.    Yes, sir.

2    Q.    Okay. How many times did you have to command the

3    defendant to stop before he actually stopped?

4    A.    At least three.

5    Q.    Defense counsel asked you about your purpose to

6    delay the defendant. Do you remember those questions?

7    A.    Yes, sir.

8    Q.    Now, if we talk about strategy and tactics, are

9    you with me?

10   A.    Yes, sir.

11   Q.    Okay. You're overall strategy, that's the

12   overarching scheme, your strategy was to do what?

13   A.    Investigate the burglary.

14   Q.    And the tactics you used to do that would include

15   keeping the defendant at the scene, right?

16   A.    Yes, sir.

17   Q.    So you could do what?

18   A.    Investigate the burglary.

19   Q.    Okay. But specifically, then, what tactic would

20   you use with regard to the defendant if you keep him at the

21   scene? Why would you keep him at the scene to investigate

22   the burglary?

23   A.    I would detain him to determine if he was involved

24   in the burglary.

25   Q.    By doing what, talking to him?

1    A.        Talking to him, talking with witnesses, looking at

2    the evidence, you know, if there was property from, you

3    know, the building, you know, whatever he would have,

4    potentially; tools on him that would have allowed him to get

5    in the building.

6    Q.        Now, defense counsel asked you about the position

7    of your automobile.

8    A.        Yes, sir.

9    Q.        What was the position of your automobile?  I guess

10   I prefer the term cruiser.  What was the position of your

11   cruiser with regard to his truck?

12   A.        I was north of his location, I wasn't facing him.

13   I was from -- coming eastbound from the alley.  He was

14   facing northbound.  I was somewhat canted towards his

15   direction (indicating).

16   Q.        And you just did a shake with your hands, and I

17   want to preserve it for our record to just tell us how you

18   manipulated your hands.  You've shown it to us, but I just

19   need it for our record.

20   A.        His truck was facing northbound, and I was coming

21   eastbound from the alley, and I had canted my vehicle

22   southbound.  Like I said, I didn't want to turn all the way

23   into the northbound-only lane.

24   Q.        Is it fair to say that you just held up your right

25   hand, right hand, and that was perpendicular to your body?

1    A.       Correct.

2    Q.       And then you canted your left hand at it?

3    A.       Yes.

4    Q.       Is that -- Did I get the hands right?

5    A.       Yes.

6    Q.       Okay.  All right.  Thank you.

7            Why did you want the defendant out of the vehicle?

8    A.       To -- Like I said, to further investigate him; to

9    separate him from the witness; to have a potential witness,

10    you know, positively or negatively identify him as being

11    involved; to determine if he had any weapons on him or in

12    the vehicle, you know.  I don't want to investigate someone

13    who is involved in a possible felony who is sitting in a

14    vehicle who could potentially have a weapon right there.

15    You know, I don't know what's in the vehicle.

16    Q.       Defense counsel questioned you about the idea that

17    the defendant was actually exiting his car.  Was he exiting

18    his car?

19    A.       No, not really.

20    Q.       Okay.  Explain.

21    A.       When I asked him to exit, he was, like I said,

22    hesitant to get out.  And then I said, No, you need to get

23    out of the vehicle.  When he stepped out, he only had part

24    of his body out.  His left leg was on the ground, but he was

25    still partially in the vehicle.

1    Q.      And when Officer Groves went to maneuver him, did

2    he continue to exit?

3    A.      No.

4    Q.      Okay.

5    A.      He immediately stopped and pulled back towards the

6    truck.

7    Q.      Okay.

8            Defense counsel asked you about the idea of

9    whether or not the defendant was safer inside his vehicle or

10   outside his vehicle.  Why is the defendant safer when you're

11   dealing with him as a police officer outside the vehicle?

12   A.      The chance he would have access to a weapon; if he

13   were to reach for that weapon, that would obviously change

14   the course of direction.

15   Q.      Is it safer for him if you're going to detain him,

16   if you know that he doesn't have weapons?

17   A.      Yes, sir.

18   Q.      Okay.  If he's in his vehicle before you secured

19   that vehicle, do you know whether he has weapons?

20   A.      No, sir.

21   Q.      Okay.  Defense counsel asked you some questions

22   about your perception of defendant's race.  You remember

23   those questions?

24   A.      Yes, sir.

25   Q.      Fair to say race is a complicated issue in our

1  society?

2  A.        Yes.

3  Q.        And when you have to make an identification, is

4  race given to you -- why is race given to you?

5  A.        It could -- You know, it's like any other

6  descriptor, brown hair, blond hair. It could potentially

7  give me, you know, what they may look like.

8  Q.        Okay. As an example, you're going to get --

9  you're going to give a description of me, to air a

10  description of me; are you going to air what you think my

11  ethnicity is, or are you going to assume my race is --

12  A.        I would air what I believe your race would be.

13  Q.        For what purpose?

14  A.        It could -- You know, if I say you're a male,

15  white, it could, you know, tell somebody else who is hearing

16  the description that you have light skin.

17  Q.        Okay.

18            MR. STEINBERG: Your Honor, may I approach the

19  witness?

20            THE COURT: Yes, you may.

21  BY MR. STEINBERG:

22  Q.        I'm going to show you what we marked as

23  Plaintiff's Exhibit J.

24            MR. HEMMINGER: Your Honor, I'm going to object to

25  this.

1      MR. STEINBERG:  Can we approach?

2      THE COURT:  Yeah.

3                    - - -

4      The following discussion was held at the bench,

5  out of the hearing of the jury:

6      THE COURT:  Before you start, let me see what --

7  Just going to use the race part?

8      MR. STEINBERG:  Yes.

9      THE COURT:  Your objection?

10     MR. HEMMINGER:  It's inadmissible.  It's just the

11 police report.  It's hearsay.  I don't know who has filled

12 it out.  I understand that it's not being used for the

13 purpose of -- to refresh her recollection or anything of

14 that nature.  If the document itself can't be used --

15     MR. STEINBERG:  I understand defense counsel's

16 concern.  Here's my response:  I don't -- There's this

17 contention that the defendant, who is African American,

18 should be perceived as African American.  And this officer

19 is going to testify she filled this out, I believe.

20     THE COURT:  She did?

21     MR. STEINBERG:  I can ask her beforehand.  I

22 believe she did.  To be fair, I haven't asked her.

23     THE COURT:  Okay.

24     MR. STEINBERG:  If we assume she answers, Yes, I

25 did fill this out, I'm just going to ask her what she filled

1    out in terms of race. It is not my intention to admit this.

2            THE COURT: No.

3            MR. STEINBERG: But I want her to identify it,

4    talk about whether she filled it out, what she filled out,

5    because I think it goes to her perception of the defendant.

6    That is, specifically, because there's been this back and

7    forth about what the dispatch was and then how she responded

8    to it.

9            THE COURT: I think that's proper. I think that's

10   proper.

11           MR. HEMMINGER: I don't think it's proper.

12           THE COURT: And the reason being? It doesn't have

13   to be admitted, but if she filled it out, that -- that is a

14   proper response.

15           MR. HEMMINGER: If it's not an exhibit, then it's

16   not being admitted into evidence; then there's no purpose

17   for it. It has to be used for a purpose.

18           THE COURT: You can, lots of times, use something

19   that is not going to be offered.

20           MR. STEINBERG: I'm more than happy also --

21           MR. HEMMINGER: Offered for what purpose?

22           MR. STEINBERG: I'm also more than happy to admit

23   it with the back side redacted to demonstrate that she did

24   it, because then it wouldn't have anything --

25           THE COURT: I'm going to allow it, assuming she

GB000251

1    filled that out.  If she didn't, that's a whole different

2    story.

3                MR. STEINBERG:  Yeah.  I want her to look at it.

4    If she says, No -- My assumption is she will say yes, but I

5    don't obviously know.

6                       -  -  -

7                MR. STEINBERG:  Officer Blair, I've handed you

8    what we've marked as Plaintiff's Exhibit J.

9                What is Plaintiff's Exhibit J?

10   A.        That is part of the U-10.100.

11   Q.        Who is the author of Plaintiff's Exhibit A?

12   A.        I am.

13   Q.        Okay.  Does that mean that you filled out

14   everything in Plaintiff's Exhibit A?

15   A.        Yes, sir.

16   Q.        At the top of Plaintiff's Exhibit A, are there

17   identifying information --

18   A.        Yes, sir.

19   Q.        -- box -- Are there identifying information boxes?

20   Okay.  And would you have filled those out?

21   A.        Yes, sir.

22   Q.        And did you fill out the defendant's name?

23   A.        Yes, sir.

24   Q.        How did you get the defendant's name?

25   A.        The license I was provided.

1    Q.    Okay.  Did you fill out the defendant's birthday?

2    A.    Yes, sir.

3    Q.    Okay.  Did you fill out identifying information

4    about the defendant's height and weight?

5    A.    Yes, sir.

6    Q.    Okay.  Did you fill out identifying information

7    about the defendant's gender?

8    A.    Yes, sir.

9    Q.    Okay.  And let's talk about that really quickly.

10   Did you make a decision or do you have to rely on the

11   license to decide what his gender is?

12   A.    Both.

13   Q.    Okay.  All right.

14        Did you have a preconceived notion before you

15   looked at the license about what his gender was?

16   A.    Yes, I believed he was a male.

17   Q.    Did you also fill out where it says race?

18   A.    Yes, sir.

19   Q.    What did you fill out?

20   A.    White.

21   Q.    Okay.

22        MR. STEINBERG:  If I could see that back.

23        Thank you.

24        Your Honor, I do not have any other redirect

25   questions at this time.

1        THE COURT:   Thank you very much.

2        Recross, Mr. Hemminger?

3        MR. HEMMINGER:   Thank you, Your Honor.

4                - - -

5                RECROSS-EXAMINATION

6    BY MR. HEMMINGER:

7    Q.      Officer Blair, I believe the testimony was that

8    dispatch is always going on, correct?

9    A.      Yes, sir.

10   Q.      It's important that you pay attention to dispatch,

11   isn't it?

12   A.      Yes, sir.

13   Q.      They tell you where to go?

14   A.      Yes, sir.

15   Q.      They tell you why to go certain locations?

16   A.      Yes, sir.

17   Q.      They give you description of individuals that

18   you're looking for, correct?

19   A.      Yes, sir.

20   Q.      In fact, you were listening to dispatch and at one

21   point you asked dispatch to repeat the cross streets,

22   correct?

23   A.      Yes, sir.

24   Q.      Upon obtaining the defendant, did you have

25   dispatch repeat the description of the suspects?

1    A.      No, sir.  I was pulling up.

2    Q.      I'm sorry.  No, sir, what?

3    A.      No, sir.  I was pulling up.  This was a very, like

4    I said, simultaneous situation that was --

5    Q.      But you have -- you have like a portable device on

6    you?

7    A.      Yes, sir.

8    Q.      You can talk to dispatch, right?

9    A.      Yes, sir.

10   Q.      So as you're standing at defendant's driver-side

11   window, did you ask dispatch to repeat the description of

12   the suspects?

13   A.      No, sir.

14   Q.      You never asked defendant if he had a weapon on

15   him, did you?

16   A.      I do not recall, sir.

17   Q.      While you're at defendant's vehicle, you did

18   not -- you did not check his record or his driver's license,

19   correct?

20   A.      I don't have the ability, standing there.

21   Q.      Can you ask dispatch to do that?

22   A.      Yes, but I'm also waiting for other officers to

23   respond; I want to leave the air open.

24   Q.      But all you had to do was ask dispatch to identify

25   the defendant, right, run his license, run his record?

GB000255

1    A.      I could have asked her for the registered owner of

2    the license plate I provided her.  Once I did obtain the

3    driver's license, I could have asked her for the information

4    on the license, but she would not have right there checked

5    for warrants, et cetera.

6    Q.      She could have told you the race of the suspect,

7    correct?

8    A.      She would have read what was on the license.

9           MR. HEMMINGER:  I have no further questions.

10           THE COURT:  Thank you very much.  Thank you.

11    Well, it's been a long day, you are excused from the witness

12    stand.  I think you're excused from court today.

13           Prosecution, would you like -- Do you want her to

14    wait?

15           MR. STEINBERG:  Can you come here for a second?

16           MR. BENNINGTON:  May we approach, Your Honor?

17           THE COURT:  Yes.  Just come up right here.

18                - - -

19           Thereupon, a discussion was held at the bench, out

20    of the hearing of the jury and the court reporter.

21                - - -

22           THE COURT:  I don't think judges should wear black

23    robes up here.  One of the big challenges is where they

24    schedule everything, like, the last day because that's

25    what's been going crazy with this trial.