08-02-16-DALE-PHILLIPS-PARTIAL

3    That's the evidence you're going to see.  But Dale always

4    complied.

5            What the evidence is not going to show you is that

6    Dale in any way purposely interfered with the investigation

7    of a burglary.  There will be no evidence that Dale was

8    related to the burglary or that Dale purposely interfered

9    with that investigation.  So when the show is over, when the

10   smoke clears and you've seen this evidence, I am confidant

11   that you will return your verdict of not guilty.

12           Thank you.

13           THE COURT:  State may call its first witness.

14           MR. STEINBERG:  Your Honor, we're going to call

15   Officer Karen Blair.

16           THE BAILIFF:  Where is she at?

17           MR. STEINBERG:  She's in the back.

18           THE BAILIFF:  Thank you.

19           (Witness sworn.)

20           THE BAILIFF:  You may have a seat.

21           THE COURT:  Mr. Steinberg?

22                           - - -

23           THEREUPON, the City, to maintain the issues on its

24   part to be maintained, offered and introduced in evidence on

25   its behalf the following testimony:

                                                              9

1                    KAREN BLAIR,

2    called as a witness on behalf of the City, being first duly

3    sworn, testified as follows:

4                    DIRECT EXAMINATION

5    BY MR. STEINBERG:

6    Q.      Can you tell us your name, please?

7    A.      Karen Blair.

                    Page 7

Δ π EXHIBIT 24
Deponent Blair
Date 9/21/17  Rptr Sm
WWW.DEPOBOOK.COM

08-02-16-DALE-PHILLIPS-PARTIAL

8  Q.      And I'm going to ask you to speak much more
9  loudly.
10  A.      My name is Karen Blair.
11  Q.      Thank you.
12          Can you spell your first and last name for our
13  record, please?
14  A.      K-a-r-e-n, B-l-a-i-r.
15  Q.      And what do you do for a living?
16  A.      I'm a police officer for the City of Columbus.
17  Q.      How long have you been so employed?
18  A.      Eight years, sir.
19  Q.      And any previous police experience before
20  Columbus?
21  A.      No, sir.
22  Q.      Can you describe generally for us your training to
23  become a Columbus police officer?
24  A.      So when you go through the hiring process and you
25  get your conditional employment letter, you go to the

                                                          10

1  academy, which was about seven months long.
2  Q.      I'm going to ask you to speak more slowly and much
3  more loudly.
4  A.      When you are hired and you start the academy with
5  Columbus, they have their own police academy; and it's about
6  seven months long.
7  Q.      And what does that academy entail?
8  A.      It's a quasi-military environment where there's a
9  classroom and practical scenarios where they review the
10  laws, officer safety, all of the functions of a police
11  officer.
12  Q.      And did you successfully complete that?

GB000030

08-02-16-DALE-PHILLIPS-PARTIAL

13   A.     Yes, sir.

14   Q.     Okay. And after that, is there any training

15   period?

16   A.     There's continuous training every year. We have

17   in-service every year. You know, we have firearms,

18   defensive tactics, legal updates, whatever topics come up

19   every year.

20   Q.     Okay. Any type of coaching period after you're on

21   the job?

22   A.     There's 15 weeks after you graduate the academy

23   that you're in the coaching phase.

24   Q.     What's that?

25   A.     At the time I graduated, there were three

11

1   five-week phases where you worked -- spent five weeks in

2   different parts of the city; and at the end of that, they

3   evaluated whether you can function as a one-officer unit. I

4   graduated that.

5   Q.     Okay. So on September 15th, 2014, what shift

6   were you working?

7   A.     Evening midwatch.

8   Q.     What are the hours of evening midwatch?

9   A.     7:00 p.m. to 5:00 a.m.

10   Q.     And what was your assignment?

11   A.     Zone 3, evening midwatch. At the time, I believe

12   I had Tuesday, Wednesday, Thursday off.

13   Q.     Okay. Zone 3; what part?

14   A.     The west side of Columbus.

15   Q.     Okay. Can you describe the boundaries, roughly,

16   of Zone 3?

17   A.     Zone 3 includes -- There's four precincts over

Page 9

GB000031

08-02-16-DALE-PHILLIPS-PARTIAL

18    there.  We go as north as Mill Run, all the way up to 15
19    Precinct.  We go as south as almost to Grove City.  We go as
20    west as almost to Hilliard, and as east -- just pretty close
21    to downtown.
22    Q.      And how long have you been assigned to Zone 3?
23    A.      At that time, just a couple of months.
24    Q.      Is that still your current assignment?
25    A.      Yes, sir.

                                                        12

1     Q.      And how familiar were you at the time with the
2     geography of Zone 3, where streets are located and where
3     landmarks are located?
4     A.      Fairly familiar.  I didn't have streets memorized.
5     You know, I still have to look at a map to get certain
6     places, but I am fairly familiar.
7     Q.      And what shift do you currently work now?
8     A.      The same, evening midwatch.
9     Q.      Okay.  So do you recall getting a call about a
10    burglary on September 15th, 2014?
11    A.      Yes, sir.
12    Q.      Do you know about what time you received that
13    call?
14    A.      Looking at the paperwork, it was 10:40, 10:45-ish,
15    10:43, something like that.  But I know --
16    Q.      Okay.
17    A.      -- it was dark.  It was like early in my shift
18    considering I worked until 5:00 in the morning, but I know
19    it was dark outside.
20    Q.      Okay.  And what did you do -- Do you remember what
21    the call was, off the top of your head?
22    A.      The run said -- It came out -- We get a tone for a
                              Page 10

GB000032

08-02-16-DALE-PHILLIPS-PARTIAL

23  high priority.  If the tone goes out, it says there's a

24  burglary, it said.

25  Q.       Let me stop you there for a second.  You said a

13

1  tone.  What do you mean?  Describe what you mean.

2  A.       The tone is a beep on the radio that is to alert

3  officers to pay attention.

4  Q.       Like for a burglary or something like that?

5  A.       Kind of like, I don't know, like a beep

6  (demonstrating).

7          MR. STEINBERG:  Okay.  And if the record could

8  reflect that both the officer and I have made beeping

9  noises.  Thank you.

10  Q.       So there's a tone.  When you say "a tone", you

11  mean an audible?

12  A.       Yes, sir.  It's a beeping noise that kind of grabs

13  your attention, it says, hey, pay attention.  It's a

14  high-priority situation.

15  Q.       Is there actually like an electronic voice that

16  says, High-Priority Situation?

17  A.       No.  It is the tone that you hear.

18  Q.       So you got that tone?

19  A.       Yes, sir.

20  Q.       Okay.  And then did you get what the run was?

21  A.       Yes, sir.  It said -- It gave the address.  It

22  described the address, and it said there were several people

23  coming out of a vacant building.  They were inside the

24  building taking stuff out, and it said they were loading it

25  into a vehicle next to the building.

14

Page 11

GB000033

08-02-16-DALE-PHILLIPS-PARTIAL

1   Q.    Do you remember offhand if there was a description

2  of the people involved?

3   A.    I believe it said there were a couple of males,

4  two males and a female; and the female was wearing, I

5  believe it said, orange.

6   Q.    Okay.  And do you remember anything else about the

7  run off the top of your head?

8   A.    It said there was no description of the vehicle

9  that was involved.

10   Q.    And do you remember the address?

11   A.    I don't remember the exact number, sir, 2700

12  something, on the north side of the street.  So it would be

13  an even number.

14   Q.    Okay.  2700 off what street?

15   A.    Sullivant Avenue.

16   Q.    Okay.  So when you got this and you got the high

17  priority, what did you do?

18   A.    Well, I knew I was really close.  I was able to --

19  I know the cross streets, which would tell me exactly

20  where -- what streets it falls between.  So I didn't need to

21  turn on my lights and sirens because I was so close.  I was

22  in the alley behind this location.

23   Q.    Okay.  How long did it take you to get to the

24  location?

25   A.    Moments.

15

1   Q.    Okay.  So when you got to the location -- Let me

2  back up.  Were you in a cruiser?

3   A.    Yes, sir.

4   Q.    Okay.  And was it a marked patrol cruiser?

5   A.    Yes, sir.

Page 12

08-02-16-DALE-PHILLIPS-PARTIAL

6    Q.      Did it have working Visabar lights?

7    A.      Yes, sir.

8    Q.      Okay.  And audible sirens?

9    A.      Yes, sir.

10   Q.      And how were you dressed?

11   A.      I was wearing this uniform, I believe, the uniform

12   of the day.

13   Q.      Okay.  And just describe that for our record,

14   please.

15   A.      I wear a white shirt, the dark blue polyester

16   pants with the badge, name plate.

17   Q.      Did you turn on your lights and sirens when you

18   got this run or not?

19   A.      No, sir.

20   Q.      Okay.  And why not?

21   A.      Because of my proximity in responding to the

22   situation.  I could have turned on my lights and sirens; but

23   typically in a situation like this, for officer safety, you

24   would turn off the lights and sirens prior to getting close

25   to it.  So since I was so close, I did not need to activate

                                                            16

1    them.

2    Q.      And you said, "a situation like this", what do you

3    mean, "a situation like this"?

4    A.      A high-priority run where you could notify

5    potential suspects that you're there, which could create an

6    officer safety issue.

7    Q.      Is that what you're trying to avoid, notification?

8    A.      Yes, sir.  And upon arriving in that -- in that

9    tactical situation, yes.

10   Q.      Okay.  So burglary, how would you define a

                        Page 13

GB000035

08-02-16-DALE-PHILLIPS-PARTIAL

11   burglary run?

12   A.      People have forcefully gained entry into a

13   building and are taking property from the inside of it.

14   Q.      And is there anything special that you have been

15   taught on a burglary run or anything significant about a

16   burglary run as opposed to like kids jumping into a pool or

17   something?

18   A.      You want to approach differently, you know,

19   because you're dealing with someone who is committing a

20   felony crime that is not going to want to go to jail.  So

21   you're going to want to approach in a safer manner.  You

22   don't want to -- I'm not sure how to put this.  I guess,

23   just approach more tactically.

24   Q.      Okay.  You said, "Approach more tactically".

25   A.      Yes.

17

1   Q.      What do you mean specifically?

2   A.      Well, I want to approach from a safe distance so I

3   can survey the area, seeing what, who is there, if

4   there's -- you know, if it matches some of what the

5   description of the dispatched run says.  You know, if

6   there's a vehicle there, if there's people there, if there's

7   an open door of a building, you know, to be able to see as

8   much as I can without -- before people get a chance to see

9   my presence.

10   Q.      Okay.  When you got to the scene, where -- what

11   did you see?

12   A.      When I pulled around the corner, I came from the

13   alley and turned.  And when I looked toward the building, I

14   saw a black truck parked on the west side of North Harris --

15   South Harris, I'm sorry, facing northbound right next to the

Page 14

08-02-16-DALE-PHILLIPS-PARTIAL

16   building where there's a door at the building.

17   Q.        And where was this in relation to the 2700 block

18   of Sullivant?

19   A.        It was the building in question.  It was exactly

20   next to the building, next to the entrance of the building

21   on the side.

22   Q.        Okay.  Was that building then at the corner of

23   Harris and Sullivant?

24   A.        Yes.  It was the northwest corner of Sullivant and

25   Harris.

18

1    Q.        Okay.  So you see this black pickup on Harris.

2    Were you facing it, or was it facing away from you?

3    A.        It was facing me.  When I turned from the corner,

4    we ended up being head-on, facing each other.

5    Q.        Okay.  And you turned from the corner.  What

6    corner did you turn from?

7    A.        From the alley just north of Sullivant Avenue.

8    Q.        Okay.  And was it running at the time, the black

9    pickup?

10   A.        It was running.  When I initially saw it, the

11   lights were off.  When I was in my cruiser, the lights -- He

12   turned the lights on and started to pull away.

13   Q.        It was already dark?

14   A.        Yes, sir.

15   Q.        What did you do then when you saw this truck?

16   Were you able to see who was in the truck at that time?

17   A.        I could see a male and a female when I first saw

18   the truck.  That's all I was able to see, a male and female.

19   I seen two occupants.

20   Q.        Were you able to see anything else?

Page 15

GB000037

08-02-16-DALE-PHILLIPS-PARTIAL
21    A.    Not at that time.

22    Q.    And what was your thought at that time when you

23    came to the burglary run and saw two people in a truck?

24    A.    I thought this was going to be related to the

25    burglary and they were trying to leave.

19

1     Q.    Okay. So what did you do then?

2     A.    I had exited my cruiser because I was trying to

3     approach on foot, because I was facing -- like, our cruisers

4     were facing -- My cruiser was facing their vehicle. So I

5     got out of my car so there wasn't a collision. I got out of

6     my car, and I signaled the driver to try to stop because he

7     was pulling away from the curb.

8     Q.    Okay. At that point, were you able to see the

9     driver of the truck?

10    A.    Yes, I could see it was a male.

11    Q.    Okay. And so explain how you signaled and what

12    happened.

13    A.    I first used my hand and said, Stop, stop. The

14    vehicle was not stopping. It continued to pull away. And I

15    was pretty much in front of his truck when I said, Stop,

16    stop. And he still continued forward so I started to go off

17    to the side so I wouldn't get struck. And I tapped on the

18    hood, and I said, Stop, stop the vehicle, and he did stop.

19    Q.    Okay. At that point, were you able to see who was

20    in the vehicle?

21    A.    Yes, I could tell it was a male.

22    Q.    Okay. So what did you do next then?

23    A.    I approached from the driver's side. I put myself

24    into a traffic-stop position. I approached from the rear of

25    his vehicle. So I was behind his door jamb but to where I

Page 16

08-02-16-DALE-PHILLIPS-PARTIAL

20

1    could speak to him.

2    Q.      Okay. Was the window of the truck open or closed?

3    A.      I believe it was open.

4    Q.      Okay. And did you actually talk to the driver of

5    the vehicle?

6    A.      Yes, sir.

7    Q.      Okay. And describe that conversation.

8    A.      I asked for his license, and he said he did not

9    have it.

10    Q.      The person who was in that vehicle, were you able

11    to see that person at this point?

12    A.      Yes, sir.

13    Q.      And do you see that person here today?

14    A.      Yes, sir.

15    Q.      Can you point to that person and tell us what that

16    person is wearing?

17    A.      He's wearing the white short-sleeved dress shirt

18    with the dark blue/light blue striped tie.

19            MR. STEINBERG: Thank you. Your Honor, I would

20    ask that the record reflect that the witness has identified

21    the defendant.

22            THE COURT: Let the record reflect that the

23    witness has identified the defendant.

24            MR. STEINBERG: Thank you.

25    Q.      So, Officer Blair, when you asked the defendant

21

1    about whether or not he had a license on him and he said he

2    didn't have ID or something like that, did you draw any

3    conclusions or make any assumptions, based on your

4    experience, at that point?

Page 17

08-02-16-DALE-PHILLIPS-PARTIAL

5    A.     As far as what, sir?

6    Q.     If there was anything -- Is that usual, unusual?

7    A.     It made it clear that he did not want to identify

8   himself initially.

9    Q.     Okay. So then what happened?

10    A.     I asked him if he had a driver's license, if he

11  was a valid driver or if he just didn't have his license on

12  him. He said he was a valid driver. I said, Do you have

13  your license? He again told me no. And then I believe I

14  asked a third time if he had his license. And he said he

15  did have it on him, and he was able to provide it. I asked

16  him at least three times for it.

17    Q.     At that point, did you learn his identity?

18    A.     I had his ID, but I was still focused on him and

19  the situation that we had. So I didn't sit there -- I

20  didn't sit there and read it.

21    Q.     I'm going to ask you to slow down, if you could.

22    A.     Absolutely, sorry.

23    Q.     That's fine. Your voice is up. So if you could

24  answer my last question again. Did you learn his identity

25  at that time?

                                                22

1    A.     I had his identification on me, but I did not take

2  the time to stop and read it because I was still dealing

3  with the situation.

4    Q.     Okay. Was there anybody else, any other officers

5  present at that point?

6    A.     At that moment, no.

7    Q.     Okay. So then what happened next?

8    A.     At that point, I know another officer arrived.

9  And that officer went to the passenger side of the vehicle,

Page 18

08-02-16-DALE-PHILLIPS-PARTIAL

10   and she was talking to the female passenger of the truck.

11   Q.      Do you know who that officer is?

12   A.      It was Officer Jean Byrne.

13   Q.      Okay. And have you seen her here today?

14   A.      Yes, sir.

15   Q.      Okay. And do you know -- Well, what was going on

16   with you and the driver at that point?

17   A.      At that moment, I was really waiting for backup.

18   Q.      Okay. Why?

19   A.      Because he was -- You know, I had two people in

20   the vehicle. You know, at that point, I had me and another

21   officer, who had just shown up, and I was waiting for

22   another officer to come to my side of the vehicle so I could

23   handle the driver.

24   Q.      And what was your immediate goal once you would

25   get backup? What were you trying to do?

23

1    A.      At that point, I was going to make sure I could

2    positively identify him and remove him from the vehicle and

3    determine if he was involved in the burglary.

4    Q.      Were you conducting a burglary investigation at

5    that point?

6    A.      Yes, sir.

7    Q.      Okay. Have you been trained regarding -- Why is

8    it that you were waiting for somebody else to come?

9    A.      To be tactically safe in case something were to

10   happen. It was me against the one suspect, who, you know,

11   he was a larger male than I was.

12   Q.      Okay. So how long did you wait before somebody

13   else came?

14   A.      It was moments. It wasn't very long.

Page 19

08-02-16-DALE-PHILLIPS-PARTIAL

15  Q.    Okay. And who was the person who came?

16  A.    I believe it was Officer Adam Groves.

17  Q.    Okay. A Columbus police officer?

18  A.    Yes, sir.

19  Q.    And what happened when Officer Groves got there?

20  A.    When Officer Groves got there, we discussed it,

21  and we decided we were going to have to pull him from the

22  vehicle. We told the driver, you know, we're going to

23  remove you from the vehicle; you're being detained at this

24  time. The door was opened, and he initially started to step

25  out of the vehicle.

24

1  Q.    Okay. And the goal in your detention is what?

2  A.    To determine if he was involved in the burglary.

3  You know, the witness who had called in the dispatched run.

4  That was -- Our goal was to find the person who called in

5  the run and say, Is this him or not?

6  Q.    Okay. And so when you told the defendant, Hey,

7  we're going to have you exit the vehicle, did he say

8  anything?

9  A.    He was reluctant to get out, but he did -- He

10  pivoted and he let his feet touch the ground, at least his

11  left foot touched the ground.

12  Q.    What type of vehicle was this?

13  A.    I believe it was an F-150. It was a pickup truck.

14  Q.    Okay. Was it -- How far off the ground was the

15  cab of the pickup?

16  A.    I mean, it was higher than I am.

17  Q.    Okay.

18  A.    Average pickup truck, F-150.

19  Q.    Was it higher than a normal passenger car?

Page 20

08-02-16-DALE-PHILLIPS-PARTIAL

20   A.      Yes.

21   Q.      Would a person have to step down or step up?

22   Like, to get inside, you would have to step up?

23   A.      Yes, sir.

24   Q.      And to get out, you would have to step down?

25   A.      Yes, sir.

                                                                25


1    Q.      Okay.  So describe this process then when you're

2    talking to the defendant, trying to get him out of the

3    vehicle.

4    A.      Well, he basically pivots his legs toward the

5    opening of the car.  I know at least his left leg touched

6    the ground at that point.  So he was initially starting to

7    step out of the vehicle.

8    Q.      Okay.  And who was present on your side of the

9    vehicle at that point?

10   A.      Officer Groves.

11   Q.      Okay.  And you?

12   A.      Yes.

13   Q.      Then what happened?

14   A.      From there, he was hesitant to come out.  He did

15   not want to come out of the vehicle.  So Officer Groves took

16   control of his left arm, and at that point the defendant

17   immediately pulled his left arm to his chest and grabbed

18   onto the handle in the door jamb of the car.  I don't know

19   the technical name of that handle.  But the handle that's

20   near where, you know, like the side airbag might be, by the

21   windshield, he grabbed onto that with his right hand, and he

22   would not let go.

23   Q.      Okay.  And when you say that he was hesitant, what

24   do you mean?

                          Page 21

08-02-16-DALE-PHILLIPS-PARTIAL

25   A.      At what point?

26

1    Q.      Well, before he -- Before he grabbed on, you said
2    that he was hesitant.  What does that mean?
3    A.      He made it very clear he did not want to get out
4    of the vehicle.  He did not want to be involved with us,
5    which it, in my eyes, made him more suspicious for what I
6    was there investigating.  So he started to step out, and
7    then he was just hesitant like he was going to pull back
8    into the truck like he did not want to come out of the
9    truck.
10   Q.      Okay.  How did you respond?
11   A.      well, when he grabbed onto the handle, at that
12   point we have to remove him from the vehicle.  So I went to
13   his fingers on the handle and started to pull his fingers
14   off to try to loosen his grip.  And Officer Groves -- I
15   believe another officer at the time, McClain maybe, came up
16   to assist and they were able to pull him away from the
17   truck.
18   Q.      And where were you while this was going on?
19   A.      I was near his right arm --
20   Q.      Okay.
21   A.      -- when he was facing us --
22   Q.      Okay.
23   A.      -- from the truck.
24   Q.      Were you able to pry his hand free?
25   A.      Yes, sir.

27

1    Q.      And then what happened?
2    A.      We tried to handcuff him because he was fighting.

Page 22

GB000044

08-02-16-DALE-PHILLIPS-PARTIAL

3    You know, fighting, giving resistance at that time.

4    Q.      Let me back up. Where did you -- Positionally,

5    position-wise, where did you and Officer Groves and the

6    defendant go once you got him out of the vehicle? What

7    happened next?

8    A.      On the ground right by the truck.

9    Q.      Okay.

10   A.      Close to the door jamb.

11   Q.      Who was on the ground?

12   A.      The defendant was on the ground, myself,

13   officer Groves, and McClain, Officer McClain, at the time.

14   Q.      And what's going on on the ground?

15   A.      He is still -- The defendant was still resisting,

16   trying to stand up, get away from us, not complying to our

17   commands. He was given many commands over and over again to

18   stop resisting, put your hands behind your back; and he kept

19   trying to, like, hold his hands under him and get up and get

20   away from us.

21   Q.      Now, before you pulled the defendant out of the

22   vehicle, did you tell him or give him any commands?

23   A.      As far as what?

24   Q.      Anything. Were you asking him to do anything?

25   A.      He was -- We instructed him to step out of the

                                                              28

1    vehicle, you know, so we can detain you and basically

2    identify you to either be involved in the burglary or not be

3    involved in the burglary. So he was told he would be pulled

4    out of the vehicle.

5    Q.      Did he respond at all in any way when you were

6    telling him this?

7    A.      I don't recall exact words, sir.

                          Page 23

08-02-16-DALE-PHILLIPS-PARTIAL

8    Q.    Okay.  All right.  And when he -- when you saw him

9    grip onto the handle, did you continue to say anything, or

10   did anybody say anything to him; do you recall?

11   A.    Everyone was telling him to stop resisting, let

12   go, let go, you know, comply.

13   Q.    Okay.  So then what happened on the ground?

14   A.    On the ground, we were trying to get him

15   handcuffed.  I know at some point he ended up on his belly,

16   and I heard another officer tell him, If you don't give us

17   control of your hands, if you don't put your hands behind

18   your back, you're going to be maced, and I believe that

19   officer maced him at that time.

20   Q.    Okay.  So in what city did all of this occur?

21   A.    City of Columbus.

22   Q.    What state?

23   A.    Ohio.

24   Q.    And what county?

25   A.    Franklin.

                                                    29

1    Q.    Now, were you on duty?

2    A.    Yes, sir.

3    Q.    To your knowledge, was every officer involved on

4    duty?

5    A.    Yes, sir.

6    Q.    Okay.  And was every officer involved a Columbus

7    police officer?

8    A.    Yes, sir.

9    Q.    Okay.  The defendant's refusal to get out of the

10   car, how did that -- or the truck, how did that affect what

11   you were trying to do?

12   A.    I was trying to investigate the burglary.  With

                            Page 24

GB000046

08-02-16-DALE-PHILLIPS-PARTIAL

13     him being there, it seemed his actions made it certainly

14     more difficult for me to detain him to figure out if he was

15     involved or not.

16     Q.       And did it delay whatever investigation --

17     whatever preliminary investigation you were trying to do?

18     A.       Yes, sir.

19     Q.       Okay.  Were you authorized -- Well, what are your

20     duties regarding a felony call?  Do you have to respond?

21     A.       Yes, sir.

22     Q.       At different times you talked about officer

23     safety.  What have you been trained regarding officer safety

24     generally and then specific to felony runs?

25     A.       In what way, sir?

30

1     Q.       Okay.  Have you had training regarding officer

2     safety?

3     A.       Yes, sir.

4     Q.       Okay.  Generally, what's your training on officer

5     safety?

6     A.       Like I said, I'm not sure exactly what you're

7     referring to.

8     Q.       Sure.  How often does officer safety get mentioned

9     in your training?

10     A.       Every training.

11     Q.       Okay.  And how often -- During every training, how

12     do you prioritize that?  How are you trained to prioritize

13     that?

14     A.       Officer safety is number one.

15     Q.       Okay.  And are your tactics -- the tactics that

16     you are taught, are they -- how are they designed regarding

17     officer safety?

Page 25

08-02-16-DALE-PHILLIPS-PARTIAL
18    A.      What do you mean?

19    Q.      So you said you approached the driver's side as if

20    you were approaching a traffic stop from behind the driver.

21    A.      Yes, sir.

22    Q.      Why did you do that?

23    A.      That gives me an advantage.  It puts me in a

24    position where I'm out of the door jamb, the crack of the

25    door, so if the driver were to throw the door open, I

31

1     wouldn't get hit by the door.  It gives me an advantage

2     to -- if something -- if they would present a weapon, I

3     could back up, I could keep them in my sights.  I would not

4     be in front of the vehicle to where I could get run over,

5     things like that.

6     Q.      Okay.  So you take away relative -- you take away

7     different objects that anybody who wants to assault an

8     officer can use?

9     A.      Yes, sir.

10    Q.      Okay.  Why was it important to you to separate the

11    defendant from his passenger for your investigation?

12    A.      Because I don't want them to speak to each other

13    so they can't get their story together and, you know,

14    coincide their stories so we can find the truth from both of

15    them.  And also I want to remove him from the vehicle in

16    case there were any weapons in the vehicle.

17    Q.      Okay.  What have you been taught regarding a

18    stranger and weapons in a vehicle or a stop and weapons in

19    the vehicle?  What have you been taught?

20    A.      I can remove them from the vehicle and conduct a

21    sweep of the vehicle.

22    Q.      I'm asking a different question.

Page 26

GB000048

08-02-16-DALE-PHILLIPS-PARTIAL

23   A.    Okay.

24   Q.    What's the assumption you make about every

25   stranger you encounter in a vehicle?

                                   32

1    A.    I assume every person has a weapon, plus one.

2    Q.    Okay.  Why do you assume that?

3    A.    For officer safety reasons.

4    Q.    Okay.  Is that part of your training?

5    A.    Yes, sir.

6    Q.    Okay.  Before you were a police officer -- Can you

7   remember before you were a police officer?

8    A.    Yes, sir.

9    Q.    Were you trained either by experience or formal

10   training to regard every stranger as potentially a threat?

11   A.    Yes, sir.

12   Q.    You were?

13   A.    Well, when I was a little kid.

14   Q.    Okay.  Okay.  Was it your belief before you became

15   a police officer that everybody was armed?

16   A.    No.

17   Q.    Okay.  Is it your belief as an officer that

18   everybody is armed, or are you trained to operate under the

19   assumption that everyone is armed?

20   A.    Operate under the assumption that everyone is

21   armed.

22   Q.    Okay.  How often do you associate with people that

23   have no police training whatsoever, socially?

24   A.    Often.

25   Q.    Okay.  Have you ever had a conversation with them

                                   33

1   about officer safety?

GB000049

08-02-16-DALE-PHILLIPS-PARTIAL

2  A.     Yes, sir, on occasion.

3  Q.     How difficult is it or how easy is it to explain

4  what your attitude has to be as a police officer?

5  A.     It's difficult.

6  Q.     Okay. Why? How do you explain it?

7  A.     People typically don't understand it because they

8  haven't seen things. They haven't seen people be hurt by

9  other people, maybe naive to what can happen.

10  Q.     Okay. How long did it take you to develop the

11  instincts of a police officer?

12  A.     I mean, I certainly learned it in the academy.

13  Q.     Okay. And let's talk a little bit about where the

14  burglary investigation went. First of all, the defendant,

15  was he implicated or cleared in involvement in the burglary?

16  A.     We were not able to associate him to any burglary.

17  Q.     To be fair, do you believe that he was involved in

18  a burglary?

19  A.     No, sir.

20  Q.     Okay. Did you notice at the time you first came

21  upon his truck and him?

22  A.     No, sir.

23  Q.     And why is it that you had to talk to him?

24  A.     He was right outside of the door, just as

25  described, and they said they was coming out of this

34

1  building. He was parked right there. His lights were off.

2  There were two people in the vehicle. They said they were

3  loading up things from the building. The truck would be a

4  perfect, you know, vehicle for that. He was right there.

5  And I happened to be right behind the building when this was

6  dispatched, so the timing of it was so close. And he was

Page 28

GB000050

08-02-16-DALE-PHILLIPS-PARTIAL

```
 7   right there next to the building.

 8   Q.      And were there any other people that you noticed

 9   when you first got there?

10   A.      No, sir.

11   Q.      Okay.  Now, are you familiar with what a cruiser

12   video system is?

13   A.      Yes, sir.

14   Q.      Your cruiser video system didn't come on at that

15   point, did it?

16   A.      No, sir.

17           MR. STEINBERG:  Okay.  Your Honor, may I approach

18   the witness?

19           THE COURT:  Yes.

20   BY MR. STEINBERG:

21   Q.      You're familiar with the fact that there are

22   cruiser videos systems --

23   A.      Yes, sir.

24   Q.      -- right?

25   A.      Yes, sir.
```

                                                            35

```
 1   Q.      Okay.  I'm going to show you what we've marked as

 2   Plaintiff's Exhibit A.  Just tell us in the blandest terms

 3   possible what you're looking at in Plaintiff's Exhibit A.

 4   A.      It's a CD.

 5   Q.      Okay.  And I'm going to place

 6   Plaintiff's Exhibit A into our player, which is hooked up to

 7   a television monitor through a computer, and I'm going to

 8   ask you to take a look briefly at our screen once I start

 9   playing this Exhibit A.

10           But let me ask you a couple of preliminary

11   questions.  Do most cruisers in Columbus -- in the Columbus
```
                              Page 29

08-02-16-DALE-PHILLIPS-PARTIAL

12    police force have cruiser video systems?

13    A.    Yes, sir.

14    Q.    And, generally, how do they -- how are they

15    triggered, based upon your experience?

16    A.    There's a few things that trigger them. You can

17    turn it on manually. There's several different ways to turn

18    them on. If you go over 70 miles an hour, it triggers it

19    and activates it. If you turn on your overhead lights, the

20    beacons, it activates it. If you're involved in a crash, I

21    believe, it turns on.

22    Q.    Okay. So is it fair to say that there are

23    automatic ways and then manual ways to turn it on?

24    A.    Yes, sir.

25    Q.    Okay. So then, like I said, I'm going to ask you

                                                              36

1     to take a look at a video screen where I'm going to project

2     the Plaintiff's Exhibit A.

3           (Video played and then stopped.)

4           MR. STEINBERG: So I've stopped Plaintiff's

5     Exhibit A at 22:46:30, and before I continue, I would ask if

6     the Court could ask the jurors if everybody can see

7     Plaintiff's Exhibit A.

8           THE COURT: Can you all see Plaintiff's Exhibit A?

9           THE JURORS: Yes.

10    BY MR. STEINBERG:

11    Q.    Officer Blair, can you see it?

12    A.    Yes, sir.

13          MR. STEINBERG: Your Honor?

14          THE COURT: Yes.

15    Q.    So I've stopped it at 22:46:30. Officer Blair,

16    are you able to tell us what the view we're looking at at

                              Page 30

08-02-16-DALE-PHILLIPS-PARTIAL

17    22:46:30 is?

18    A.        That looks like Sullivant Avenue.

19    Q.        Okay.  And do you see a time stamp?

20    A.        I do, sir.

21    Q.        What's the time stamp on it?

22    A.        10:46 p.m. and 30 seconds.

23    Q.        Okay.  And...

24    A.        9-15-2014.

25    Q.        Time and date stamped, okay.  Thank you.

37

1              (Video played and then stopped.)

2     Q.        I've stopped it at 22:47:18.  And what are we

3     looking at in this still?

4     A.        The cruiser you see on the left, I believe, is

5     Officer Jean Byrne's vehicle.

6     Q.        Okay.  And if you -- I don't mind if you approach

7     and just show us what you're pointing to, if you don't mind.

8     A.        I believe this is Jean Byrne's vehicle.

9     Q.        Okay.  And where is that?  Just point to it.

10    A.        Okay.  (Witness pointing).

11    Q.        The rear on the left of our screen at 22:47:18?

12    A.        Yes, sir.

13    Q.        Okay.  And do you see where your vehicle is?

14    A.        My vehicle is on the other side of his truck.

15    Q.        And where is the truck?

16    A.        Right here (indicating).

17    Q.        Okay.  Thank you.  And do you see anything else in

18    this picture?

19    A.        I see -- I believe this is Jean Byrne

20    (indicating).  I don't know what officer this is.

21    Q.        Okay.  If you could grab your seat.
                        Page 31

GB000053

08-02-16-DALE-PHILLIPS-PARTIAL

22        Officer, I'm going to ask you to tell me when you

23    believe you first see the defendant, if at all.

24            (Video played and then stopped.)

25    A.      This may be him right there (indicating).

                                                                38

1    Q.      Okay.

2    A.      If you go back a couple of seconds.  I'm not sure

3    if it's him or another officer.  It's hard to tell from

4    here.

5            (Video played in slow motion and then stopped.)

6    Q.      Do you see where you are in this?

7    A.      I can't see me in the video, but I'm on the

8    driver's side of the truck.

9    Q.      Okay.  And just if you could, come up and

10   demonstrate to us where you would be on the video screen.

11   A.      I would be on the driver's side of the truck over

12   here (indicating).

13   Q.      Okay.  And were you already with Officer Groves at

14   this point?

15   A.      I don't know if he was there or not.

16   Q.      Okay.

17   A.      He may have come out of the vehicle that this

18   video is from.

19   Q.      Okay.  If you want to resume your seat.

20           (Video played and then stopped.)

21   Q.      At 22:48:10, what did you just see in the middle

22   of the screen?

23   A.      That was a passenger vehicle that got in the way.

24           (Video played and then stopped.)

25   Q.      At 22:49:14, have you seen the defendant yet?

                                                                39

Page 32

GB000054

08-02-16-DALE-PHILLIPS-PARTIAL

1   A.      It's very hard to tell.  It's pretty dark on the
2   left side of the screen there.
3           (Video played and then stopped.)
4   A.      I see him now.
5   Q.      I'm sorry?
6   A.      I see him now.
7   Q.      Okay.  And we're at 22:49:22.  If you could just
8   point out where you see him.
9   A.      He was right here in between the two officers
10  there.
11  Q.      Okay.  And what's going on at this point?
12  A.      He's being escorted to the rear of the cruiser.
13  Q.      Okay.  You can take your seat.  Thanks.
14          (Video played and then stopped.)
15  Q.      At 22:50:59, what just happened, Officer?
16  A.      He was placed in the rear of Cruiser 7314.
17  Q.      And, again, please slow down just a little bit.
18  A.      I'm sorry.
19  Q.      No, you're fine.  Thank you.  So do you remember
20  anything specific that the defendant would have told you
21  about his occupation during this event?
22  A.      I remember while we were on the ground still
23  struggling, he yelled that he was a state trooper.
24  Q.      Okay.  And do you remember what specifically he
25  said or...

                                                    40

1   A.      During the struggle, I don't remember exactly what
2   he said.  I recall him saying he was a state trooper.  When
3   we put him in the rear of the cruiser, he was asked about
4   that, and he said he was a former state trooper.

                        Page 33

GB000055

08-02-16-DALE-PHILLIPS-PARTIAL

5 MR. STEINBERG: Okay. Now, if I could have one

6 second.

7 (Brief pause.)

8 MR. STEINBERG: Your Honor, can we approach on the

9 record, please?

10 THE COURT: Yes.

11     - - -

12 The following discussion was held at the bench,

13 out of the hearing of the jury:

14 MR. STEINBERG: I have just one procedural

15 question, which is this: I have a bunch of exhibits that I

16 plan to introduce that are still marked with the previous

17 stickers. And my hope was to leave them on some exhibits

18 that I may not admit in the same order. Does the Court --

19 THE COURT: It doesn't matter.

20 Does anybody care? I mean, you can call it

21 whatever number you want to call it.

22 MR. STEINBERG: I just wanted to make sure.

23 THE COURT: That's fine. I mean, you can number

24 them whatever you want to number them.

25     - - -

41

1 MR. STEINBERG: Your Honor, may I approach the

2 witness?

3 THE COURT: Absolutely.

4 BY MR. STEINBERG:

5 Q. Officer Blair, I'm going to show you

6 Plaintiff's Exhibits B, C, D, E, F, G, H, I believe that's

7 I, K, L, M, and N. And I'm going to ask about those in just

8 a second. But before I ask you, when did your contact with

9 the defendant end, your personal contact?

Page 34

08-02-16-DALE-PHILLIPS-PARTIAL

10   A.     When he was released at Franklin County Jail.

11   Q.     I'm sorry?

12   A.     When he was released at Franklin County Jail.

13   Q.     Okay.  So did you end up placing the defendant

14  under arrest?

15   A.     Yes, sir.

16   Q.     Okay.  And did you end up charging the defendant?

17   A.     Yes, sir.

18   Q.     Okay.  And what did you charge the defendant with?

19   A.     We charged him with obstructing official business.

20   Q.     And who made the ultimate charging decision?

21   A.     It was a collective agreement.  The sergeant who

22  responded to the scene was involved in that.

23   Q.     Okay.  Were you also part of that?

24   A.     Yes, sir.

25   Q.     Okay.  And why did you charge him with obstructing

                                                42

1  official business?

2   A.     Because he hindered my ability to investigate the

3  burglary.

4   Q.     Okay.  Did you ever determine whether, in fact,

5  the burglary had actually occurred?

6   A.     There was entry gained into the building.  We

7  found the side door locked from the outside but you were

8  able to exit it.  There was an open roof -- like a door on

9  the roof of the building, and we located someone inside the

10  building.

11   Q.     Okay.  Now, did you have a chance to see whether

12  the defendant had sustained any injury after you had him on

13  the ground?

14   A.     Yes, sir.

GB000057

08-02-16-DALE-PHILLIPS-PARTIAL

15   Q.     Okay. And had he sustained injury?

16   A.     It seemed -- I know he had scratches. His knee

17  was scratched and he had been maced in the face.

18   Q.     Okay. Any other injury, that you recall?

19   A.     When we transported him to police headquarters

20  through the identification bureau to have his fingerprints

21  and mug shot taken, it was at that point he notified us that

22  his -- I believe his right bicep was hurt.

23   Q.     Okay. But physically, what you were able to see,

24  just what you were able to observe, did you observe some

25  type of injuries, superficial or not, to the defendant?

                                                    43

1   A.     Yes, sir.

2   Q.     And I have given you Plaintiff's Exhibits B

3  through -- I think it was B through N, save J, so you don't

4  have a J, but if you could examine all of those, B through

5  N, minus J.

6         (Brief pause.)

7   Q.     Have you had a chance to look at B through N, save

8  J?

9   A.     Yes, sir.

10   Q.     What are they?

11   A.     These are photographs of the defendant and his

12  injuries.

13   Q.     Okay. And are they a true and accurate

14  representation as you recall seeing the injuries back on the

15  15th of September, 2014?

16   A.     Yes, sir.

17   Q.     Okay. The exhibit that we played for you on our

18  video screen, was that a true and accurate representation,

19  as you recall it?

GB000058

08-02-16-DALE-PHILLIPS-PARTIAL

20   A.        Yes, sir.

21   Q.        Okay.  If I could see those exhibits, you can

22   just -- the order doesn't matter.  I can put them in order.

23   Thank you.

24             MR. STEINBERG:  Your Honor, May I have one minute

25   please?

                                                    44

1              THE COURT:  Yes.

2              MR. STEINBERG:  Okay.  Thank you.

3              Your Honor, at this time I do not have any more

4    direct examination for Officer Blair.

5              THE COURT:  Cross?

6                           - - -

7                    CROSS-EXAMINATION

8    BY MR. HEMMINGER:

9    Q.        Good afternoon, Officer Blair.

10   A.        Hello, sir.

11   Q.        You received -- You responded to the dispatched

12   call; correct?

13   A.        Yes, sir.

14   Q.        And when you received that call from dispatch,

15   where were you located?

16   A.        I was in the alley north of Sullivant, pretty

17   close to Hague.

18   Q.        And when you responded to that dispatched call to

19   the location at 2756 Sullivant Avenue, you proceeded through

20   that alley to the rear of that building all the way to

21   Harris Avenue; is that correct?

22   A.        Yes, sir.

23   Q.        Okay.  And you testified earlier that you

24   tactically respond to a call for a high-priority call like

                        Page 37

08-02-16-DALE-PHILLIPS-PARTIAL

25    that?

45

1    A.      Yes, sir.

2    Q.      And you said that you do that to match the

3    description of the dispatched run; correct?

4    A.      Yes, sir.

5    Q.      You have listened to the recording of the dispatch

6    in this matter; correct?

7    A.      It's been a long time, but, yes.

8           MR. HEMMINGER:  Okay.  Your Honor, if I may, I

9    would like to play what's been marked as

10   Defendant's Exhibit 1.

11          MR. STEINBERG:  Can we take a two-minute break?  I

12   need to get this cued up.

13          THE COURT:  Yeah.  Do the jurors need to get up

14   and come in the back or...

15          THE BAILIFF:  You guys good to go?  Do you have to

16   use the rest room or anything like that?

17          THE COURT:  All rise.

18          (Short recess taken.)

19                          - - -

20          The following discussion was held in the Court's

21   chambers, out of the hearing of the jury:

22          THE BAILIFF:  While the court was on a short

23   recess, the jurors asked me a question, and they have put it

24   writing.

25          Is it possible to have a map that shows the

46

1    streets in which the defendant was located, where the

2    officer was located, and the position of the other officer's

3    car and the location of the building that was broken into?

Page 38

08-02-16-DALE-PHILLIPS-PARTIAL

4      Thank you.

5             That was a collective request.

6             MR. HEMMINGER:  I have a photo of it.

7             THE BAILIFF:  It wasn't one.  They all agreed and

8      chimed in.

9             MR. STEINBERG:  I mean...

10            MR. HEMMINGER:  That's a lot --

11            MR. STEINBERG:  So the real --

12            THE COURT REPORTER:  One person speaking at a time

13     unless we're going to go off the record.

14            THE COURT:  Off the record.

15            (Discussion held off the record.)

16            THE COURT:  So the answer to the question is:  At

17     the end of the case you will have all of the exhibits that

18     are properly admitted at your disposal and it may or may not

19     include that information.

20            MR. STEINBERG:  We don't have an objection to

21     that.

22            MR. HEMMINGER:  Yes.

23                    - - -

24            Thereupon, the jury returned to the courtroom.

25                    - - -

                                                              47

1             THE COURT:  Please be seated.

2             MR. HEMMINGER:  May I proceed, Your Honor?

3             THE COURT:  Absolutely.  Let's get this going.

4             MR. HEMMINGER:  Thank you.

5             For the record, I'm going to play what's been

6      marked for purposes of identification as

7      Defendant's Exhibit 1.

8             (Audio played and then stopped.)
                         Page 39

08-02-16-DALE-PHILLIPS-PARTIAL

9      MR. HEMMINGER:  I'm sorry.  I noticed that was
10   repeating.  There's a series of four recordings on
11   Exhibit 1.
12      (Audio played and then stopped.)
13   BY MR. HEMMINGER:
14   Q.      Okay.  Officer Blair, you could hear that --
15   A.      Yes, sir.
16   Q.      -- recording; correct?
17   A.      Yes, sir.
18   Q.      Did you hear yourself on that recording at all?
19   A.      Yes, sir.
20   Q.      Okay.  And, in fact, that was you responding to
21   the dispatched call; correct?
22   A.      Yes, sir.
23   Q.      And, in fact, I believe you actually say, Edward,
24   John, Young at one point in time; correct?
25   A.      Yes, sir.

                                            48

1    Q.      Okay.  And what does Edward, John, Young
2    represent?
3    A.      Those are the first three letters of the license
4    plate on the front.
5    Q.      Okay.  The description of the suspects that was
6    relayed to you by dispatch was two white males, gray coat,
7    one black female with an orange wrap on her head; is that
8    accurate?
9    A.      Yes, sir.
10   Q.      Then dispatch informed you that the suspects were
11   loading the vehicle in the rear of the building; correct?
12   A.      Yes, sir.
13   Q.      And dispatch informed you that the caller stated
                          Page 40

GB000062

08-02-16-DALE-PHILLIPS-PARTIAL

14    the suspects are all back inside; correct?

15    A.      Yes, sir, it says that.

16    Q.      Okay. So your earlier testimony about a vehicle

17    being loaded on the side of the building was inaccurate;

18    correct?

19    A.      There isn't an access to the rear of the building.

20    There were trees and another building directly behind the

21    building.

22    Q.      Well...

23    A.      So the access would be from Harris Avenue from the

24    side.

25    Q.      In fact, there's actually a parking lot behind

                                         49

1    that building; correct?

2    A.      There's the alley that I came from. I don't

3    remember a big parking lot.

4    Q.      Okay. But dispatch informs you that suspects are

5    loading the vehicle in the rear of the building; correct?

6    A.      Yes, sir.

7    Q.      Okay. And they do not tell you that they're

8    loading a vehicle on the side of the building; correct?

9    A.      No, sir. They said the rear.

10    Q.      And dispatch does not tell you that they're

11    loading a vehicle on Harris Avenue; correct?

12    A.      It does not specify, no.

13    Q.      Okay. And you arrived on scene from the alley

14    behind the building; correct?

15    A.      Yes, sir.

16    Q.      Okay. So did you stop at any point in that alley

17    behind the building?

18    A.      I approached slowly.

                     Page 41

08-02-16-DALE-PHILLIPS-PARTIAL

19   Q.     Okay. And then you stopped your vehicle at

20  Harris Avenue; correct?

21   A.     Yes, sir.

22   Q.     And at that time you have enough time that you are

23  able to read the letters on Dale's truck, correct, on his

24  license plate?

25   A.     I'm reading them as I'm walking toward them.

                                            50

1   Q.     So you are -- Your testimony is now that you

2  are -- you've left your cruiser and you're on foot?

3   A.     Yes, I did exit my cruiser.

4         At what point are we talking about?

5   Q.     When you call in Edward, John, Young, the

6  recording that we just listened to.

7   A.     Yes, sir.

8   Q.     You're still inside of your cruiser at that time;

9  correct?

10   A.     I was either -- I don't remember exactly. I was

11  either still in my car and getting out, or I was walking

12  toward it.

13   Q.     Okay. At the point that you arrived or your

14  cruiser arrives from the alley at Harris Avenue to the point

15  that you call in Edward, John, Young, at no point do you see

16  anybody walking from the building to Dale's truck; correct?

17   A.     No, sir.

18   Q.     Nobody is loading anything into Dale's truck on

19  Harris Avenue; correct?

20   A.     Not that I could see, sir.

21   Q.     So you respond tactically to these calls to match

22  the description that dispatch gives you. That was your

23  testimony; correct?

                           Page 42

08-02-16-DALE-PHILLIPS-PARTIAL

24    A.      Yes, sir.

25    Q.      But you proceeded past the building all the way to

51

1     Harris Avenue; correct?

2     A.      It was at the corner, but, yes, where the entrance

3     was.

4     Q.      You don't activate your overhead lights; correct?

5     A.      No, sir.

6     Q.      And you made a conscious decision not to do that;

7     correct?

8     A.      Yes, sir.  It was my proximity to it, and, yes.

9     Q.      I believe your testimony earlier was that on a

10    high-priority run like this, you are, for lack of a better

11    word, essentially sneaking up on the location; correct?  You

12    don't want to make the people aware; correct?

13    A.      Yes, sir.

14    Q.      Okay.  So at some point when you're responding to

15    a high-priority run, you decided not to activate your

16    overhead lights?

17    A.      The overhead lights in that situation would have

18    been used to respond using emergency vehicle operations.  So

19    to get through traffic and since I was basically there, I

20    didn't need to activate it.

21    Q.      So, likewise, you made the decision not to

22    manually activate the camera in your cruiser; correct?

23    A.      I didn't really think about it at the time.  I was

24    trying to stop the vehicle.  I didn't have --

25    Q.      But you're very concerned about officer safety.

52

1     That's your testimony earlier; correct?

Page 43

08-02-16-DALE-PHILLIPS-PARTIAL

2   A.     Yes, sir.  I wanted to be out of the vehicle in a

3  safe position.

4   Q.     But are you wearing a body mic?

5   A.     I don't know if I had it in my pouch or not at

6  that time.

7   Q.     So there's no video or audio recording of you

8  stopping and approaching Dale's vehicle; correct?

9   A.     Not that I'm aware of, sir.

10   Q.     Well, there's no audio or video recording from you

11  or your cruiser; correct?

12   A.     Correct.

13   Q.     Let's be clear, you're not stopping Dale for a

14  traffic violation; correct?

15   A.     No, sir.

16   Q.     You don't write him a traffic ticket; correct?

17   A.     No, sir.

18   Q.     You arrive on location and you approach Dale in

19  his truck; correct?

20   A.     Yes, sir.

21   Q.     And Dale, as you see him, I believe your testimony

22  earlier is, he begins to drive, he's driving down

23  Harris Avenue, and you have to stop his vehicle; correct?

24   A.     When I first saw him, he was parked against the

25  curb.  And when I exited my cruiser, he started to pull away

                                                 53

1  from the curb.

2   Q.     Okay.  But you haven't activated your overhead

3  lights, you haven't indicated to him at this point that he

4  was to stop; correct?

5   A.     When I exited my cruiser, I signaled for him to

6  stop.

Page 44

08-02-16-DALE-PHILLIPS-PARTIAL

7   Q.    And his vehicle is in motion, that's why you're

8  telling him to stop; correct?

9   A.    Yes, sir.

10   Q.    And you wouldn't tell him to stop if he was

11  already stopped, that's pretty straightforward; right?

12   A.    Yes, sir.

13   Q.    Okay.  You tell Dale to stop and you tap on his

14  hood, I want you to stop, and he stops?

15   A.    Yes, sir.

16   Q.    Okay.  So he complied with your direction to stop;

17  correct?

18   A.    Yes, sir.

19   Q.    And you approached Dale at his driver's side, his

20  window was down, and do you at that moment in time tell Dale

21  why you stopped him?

22   A.    Not at that moment.

23   Q.    Okay.  And Dale proceeds to ask you, why did you

24  stop me; correct?

25   A.    Yes, sir.

                           54

1   Q.    And you intentionally don't answer his question;

2  correct?

3   A.    Initially, yes.

4   Q.    And you're doing that because you, yourself, are

5  intentionally delaying your investigation; correct?

6   A.    No, sir.

7   Q.    The truth is, Officer Blair, that you're

8  intentionally delaying your investigation until other

9  officers can arrive on scene; is that correct?

10   A.    I guess you used the word delaying.  I guess it

11  could apply.  I mean, yes.  You know, I'm trying to slow the

Page 45

08-02-16-DALE-PHILLIPS-PARTIAL

12 situation down to get myself in a safe position before

13 officers are at scene so I can then proceed to the next

14 step.

15 Q. Okay. And your testimony earlier was that you

16 asked Dale for his license; correct?

17 A. Yes, sir.

18 Q. Okay. But before you did that, you actually asked

19 Dale for his ID; isn't that correct?

20 A. Yes, sir, which would -- usually they're the same

21 thing.

22 Q. Okay. But there's a distinction between the state

23 ID and a driver's license; correct?

24 A. Yes, sir.

25 Q. You as an officer know that; correct?

55

1 A. Yes, sir.

2 Q. And you asked Dale for his ID and his response was

3 that he didn't have one; correct?

4 A. Yes, sir.

5 Q. And then you asked him if he had a valid license;

6 isn't that correct?

7 A. Yes, sir.

8 Q. And he said, Yes, I have a valid license; correct?

9 A. Yes, sir.

10 Q. All right. And then you asked him if you could

11 have his license?

12 A. I asked for his ID.

13 Q. Okay. You asked for his ID. Then eventually Dale

14 reaches into the backseat, grabs his license and provides it

15 to you; correct?

16 A. Yes, sir.

Page 46

GB000068

08-02-16-DALE-PHILLIPS-PARTIAL
17  Q.      Okay.  You are outside of Dale's vehicle; correct?

18  A.      Yes, sir.

19  Q.      Okay.  And you allowed Dale to reach in the

20  backseat of his vehicle; correct?

21  A.      I did not want him to reach in the backseat of his

22  vehicle.

23  Q.      Well, you didn't indicate that.  You asked him for

24  his ID, he reached in the backseat and he gave you his ID;

25  correct?  You didn't stop him?  You didn't say, Don't reach

                                                          56

1   in your backseat?

2   A.      I don't know if I told him not to reach in the

3   backseat or not.  I don't recall.

4   Q.      You have given no testimony in this matter at any

5   point that you ever told him to stop, don't reach into his

6   backseat; correct?

7   A.      No, sir.

8   Q.      Okay.  In fact, he got his license, he gave it to

9   you, he complied with your oral command; correct?

10  A.      Yes, sir.

11  Q.      Dale reached in the backseat, hands you his

12  license but he didn't pull a weapon on you; correct?

13  A.      No, sir.

14  Q.      So you ordered him to turn the vehicle off;

15  correct?

16  A.      I don't recall.

17  Q.      Okay.  Was the vehicle in park?

18  A.      I believe it was in park.

19  Q.      Was the vehicle turned off; do you know?

20  A.      I don't recall, sir.

21  Q.      Would it be typical in a situation like that you

                          Page 47

08-02-16-DALE-PHILLIPS-PARTIAL

22    would instruct the driver to turn off the vehicle?

23    A.      Sometimes.

24    Q.      When we watched what was previously marked, the

25    video that we previously marked, which was the City's

57

1    Exhibit A, I believe -- yes, City's Exhibit A -- we don't

2    see brake lights or anything from Dale's truck; correct?

3    A.      Not that I could tell.

4    Q.      Okay.  And while you're by Dale's truck, Dale has

5    asked you multiple times why you've stopped him; correct?

6    A.      Yes, sir.

7    Q.      And at no point when he's in his truck do you tell

8    him that he's under arrest; correct?

9    A.      No, sir.

10    Q.      Eventually at some point when I believe other

11    officers arrived, you tell him that you're investigating a

12    burglary; isn't that correct?

13    A.      Yes, sir.

14    Q.      And Dale's response to you, he immediately said, I

15    had nothing to do with a burglary; correct?

16    A.      Yes, sir.

17    Q.      And Officer Byrne arrives and she has removed the

18    female passenger from the vehicle; correct?

19    A.      Yes, sir.

20    Q.      So the witnesses have been separated at that

21    moment in time; correct?

22    A.      She was just on the other side of the truck, the

23    female passenger.

24    Q.      She's not in the truck, though; correct?

25    A.      No.

58

Page 48

GB000070

08-02-16-DALE-PHILLIPS-PARTIAL

1   Q.     And Officer Byrne is talking to the female

2  passenger outside of the truck; correct?

3   A.     Yes, sir.

4   Q.     Did you, at any point in your conversation, ask

5  Dale if you could search his truck?

6   A.     No, sir.

7   Q.     When other officers arrived on the scene, did you

8  ask any of them to search his truck?

9   A.     No, sir.

10   Q.     And Dale never put his vehicle in drive and tried

11  to pull away from you; correct?

12   A.     No, sir.

13   Q.     And when Officer Groves arrived on scene, you

14  ordered Dale out of his vehicle; correct?

15   A.     Yes, sir.

16   Q.     And your testimony earlier was Dale started to

17  partially exit his vehicle; correct?

18   A.     Yes, sir.

19   Q.     So, at that point in time, Dale has complied with

20  every single one of your verbal commands; correct?

21   A.     Slowly, but, yes.

22   Q.     And when Dale has one foot on the ground -- I

23  believe that was your testimony earlier.

24   A.     I believe it was one foot, yes.

25   Q.     -- officer Groves physically grabs Dale by the

                                                        59

1  arm; correct?

2   A.     I believe so, yes.

3   Q.     And at that point in time, Dale had his reflexes

4  tense up; is that correct?

5   A.     He pulled away with the arm that Officer Groves

GB000071

08-02-16-DALE-PHILLIPS-PARTIAL

6    had ahold of. He pulled away toward him, which was a move

7    to get away from us, and he started to reach into the

8    vehicle and he grabbed that handle.

9    Q.      Okay. But actually when Dale was exiting the

10    vehicle, he exited the vehicle by grabbing that handle at

11    the top of the doorframe and lowering himself out of this

12    pickup truck; correct?

13    A.      No, sir. His hand was not on that handle when he

14    exited the truck the first time, no, sir.

15    Q.      Okay. And when Dale has a reaction to being

16    forcefully grabbed by Officer Groves, you --

17            MR. STEINBERG: Objection.

18    Q.      -- you then begin --

19            MR. STEINBERG: Can we approach real quickly?

20            THE COURT: Yes. Are you objecting?

21            MR. STEINBERG: Yes.

22               - - -

23            The following discussion was held at the bench,

24    out of the hearing of the jury:

25            MR. STEINBERG: I'm objecting to his --

1            THE COURT: Misconstruing what she said.

2            MR. STEINBERG: My objection is essentially

3    there's no foundation that this was a reaction. This person

4    can't testify that this was a reaction. Counsel's question

5    is specifically his reaction as opposed to his action or his

6    movement.

7            MR. HEMMINGER: I think that's a reasonable

8    inference. I think that's pretty clear that --

9            THE COURT: I'm going to sustain the objection,

10    and you may restate your question.

Page 50

08-02-16-DALE-PHILLIPS-PARTIAL

11      MR. HEMMINGER:  Okay.

12      MR. STEINBERG:  Thank you.

13              - - -

14  BY MR. HEMMINGER:

15      Q.      Officer Blair, after Officer Groves grabs Dale by

16  the arm, you then proceed to grab Dale's other hand;

17  correct?

18      A.      I didn't have the opportunity.  The defendant

19  immediately grabbed onto that handle.

20      Q.      That's a yes-or-no answer, Officer.

21      A.      Yes, sir, I grabbed his arm.

22      Q.      And you, along with Officer Groves, pull Dale out

23  of his vehicle; correct?

24      A.      Yes, sir.

25      Q.      And a third officer, Officer Cazan took out Dale's

                                                        61

1  legs; correct?

2      A.      I don't know what defensive tactic move was used.

3  I was still focused on his right arm and trying to get it

4  behind his back.  I know he was placed on the ground

5  physically.

6      Q.      Okay.  Placed face first onto the pavement;

7  correct?

8      A.      I believe he was on his stomach when he went to

9  the ground.

10      Q.      Face down onto the pavement?

11      A.      Yes, sir.

12      Q.      After Dale was handcuffed, and, as we saw on the

13  video, he was placed in the backseat of the cruiser, you

14  talked to Dale at some point after that; correct?

15      A.      Yes, sir.

                        Page 51

GB000073

08-02-16-DALE-PHILLIPS-PARTIAL

16    Q.       In fact, I'm going to play what's been marked as
17    City's Exhibit A.  We're at 22:49:53 on what's been marked
18    as the City's Exhibit A.  Officer Blair, are you one of the
19    officers that escorted Dale to Cruiser 7134?
20    A.       I don't know -- The time is on the left or right
21    side -- but I was in the vicinity.
22             (Video played and then stopped.)
23    Q.       Officer Blair, I just paused it at 22:51:00.  Are
24    you able to identify the officers that are placing Dale into
25    the back of Cruiser 7134?

                                                              62

1     A.       No, sir.
2     Q.       Would it help you if you approached closer?
3     A.       I can try.
4              MR. STEINBERG:  Mr. Hemminger, you might be able
5     to make it bigger, too, if you go to the --
6              MR. HEMMINGER:  There we go.  That helps.  And I'm
7     going to proceed to play it just so that the witness can get
8     a better view of it.
9              (Video played and then stopped.)
10    BY MR. HEMMINGER:
11    Q.       Can you identify this officer, Officer Blair, from
12    the cruiser video?  The question was:  Can you identify this
13    officer standing in front of Cruiser 7134?
14    A.       I don't know exactly which officer.  I can only
15    guess based on his build and where he was wearing his body
16    mic, his radio mic.
17    Q.       Officer Blair, who do you believe that officer to
18    be?
19    A.       I believe it's Cazan.
20             (Video played and then stopped.)
                        Page 52

08-02-16-DALE-PHILLIPS-PARTIAL

21    Q.       Officer Blair, I paused it at 22:52:24.  Are you

22    able to identify the officer now standing next to

23    Cruiser 7134?

24    A.       I believe it's the same officer that's standing

25    there in the road a moment ago and Officer Jean Byrne on the

                                                              63

1     right side.

2     Q.       And, Officer Blair -- Actually, I'm going to let

3     you go back to the witness stand.  Thank you.

4              At any point when Dale is in the back of Cruiser

5     7134, do you have a follow-up discussion with Dale?

6     A.       I believe I did speak to him.

7     Q.       Okay.  And did you talk to him about the incident?

8     A.       I believe so.

9     Q.       Okay.  And during the course of your investigation

10    and preparation for trial, have you watched the entire

11    video --

12    A.       No, sir.

13    Q.       -- of this incident?  Okay.

14             Were you on scene until the scene cleared?

15    A.       I believe so.

16    Q.       Okay.  Did you, in fact, escort Dale from the

17    scene to the jail that evening?

18    A.       Yes, sir.

19    Q.       Okay.  And during that course of time, you

20    testified -- Well, you testified earlier about the

21    photographs of Dale, and, during that course of time, you

22    were able to observe his injuries; correct?

23    A.       Yes, sir.

24    Q.       Okay.  And did you tell Dale that he was under

25    arrest for obstructing official business?
                          Page 53

GB000075

08-02-16-DALE-PHILLIPS-PARTIAL

64

1   A.      I believe at some point, yes.

2   Q.      Were other officers present at that time?

3   A.      I don't know who was where, sir.  I don't recall.

4   Q.      Okay.  And Dale stated, I did not resist, I

5   complied; correct?

6   A.      I don't recall, sir.

7   Q.      So I'm going to review.  You told Dale to stop his

8   vehicle, and he stopped; correct?

9   A.      Eventually, yes, sir.

10  Q.      Okay.  When he stopped, you engaged in a

11  conversation with Dale, and he eventually provided you with

12  his license?

13  A.      Eventually, yes, sir.

14  Q.      And you ordered Dale to exit his vehicle, and he

15  may have been slow, but he complied and began to exit his

16  vehicle; correct?

17  A.      Eventually, yes, sir.

18  Q.      Okay.  And were you eventually able to complete

19  your burglary investigation?

20  A.      Yes, along with other officers at scene.

21  Q.      Okay.  You and the other officers eventually

22  completed the burglary investigation; correct?

23  A.      Yes, sir.

24  Q.      And, in fact, there was a suspect taken into

25  custody from the building; correct?

65

1   A.      Yes, sir.

2   Q.      Okay.  And did you, at any time, see that suspect?

3   A.      I believe it was a female, but I didn't -- she

Page 54

08-02-16-DALE-PHILLIPS-PARTIAL
4    didn't go in my cruiser.

5    Q.    Okay. She didn't go in your cruiser, but did you

6    see her at any point on the scene?

7    A.    I don't remember what she looks like, sir, but I

8    would have seen her. She did come out of the building.

9    Q.    The suspects were actually apprehended by other

10   officers then; correct?

11   A.    Yes, sir. We had a K-9 unit that responded to the

12   scene and went in the building.

13   Q.    Okay. And none of those officers ever informed

14   you that Dale was involved in the burglary; correct?

15   A.    No, sir.

16   Q.    Okay. And Dale's passenger, for the record, was a

17   white female; correct?

18   A.    I believe so. I only briefly saw her.

19   Q.    Other than you mentioning to Dale that you were

20   investigating a burglary, you have zero evidence that Dale

21   actually knew anything about a burglary at

22   2756 Sullivant Avenue; correct?

23   A.    At this time, after reviewing the whole situation,

24   I have none.

25         MR. HEMMINGER:  Just one moment, Your Honor.

                                                        66

1          THE COURT:  Okay.

2          MR. HEMMINGER:  I have no further questions for

3    this witness, Your Honor.

4          THE COURT:  Any redirect?

5                       - - --

6                    REDIRECT EXAMINATION

7    BY MR. STEINBERG:

8    Q.    Officer Blair, was it dark when you got this call?

                    Page 55

08-02-16-DALE-PHILLIPS-PARTIAL

9    A.    Yes, sir.

10    Q.    Okay. Is there any difference in getting a felony

11   call in the dark versus getting a felony call in the light?

12    A.    By nature, yes.

13    Q.    What's the nature?

14    A.    You can't see everything. You can only see where

15   there's light.

16    Q.    On cross, defense counsel asked you about the idea

17   of you intentionally delaying your investigation. Do you

18   remember that question and that line of questioning?

19    A.    Yes, sir.

20    Q.    Okay. At the time, there was a point in the

21   investigation, in the initial contact, when you were

22   stalling; is that correct?

23    A.    Yes, sir.

24    Q.    Why were you stalling?

25    A.    I was waiting for more officers to get on scene.

67

1    Q.    Were you able to do your investigation just by

2   yourself?

3    A.    No, sir.

4    Q.    Okay. Did you need more officers to do your

5   investigation?

6    A.    Yes, sir.

7    Q.    So were you, in fact, delaying your investigation

8   by waiting for more officers?

9    A.    Yes, we were delaying.

10    Q.    But were you able to conduct your investigation

11   without those officers?

12    A.    No, sir.

13    Q.    Okay. So were you the cause of the delay, or was

Page 56

08-02-16-DALE-PHILLIPS-PARTIAL

14   it the fact that there weren't enough officers that was the

15   cause of the delay?

16   A.       The fact that there weren't enough officers at

17   scene.

18   Q.       Were there eventually enough officers at scene?

19   A.       Yes, sir.

20   Q.       Okay.  Defense counsel asked you about allowing

21   the defendant to reach into the backseat of his vehicle.

22   What type of vehicle was this?

23   A.       It was an F-150.

24   Q.       Okay.

25   A.       A pickup truck.

                                                        68


1    Q.       All right.  Did it have a backseat?

2    A.       No.  It had, like, space behind the seat.  I don't

3    recall if it was a backseat or if it was the space behind

4    the seat.

5    Q.       Okay.  Do you remember if it was, like, a king cab

6    with four doors or...

7    A.       I don't believe there were four doors.

8    Q.       Okay.  At some point, defense counsel asked you

9    summarily stating:  Defendant has complied with all of your

10   commands at this point.  Do you remember that question?

11   A.       Yes, sir.

12   Q.       Okay.  When did the defendant's compliance stop?

13   A.       When we tried to detain him out of the vehicle.

14   Q.       Okay.  How did it stop?

15   A.       When he grabbed onto the handle and tried to get

16   back into the vehicle to keep us from detaining him.

17   Q.       And how clear to you was it that the defendant

18   wasn't complying with your requests any more?

Page 57

08-02-16-DALE-PHILLIPS-PARTIAL

19   A.     It was very clear.

20   Q.     Okay. Defense counsel characterized

21  Officer Groves as grabbing the defendant's arm before the

22  defendant actually stopped complying. Do you remember that

23  question?

24   A.     Yes, sir.

25   Q.     Okay. Would you characterize Officer Groves as

69

1  grabbing, or would you characterize it differently?

2   A.     I don't know exactly how he touched him. I can

3  only speak for how I touched him. But he did grab -- I

4  guess grabbed hold of his arm in an attempt to turn him

5  around.

6   Q.     Okay. And why?

7   A.     We would have turned him around to use the door

8  jamb to handcuff him in the door jamb.

9   Q.     Okay. I mean, before the defendant stopped

10  complying -- Before the defendant stopped complying, did you

11  see Officer Groves touch the defendant?

12   A.     I don't recall, sir.

13   Q.     Okay. So when you are referring to Officer Groves

14  grabbing the defendant, that's after he's not complying?

15   A.     I believe so, yes.

16   Q.     At that point, when you are trying to get the

17  defendant out of the vehicle, were you still trying to

18  investigate a burglary?

19   A.     Yes, sir.

20   Q.     And does investigating -- what does investigating

21  a burglary entail, just very broadly?

22   .A.    We need to find the witness who called in the

23  dispatch run, who I assumed we would speak with at that

Page 58

08-02-16-DALE-PHILLIPS-PARTIAL

24 time; detain the possible suspect; and have the witness say

25 yes or no that was him.

70

1 Q. And does that result -- can that result in ruling

2 people out?

3 A. Yes, sir.

4 Q. Okay.  And if you rule people out, does that --

5 does that advance your investigation?

6 A. Yes, sir.

7 Q. Were you able to rule this defendant out as a

8 burglary suspect in this particular incident?

9 A. We were not able to associate him to any burglary,

10 so yes.

11  MR. STEINBERG:  If I could have one second.

12 Your Honor, could I have a minute just to confer with

13 defense counsel?

14  THE COURT:  Yes.

15  MR. STEINBERG:  I'll come to you.

16  MR. HEMMINGER:  Okay.

17  (Discussion held off the record.)

18  MR. STEINBERG:  May I have the Plaintiff's exhibit

19 stickers, please?

20  Your Honor, may I approach the witness?

21  THE COURT:  Yes.

22 BY MR. STEINBERG:

23 Q. Officer Blair, I'm going to show you what I've

24 marked as Plaintiff's Exhibit O.  If you would take a look

25 at that.  Do you know what Plaintiff's Exhibit O is?

71

1 A. Yes, sir.  It's an aerial view of Sullivant and

2 Harris.

Page 59

08-02-16-DALE-PHILLIPS-PARTIAL

3    Q.      Okay.  And does Plaintiff's Exhibit O on its face

4    indicate its source?

5    A.      Google maps.

6    Q.      Okay.  What is Google maps, if you know?

7    A.      It's a search engine pretty widely known.

8    Q.      Okay.  And in looking at Plaintiff's Exhibit O,

9    does it look to be accurate and true in its depiction -- in

10   its depiction of the geography, first of all?

11   A.      Yes, sir.

12   Q.      Does it look to be accurate and true in its

13   depiction of relative proximity, relative proximity to

14   various structures?

15   A.      Yes, sir.

16   Q.      Okay.  And what's the view that you're looking at

17   in Plaintiff's Exhibit O?

18   A.      It's the building on Sullivant Avenue, where we

19   were at.

20   Q.      And can you hold that up?

21   A.      (Witness complies.)

22   Q.      And are you able to point to the building in

23   question?

24   A.      Right here (indicating).

25   Q.      Okay.  And do you mind marking that?  Do you have

                                                              72

1    a pen on you?

2    A.      Yes, sir.

3    Q.      And can you mark that with -- I guess just mark it

4    with an A just as an outline.

5    A.      This is the building, with the A, row or

6    something.

7    Q.      And what's directly behind the building?
                          Page 60

08-02-16-DALE-PHILLIPS-PARTIAL

8    A.    There's another little building.

9    Q.    Okay.

10   A.    A bunch of trees.

11   Q.    So the building that was the subject of the

12   burglary call, you've located that; correct?

13   A.    Yes.

14   Q.    Can you hold up Plaintiff's Exhibit O and show us,

15   by marking it with a B, where you stopped your car, your

16   cruiser, roughly.

17   A.    I was about here, outside of the alley

18   (indicating).

19   Q.    And can you note where the defendant's vehicle

20   was, with a D, please.

21   A.    He was about there next to the building

22   (indicating).

23   Q.    Okay.  And can you show our jurors, please, too?

24   A.    Yes.

25   Q.    And the markings you made, are they true and

                                                              73

1    accurate, generally, as you recall?

2    A.    I believe so.

3    Q.    Okay.  And are they to scale?  Like, was the B the

4    size of your car relative or much bigger?

5    A.    It's not to scale.

6    Q.    All right.  That's fine.  You talked about a door

7    that may or may not have been involved in the burglary; do

8    you remember that?

9    A.    Yes, sir.

10   Q.    Are you able to mark that with -- mark that with

11   an E, please, and just show us.

12   A.    Somewhere in there on the building (indicating).
                          Page 61

GB000083

08-02-16-DALE-PHILLIPS-PARTIAL

13   Q.     Okay.

14   A.     Yes, sir.

15   Q.     Okay.

16          THE COURT:  Let me see that.

17          MR. STEINBERG:  Your Honor, I don't have any other

18  questions for Officer Blair at this time.

19          THE COURT:  Recross?

20          Now, remember, limit your questions to the

21  questions that were on redirect.  I don't want to start all

22  over.

23          MR. HEMMINGER:  Absolutely, Your Honor.

24          If I may approach so I can see the exhibit marked

25  as Plaintiff's Exhibit O.

                                       74

1                       - - -

2                RECROSS-EXAMINATION

3  BY MR. HEMMINGER:

4   Q.     Officer Blair, on Plaintiff's Exhibit O, are you

5  able -- you were able to identify the building known as

6  2756 Sullivant Avenue; correct?

7   A.     Yes, sir.

8   Q.     Okay.  That's the building on the corner; correct?

9   A.     Yes, sir.

10   Q.     And directly behind that building is a treeline;

11  correct?

12   A.     Yes, sir.

13   Q.     But as you're looking at that photograph, what

14  would be on your -- toward the left, away from the side of

15  the building, away from Harris Avenue, there's what appears

16  to be a large parking lot; correct?

17   A.     I think there was a building in there, also.

                       Page 62

08-02-16-DALE-PHILLIPS-PARTIAL

18       MR. HEMMINGER:  Your Honor, may I approach the
19  witness?
20       THE COURT:  Uh-huh.
21  BY MR. HEMMINGER:
22  Q.      Officer Blair, could you identify for me what
23  you're referring to me as a building in there?
24  A.      I think along here there's a building.
25  Q.      In this exhibit you're saying that on the other

                                                    75

1  side of the treeline, behind 2756 Sullivant Avenue, there's
2  another building between the treeline and the alley; is that
3  correct?
4  A.      I believe so.
5  Q.      So does the front of that building face
6  Harris Avenue?
7  A.      I believe so.
8  Q.      Okay.  Then immediately behind that building
9  there's a large parking lot; correct?
10  A.      Yes, sir.
11  Q.      And that building -- that parking lot runs down
12  alongside the building, 2756 Sullivant Avenue; correct?
13  A.      Yes, sir.
14  Q.      And that parking lot connects out to the alley
15  behind 2756 Sullivant Avenue?
16  A.      Yes, sir.
17  Q.      And when you responded to the scene, you would
18  have driven right past that large parking lot; correct?
19  A.      Yes, sir.
20       MR. HEMMINGER:  No further questions, Your Honor.
21       MR. STEINBERG:  I have no other questions.  Thank
22  you, Your Honor.
                        Page 63