Deposition of:

**Commander Suzanne Curmode**

September 28, 2017

DALE PHILLIPS

v.

KAREN BLAIR, et al.

Case No. 2:16-CV-880



513-233-3000
877.233.4403
FAX: 513-233-2310
depo@elitereportingagency.com

www.elitereportingagency.com

```
 1                 UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF OHIO

 3                      WESTERN DIVISION

 4

 5    _____
                                     )
 6    DALE PHILLIPS,                 )
                                     )
 7           Plaintiff,              )
                                     ) CASE NO.
 8                 vs.               ) 2:16-CV-880
                                     )
 9    KAREN BLAIR, et al.,           )
                                     )
10           Defendants.             )
      _____)
11

12

13

14

15        Deposition of:  COMMANDER SUZANNE CURMODE

16        Pursuant to:    Notice

17        Date and Time:  Thursday, September 28, 2017
                          9:05 a.m.
18        Place:          Office of Columbus
                            City Attorney
19                          Richard C. Pfeiffer, Jr.
                          77 North Front Street
20                        Columbus, Ohio  43215

21        Reporter:       Wendy Scott
                          Notary Public - State
22                                    of Ohio

23

24

25
```

2

```
 1   APPEARANCES OF COUNSEL:

 2

 3          For the plaintiff:

 4              Janaya Trotter Bratton, Esq.
                   of
 5              Gerhardstein & Branch Co., LPA
                432 Walnut Street
 6              Suite 400
                Cincinnati, Ohio  45202
 7              513.621.9100
                jtbratton@gbfirm.com
 8

 9

10          For the defendants:

11              Paula Jennings Lloyd, Esq.
                   and
12              Pamela J. Gordon, Esq.
                   of
13              Office of Columbus City Attorney
                  Richard C. Pfeiffer, Jr.
14              77 North Front Street
                Columbus, Ohio  43215
15              614.645.0808
                614.645.7385
16              pjlloyd@columbus.gov
                pjgordon@columbus.gov
17

18

19          Also Present:

                Dale K. Phillips, II
20

21

22                        - - -

23

24

25
```

3

```
 1                    I N D E X

 2

 3  COMMANDER SUZANNE CURMODE                    PAGE

 4      EXAMINATION BY MS. BRATTON                 4

 5

 6

 7  EXHIBITS                    MARKED    REFERENCED

 8      PLAINTIFF'S EXHIBIT   2        -         54
        PLAINTIFF'S EXHIBIT   3        -         56
 9      PLAINTIFF'S EXHIBIT  10        -         30
        PLAINTIFF'S EXHIBIT  33       21         21
10

11
                         - - -
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              COMMANDER SUZANNE CURMODE
 2   a witness herein, having been duly sworn, was
 3   examined and deposed as follows:
 4                    EXAMINATION
 5   BY MS. BRATTON:
 6        Q.   Good morning.
 7        A.   Morning.
 8        Q.   Could you please state your name for
 9   the record?
10        A.   It's Suzanne Marie Curmode.
11        Q.   Okay.  And what is your position with
12   the Columbus Police Department?
13        A.   I'm a police commander.
14        Q.   Okay.  Can you, Commander Curmode,
15   spell your last name?
16        A.   It's C-u-r-m-o-d-e.
17        Q.   Okay.  Thank you.
18             Have you ever had your deposition taken
19   before?
20        A.   Yes.
21        Q.   Okay.  So you know to answer out loud.
22   Kind of like trial, no uh-huhs or uh-uhs, and
23   I'll try to remind you.  And sometimes I may do
24   it, too.
25        A.   Okay.
```

1         Q.   If you don't understand something, the

2    question is too long or convoluted, just let me

3    know and I'll restate it.

4              If you remember something later on in

5    the deposition from a prior question, just let me

6    know and we'll go back to it to make sure that

7    the record is clear.

8              And if you need a break, just let me

9    know.  Then I'll just ask that we finish the

10   question that we're on and then take a break.

11             Is there any reason today that -- for

12   medication or distractions that would impair your

13   ability to concentrate?

14        A.   No.

15        Q.   And have you looked at any

16   depositions -- not depositions.  Have you looked

17   at any documents in preparation for your

18   deposition today?

19        A.   No.

20        Q.   And did you -- so you didn't look at

21   any of the use of force?

22        A.   No.

23        Q.   Okay.  And what about any video or

24   audio?

25        A.   No.

1          Q.   Okay.  And other than your attorney,

2     have you talked to anybody about the incident

3     involving Dale Phillips?

4          A.   No.

5          Q.   And while the investigation was

6     pending, who did you talk to?

7          A.   I don't remember.

8          Q.   And instead of asking you about

9     personal information, we'll go through your

10    counsel in the event we need you for trial.

11         A.   Okay.

12         Q.   And do you have -- or how long have you

13    been with City of Columbus?

14         A.   Thirty-three years.

15         Q.   And is that your only law enforcement,

16    or were you with law enforcement prior to joining

17    Columbus?

18         A.   No, it's my only one.

19         Q.   What about military experience?

20         A.   No military.

21         Q.   And education?

22         A.   I have a bachelor's degree from The

23    Ohio State University in social work.

24         Q.   Okay.  And how long have you been a

25    commander?

```
 1        A.    Seventeen years.  Almost 17 years,
 2   yes.
 3        Q.    Can you explain to me how you started
 4   and rose up the ranks?
 5        A.    Right.  I came on in 1984, was an
 6   officer, got promoted as sergeant approximately
 7   four years after that; got promoted to lieutenant
 8   a few years after that, maybe three years after
 9   that; and then commander in 2001, early 2001.
10        Q.    Okay.  And were all of the positions in
11   patrol like sergeant of patrol or lieutenant?
12        A.    No; different places.
13        Q.    And what were the -- I guess, are they
14   departments or --
15        A.    Bureaus, units, yes.
16        Q.    Okay.
17        A.    Worked South End patrol; worked in
18   narcotics bureau; worked in SCAT, which was a
19   juvenile task force bureau; strategic response
20   bureau is my current assignment; and a couple
21   different areas in patrol --
22        Q.    Okay.
23        A.    -- and patrol admin section.
24        Q.    Okay.
25        A.    I think that's it.
```

1        Q.   Okay.  And what were your duties as

2    commander, as of September 2014?

3        A.   September 2014, I was commander of the

4    strategic response bureau.

5        Q.   Okay.  And that's where you're at now,

6    correct?

7        A.   Yes.

8        Q.   Okay.  And what are your duties as

9    commander?

10       A.   I have various units assigned to me,

11   community liaison officers, school resource,

12   different units.  And I'm the commander of that

13   unit.  I've got lieutenants and sergeants and

14   maybe a hundred-and-some officers, 120 officers.

15       Q.   Okay.  And at what point do you get

16   involved in investigations of your officers?

17       A.   It depends on the investigation.

18       Q.   Okay.  And what kind of investigations

19   do you conduct of the officers?

20       A.   Okay.  I'm not sure I understand

21   exactly what you're asking.

22       Q.   So if -- you said it depends on the

23   investigation what your involvement is.

24       A.   Right.

25       Q.   So would there be like an internal or

1    something that you happen upon -- happen upon or

2    a citizen complaint?

3            I guess the proper question would be,

4    how do complaints come to you?

5    A.    Well, we have chain of command.

6    Complaints would go, typically, through the

7    internal affairs bureau.  And we have a chain of

8    command, and certain things do come to the

9    commander level --

10   Q.    Okay.

11   A.    -- for disposition or for a

12   recommendation.  Some do not.

13   Q.    Okay.

14   A.    Some are handled at lower levels.  It

15   depends on the circumstances and the situation.

16   Q.    Okay.  And have you had the occasion to

17   investigate whether an officer -- whether any of

18   your officers made constitutional stops and

19   detentions?

20           MS. LLOYD:  Objection as to form.

21   BY MS. BRATTON:

22   Q.    You can answer.  If there's an

23   objection, unless she directs you not to answer,

24   you can --

25   A.    I guess the word investigate, I -- I

1    don't do the investigation.  I would read and

2    review and recommend.

3         Q.   Okay.  If you read -- have you ever had

4    the occasion to read and review an investigation

5    and ask for further investigation?

6         A.   At times.

7         Q.   Okay.  So I guess, then, have you ever

8    read and reviewed an investigation of a stop and

9    detention that a citizen alleged to be

10   unconstitutional?

11             MS. LLOYD:  Again, objection as to

12        form, and as to what the investigation could

13        be.

14             Again, maybe I'm not being clear, but I

15        think we've already had testimony as to what

16        internal investigations are.  And I believe

17        you're mischaracterizing what an internal

18        investigation could be.

19   BY MS. BRATTON:

20        Q.   You all teach your officers about

21   constitutional stops, is that correct, in the law

22   training?

23        A.   Officers have constitution and legal

24   training in the academy and community service,

25   yes.

1      Q.   Okay.  So do you have the occasion to

2  look at investigations when a citizen -- to

3  review an investigation when a citizen has made a

4  complaint that they have been stopped in

5  violation of their constitutional rights?

6           MS. LLOYD:  Again -- I'm going to

7           object, once again, to the extent that we've

8           already had testimony as to what an internal

9           police investigation could be and that it is

10          not a -- well, again, I think you know what

11          I'm talking about.

12          MS. BRATTON:  No, I don't.

13          MS. LLOYD:  Okay.  We've had testimony,

14          much testimony, in this case from internal

15          affairs that an internal police

16          investigation is not an investigation as to

17          whether or not the constitution has been

18          violated.

19          MS. BRATTON:  There was testimony from

20          Johnson that internal affairs can

21          investigate whether or not an officer

22          stopped a person -- he did not use the word

23          constitutional --

24          MS. LLOYD:  Right.

25          MS. BRATTON:  -- but -- but it's --

1      according to their training, from the

2      constitution, you just can't stop a random

3      person walking down the street.  And he

4      specifically said that -- well, I'm not --

5      I'm not going to argue with you.

6  BY MS. BRATTON:

7      Q.   If you can understand the question, you

8  can answer it.

9      A.   I don't understand.

10     Q.   Okay.  You -- officers are trained to

11  know when they can or cannot stop someone; is

12  that correct?

13     A.   Yes.

14     Q.   Okay.  And that is in the law training,

15  the legal training that officers are given,

16  correct?

17     A.   Yes.

18     Q.   Okay.  And that legal training is

19  updated as, I guess, case -- or as cases come

20  out, you all get updates, correct?

21     A.   Yes.

22     Q.   And what is that -- when you all are

23  trained on it, what are your trainings

24  surrounding stops and detentions, as far as the

25  legal training?

1          MS. LLOYD:  Again, objection as to

2     form.

3     A.    Okay.  I don't understand exactly what

4     you're asking.

5     BY MS. BRATTON:

6     Q.    What are officers trained what they can

7     or cannot do, or their limits, when they're

8     stopping a citizen?

9          MS. LLOYD:  Objection as to form.

10    A.    I don't personally conduct the

11    training.  Our legal bureau does the updates on

12    case law, Supreme Court decisions, that kind of

13    thing.  And they receive those updates on a

14    regular basis.

15         So I don't know if that answers your

16    question or not.

17    BY MS. BRATTON:

18    Q.    I -- do you participate in the

19    trainings?

20    A.    We -- everyone sworn does training,

21    yes.

22    Q.    Okay.  And when you participate in

23    those trainings, what are you taught -- even

24    though you're not doing the training, what are

25    you taught about your ability to stop a

1  citizen?

2           MS. LLOYD:  Objection as to form.

3      A.   Can you rephrase it?  I don't really --

4  BY MS. BRATTON:

5      Q.   Yes.

6      A.   -- understand exactly what you're

7  asking.

8      Q.   Uh-huh.

9      A.   Your phrasing is kind of --

10     Q.   Are you able to stop anyone who you

11 want for any reason that you want?

12     A.   No --

13     Q.   Okay.

14     A.   -- you cannot.

15     Q.   And so what would be a lawful reason

16 than an officer can stop an individual citizen

17 walking down the street?

18     A.   You have to have some type of

19 reasonable suspicion that -- an investigative

20 type of detention or that some type of criminal

21 activity is afoot.

22     Q.   Okay.  And what about for a lawful

23 detention?

24     A.   Same -- same type of thing.  You have

25 to have some reasonableness that something is

1    up.

2        Q.   Okay.  And if a citizen complains that

3    their stop and detention is not lawful and that

4    is investigated --

5        A.   Yes.

6        Q.   -- have you had the opportunity to

7    review cases such as that?

8            MS. LLOYD:  Again, objection as to

9        form.

10           And I think I can make this easier and

11       clearer.  Based on all the testimony we've

12       already had and all the investigative

13       material that you already have, the division

14       of police, they're not judges in our courts.

15       They don't make decisions of law.  Internal

16       affairs is investigating whether or not

17       divisional policy was violated.

18           That's the confusion that we're having

19       here.  Because they're not judges.

20   BY MS. BRATTON:

21       Q.   Your policy is based off of the law,

22   correct?

23       A.   Yes.

24       Q.   Okay.  So I'm asking you, then, you

25   consider if something is a proper stop or not

1 based off of whether your officers are violating

2 someone's rights?

3      A.   We look at policy --

4      Q.   Okay.  So we'll go to policy then.

5      A.   -- our policies.

6      Q.   So have you had the opportunity to

7 review whether someone's actions were in

8 violation of policy regarding stopping and

9 detaining a person?

10      A.   I've had investigations over the years

11 that talk about a legal detention or the --

12 whether a detention should or shouldn't have

13 been.

14      Q.   Okay.  And when you say, a legal

15 detention, what do you determine to be a legal

16 detention?

17      A.   Like I said, based on reasonableness

18 that the criminal activity did or didn't, or so

19 some type of investigative information --

20      Q.   Okay.

21      A.   -- is -- the totality of the

22 circumstances.

23      Q.   Okay.  And so you do look at, then, a

24 legal standard when you make that

25 determination?

1          MS. LLOYD:  Again, objection as to

2     form.

3     A.    I look at the policies that we have.

4 BY MS. BRATTON:

5     Q.    Okay.  Well, I'm just using your words.

6 You said legal.  So I'm just asking whether or

7 not you consider the legality of something --

8          MS. LLOYD:  Again, objection as to

9     form, asked and answered.

10    A.    Oh, you want me to answer it?

11 BY MS. BRATTON:

12    Q.    Yeah.

13    A.    The legality of it?

14         Of course we look at the legality of

15 policies -- our policies.  That's our big thing,

16 is with our policies.

17    Q.    Okay.  And when you look at a --

18 whether or not a stop and detention is within

19 policy, how do you -- I guess, let me rephrase

20 that.

21         Does that complaint -- a complaint

22 regarding a stop and detention, would that come

23 to you through internal or through the officer's

24 normal chain of command?

25    A.    If someone makes a complaint, it goes

1    to internal affairs.

2         Q.   Okay.  And are you in the chain of

3    command for internal affairs?

4         A.   No.

5         Q.   Okay.  So how would a case, then, get

6    to you, to your chain of command, for an

7    officer -- for cases that you've reviewed, that

8    deal with stops and detentions?

9              MS. LLOYD:  Objection as to form.

10        A.   It could come in a variety of ways.  If

11   it's a stop and detention, it could come through

12   the chain of command.  It could come through

13   internal affairs if it was made out of a citizen

14   complaint.  It could come in different --

15   different ways.

16   BY MS. BRATTON:

17        Q.   Okay.  If it goes through internal

18   affairs --

19        A.   Yes.

20        Q.   -- you're not involved in that

21   complaint process; is that an accurate

22   statement?

23        A.   I'm not sure what you're saying.

24        Q.   If a citizen makes a complaint to

25   internal affairs --

1  A. Uh-huh. Yes.

2  Q. -- about an officer in your chain of

3 command --

4  A. Right.

5  Q. -- the internal affairs chain of

6 command handles that complaint?

7  A. Yes.

8  Q. Okay. So then that complaint wouldn't

9 come to you?

10  A. It would come to me -- after internal

11 affairs investigates it, it would come through my

12 chain of command.

13  Q. Okay. So it goes through internal

14 chain of command. Once they make a -- is it like

15 a recommendation?

16  A. They do an investigation.

17  Q. Okay. And then after they do the

18 investigation, then it comes to you for approval

19 or review?

20  A. It would go to my chain of command,

21 yes.

22  Q. Okay.

23  A. It would go down the chain of command

24 for review.

25  Q. Okay. And is that the same for use of

1  force, if an officer is alleged of using

2  excessive force, more force than necessary?

3      A.   If it goes to internal affairs as a

4  citizen complaint, yes; same process.  It would

5  come down the chain of command after they

6  investigate it.

7      Q.   Okay.  And as commander, are you the

8  final decision-maker on the levels of force -- or

9  on the use of force by your officers?

10     A.   There's a continuum of force.  It

11  depends on which force --

12     Q.   Okay.

13     A.   -- you're asking about.

14     Q.   And which level of the continuum would

15  you be the final decision-maker on?

16     A.   The final decision-maker would be on

17  uses of mace.

18     Q.   Okay.

19     A.   And that would be it.

20          The rest go to -- after my level, it

21  would go to the deputy chief.

22     Q.   Okay.  So then I -- would yours be

23  level -- mace is level 2 use of force, correct?

24     A.   Yes.

25     Q.   Okay.  So then your chain of command --

1   you're the final decision-maker for level

2   0 to 2 uses of force?

3       A.   Yes.

4       Q.   Okay.  All right.

5            (Deposition Exhibit 33 was marked for

6            identification.)

7   BY MS. BRATTON:

8       Q.   I'll give you what's been marked as

9   Exhibit 33.  And is this your signature on the

10  second line, where it says, Forward to Commander

11  Suzanne Curmode?

12      A.   Yes.

13      Q.   Okay.  And you found that the

14  level 2 use of mace was within policy; is that

15  correct?

16      A.   Yes.  That's what I have down here,

17  yes.

18      Q.   Okay.  And can you tell me what your

19  process of review was to get to that

20  conclusion?

21      A.   Well, the -- this is the routing sheet

22  to the investigation, so I'm certain I reviewed

23  the investigation that was attached to this.

24      Q.   Okay.  If -- I'm sorry.  You said that

25  you would have reviewed the investigation?

1          A.    Yes, that would have been attached to

2     the routing sheet.

3          Q.    Okay.

4          A.    These are routing sheets.  But you

5     probably know that.  These are routing sheets.

6          Q.    Yes.

7                And when you review an investigation,

8     do you listen to the tapes and review the

9     audio?

10         A.    If there's some available, yes.

11         Q.    Okay.  And do you ask follow-up

12    questions if necessary?

13         A.    If I feel they're needed, yes.

14         Q.    Okay.  And do you remember asking any

15    follow-up questions of any of the officers

16    involved with Mr. Phillips?

17         A.    No, I don't remember.

18         Q.    Okay.  Could you have?

19         A.    Could I have asked the officers?

20         Q.    Yes.

21         A.    If I had a follow-up question, I would

22    go with the chain of command.  I would send it

23    back to the lieutenant to do the follow-up.  And

24    he would, in turn, go to who he needed to go to

25    to get any follow-up clarifications or answers.

1     Q.   Okay.  And did you do that?

2     A.   I don't remember.

3     Q.   Okay.  And how many officers are you

4 responsible for reviewing their use of force?

5     A.   Anyone who works for me, is in my chain

6 of command, I would be responsible for reviewing

7 it.  So currently a little over a hundred,

8 110 maybe.

9     Q.   Okay.  And do you know the statistics

10 on the use of force for the Columbus police

11 department?

12     A.   No.

13     Q.   Do you review those numbers at all as

14 part of your job?

15         MS. LLOYD:  Objection as to form.

16     A.   No.

17 BY MS. BRATTON:

18     Q.   Okay.  And are you aware whether or not

19 there is any documents that detail use of force

20 by officers?

21         MS. LLOYD:  Objection as to form.

22     A.   Internal affairs, I believe, does

23 reports, documenting just different circumstances

24 on various levels of force.

25 BY MS. BRATTON:

1      Q.   Okay.

2      A.   I think that's part of their job.

3      Q.   Okay.  And when you review the use of

4  force, are you looking for whether the officer

5  was acting within policy and training?

6      A.   Yes.

7      Q.   And as part of your review, do you also

8  look to see if the policies in training are as

9  clear as they can be?

10         MS. LLOYD:  Objection as to form.

11     A.   No.

12  BY MS. BRATTON:

13     Q.   Okay.  Do you recall a Department of

14  Justice review of the Columbus police department

15  in the 2000s?

16     A.   I recall it.

17     Q.   Okay.  And were you on the force at

18  that time?

19     A.   Yes.

20     Q.   Okay.  And has there been any changes

21  in the police force since that review that you've

22  experienced when it comes to use of force?

23         MS. LLOYD:  Objection as to form.

24     A.   I'm not responsible for the policies

25  governing those areas.  Our policies change, not

1   all the time, but they do change in response to

2   different things.  So I don't feel I can really

3   answer what came out of that or what didn't come

4   out of that.

5   BY MS. BRATTON:

6        Q.   Okay.  What about any training that has

7   been different?

8             MS. LLOYD:  Objection as to form.

9        A.   We're constantly doing training,

10  service training updates, manual training.

11  BY MS. BRATTON:

12       Q.   Do you know if any of that training is

13  different than prior to the Department of Justice

14  report?

15       A.   I can't answer that.

16       Q.   You can't answer because you don't

17  know?

18       A.   I -- that's not my area of expertise,

19  of what training has changed and what reason.  I

20  don't work there, in that area.

21       Q.   Do you know -- you -- you participate

22  in the trainings, though, correct?  You have to

23  be trained?

24       A.   Everyone is -- in-service training,

25  yes.

1          Q.   Okay.  Based on your training, has

2     anything changed from the time that -- in your

3     training, that that report came out to now?

4               MS. LLOYD:  Again, objection as to

5          form, asked and answered.

6          A.   I don't know.

7     BY MS. BRATTON:

8          Q.   So I'm not asking if anything changed

9     in response to it.  I'm just asking, from the

10    time it came out to September of 2014, did any of

11    your training change, for whatever reason?

12         A.   I don't remember time frames of

13    training.  We get -- we've gotten Tasers over the

14    years.  I don't know exact time frame of that.

15              So things change.

16         Q.   Okay.

17         A.   Whether it was pursuant to a certain

18    event or a certain thing, I can't answer that.

19         Q.   Okay.  And officers are required to

20    follow the constitutional standards for use of

21    force, correct?

22         A.   We follow our policies, yes.

23         Q.   Okay.  And do you expect your officers

24    to do that?

25         A.   To follow policy?

1       Q.   Yes.

2       A.   Yes.

3       Q.   And this means that they have to comply

4  with the Fourth Amendment standard on use of

5  force?

6       A.   Yes.

7       Q.   Okay.  And are your officers taught

8  what that standard is?

9       A.   Yes.

10      Q.   And when are they permitted to use

11  force?

12           MS. LLOYD:  Objection as to form.

13      A.   They're -- they're not to desist in

14  doing their police work because someone offers

15  resistance.  So they could use force -- it's

16  circumstantial, based on the suspect's actions,

17  aggressiveness, the totality of the situation,

18  severity of the crime.  There's various factors

19  that come into play when an officer decides to do

20  that.

21           Reasonableness is probably a big part

22  of it --

23  BY MS. BRATTON:

24      Q.   Okay.

25      A.   -- if not the main part.

1       Q.   And when would an officer be able to

2  use level 2 force --

3            MS. LLOYD:  Objection as to form.

4  BY MS. BRATTON:

5       Q.   -- on a suspect?

6       A.   Level 2 use of mace -- again, it's kind

7  of what I just said, to control a resistive or

8  combative suspect, to protect others, to protect

9  the officers, to protect the suspect, kind of

10 like what I just answered to.

11      Q.   Okay.  Do your officers have

12 de-escalation training, or is -- let me say this.

13 Are officers trained in de-escalation

14 techniques?

15      A.   I'm not sure what you mean by

16 de-escalation techniques.

17      Q.   Are officers trained not to,

18 themselves, escalate a situation with a compliant

19 individual, suspect, or anyone who they stop?

20           MS. LLOYD:  Objection to form.

21      A.   Trained to not -- not escalate

22 something?

23 BY MS. BRATTON:

24      Q.   Yes.

25      A.   I -- I don't think that the training to

1    not -- I don't know if you're -- I'm not sure

2    exactly what you're -- how you're asking this.

3    If you can clarify it, maybe, for me.

4         Q.   Yes.

5              If someone is fully compliant, are

6    officers trained that they can still use physical

7    force on the person?

8              MS. LLOYD:  Objection as to form, asked

9         and answered.

10        A.   If someone's fully compliant, one, the

11   reason probably would not exist to use the force

12   on them.

13   BY MS. BRATTON:

14        Q.   Okay.  And when you are reviewing use

15   of force, what is policy that you're comparing

16   the officer's use of force to in making a

17   reasonableness determination?

18        A.   I'm not sure what you mean.  I'm

19   sorry.

20        Q.   When you determine that the use of

21   force used in whatever situation --

22        A.   Right.

23        Q.   -- you're reviewing was reasonable or

24   within policy --

25        A.   Uh-huh.

30

```
1        Q.    -- what policies are you looking to to
2   make that determination?
3        A.    We've got a couple different ones
4   that --
5        Q.    Okay.
6        A.    -- govern the issue.  There's a main
7   use-of-force policy that are covered in the
8   division directives that govern conduct.  So
9   there's a couple different ones that apply to
10  that.
11       Q.    Okay.  If you could, look in here
12  please.  It will be Exhibit 10.
13       A.    Exhibit 10?
14             (Off the record.)
15  BY MS. BRATTON:
16       Q.    Exhibit 10, would that be one of the
17  policies that you all use?
18       A.    Yes.  That's our use-of-force policy.
19       Q.    Okay.  And I'm sure this is going to
20  sound silly, but --
21       A.    Okay.
22       Q.    -- you don't want officers using force
23  if it's not within policy; is that correct?
24       A.    No, we don't want people to do
25  out-of-force uses of -- or out-of-policy uses of
```

1    force.

2         Q.   Okay.  And that could be because

3    it's -- could harm the citizen, it could harm a

4    fellow officer?

5              MS. LLOYD:  Objection as to form.

6         A.   There's many reasons why.  You just

7    don't want someone to act outside policy.  There

8    are policies for a reason.  So --

9    BY MS. BRATTON:

10        Q.   And the use-of-force policies -- do you

11   know what the reasoning behind use-of-force

12   policies are?

13             MS. LLOYD:  Objection as to form.

14        A.   The reason behind use-of-force

15   policies?

16             Yes.  You need to have a set of rules,

17   per se, that govern your actions.

18   BY MS. BRATTON:

19        Q.   Okay.  And I guess that was what I was

20   getting to.  You don't want people using force

21   that unnecessarily harms a citizen or a fellow

22   officer?

23             MS. LLOYD:  Objection as to form and

24        mischaracterization of the policy.

25        A.   We want to follow policy.

1    BY MS. BRATTON:

2         Q.   I understand.

3         A.   Okay.

4         Q.   So I guess what I'm asking you is,

5    use-of-force policy tells an officer --

6         A.   Uh-huh.

7         Q.   -- this is what you can do, basically,

8    when you're confronted with this situation?

9              MS. LLOYD:  Again, objection as to

10        form.  The policy speaks for itself.

11   BY MS. BRATTON:

12        Q.   You can answer.

13        A.   Okay.  Can you ask the question again?

14        Q.   Uh-huh.

15             So you have use-of-force policies.

16        A.   Yes.

17        Q.   And the use-of-force policies tell

18   officers what they can do when faced with certain

19   situations or resistance?

20             MS. LLOYD:  Objection as to form.

21        A.   Our policies govern uses of force.

22   It's what officers comply with for uses of force.

23   It's policy.

24   BY MS. BRATTON:

25        Q.   And I guess I'm asking, what is the

1    importance of use-of-force policies?

2            MS. LLOYD:  Okay.  Again, objection,

3        asked and answered several times.

4        A.   Policies govern our uses of force.  You

5    have to have some type of a -- of a directive or

6    a policy to guide the officers, what they adhere

7    to on uses of force.

8    BY MS. BRATTON:

9        Q.   And is that so that citizens and

10   officers are protected?

11           MS. LLOYD:  Again, asked and answered

12       already.

13       A.   We have to have policies.  We have

14   policies that govern everything we do.  You have

15   to have policies that direct uses of force.

16   BY MS. BRATTON:

17       Q.   Okay.  So I just want to make sure that

18   I understand the answer.  So the answer to the

19   importance of use-of-force policies is just that,

20   the department has to have policies to govern use

21   of force?

22           MS. LLOYD:  Objection as to

23       characterization of her answer.

24       A.   I was going to say, that's not what

25   I -- that's not what I said.

1   BY MS. BRATTON:

2       Q.   Okay.  I'm sorry that I misunderstood.

3   I want to just make the record clear.

4            Because I guess I'm asking -- well, my

5   question was -- is that -- does the department

6   have use of force so that it governs an officer's

7   actions to protect officers and to protect the

8   public?

9            MS. LLOYD:  Asked and answered.

10      A.   They're not simply just so we have --

11  so we can say we have a policy.  They're clearly

12  there for a reason, to make sure that the

13  officers act in compliance with the law, with our

14  policy, and to make sure that they properly apply

15  the various continuum and the various levels of

16  force.

17  BY MS. BRATTON:

18      Q.   Okay.  And why is it important that

19  they comply with the continuum of force?

20      A.   They need to ensure they use the

21  correct level of force, given the circumstance,

22  and that they act properly.  They don't want to

23  use more force than is necessary or less force

24  than they maybe should be using, or it just -- it

25  is to ensure that -- that they follow the policy

1    and that they do the right thing.

2         Q.   Okay.  And do officers need to assess

3    situations prior to using force?

4              MS. LLOYD:  Objection as to form.

5         A.   What do you mean by assess?

6    BY MS. BRATTON:

7         Q.   Do they need to determine whether or

8    not a threat exists prior to using force?

9              MS. LLOYD:  Objection as to form.

10        A.   It would depend on the circumstances.

11   Yes, they think about the circumstances.  It's a

12   quick decision oftentimes, but they think about

13   the circumstances.  They have to.

14   BY MS. BRATTON:

15        Q.   Okay.  And what factors do you want the

16   officer to take into account before deciding

17   whether or how much force to use?

18        A.   Again, we need to look at the totality

19   of circumstances, the actions of the suspect, the

20   aggressiveness, the size of the suspect, the

21   crime.

22             Again, I referenced these.  There's a

23   whole score of things that they think about when

24   they look at -- it's just the whole totality of

25   what's going on.

1      Q.   Okay.  And should your officers give

2   commands prior to using force?

3           MS. LLOYD:  Objection as to form.

4      A.   What do you mean command?  Could you

5   give an example?

6   BY MS. BRATTON:

7      Q.   Yes.

8           Step out of the car, should they give

9   somebody -- if I give you a command, step out of

10   the car, should an officer allow the person to

11   step out of the car before pulling them out of

12   the car?

13           MS. LLOYD:  Objection as to form.

14      A.   That's a tough question, because it all

15   depends on the circumstances.  Just saying, step

16   out of the car, and they don't -- that doesn't

17   really give me enough details to answer your

18   question.

19   BY MS. BRATTON:

20      Q.   Okay.  So if -- if an officer wants a

21   citizen to get out of the car, should they say,

22   step out of the car, or should they open the door

23   and just pull somebody out?

24           MS. LLOYD:  Objection.

25      A.   It depends, again, on what the

1    circumstances are.

2    BY MS. BRATTON:

3         Q.   Okay.  And if a citizen is being

4    compliant, what would be the circumstance where

5    you would pull somebody out of the car without

6    saying anything to them?

7         A.   We can take someone out of a car under

8    nearly any circumstance.  I mean, we could take

9    them out of a car.

10        Q.   Okay.  So then you all are not trained

11   to ask a citizen to step out of the car before

12   you would --

13        A.   Again, it depends on what the run is,

14   what the stop's about, what the circumstances

15   surrounding it are.

16        Q.   Okay.  Should officers give commands

17   one at a time?

18             MS. LLOYD:  Objection as to form.

19        A.   One command at a time or one officer at

20   a time?

21   BY MS. BRATTON:

22        Q.   That's the next question.

23        A.   I'm not sure --

24        Q.   So the first is one command at a time.

25        A.   Again, we don't have black-and-white

38

1    rules, and policing isn't like that.  You have to

2    gear your response to each situation --

3         Q.    Okay.

4         A.    -- and what's happening at a situation.

5              I can't answer that as a carte blanche,

6    yes, we should or shouldn't do this, because it's

7    so fluid.

8         Q.    What about -- and this may be the same

9    answer.  But what about multiple officers giving

10   multiple commands at the same time?

11        A.    What about it?  I mean --

12        Q.    Should officers do that?

13        A.    Again, there's no black-and-white on

14   that.

15        Q.    Okay.

16        A.    It can happen, it may not happen.

17        Q.    What about, should officers give

18   conflicting commands?

19             MS. LLOYD:  Objection as to form.

20        A.    They shouldn't.  But it doesn't

21   necessarily mean that something may not come off

22   as a conflicting order sometimes.

23   BY MS. BRATTON:

24        Q.    And if an officer -- if one officer

25   says, get on the ground, and another officer

1    says, don't move, and a suspect doesn't move,

2    would that suspect not be complying with officer

3    orders?

4            MS. LLOYD:  Objection as to form.

5        A.   Again, I can't -- it's tough to answer

6    that not knowing the totality of what's going on

7    prior to the suspect being told to do one thing

8    or another.

9    BY MS. BRATTON:

10       Q.   If commands come in at the same time;

11   somebody opens a car door and says, get out of

12   the car, another officer, at the same time, says

13   don't move, and the person just doesn't move --

14       A.   Okay.

15       Q.   -- is that -- the person, the citizen,

16   who is not moving, because they received two

17   commands -- get out of the car, don't move -- is

18   that citizen then deemed to be not following

19   officer commands?

20           MS. LLOYD:  Again, objection as to

21       form, and asked and answered.

22       A.   Again, it's the totality of it.

23   It's -- it's -- you can't go back on information

24   not known at the time and try to judge what's

25   going on.

40

1          I -- there are so many things on these
2    stops, there's so many different circumstances, I
3    can't answer a black-and-white, yes or no, this
4    is right or this is not right, given the totality
5    of something.
6    BY MS. BRATTON:
7        Q.   Okay.  If you were reviewing a case --
8    and you said you look at the tape or listen to
9    the video, whatever is part of the packet that's
10   attached to the routing sheet --
11       A.   Okay.
12       Q.   -- and you were given -- officer A
13   said, open up the car door, and said, get out of
14   the car.  Officer B is on the other side and
15   says, don't move, how do you make the
16   determination -- and the person is arrested for
17   not following officer commands.
18          How do you make the determination about
19   whether or not the officers' actions were within
20   policy or not within policy, as it relates to the
21   person's arrest?
22          MS. LLOYD:  Again, objection as to form
23      of the question.  And objection as to a
24      question I believe has now been asked and
25      answered three times.

1          A.   I don't understand the question.  It

2    was a multiple-parts question.

3    BY MS. BRATTON:

4          Q.   Uh-huh.

5          A.   And I don't want to answer one part

6    and --

7          Q.   I got it.

8          A.   Can you break it down or give it to

9    me --

10         Q.   Uh-huh.

11              So you have a complete packet of

12   information.

13         A.   Uh-huh.

14         Q.   And that information comes in front of

15   you for you to determine whether or not an

16   officer was -- acted within or outside of policy,

17   correct?

18         A.   Yes.

19         Q.   Okay.  And that packet of information

20   contains a narrative or a video or whatever, what

21   have you.  And that narrative or video has a

22   suspect, officer opens up the suspect's car door,

23   tells the suspect, get out.  Another officer

24   says, don't move.  And the suspect is arrested.

25              And the issue at hand is whether or not

1    it was a proper arrest, based on not following

2    commands.

3            How -- how would you make the

4    determination whether or not it was within

5    policy?

6            MS. LLOYD:  Again, objection as to

7        form, and as to multiple questions, and

8        also, the mischaracterization of what a

9        use-of-force investigation could be, not

10        whether or not an arrest was lawful.

11    A.   I don't know what the -- again, I don't

12    know what the arrest was for that you're talking

13    about in your -- in your scenario.

14            And it's the totality of it.  Like the

15    commands would not be -- I'd have to know more

16    about each individual situation.  Again, it --

17    BY MS. BRATTON:

18    Q.   If someone was arrested for obstruction

19    of justice for not following an officer's orders,

20    and that suspect received conflicting commands,

21    then how would you make the determination whether

22    or not your officer acted within policy charging

23    this person with obstruction for not following

24    the command?

25            MS. LLOYD:  Again, objection as to

1      form.

2          And I've said this before, and we've

3      had lengthy testimony from the IAB sergeant,

4      that internal affairs does not make a

5      determination of whether an individual is

6      actually guilty of a particular crime and

7      whether or not a charge is lawful when this

8      whole situation is going to be determined by

9      a judge in a court.

10          There's been lengthy testimony as to

11     what the parameters of an internal

12     investigation are.  And you are misstating

13     and mischaracterizing what an internal

14     investigation could be.

15          MS. BRATTON:  One, I'm not asking about

16     an internal investigation, I'm asking about

17     her investigation, which can go through the

18     internal chain of command or directly

19     through her.

20          MS. LLOYD:  You started off saying --

21 BY MS. BRATTON:

22     Q.   And did you not say that internal can

23 come through you or that an investigation can go

24 through internal chain to come to you, or it can

25 go through the officer's chain of command,

1    outside of internal, and come to you?

2        A.   Are you talking about internal affairs

3    when you say internal?

4        Q.   Correct, internal affairs.

5        A.   It depends on -- on the investigation.

6        Q.   Okay.  So --

7        A.   Different things are done different

8    ways.

9        Q.   Okay.  That -- that's the question.

10            So something doesn't have to go through

11   internal affairs bureau for you to be able to

12   review an officer's actions?

13            MS. LLOYD:  Again, objection as to

14        form.

15            We're talking about use-of-force

16        investigations, or internal affairs

17        investigations.  We're not talking about the

18        issue which is before a court of law.

19            MS. BRATTON:  I'm asking about a stop

20        and detention, not a use of force in this

21        particular question.

22            MS. LLOYD:  And that's not -- again,

23        you are asking -- I believe your exact

24        question was whether or not there's a

25        determination that the individual should

```
 1          have been charged with the crime he was

 2          charged with, which is not an issue that is

 3          subject under an internal investigation.

 4               MS. BRATTON:  No.

 5     BY MS. BRATTON:

 6          Q.   My specific question was, how do you

 7     make the determination about whether or not the

 8     officer acted within policy when they gave

 9     conflicting commands --

10               MS. LLOYD:  Well, that's not -- that

11          was not the last question.  But --

12               MS. BRATTON:  Could you go back,

13          please, and read my last question?

14               (The record was read.)

15               MS. LLOYD:  That is exactly what I

16          stated.  Charging the individual, that's not

17          something that's reviewable.

18     BY MS. BRATTON:

19          Q.   Okay.  So you all can't review anything

20     that your officers charged a suspect with?

21          A.   We review it, but I don't make the

22     determination on a criminal charge.

23          Q.   I understand about the -- whether or

24     not the criminal charge is -- goes through

25     process.
```

46

```
1              But have you ever made a determination
2    about whether or not a person should or should
3    not have been charged with a particular crime?
4         A.   No.
5         Q.   Okay.
6         A.   You mean reinvestigation; no.
7         Q.   I'm sorry?
8         A.   You mean reinvestigation on that?  You
9    mean, if I was redoing an investigation; is that
10   what you're asking?
11        Q.   Have you ever -- I'm just asking, in
12   your supervisory career, sergeant, lieutenant,
13   and now commander --
14        A.   Yes.
15        Q.   -- have you ever looked at something
16   and said, oh, I don't think this person should
17   have been charged with this?
18             MS. LLOYD:  Are you talking about --
19        A.   I don't remember.
20   BY MS. BRATTON:
21        Q.   Okay.  And if you could, go back to
22   Exhibit 33.
23        A.   I don't think I have a 33.
24        Q.   It's that one.
25        A.   Oh.
```

1    Q.   The date, it looks like, that you

2   received it was 11/26/14?

3    A.   Uh-huh.

4    Q.   And then it says, Forwarded,

5   11/26/14?

6    A.   Yep.

7    Q.   Okay.  So you did the entire review in

8   one day?

9    A.   Well, I don't have the investigation

10   here, but if those are the dates I put, yes, I

11   would have received it and forwarded it on the

12   same day.

13    Q.   Okay.  And when it's forwarded, where

14   does it -- is this the forward to internal

15   affairs bureau?

16    A.   Yes, IAB, Internal Affairs Bureau.

17    Q.   Okay.  And then I'm assuming that IAB

18   would do a -- an investigation as well?

19        MS. LLOYD:  Your -- they've already

20        done it.

21    A.   This was sent to them for filing.  This

22   one's already been resolved.  The investigation's

23   been done.  It was done by a chain-of-command

24   investigation, this particular one, this routing

25   sheet.

48

 1    BY MS. BRATTON:

 2         Q.    Okay.  So this -- this one wasn't done

 3    by IAB?

 4         A.    I don't have it here, but it doesn't

 5    appear, no.  This is a use of force, level 2,

 6    that came through the chain of command.

 7         Q.    Okay.  And then when you forwarded it

 8    to IAB, was that just for filing, or what was the

 9    purpose of forwarding it to IAB?

10         A.    That's our policy to forward it to IAB.

11    I'm sure they file it.  I don't -- I've never

12    worked there.  So they may do other things with

13    it.  I don't know.

14         Q.    Okay.  And so just to be -- to be

15    clear, because there was, I think, some

16    objection.  I want to make sure that the record

17    is clear.

18         A.    Okay.

19         Q.    This particular routing sheet --

20         A.    Uh-huh.

21         Q.    -- is a level 2 use of force outside of

22    the IAB chain of command?

23         A.    This particular one, yes.

24         Q.    Okay.  And when you conducted your

25    investigation, were you aware that Mr. Phillips

```
 1    had filed a separate internal affairs complaint?

 2         A.   I don't remember.

 3         Q.   Okay.  And do you remember -- well, if

 4    you don't remember if you filed it, you don't

 5    remember if you reviewed his complaint, then.

 6              Do you -- did you watch the videos

 7    associated with Mr. Phillips' arrest?

 8         A.   I don't remember.  If there were some,

 9    I did.  But I don't remember if there were any

10    attached with this investigation.

11         Q.   Okay.  Did you interview any of the

12    officers that were involved?

13         A.   No.

14         Q.   Did you ask any clarifying questions to

15    conflicting statements?

16              MS. LLOYD:  Objection, asked and

17         answered.

18         A.   I don't remember.

19    BY MS. BRATTON:

20         Q.   Did you do any follow-up after -- or

21    have you ever followed up to see what your

22    officers' testimony was in a criminal trial

23    compared to what they wrote down on their

24    use-of-force statements or --

25         A.   No.
```

1     Q.   Okay.  And do you know whether, in this

2  particular chain of command that's on the routing

3  sheet, anyone else besides Sergeant Rector,

4  Lieutenant -- I can't pronounce his name --

5     A.   Eckenrode.

6     Q.   -- Eckenrode, and yourself, prior to

7  going to IAB, participated in or reviewed the

8  incident with Mr. Phillips?

9     A.   Oh, I don't know.

10    Q.   Okay.  Would they be on here if anyone

11  else reviewed it?

12    A.   With -- you mean with him personally

13  or --

14    Q.   Yes.

15    A.   -- in --

16    Q.   I'm sorry; this particular incident

17  that is the subject of the routing sheet.

18    A.   Okay.  Can you ask it again,

19  because I --

20    Q.   Yeah.

21    A.   -- I -- are you saying did I talk with

22  him personally --

23    Q.   No.

24    A.   -- or reviewed --

25    Q.   I'm sorry.

1        A.    -- this investigation?

2        Q.    This particular investigation --

3        A.    Yes.

4        Q.    -- would anyone else who is not on this

5   routing sheet have reviewed the investigation?

6        A.    Someone else may have read it, but I

7   don't know.

8        Q.    Okay.

9        A.    And likely, because they would be on

10  here, but --

11       Q.    Okay.  And can you take me through your

12  normal review process when you get an

13  investigation?

14       A.    Well, depending on the investigation,

15  obviously, I would read the routing sheet, the

16  recommendations, any attachment, any documents,

17  any audio, video, anything else that's attached

18  to the investigation.

19       Q.    Okay.  And then if you see a

20  discrepancy in two or three officers' statements,

21  what would you do at that point?

22       A.    As I said, if I see an issue with the

23  investigation, as done, I would refer it back to

24  the chain of command, back down to the

25  lieutenant, give them what my concerns or

1    questions were for clarification.

2         Q.   Okay.  And that didn't happen in the

3    investigation, correct?

4         A.   I don't remember.

5         Q.   Okay.  Would it be on the routing sheet

6    if it went back?  Like under remarks, would it

7    say, go back and look at one -- Officer A's

8    testimony compared to Officer B's?

9         A.   It could.  Depending on what it was, it

10   could.  It could, but not necessarily.

11        Q.   Would there be a writing?  Would there

12   be like an e-mail, go back and look?

13        A.   Myself, if I had a question with

14   something, a lot of times I will talk personally

15   to the person, the lieutenant, the serg -- well,

16   in this case, it would be the lieutenant,

17   following the chain of command principles, just

18   because I'd rather have a face-to-face than an

19   e-mail.  That way question's going to be answered

20   right then and there and clarification is

21   given --

22        Q.   Okay.

23        A.   -- rather that bantering back and

24   forth.

25             That's just my style.  There's no set

1    rule on that.

2         Q.   Okay.  And then, I guess, in that

3    instance, would there not be any documentation of

4    whatever clarification that you needed or --

5              MS. LLOYD:  Objection as to form.

6         A.   It depends.  If I asked for it,

7    typically, there will be some type of

8    clarification given.

9    BY MS. BRATTON:

10        Q.   Okay.  I guess the question that I'm

11   asking is if, in the entire investigation, there

12   is not a piece of paper that says, go look back

13   at officer A's statement, go look back at

14   officer B's statement, what happened here; that

15   it's a reasonable assumption that you didn't send

16   it back for additional follow-up?

17             MS. LLOYD:  Objection as to form.

18        A.   In this one you're talking about?

19   BY MS. BRATTON:

20        Q.   Yes.

21        A.   Okay.  What -- what exactly are you

22   asking about this one?

23        Q.   So in the investigation, if there is

24   nothing from you to an officer about a follow-up,

25   is it reasonable for you to assume that there

1    was -- that it didn't go back for further

2    investigation?

3          A.   No, I don't think it's reasonable to

4    assume that.

5               I don't remember in this particular --

6    if it happened or not.

7          Q.   Okay.  And why did you come to the

8    conclusion that all officers' actions were within

9    policy in this case?

10              MS. LLOYD:  Where -- which line was

11         that?

12              MS. BRATTON:  Level 2 mace within

13         policy.

14              MS. LLOYD:  Where does it say all

15         officers?  There's only one use of mace.

16   BY MS. BRATTON:

17         Q.   So let me -- did you only review, then,

18   the use of force, level 2 mace?

19         A.   If that's what's attached to this, yes.

20   I have not seen --

21         Q.   Okay.  Let me -- okay.  If you could,

22   turn to Exhibit 2, and then that's Exhibit 2,

23   right there.

24         A.   Gotcha.

25         Q.   At the bottom of the page there will be

1    a Bates number that starts with GB.

2        A.    Yes.

3        Q.    Could you turn is GB784?

4        A.    784?

5        Q.    Yes.

6        A.    Okay.

7        Q.    When you conduct an investigation -- or

8    I'm sorry -- review, do you have the incident

9    detail?

10            MS. LLOYD:  Again, objection as to

11        form.

12            And identification of -- this exhibit

13        has not been identified for her.

14        A.    Yeah.  I'm not sure what I'm looking

15    at.  It looks like a radio run printout.

16    BY MS. BRATTON:

17        Q.    Okay.  This is the radio run for

18    2756 Sullivant Avenue incident --

19        A.    Okay.

20        Q.    -- for Mr. Phillips.

21        A.    Okay.

22        Q.    And do you have the -- when you do a

23    review, the -- the printout of the run that the

24    officer was on?

25            MS. LLOYD:  Again, objection as to

1      form.

2          A.   If it's in the packet, I will look at

3      it, yes.

4      BY MS. BRATTON:

5          Q.   Okay.  And what about the officer

6      written statements?

7          A.   If they're in the packet, I would

8      review the entire packet.

9          Q.   Okay.  So before I play Exhibit 3,

10     would -- and based on this routing sheet, would

11     you have only been looking at the use of force,

12     or would your review have been over the entire --

13     all of the circumstances surrounding

14     Mr. Phillips' stop, through the use of force?

15         A.   I would review what's in the

16     investigation that I received.

17         Q.   Okay.  So if in the investigation it

18     has, this is why we stopped him, this is what

19     happened when he stopped him, this is what we

20     arrested and charged him with, this is the use of

21     force -- when you review the packet, if all of

22     that is in there, what part are you reviewing for

23     whether or not the officers followed policy?

24             MS. LLOYD:  Again, objection as to form

25         and as to what it is she's reviewing.

1        A.    I review what's -- every -- I review

2    the packet that's presented to me --

3    BY MS. BRATTON:

4        Q.    Okay.  And when you --

5        A.    -- the entire packet.

6        Q.    And when you review the packet -- so

7    here, at the top of the routing sheet,

8    Exhibit 33 --

9        A.    Yes.

10       Q.    -- it says, Subject, Use of Force,

11   Level II, Mace.  It has the incident number,

12   slash, injury to prisoner.

13       A.    Uh-huh.

14       Q.    So when you are looking at whether

15   officer violated policy, are you only looking at

16   the level 2 use of force, mace, or when you read

17   all your officers' statements, are you looking at

18   whether or not policy was followed all the way

19   through, from the beginning of the interaction to

20   the use of force and the end of the interaction?

21           MS. LLOYD:  Excuse me.

22           Objection as to form.

23           And we're going to have a problem here.

24       You're presenting her with a use-of-force

25       chain-of-command investigation.  It's

1          already been established this is chain of

2          command on the officer who completed a

3          use-of-force report.  So you're mixing

4          apples and oranges here with your

5          questioning.

6                MS. BRATTON:  No.

7     BY MS. BRATTON:

8          Q.   I'm asking you whether or not, if you

9     get a packet and your packet just doesn't have in

10    it, I sprayed somebody in the face with mace, it

11    will -- I would -- presumably, it will start, I

12    came into contact on --

13                MS. LLOYD:  Again, objection as to

14          form.

15    BY MS. BRATTON:

16         Q.   -- September 1st with subject A.

17    Subject A resisted.  I maced the person.

18                MS. LLOYD:  Objection to form.

19    BY MS. BRATTON:

20         Q.   Do you only look at, I maced the

21    person, or do you look at the entire officer

22    statement and make a determination about whether

23    every action in that officer's statement was

24    within policy?

25         A.   I need to look at the entire packet to

59

1    make a determination if this use of force, mace,

2    was within policy.

3           Q.   Okay.

4           A.   I don't just read one paragraph.  I

5    look at the entire packet that's presented to

6    me.

7           Q.   Okay.  And if there is a question

8    beyond the use of mace, do you have the ability

9    to follow up on that?

10          A.   If I have a question or I need

11   clarification, as I said, yeah, I would send it

12   back to the lieutenant --

13          Q.   Okay.

14          A.   -- or contact a lieutenant for -- to

15   say, hey, I have this concern, there's

16   clarification needed.

17          Q.   Okay.  So you have the ability, in your

18   chain of command, to ask a question that doesn't

19   deal specifically with use of force?

20          A.   Yes, on -- yeah.  Yes.

21          Q.   Okay.

22          A.   Yes.

23          Q.   Okay.  I am about to play what's been

24   previously marked Exhibit 3.  It's the radio

25   dispatch.

```
1      A.    Okay.

2      Q.    And I will play --

3            MS. LLOYD:  Could you explain, what is

4      this that we're seeing?  What is that part

5      of, Exhibit 3?  What is that part of?

6            MS. BRATTON:  I just said the radio

7      dispatch.

8            MS. LLOYD:  Which is part of the -- is

9      it part of the use-of-force report?

10           MS. BRATTON:  Yes.

11           MS. LLOYD:  Part of the use-of-force

12     investigation?

13           MS. BRATTON:  Yes.

14           MS. LLOYD:  Where is that?  You were

15     saying -- isn't this the IAB investigation

16     that you're presenting to her?

17           MS. BRATTON:  No.

18           MS. LLOYD:  Okay.  Is it not?

19           MS. BRATTON:  This routing --

20           MS. LLOYD:  Is Exhibit 3 that we're

21     looking at here the IAB investigation?

22           MS. BRATTON:  No.  Exhibit 3 is the

23     radio run itself, not the IAB --

24           MS. LLOYD:  Okay.

25     BY MS. BRATTON:
```

61

```
 1        Q.   I am going to play what has been --
 2             MS. BRATTON:  Actually, if we could
 3        take a break for a minute.
 4             (A recess was taken from 10:09 to
 5             10:12.)
 6   BY MS. BRATTON:
 7        Q.   I'm going to play for you what has been
 8   previously marked as Deposition Exhibit 3.
 9        A.   Okay.
10        Q.   It is the dispatch from the radio run
11   that was involved -- the burglary dispatch
12   involved in the incident with Mr. Phillips.
13        A.   Okay.
14        Q.   And I'm going to play the recording at
15   22 hours, 44 minutes, and 22 seconds.
16             (Audio was played.)
17   BY MS. BRATTON:
18        Q.   And then I'm going to play 22 hours,
19   45 minutes, 32 seconds, of Exhibit 3.
20             (Audio was played.)
21   BY MS. BRATTON:
22        Q.   So if you had listened to the
23   recording, and the -- Mr. Phillips and his
24   passenger did not match the description of the
25   subjects that were described by dispatch, would
```

1    you have asked a follow-up question?

2            MS. LLOYD:  Again, objection as to form

3        and lack of any connection as to what this

4        officer had testified to in connection with

5        her chain-of-command use of force.

6        A.   Can you ask the question again?

7    BY MS. BRATTON:

8        Q.   Yes.

9            If you had listened to the audio and

10   looked at the officer statements, and the officer

11   statements -- I'm sorry -- the radio dispatch and

12   the actual suspects -- so Mr. Phillips and

13   Mr. Phillips' passenger did not match the

14   description provided by dispatch, would you have

15   asked a follow-up question?

16           MS. LLOYD:  Again, objection as to form

17       and as to what it is we're talking about

18       here.  You're pluralizing officers when

19       there's no pluralizing in this document.

20       A.   The radio room information -- it's very

21   difficult to answer that question, because I'm

22   not at the scene.  I'm not -- the lighting, I'm

23   assuming it's dark out, it's 10:30 at night.

24   It's -- it's impossible for me to answer that

25   question.

1          A radio room information isn't always

2     what's happening out there.  When someone calls

3     in -- a citizen calls in, a lot of times there's

4     so much more to what the officers are seeing that

5     plays into their decision-making and what actions

6     they take.

7          It's very difficult to answer that

8     question.

9     BY MS. BRATTON:

10         Q.   Okay.  If the location of the suspect

11    that's stopped is not the same that dispatch

12    reported, and the race and clothing is not the

13    same as dispatch reported, and dispatch reported

14    that all of the suspects were back inside of

15    building, what would you, in a determination that

16    you were making in reviewing a packet, that the

17    officers had reasonable articulable suspicion to

18    stop -- if you were making that determination,

19    what questions would you have of the officers if

20    none of those things matched about why they

21    stopped an individual?

22         MS. LLOYD:  Again, I'm going to object.

23         I'm going to object as to speculation and

24         object as to what appears to be an attempt

25         to mischaracterize what Commander Curmode's

1      role was in this situation.

2           MS. BRATTON:  And I'm -- for the

3      record, Counsel has asked a hypothetical

4      question with facts about what or how

5      Commander Curmode, who makes decisions -- is

6      a final decision-maker -- how she goes about

7      those decisions, what she uses to make those

8      decisions.

9           Counsel is able to ask those questions.

10          Counsel is not asking the specific

11     facts about this case.  Counsel is asking

12     the witness how the witness goes about her

13     decision-making when deciding whether or not

14     to -- to say that an action was within or

15     without policy, whether or not it's use of

16     force, whether it's a stop investigation.

17 BY MS. BRATTON:

18     Q.   So that's the question that I'm asking

19 you.  Because you don't only investigate use of

20 force.

21          MS. LLOYD:  All right.  Then I'm going

22     to object to the form of the question.

23 BY MS. BRATTON:

24     Q.   I'm sure you don't remember what --

25     A.   Well, at this point, probably -- your

1    questions are really long.  And there are a lot

2    of parts to the question.

3    BY MS. BRATTON:

4        Q.   Yeah.

5        A.   So if I'm asking you to repeat it,

6    that's why.

7        Q.   No, I understand.

8        A.   Deciding if something's in conformance

9    with policy, again, you look at the totality of

10   it.

11           Looking at radio dispatch information,

12   that's fluid.  Suspects are not always where they

13   were when it was called into radio.  They move,

14   they change, things change.  You would go with

15   the information that's presented from the

16   sergeant or the supervisor's investigation, and

17   if that's included, then you look at it.

18           But, again, the radio dispatch

19   information is coming from various sources, and

20   it changes and things happen at the scene.  So

21   it's a hypothetical, but it's almost too broad to

22   answer.

23           Each situation would have a different

24   answer, because it's just the way police work

25   works.

1        Q.    Okay.  So I'll be specific to

2   Mr. Phillips' situation with facts that have been

3   developed throughout the depositions in this

4   case.

5        A.    Okay.

6        Q.    So radio dispatch calls in what you

7   just heard, two white males -- a black female

8   with an orange wrap around her head and shorts,

9   two white males, one with a gray coat, loading

10  items into an unknown vehicle in the back or the

11  rear of the bar.

12            So that's the initial radio dispatch.

13            MS. LLOYD:  Again, objection as to

14        characterization of the dispatch.

15  BY MS. BRATTON:

16        Q.    Do you want me to play it again?

17        A.    You can play it --

18        Q.    Okay.

19        A.    Well, no, you don't have to.  I mean,

20  I'm not sure what exactly -- it's hard to hear

21  some of it.  I'm not sure exactly the time

22  frames.  There's so much to it --

23  BY MS. BRATTON:

24        Q.    Okay.

25        A.    -- that -- and, again, descriptions are

1    called in.  A lot of times it's just a -- a kind

2    of a guide for the officers to start the run.

3              But there's so many things that

4    happened at the scene and so many other

5    perceptions and changes that happen from the time

6    it's called in.

7              I don't know what time it was called in

8    and the time frame.  There's so many variables to

9    this that I can't --

10        Q.   Okay.  So that wasn't necessarily going

11   to be my question, but --

12        A.   Okay.

13        Q.   So I will play the recording again so

14   that we can get the suspect -- unless --

15        A.   You don't have to play it again.

16        Q.   Okay.

17        A.   I mean --

18        Q.   So that's the --

19             THE WITNESS:  Unless you -- I'm not

20        sure --

21             MS. LLOYD:  I don't know what the

22        question is going to be.

23        A.   Yeah.  I don't know really what I'm --

24   what --

25   BY MS. BRATTON:

1      Q.   Okay.

2      A.   -- I'm listening to.  And it's very

3  garbled.  I'm not sure who's what call number.

4  So I'm not really sure who was dispatched --

5  whose radio was listening to that.  It's not a

6  clear recording.

7      Q.   So Officer Blair has testified that she

8  didn't even run lights and sirens because she was

9  there in the alley of where the incident took

10  place.  So it took her seconds, a matter of

11  seconds, to get to the location.

12          MS. LLOYD:  Again, objection.  You'll

13      have to ask her to assume a fact she -- this

14      woman can't possibly know what another

15      officer has testified to.

16  BY MS. BRATTON:

17      Q.   Okay.  You can assume that I'm telling

18  you the truth --

19          MS. LLOYD:  No --

20  BY MS. BRATTON:

21      Q.   -- and --

22          MS. LLOYD:  -- you cannot assume.

23  BY MS. BRATTON:

24      Q.   You can assume that I'm telling you the

25  truth.  And based on your counsel's behavior, you

1    can assume that if I say something false, that

2    she will call me on it.

3              So I am saying that Officer Blair

4    testified -- you can assume it, you can believe

5    it or not.

6              But if Officer Blair testified that she

7    was seconds away; the call was to -- a car in the

8    rear of the building; Mr. Phillips was on an

9    opposite, one-way street that was the side, not

10   the rear of the building; and Mr. Phillips is a

11   black man with a white woman; the white woman has

12   on black pants, nothing on her head; and

13   Mr. Phillips does not have on a coat; and

14   Mr. Phillips is driving a pickup truck and

15   there's no vehicle description, would you have --

16   in the course of your investigation, would you

17   have any questions of your officers at all; why

18   did you stop them?

19             MS. LLOYD:  Objection as to the form of

20        that question.  And objection if counsel is

21        representing that that was Officer Blair's

22        testimony, the entirety of that question;

23        which definitely it was not.

24   BY MS. BRATTON:

25        Q.   Officer Blair's testimony was how long

1  it took her to get somewhere, which was a matter

2  of seconds.

3          The other came from -- the description

4  of the suspects came from the radio dispatch, and

5  the other is Mr. Phillips is a black male.

6          I can play the video for you, that the

7  suspect was a white -- or his passenger was a

8  white woman with black pants on.

9          But I'm just asking you, in general,

10  whether or not these facts would be -- true or

11  not, if those facts were true, and they were

12  before you -- that a suspect's location, within a

13  matter of seconds of something being called in

14  that the officer receives the call to the time

15  they get there, in a matter of seconds, if the

16  car is not in the right place, if the people are

17  completely different races, the number of people

18  is different, the clothing is different -- would

19  you have any follow-up whatsoever?

20          This is just a general question:  Would

21  you have followed up, hey, what was your reason

22  for stopping this person, because I notice these

23  things don't match up?

24          MS. LLOYD:  Objection as to form --

25      complicated form of that question and the

71

1          extreme hypothetical.

2          A.   Again, as I said, the officer is going

3     to look at what they're seeing, the totality of

4     it.  The radio dispatch is a portion to guide

5     their response to the run, but there's so much to

6     that.

7               Now I can't even begin to second-guess

8     what they saw physically at the scene, after the

9     fact.

10    BY MS. BRATTON:

11         Q.   I understand.  Well, I guess my

12    question is, would you ask them why they did it.

13    That -- not second-guess what they did, but if

14    you --

15         A.   If I saw a discrepancy, I would.  But

16    I -- I don't -- again, descriptions are never --

17    are often not as accurate as they could be.  It's

18    a guide for the officers; the person calling in,

19    it's a guide.

20              It's night.  He is a light-skinned

21    individual.  I'm not going -- like I said, I'm

22    not going to second-guess what the officers did

23    or saw at the scene.

24         Q.   So then --

25         A.   I wasn't at the scene.

72

1        Q.   Okay.  So then would officers,

2    according to your training -- because a dispatch

3    may be wrong, can an officer then just stop

4    anybody walking down the street because they're

5    in the vicinity, whether or not they match any

6    description whatsoever?

7           MS. LLOYD:  Objection as to the form of

8        the question.

9        A.   Well, obviously, you know the answer to

10   that.  You don't have to ask me that.

11          They cannot stop anyone for any reason

12          And like I said, it's a guide.  It's --

13   it's a guide to them.  The radio calls are a

14   guide to take -- to build on to complete the run

15   or to follow through on the run.

16          I wasn't there.  I cannot tell you what

17   they saw or what they didn't see or what may have

18   changed, how long ago the call came in, all kinds

19   of variables that are difficult to second-guess,

20   after the fact.

21   BY MS. BRATTON:

22       Q.   Right.  And so that's kind of my

23   question.

24          There's one end of the spectrum, you

25   can't stop just anybody walking down the street.

1    On the other end of the spectrum, if people are

2    on the street and they don't match any of the

3    description, how do you -- how do you determine,

4    if you are reviewing whether an officer's -- let

5    me go back.

6              An officer would be outside of policy

7    if they just stopped a person for no reason,

8    walking down the street, and detained them; is

9    that accurate?

10        A.    There was no reason whatsoever?

11        Q.    Yes.

12        A.    They can initiate a conversation, but,

13   yeah, they do not detain them.

14        Q.    Okay.  And so the person would be free

15   to leave if they wanted to?

16        A.    Correct.

17        Q.    Okay.  And then on the other end of the

18   spectrum, if the officer has reasonable suspicion

19   to detain, then they're allowed to talk to that

20   person to dispel whatever suspicions -- or to

21   detain that person?

22        A.    Right.

23        Q.    Okay.  So if you're investigating

24   between those two spectrums, a citizen on one

25   side saying, I'm walking down the street, they

1    don't have any reason to stop me, and an officer

2    saying, no, I had a reasonable -- I can tell you

3    why I stopped them, those two spectrums, if you

4    have in front of you that the person -- the

5    location doesn't match, the person's description

6    doesn't match, the only thing that matches is

7    that they're on that street, what -- what do you

8    do to determine whether or not the officer's

9    actions were outside of policy; which the citizen

10   is saying, you shouldn't have stopped me, or

11   their actions are within policy, where the

12   officer is saying, I had reasonable suspicion?

13        MS. LLOYD:  Objection as to that

14        question, the form of it, the vagueness, and

15        the over --

16   A.   Again, I would look at the

17   investigation.  If there were any questions, I

18   would ask for clarification.

19   BY MS. BRATTON:

20   Q.   So -- so I guess, just sitting here

21   today, would you have any questions if, if the

22   individual was stopped -- and I understand that

23   dispatch may or may not be correct, but if the

24   only fact that matches up specifically is that

25   person was on the street, same street, that is

1    literally the only fact that matches up, is this

2    individual is on the street, would you have any

3    follow-up questions?

4              MS. LLOYD:  Objection as to form.

5         A.   Can you ask the second part again?

6    BY MS. BRATTON:

7         Q.   Yeah.

8         A.   Your questions your very lengthy.

9         Q.   So --

10        A.   And, as I said, they're multi --

11        Q.   Uh-huh.

12        A.   -- parts.

13        Q.   Yes.

14             So an officer -- we've already

15   established that an officer cannot stop anybody

16   walking down the street.

17             If a dispatch comes in, and the only

18   fact that matches with dispatch is that the

19   person is near the location, would you have any

20   follow-up questions for your officers as to why

21   that individual was stopped?

22             MS. LLOYD:  Again, objection as to

23        form.  And we've been over this several

24        times now.

25             As far as Commander Curmode's role,

1          what is it that she's being presented with

2          in her packet?

3     A.   I assume you're talking hypothetical.

4          Rarely is that the only reason that's

5     coming out.  Rarely is that the only thing that

6     would be presented in the packet, that they just

7     stopped somebody in the street.

8     BY MS. BRATTON:

9     Q.   Okay.  You said when you get a

10    packet --

11    A.   Uh-huh.

12    Q.   -- you read all of the report.  If

13    there's audio, you listen to the audio, if

14    there's video, you watch the video --

15    A.   Uh-huh.

16    Q.   -- right?

17         So you look at everything?

18    A.   Uh-huh.

19    Q.   Okay.  So if you're reading through,

20    and you see, I, you know, stopped this individual

21    to investigate something.  And you listen to the

22    dispatch and nothing matches the person who was

23    stopped except that they were near the location,

24    would you have follow-up questions?

25         MS. LLOYD:  Objection as to form.

1          A.    Again, there is a totality of a

2    situation.  And it's -- if I saw a problem in any

3    investigation that I felt didn't look right or

4    needed follow-up or maybe was not clear, I would

5    ask for follow-up.

6    BY MS. BRATTON:

7          Q.    Okay.  So dispatch called Mr. Phillips'

8    truck -- or actually, not his truck, because it

9    wasn't him -- called and -- that there was an

10   unknown vehicle loading items into the rear of

11   the bar.

12         MS. LLOYD:  Again, objection as to form

13      and mischaracterization of unknown vehicle.

14   BY MS. BRATTON:

15         Q.    I'm going to play Exhibit 3, 22 hours,

16   44 minutes, and 22 seconds.

17         A.    Is that the one we listened to already?

18         Q.    Yes.

19         (Audio was played.)

20   BY MS. BRATTON:

21         Q.    Okay.  So from that dispatch, can we

22   agree that dispatch called in, suspects are

23   loading items into an unknown vehicle in the rear

24   of the closed bar?

25         A.    No.  Dispatch didn't call that in.

1      Q.   I'm sorry.  Dispatch radioed that to

2   officers.

3      A.   They radioed that, yes.

4      Q.   Okay; and that the suspects were two

5   white men, one black woman.  The white man -- one

6   of the white men has on a gray coat.  The black

7   woman has an orange head wrap and shorts.

8           MS. LLOYD:  What is the question?

9   BY MS. BRATTON:

10      Q.   Can we agree that that is what dispatch

11   just radioed to the officers?

12      A.   That's the information that they put

13   there.

14      Q.   Okay.

15      A.   I don't know where they got it from.

16   So --

17      Q.   Yes.  But I'm just saying, that's what

18   was given to the officers.

19      A.   I'm hearing that on the radio.

20      Q.   Yes.

21      A.   I'm hearing that on your recording.

22      Q.   Okay.  And if Mr. Phillips was parked,

23   not on the rear of the building --

24      A.   Uh-huh.

25      Q.   -- but on the side of the building --

1           A.    Uh-huh.

2           Q.    -- or driving down the street --

3    there's a dispute, parked on or drove down -- the

4    side of the building, not the rear; and

5    Mr. Phillips is black, and we've established he's

6    light-skinned -- black on the record -- his

7    passenger is white; his passenger does not have a

8    head wrap; his passenger has on pants; and

9    Mr. Phillips does not have on a coat -- what, if

10   any, follow-up questions would you have if the

11   only thing that matched in that situation is

12   Mr. Phillips is near the dispatch location?

13          MS. LLOYD:  Again, objection as to

14     form.

15          Are we talking about a hypothetical

16     here?  Because, obviously, we know there are

17     many more circumstances to this particular

18     incident.

19   BY MS. BRATTON:

20          Q.   The initial stop itself, this is what

21   the officers have, is what dispatch gave them.

22          A.   Again, there's more to than what is --

23   dispatch is giving.

24          They said they didn't know what kind of

25   a car it was being loaded into.  The caller

1    couldn't see that.

2         Q.   Yes.

3         A.   So the officers have to take the

4    information, the limited information, given from

5    dispatch, along with everything else that they're

6    seeing at the time.  And things change.  Head

7    wraps can be taken off.  If they're in a car, you

8    don't know what they're wearing from the waist

9    down.  It's 10:30 at night.

10            There's so many variables to police

11   work that the officers have to make calls on,

12   judgement calls on, at the scene, that going back

13   and saying, yes, this can happen, this should

14   have happened, or whatever, after the fact is

15   difficult if not impossible; looking at

16   everything after the fact, not being at the

17   scene, not seeing everything that they're looking

18   at and that they're experiencing.

19        Q.   So my question is not that.

20            My question is, would you ask follow-up

21   questions so that you can get to that conclusion

22   that there were other factors that the officer

23   considered?

24            MS. LLOYD:  Again, objection as to the

25            repeated asking her about follow-up

1          questions, when we've established her role

2          is that she's reviewing an entire packet in

3          this hypothetical, that she's reviewing an

4          entire packet of information.

5               And she has repeatedly said, if she had

6          questions, she would ask.

7          A.   I mean, I understand police, and I

8     understand the totality of it, and I understand

9     that what they're acting upon is what they see

10    and what they're -- what they're doing at the

11    scene.

12              So if I had questions, I would ask

13    them.  But I'm not only reading the packet, I'm

14    going on my experience as a supervisor and

15    knowing that there's so many variables leading

16    into it.

17    BY MS. BRATTON:

18         Q.   When officers write a report, is their

19    report supposed to contain as much detail as

20    possible about the stop or about the incident?

21              MS. LLOYD:  Objection as to form.

22         A.   It's kind of vague.  What report?  What

23    kind -- report's a big term.

24    BY MS. BRATTON:

25         Q.   Arrest --

1          A.    What are you talking about?

2          Q.    An arrest or incident report.

3          A.    Which one?

4          Q.    Incident report first.

5          A.    Okay.  It depends on the incident

6    report what information goes in.  A lot of it has

7    check-boxes and things like that.  So you have to

8    be more specific.

9               I mean, they -- all the details that

10   they can find, all the details that are

11   available, yes.  But certain ones ask for

12   different details.

13         Q.    Okay.  And would the race of the

14   suspect, any passengers, would that -- would

15   those things be expected to be included in the

16   incident report?

17              MS. LLOYD:  Objection as to form.

18         A.    Yeah.  I'm not sure what you mean by

19   incident report.

20   BY MS. BRATTON:

21         Q.    If -- if an officer stops someone for

22   an investigation, they're investigating someone,

23   and that investigation turns into an arrest --

24         A.    Uh-huh.

25         Q.    -- are the officers expected to detail

1    in their incident report what led up to that

2    arrest -- what led up to that arrest?

3         A.   Well, you're talking -- in that case,

4    if there's an arrest made, you're talking about

5    an arrest report, not an incident report.

6              Are you talking about the arrest

7    information form?

8         Q.   Okay.  So, I guess, let me go back.

9              What's the difference between an

10   incident and --

11        A.   I'm not sure what you're talking about,

12   about incident report.  I'm not really clear on

13   what you're -- what -- can you give me an example

14   of what the incident report is that you're

15   talking about?  I mean, I know we have a lot of

16   forms.

17        Q.   If we go to Exhibit 2, 790.  So I guess

18   she titles this Arrest Summary.

19              MS. LLOYD:  Yes.

20              What is it you want her to --

21   BY MS. BRATTON:

22        Q.   I'm -- I'm asking, would this be what

23   is an incident report or an arrest --

24        A.   It would be -- it says, Arrest --

25        Q.   -- summary?

84

```
 1        A.    -- Summary.  So I'm assuming it's the
 2   details for the arrest information form.
 3        Q.    Okay.
 4        A.    And I didn't -- I'm not really sure.  I
 5   didn't write it, so I'm not really sure.
 6        Q.    And then when you all write arrest
 7   summaries, are you all trained on when -- what
 8   information should be included in the
 9   summaries?
10        A.    Yes, in the arrest summary training.
11        Q.    Okay.  And in your summary training,
12   should suspect descriptions be included?
13              MS. LLOYD:  Objection to form.
14        A.    The arrested suspects?  I mean, I'm not
15   sure what you're asking me.
16   BY MS. BRATTON:
17        Q.    Yes, arrested sus -- well, yes,
18   arrested suspects.
19        A.    Yeah, I believe there's a place for
20   race of the arrested -- of the arrestee.
21        Q.    Okay.  And what about if dispatch
22   information was provided and it differed from
23   whom they arrested, should --
24              MS. LLOYD:  Objection.
25   BY MS. BRATTON:
```

1      Q.   -- that be in there?

2           MS. LLOYD:  Objection to form.

3      A.   Again, as I said, it can differ.  It's

4  a lot more than just what dispatch put out when

5  an officer decides to make an arrest.  There's

6  just a lot more surrounding circumstances.

7           So it can differ.

8  BY MS. BRATTON:

9      Q.   Okay.  So are they expected, though --

10 then should they not -- are they trained to put

11 in what dispatch said, even if it differs, or is

12 that not something that they need to bother with?

13          MS. LLOYD:  Again, objection as to form

14      of that question.

15     A.   I mean, it depends on circumstance.  If

16 it's something they feel is pertinent to put into

17 here, they would put it in.

18          This is -- hypothetically, it's so

19 difficult to go back and determine what the

20 thought process was when they were making the

21 arrest.

22 BY MS. BRATTON:

23     Q.   Okay.

24     A.   There's no rule that says that

25 dispatch -- from -- has to go in there.  But if

1    it had some pertinence to -- pertinence?  Is it

2    pertains?  It may not be the right word.

3              If it pertains to the run, then they

4    would likely include it as part of the complete

5    summary.

6         Q.   Okay.  And when you -- what are your

7    expectations of an investigation when it gets to

8    you, as far as information that the investigator

9    collects?

10             MS. LLOYD:  Objection as to form.

11        A.   My expectations?  What do you mean by

12   that?

13   BY MS. BRATTON:

14        Q.   So if they just gave you a routing

15   sheet with nothing attached to it, would that be

16   something that you would say, hey, I can't make a

17   decision on?

18        A.   That doesn't happen.  The routing sheet

19   is an extra thing.  That wouldn't happen.

20        Q.   Okay.  So I guess that's my -- the

21   question is, what do you expect to be included in

22   an investigation so that you can make a decision

23   about whether or not the investigation was a

24   thorough one?

25             MS. LLOYD:  Objection as to form.

1          A.    It includes all the applicable forms, a

2    recommendation, any attachments that were deemed

3    by the investigating supervisor to be necessary

4    for a complete investigation.

5               That's what -- I would expect the facts

6    and the details to be there so I can make a

7    logical recommendation.

8          Q.    And are cruiser cam and body cameras

9    deemed to be necessary in making use-of-force

10   determinations?

11              MS. LLOYD:  Objection as to form.

12         A.    Well, we didn't have body cams in 2014.

13   So if it's -- if it contains information and the

14   supervisor decides to include it, yes, I would

15   expect it to be in there.

16   BY MS. BRATTON:

17         Q.    Okay.  And if a supervisor did not

18   include, at this time, a cruiser cam, and there

19   is a reference to it, would that be something you

20   would say, I want to see the cruiser cam?

21              MS. LLOYD:  Objection as to form.

22         A.    It depends what the reference was.

23              Again, these all -- you're talking in

24   such hypothetical generalities, and there is no

25   black and white on a lot of these things.  So

88

1    it's just difficult to answer some of your

2    questions, because they are kind of --

3    BY MS. BRATTON:

4        Q.    Okay.  If a cruiser -- if the cruiser

5    cam showed the incident that the use-of-force

6    complaint or investigation is based on, would you

7    expect the investigator to include that?

8        A.    They can include it.

9              They can refer -- that can be looked up

10   by incident number, also.

11       Q.    Okay.

12       A.    Sometimes that will happen.  You can

13   look it up on the system to -- it's just simpler,

14   and to save space.

15       Q.    Okay.  But you would expect it to be

16   somewhere that you know if it existed, that you

17   could review it if you wanted to?

18       A.    Most likely, yes.

19       Q.    Okay.  And what about dispatch, is that

20   something that if officers are dispatched to a

21   run, that the investigator should put, go out and

22   get dispatch and put it in their report?

23             MS. LLOYD:  Objection as to form.

24       A.    Not necessarily.  It depends on what's

25   on that particular run.  But that's not something

1    I would particularly look for necessarily.  I

2    would assume that if it was -- contained

3    pertinent information, it would have been

4    included.

5            Like I said before, it's not always the

6    same as what happens on the run.  It's a guide

7    for the officer.

8    BY MS. BRATTON:

9        Q.    Okay.  How would you, then, determine

10   if an officer's actions were within policy if you

11   don't have all of the information that -- if you

12   don't have all of the information that the

13   officers used in making the decision that they

14   made?

15           MS. LLOYD:  Objection as to form.

16       A.    The -- the information the officer uses

17   is typically within the packet.

18           Again, I don't have the packet, so I

19   don't know.  But it's in the packet.  If it's

20   not, you ask for it.

21   BY MS. BRATTON:

22       Q.    Okay.  So that was the question with

23   dispatch.

24       A.    We don't -- radio does -- go ahead.

25       Q.    No.  I'm sorry.

```
 1        A.    Yeah.  I -- I'm sorry.  I just --

 2        Q.    Part of it is --

 3        A.    Go ahead.

 4        Q.    Part of it is, I'm trying to understand

 5  the process of how you came to the decision.

 6              So if it's you typically don't listen

 7  to dispatch, then I would need to know that.

 8              So that was -- one of the questions

 9  was, how did you come to this particular

10  conclusion, and what -- so that was one question.

11              And then the other question was, what

12  did you use to come to it?  So --

13              MS. LLOYD:  Objection as to form.  And

14        I believe that particular question has been

15        asked and answered now several times.

16        A.    I look at what's attached to this.  I

17  don't know what's attached to this, or I don't

18  remember.

19              But I look at what's attached to this,

20  and I make my recommendation on what's in the

21  investigative packet.  And, again, if I see any

22  lack of information, then I ask for it.

23  BY MS. BRATTON:

24        Q.    Okay.  And if someone is stopped --

25        A.    Uh-huh.
```

91

1      Q.   -- and there is a dispute over the

2   stop, would you expect the investigator to get

3   the dispatch information to review?

4           MS. LLOYD:  Again, objection as to the

5           form of that question, and the premise of

6           that question that someone is investigating

7           a stop.

8      A.   I don't know what you mean by dispute,

9   who's disputing or where it's coming from, so I'm

10   not sure about that part of the question.

11   BY MS. BRATTON:

12      Q.   If you're reviewing a citizen or

13   another officer, someone reports an investigation

14   is open.  It comes to you for review.  And that

15   investigation -- there is a dispute -- no matter

16   how it came in, there is a dispute as to whether

17   or not a citizen should have been stopped and

18   detained, would you want whatever information was

19   available to determine what the officers used

20   to -- for reasonable suspicion to stop and

21   detain?

22           MS. LLOYD:  Again, I'm going to have to

23           object to the form of that question to

24           the -- and assuming it is a hypothetical.

25      A.   The dispute part is still throwing me.

```
1                    If there was a dispute on something,

2       that's unlikely that's the type of investigation

3       that I would receive.  A dispute would lead me to

4       believe it would be a citizen complaint or some

5       allegation of misconduct.  And I would not get

6       that initial investigation to look at.

7                    Dispute is kind of a -- I don't know

8       who's disputing what.

9       BY MS. BRATTON:

10          Q.   Okay.

11          A.   It's unclear to me.

12          Q.   If an investigation in an officer's

13      chain of command is opened or instituted because

14      an officer stopped and detained someone, and the

15      allegation is they did that lacking reasonable

16      suspicion, would you want all of the information

17      that was available to review what the officers

18      used or based their reasonable suspicion

19      determination on?

20          A.   Again, if there is a dispute and an

21      illegal detention, that would not come to me,

22      that would go to internal affairs.  I would --

23      that would not be a use-of-mace investigation.

24          Q.   I --

25          A.   I wouldn't get that.
```

1     Q.   Okay.  I understand that.  Earlier, I

2  asked you about --

3     A.   I'm not sure you understand my role.

4     Q.   Earlier, I asked you, have you -- do

5  investigations come to you for review about an

6  officer stopping and detaining someone that's not

7  in policy.  And you said yes.

8     A.   I don't think that's how it was

9  phrased.

10     Q.   Okay.  So then the only --

11     A.   An internal affairs investigation would

12  come to me, yes.  But it would have been

13  investigated already on that type of an

14  allegation.

15     Q.   Okay.  And you have the ability -- when

16  it comes to you, you do a final review on it,

17  correct?

18     A.   I would review what internal affairs

19  did, yes.

20     Q.   Okay.  And if something was missing

21  from internal affairs, you have the ability to

22  say, I think this is missing, I want to go

23  back -- I want you to go back and get it, look at

24  it, review it, or give it to me?

25     A.   We can talk to internal affairs if we

94

1    feel something is unclear in the investigation,

2    yes.

3         Q.   Okay.  And you can ask them to obtain

4    additional information?

5         A.   We can ask them to look at it, yes.

6         Q.   Okay.  And when you ask them to look at

7    it are you able to say, go get me dispatch?

8         A.   That's up to their chain of command.

9    We take our concerns to them and they have to

10   answer that.

11        Q.   Okay.  So if you need additional

12   information before you would sign off on

13   something, and the other chain of command won't

14   get it, how do you resolve that?

15        A.   They will get -- if I have a clarif --

16   if I need clarification, they will get you the

17   clarification.

18             How they get it is on -- is their realm

19   of responsibility or their area of

20   responsibility.  I've never not been given

21   information, clarifying information, if I've

22   asked internal affairs' chain of command for it.

23   They will give it.  There's -- they're not going

24   to say, no, we're not going to clarify that.

25        Q.   Okay.  So then in instances where you

95

1    are reviewing a stop and detention investigation,

2    you have the ability to go back to internal

3    affairs and say, I want dispatch, or whatever you

4    feel is missing?

5         A.    I can ask them for clarification.

6         Q.    Okay.

7         A.    If I feel that something in particular

8    is missing, I can say that.  But, again, it's

9    their investigation.  They know what they've

10   looked at and what they've done and who they've

11   talked to.

12        Q.    So then what is your role in the

13   approval process?

14        A.    Approval of what?

15        Q.    The final -- as the final

16   decision-maker, what is your role in the

17   investigation?

18        A.    On what type of investigation?

19        Q.    On --

20        A.    Because there's different roles in

21   different types of investigations.

22        Q.    On a stop and detain investigation.

23        A.    I wouldn't get that.  A stop and

24   detention investigation would probably be an

25   internal affairs compliant.  So it would go to

1    them.

2              If it was alleged to be an illegal

3    detention or something like that, it would go to

4    internal affairs.  And then I would get their --

5    if it was a person -- ultimately, I will get the

6    internal affairs packet, after they did all the

7    interviews and get anything they need to get for

8    it.

9         Q.   Okay.  And then do you sign off on

10   it?

11        A.   I would review it and make a

12   recommendation, yes.

13        Q.   Okay.  So I -- in the investigation --

14        A.   Uh-huh.

15        Q.   -- that chain, you are to make a review

16   and request -- a recommendation?

17        A.   Uh-huh.

18        Q.   And do you have any responsibilities in

19   ensuring that the investigation that was

20   conducted was thorough and accurate?

21        A.   If I see something -- as I said, if I

22   see something that's missing in an investigation,

23   I'm going to ask for clarification.

24              After I've made my recommendation, all

25   internal affairs investigations go to the deputy

97

1   chief level, so -- which provides you with

2   another level of oversight and supervision and

3   review.

4           And they also have the prerogative, if

5   they feel something is missing, to send it

6   back.

7       Q.   Okay.  So your role is not just to sign

8   off on internal affairs investigations, it's

9   to -- is that accurate?

10      A.   What do you mean by sign off?  Just

11  signing the routing sheet or --

12      Q.   Yes, without --

13      A.   No, I would --

14      Q.   -- reviewing anything.

15      A.   I would be remiss in my duties if I did

16  not read the investigation --

17      Q.   Okay.

18      A.   -- completely.

19      Q.   And with officers and dispatch, an

20  officer then is given leeway to stop anyone

21  because dispatch could be wrong?

22          MS. LLOYD:  Objection as to form.

23      A.   I don't know what you mean by leeway.

24  The officers -- we get runs.  They respond to the

25  run.  That puts them in the area.  There's so

1    much more to the situation on the streets.

2    There's so many more factors and more variables

3    that come into play.

4            And leeway is -- I don't know what

5    leeway is, what you mean by that word.

6    BY MS. BRATTON:

7        Q.   So there is still a question that I

8    don't think has been answered yet, about how,

9    when an investigation is being conducted -- so

10   when you're doing the review, I understand that

11   internal affairs, they go get all the

12   information.  They get everything.

13           But, ultimately, when it comes to you,

14   you do a complete review of what the officers did

15   before you sign and say, I recommend whatever you

16   recommend.

17       A.   Okay.

18       Q.   So in that regard, you are reviewing

19   all of the facts contained in the investigation;

20   is that correct?

21       A.   Right, reviewing the investigation.

22   Right.

23       Q.   Okay.  So if nothing matches a

24   description except that a person is near a

25   location -- once you read it, you listen to a

99

1    tape, you watch a video, the only thing that is

2    exact is that somebody is near a location, would

3    you have any follow-up at all?

4         MS. LLOYD:  Again, objection as to the

5         form of that question and departing from the

6         facts of this case.

7         A.   Again, there is more to every bit of

8    policing that we do out there than just what

9    comes across the radio.

10        And, again, I can't begin to

11   second-guess what they saw and what they did in

12   this hypothetical that you're giving, out in the

13   streets.  There is so much more to it.

14   BY MS. BRATTON:

15        Q.   I understand that there is a number of

16   instances or a number of variables that can

17   happen on the street.

18        A.   Uh-huh.

19        Q.   But when you get an investigation

20   packet, your investigation is kind of limited to

21   what those officers put in your experience; is

22   that accurate?

23        MS. LLOYD:  Excuse me.  Could you

24        read the -- I didn't hear the last part of

25        that question, just the last phrasing.

```
 1              (The record was read.)
 2              MS. LLOYD:  Objection as to form.
 3   BY MS. BRATTON:
 4       Q.   When -- there are a number of
 5   variables -- you've already testified to -- that
 6   can occur when an officer stops someone in your
 7   decision-making.
 8       A.   Uh-huh.
 9       Q.   But when you make a determination,
10   you're looking at the facts in the packet that's
11   before you, correct?
12       A.   Yes.
13              Okay.  So if you have a packet before
14   you, and you're investigating a stop -- or you're
15   reviewing an investigation of a stop and
16   detention, in the facts in your packet, the only
17   thing that matches up is that the suspect was
18   near the location, would you have any follow-up?
19              MS. LLOYD:  Again, objection as to form
20         and the fact that this question has now been
21         asked numerous times.
22              I would also object to the clar --
23   matches up with what?
24       A.   Again, if I saw anything lacking or
25   something that is amiss in any investigation that
```

1    I review, I would ask for clarification or seek

2    clarification on it.

3              Saying that one thing is the only thing

4    that matches up, you can't be that -- it's not,

5    again, black and white.  You can't just say,

6    well, this and that.  There's going to be more to

7    that packet.

8              And if I saw anything that was amiss, I

9    would ask for clarification.

10             I've said that several times.  And

11   trust me when I say, I would ask for

12   clarification.

13   BY MS. BRATTON:

14       Q.   No.  I under -- I understand that.  I'm

15   trying to understand what dispatch's role is in

16   policing, if any.

17             So if dispatch calls in a black woman

18   with shorts walking down the street, and one of

19   your officers stops a white woman with a short

20   skirt on just because they're on the same street

21   and in the vicinity, is that something, if the

22   white woman made a complaint, that you would

23   review?

24             MS. LLOYD:  Again, objection as to the

25             impossible form of that question.

1              And the initial question, I believe,

2        was something that you want to understand

3        about the role of dispatch.  The question is

4        impossible to answer.  It went on for a long

5        time with several subparts.

6        A.   I forgot the question.

7   BY MS. BRATTON:

8        Q.   So --

9        A.   Because it was, again, a long question.

10       Q.   Yes.

11             If an officer can just stop anybody

12  because dispatch is -- can be inaccurate, then

13  what is dispatch used for?

14             MS. LLOYD:  Again, objection as to form

15        and the premise of that question, which is

16        an absolute mischaracterization of what

17        Commander Curmode has said numerous times.

18        A.   In fact, I think I said you can't just

19  stop anybody for anything.  I'm sure I said that.

20             Again, a citizen calls in, oftentimes

21  anonymous, saying -- at night in the dark -- that

22  they saw a male black, male white, what have you.

23  There are perceptions.  You cannot go exact --

24  well, I'm going to drive by him because he's not

25  a male black with a shirt on, because I see a

1    light-skinned male black who took his shirt off.

2          Things change.  They're fluid.  The

3    officers need to get the -- they're at the scene.

4    They need to take what they have, put all the

5    pieces together to make a determination.

6    BY MS. BRATTON:

7          Q.   Okay.  So --

8          A.   I feel like I'm answering the same

9    question different ways for you, trying to

10   clarify for you.

11         Q.   Yeah.  Maybe it's just me not getting

12   it.

13         Because if you can't stop anybody -- if

14   an officer can't stop just anybody on a street,

15   but someone on the street doesn't match any

16   description, then is it that the officer can stop

17   because of vicinity, or -- that's -- that's what

18   I'm trying to get to.

19         Because it was said that an officer

20   can't just stop anybody.  And then it was said

21   that officers have to rely on more than just

22   dispatch.

23         So if vicinity to a dispatch location

24   is all that is in line with dispatch, what was

25   dispatched out as far as race, as far as gender,

1   then how -- what is reas -- how do you make a

2   determination about whether the stop was

3   reasonable?

4         MS. LLOYD: Again, objection as to the

5       form of that question, which went on

6       forever, without ever indicating what is the

7       criminal activity that is the source of the

8       dispatch report or call.

9   A.  Can you ask the last part of the

10  question again?

11  BY MS. BRATTON:

12   Q.  Uh-huh.

13       Where -- how do you make a

14  reasonableness determination of an officer's stop

15  and detention when the only -- when vicinity is

16  the only descriptor that is in line with what

17  dispatch sends out?

18        MS. LLOYD: Again, this question has

19      now been asked several times.

20      And, also, Commander Curmode has

21      testified now several times as to this issue

22      of investigating a stop and detention.

23   A.  Again, the officers are at the scene.

24  They make the stop. If it's just vicinity, they

25  make the stop. Something more is going to

1    happen.  Something happens.  Something else is

2    going to contribute to that situation.

3    BY MS. BRATTON:

4        Q.   Okay.  So then vicinity is a

5    reasonable -- you can stop someone just because

6    they're in the vicinity?

7            MS. LLOYD:  Objection as to form and as

8            to mischaracterization of her testimony.

9            She's just testified that there are other

10           variables in any situation.

11           All of your questions have eliminated

12           the underlying criminal activity that would

13           be inherent in the situation.

14       A.   We've also -- earlier, I testified that

15   you can have a consensual encounter with someone

16   based on vicinity.

17           10:30 at night, you can have -- and

18   that -- they didn't get the car description, they

19   can reasonably stop someone for vicinity, yes.

20       Q.   Okay.

21       A.   But, as I said also -- because I'm

22   giving a multi-part answer -- there are those

23   other factors, and other things will come into

24   play when that stop is made.  Things happen.

25   Things change.  Things evolve.

1     Q.  Okay.  But if the original -- just

2  going back to what you said, is that they can

3  stop for vicinity.

4        Is that the only thing that -- can they

5  base a reasonable stop just off of suspicion --

6  vicinity?

7        MS. LLOYD:  Again, objection as to form

8       and as to mischaracterization of her

9       testimony, now which is getting to the point

10      where this is badgering.  And this is

11      ridiculous.  She has answered the same

12      question now, I would say, maybe up to

13      30, 40 times.

14      MS. BRATTON:  For the record, I just

15      asked the witness a question as opposed to

16      mischaracterizing testimony.

17      My question was, can an officer base a

18      stop solely off of vicinity.  That is not

19      mischaracterizing anything.  That is asking

20      a question.

21      MS. LLOYD:  That question has been

22      asked and answered now several times.

23     A.  There's other circumstances involved in

24  that.  They can make a stop.  Vicinity is a big

25  part of it.  It's not the whole part.  I cannot

1    second-guess what the officers saw, if we're

2    talking hypothetical or we're talking about his

3    specific situation.

4    BY MS. BRATTON:

5         Q.   So my question was not the other.  I'm

6    just asking solely, so one thing.

7              If -- can the officers solely base -- I

8    understand that it can be vicinity, it can be

9    race.  I understand there can be variable

10   factors.

11             The question, which has not been

12   answered, this specific question is, can an

13   officer within Columbus police training stop a

14   citizen solely -- for no other reason, solely

15   because they are in the vicinity of a dispatched

16   crime?

17        A.   Vicinity has a big part of it.  It can

18   have a big role in it.

19        Q.   Okay.

20        A.   But the word solely, again, you're

21   black-and-whiting policing, and it isn't like

22   that.

23             That's kind of an absolute that you're

24   giving me.

25        Q.   So then is it --

1       A.   I guess I don't -- I'm not

2   understanding the question.  You're asking the

3   question different ways, and I'm not -- clearly,

4   since you keep asking it, I must not be following

5   what you're asking me, or I've answered it.  I'm

6   not sure.

7       Q.   I mean, I don't even -- I don't know

8   how to make it clearer -- is that -- is the --

9   can an officer stop somebody and the only reason

10  they stop them is because they're in the vicinity

11  of a reported crime?

12      A.   It's not going to be the only reason.

13  There's going to be a reported crime.

14      Q.   No, that's what I said, reported crime.

15      A.   Right.  That -- so it wouldn't be the

16  only reason they stopped them.  They may stop

17  them just to ask if they saw somebody in the

18  area.  There can be very many different ways to

19  have contact with a person in the vicinity of

20  something.

21           And then something may transpire from

22  there, where there's more or there's some other

23  factor that would lead them to believe, huh, this

24  person isn't just here, they potentially could

25  have something to do with this.

1      Q.   Okay.  So that was the answer --

2      A.   Is that --

3      Q.   So, yes, they can stop them because

4  they're -- just because they're in the

5  vicinity?

6           MS. LLOYD:  In the vicinity of --

7      A.   A reported crime, right.

8  BY MS. BRATTON:

9      Q.   Yes.

10     A.   That's what I thought I answered -- or

11 trying to answer.

12     Q.   Yes, you did.  Thank you.

13          And if they stop someone -- if an

14 officer stops someone in the vicinity of the

15 crime, and that person -- there is no reasonable

16 suspicion, at that time, that that person is

17 involved in the reported crime, then that person,

18 if they don't consent, can leave; is that

19 accurate?

20     A.   Well, if it's a consensual encounter,

21 yes, they can leave.  If the officers feel

22 there's something more to make it into the realm

23 of the investigative stop, then they need to

24 comply with the investigation and either clear

25 themselves, or the officers will figure out that

1   they do or do not have anything to do with it.

2       Q.   Okay.  And to take it from one realm to

3   the other, they have to have reasonable

4   suspicion?

5       A.   Something more is -- needs to come up.

6   Some other circumstance would come up.

7       Q.   Okay.  Are there different chains of

8   command that a -- that you use of mace would go

9   through, depending on whether or not a suspect

10  was handcuffed when they were maced?

11      A.   A use of mace against a handcuffed?

12  It's the same chain of command, but it would go

13  up to the deputy chief's level --

14      Q.   Okay.

15      A.   -- beyond the commander level.

16      Q.   Okay.  And from the -- from this

17  routing sheet, does it look like this went to

18  that particular level?

19      A.   No.

20      Q.   Okay.

21      A.   Doesn't indicate that on the routing

22  sheet, no.

23      Q.   Okay.  And if a sus -- if a suspect who

24  was maced alleges they were handcuffed when they

25  were maced, and an officer says that they were

1  maced and then handcuffed, which route would --
2  which chain of command would the -- would you put
3  that in?
4       MS. LLOYD:  Again, objection as to form
5       and as to where this information is.
6       Is this a use-of-force investigation?
7  A.  Yeah.  Because that -- that sounds to
8  me like something that would be an internal
9  affairs investigation, later on, that wouldn't be
10 on the initial use-of-mace or use-of-force
11 investigation.
12      Is that what you're asking?
13 BY MS. BRATTON:
14 Q.  Okay.  Well, I guess that just answered
15 part of the question.
16      So it would only go -- if an -- it
17 would only initially, without a citizen making
18 the complaint that they were handcuffed at the
19 time, the chain of command would just be based
20 off of the officer's report, initially?
21      MS. LLOYD:  Use-of-force
22      investigation.
23 A.  Use of mace?  Use of force?
24 BY MS. BRATTON:
25 Q.  Would only be based on the officer's

1   report at that time?

2        A.   I don't know what you mean.

3        Q.   When an officer uses mace, they have to

4   write out the use-of-force report, correct?

5        A.   Right.

6        Q.   Okay.

7        A.   The supervisor would talk to the -- I

8   don't want to point to him -- would talk to the

9   suspect also.

10       Q.   Okay.

11       A.   So it's -- it's totality of the

12  supervisor, the at-scene supervisor's

13  investigation.

14       Q.   Okay.  So then it doesn't necessarily

15  have to go through internal affairs for if there

16  was a conflicting account given by the suspect

17  and the officer's use-of-force report?

18       A.   No.  It would not necessarily have to

19  go to it.  Internal affairs is for internal and

20  external citizen complaint investigations.

21       Q.   Okay.  So if a suspect said, I was

22  handcuffed when the officer maced me, and an

23  officer says, I maced him first and then I

24  handcuffed him, which -- who would decide what --

25  if that went to the deputy chief or not?

1   A. If it was written up by the at-scene

2 supervisor as a use of mace, it would stop there,

3 if that makes sense.  It would stop at me, at the

4 commander level, and I would send to internal

5 affairs.

6    It would only go to the deputy chief if

7 it was, you know, clear that the person was

8 handcuffed.

9    I -- I don't really know what you're

10 saying.  Because that -- that detail might come

11 up, but again, that's more of an internal affairs

12 allegation.

13   Q. Okay.  So you --

14   A. If it was the at-scene supervisor and

15 lieutenant that made that determination that this

16 was a use of mace -- or it was a use of mace --

17 not seeing the packet, I don't know.

18    We're talking hypothetical, right --

19   Q. Yeah.

20   A. -- just use of mace?

21   Q. Uh-huh.

22   A. So --

23   Q. So then you would send it to internal

24 affairs, and internal affairs would do the

25 investigation?

1     A.   No.

2     Q.   So it would just through internal

3 affairs and stop?

4     A.   If it's -- if I had a use of mace --

5 just a use of force, if it's a use of mace, I

6 would send it to internal affairs, as I stated

7 way back in the beginning of this.

8       I -- I don't know if they file it,

9 if -- for staff purposes.  But they take it and

10 they maintain it.  What they do with it, that's

11 in IA.  But that's where it goes on just a use of

12 mace -- not handcuffing, just a use of mace.

13     Q.   Okay.  So what I'm asking is, who makes

14 the decision between whether it goes to internal

15 affairs or whether it goes to the assistant

16 chief -- or deputy chief --

17     A.   Uh-huh.

18     Q.   -- if there is a dispute between the

19 version of facts that the suspect gives -- I'm

20 handcuffed and maced -- or the version of facts

21 that the officer puts in their use-of-force

22 report, that they're maced and then handcuffed?

23       MS. LLOYD:  Again, objection as to

24     form.

25       And just for clarification, which she's

1          already testified, the supervisor is the one

2          who is investigating the use of force.

3     A.   The at-scene supervisor makes the

4     determination.

5          And that's why we have the internal

6     affairs route.  If the -- sorry.  If the suspect

7     feels that they were wronged or that something

8     improper happened.  That's why we have internal

9     affairs.  It's separate.  It's a separate entity

10    from chain of command.

11         Again, not seeing this, if it indicated

12    handcuff or whatever, it came in as a use of

13    force, that determination was made by the

14    at-scene supervisor of the investigation, through

15    the course of their in-person interviews, their

16    observations at the scene, just everything that

17    they saw while they were doing their

18    investigation.

19    BY MS. BRATTON:

20    Q.   Okay.  I don't know if I'm asking this

21    question wrong or not.

22         If a person -- if a suspect would not

23    give -- never calls internal affairs, but on

24    scene they give a statement that I was handcuffed

25    first, and then maced --

116

1       A.    Uh-huh.

2       Q.   -- and then the officer puts in her

3   use-of-force report the opposite, who would be

4   the -- the person who makes the decision about

5   whether or not you're the last person to review

6   it or whether or not the deputy chief -- just the

7   decision itself, not whether or not it was

8   justified, but who would be the last level of

9   review for that?

10      A.    When the at-scene supervisor

11  commences their use-of-mace or use-of-force

12  investigation, they make that determination from

13  the statements that they gather at the scene,

14  what's happening at the scene.

15          They would title their investigation

16  either use of force, level 2, mace, or use of

17  force against handcuffed prisoner.  That

18  determination is made at the scene by the

19  supervisor who's with the suspect, who's with the

20  officers, who sees what's going on, who looks at

21  the physical evidence.

22          And that's how the letter comes up.  So

23  that determination is made when they -- the

24  determination is made when they do the

25  investigation.

1       Q.   Okay.  Okay.  Can you describe the

2  three-second rule that you all use for use of --

3  for an individual complying with commands?

4       A.   What are you referring to?

5       Q.   Yesterday, trainer -- what is his

6  name?

7            MS. LLOYD:  Sergeant Cheatham?

8            MS. BRATTON:  Yes.

9  BY MS. BRATTON:

10       Q.   Sergeant Cheatham mentioned the

11  three-second rule for compliance.

12       A.   I'm not sure what he's referring to.

13            That three -- that phrase, three-second

14  rule, is not really in our policies.  It's

15  something that I'm sure he teaches, but I

16  don't know exactly what he referred to when he

17  told you that.  I really can't comment on what he

18  said.

19       Q.   Okay.  How long should an officer give

20  a person to comply after they make a command?

21            MS. LLOYD:  Objection as to form.

22       A.   There's no absolute.  That's

23  situational.  It depends on various factors.

24  BY MS. BRATTON:

25       Q.   Okay.  So then are you all trained to

1    give somebody three seconds or --

2         MS. LLOYD:  Objection as to form, asked

3      and answered.

4    A.   Again, that -- I'm not sure what he

5    testified to.  I don't know what his phrasing is.

6    That's not a term that I use.  But it's

7    situational.

8         There's one -- it depends what the

9    person's state is, the aggressiveness that's

10   being displayed, type of run.  There's so many

11   factors involved in it, you can't just absolute

12   anything.

13   Q.   So then I guess the answer would be,

14   you all are not trained on -- to give a suspect

15   three seconds to comply?

16        MS. LLOYD:  Again, objection as to

17     form, asked and answered.

18   A.   That is Sergeant Cheatham's area of

19   expertise.  He was the DT sergeant.  If he's

20   using a certain phrase, and we're saying the same

21   thing, again, I don't know exactly what the

22   whole -- like how he said what he said to you.

23   BY MS. BRATTON:

24   Q.   Okay.  My question to him was, if a

25   suspect is complying, how long do you give them

1   to comply.  And he said that Columbus police have

2   a three-second rule.

3               So I'm asking, what is your

4   understanding of how long -- if a -- and let me

5   compartmentalize it, because that was broad.

6               If a person is fully compliant with --

7   with you, and you give them a command, how long

8   from -- how you are trained -- are you supposed

9   to give them to comply with your command?

10              MS. LLOYD:  Objection.  Asked and

11          answered.

12         A.   Again, it's a reasonableness.  You

13   can't put -- you -- again, I don't understand

14   exactly what he told you about the three seconds.

15   I'm not the DT, the defensive tactics sergeant.

16   What his phrasing and terminology is, I don't

17   know.

18              It's all down to reasonableness.  It

19   depends on what they're doing.  Are they

20   clenching up?  There's so many factors on

21   suspects' actions, scene.  There's -- there's so

22   many variables involved in this, you -- it's

23   difficult to put an absolute time on that.

24   BY MS. BRATTON:

25         Q.   Okay.  Do you remember, in any of your

1    training, anything about giving someone three

2    seconds to comply?

3        A.   We talked about reasonableness.  I

4    don't know that I personally was told a

5    three-second.  But you must remember, I went to

6    the academy 33 years ago.  So Sergeant Cheatham

7    wasn't on the department then.

8            But, again, that's a term he's using in

9    a training situation that, to me, comes down to

10   reasonableness.  And that's basically -- three

11   seconds is not a long period of time.

12   BY MS. BRATTON:

13       Q.   Okay.  Do you still do any patrol on

14   the -- are you -- I guess still on the street

15   is -- I don't know the correct term.

16       A.   I'm not in a marked cruiser.

17       Q.   Okay.

18       A.   I go out with officers now and again,

19   just to go out.  But, no, I'm not on patrol.  No

20   commanders are on patrol --

21       Q.   Okay.

22       A.   -- a routine patrol.  Even though

23   they're out and about, they're not assigned a

24   cruiser.

25       Q.   Okay.  And when was the last time that

1    you conducted a traffic stop where you took

2    someone out of the car?

3         A.   I don't have a marked cruiser, so I'm

4    not permitted to conduct a traffic stop.

5         Q.   Okay.  Have you rode with anyone who --

6         A.   Not since I've been with the strategic

7    response bureau, because that's not -- we're

8    not -- we're not patrol.  We're assigned to

9    patrol, but we're not patrolling and taking runs.

10   We have different responsibilities.

11        Q.   Okay.  And can the strategic response

12   make an arrest?

13        A.   Yeah, they're sworn officers.  Yes,

14   they can.

15        Q.   Okay.

16        A.   They're officers.  I'm sorry.

17        Q.   Okay.  No, I was just trying to see

18   what they are.

19        A.   Yeah, you don't know what they are.

20   So, yeah, they do community relations, things

21   like that, school resource officers, recruiting

22   units, things like that.

23        Q.   Okay.

24        A.   But, yes, they clearly have -- and they

25   do make arrests.

1      Q.   Okay.  And are they in regular uniform

2  or different?

3      A.   They're all in uniform, except for the

4  mounted, they're in a different uniform, but

5  they're still in uniform.

6      Q.   Okay.

7           MS. BRATTON:  All right.  I think I'm

8      done, but just give me a minute.

9           (A recess was taken from 11:29 to

10          11:34.)

11          MS. BRATTON:  I don't have any further

12      questions.

13          THE REPORTER:  Do you want signature if

14      it's ordered?

15          MS. LLOYD:  Yes.

16

17          _____

                    COMMANDER SUZANNE CURMODE

18

19                      - - -

20       DEPOSITION ADJOURNED AT 11:34 A.M.

21                      - - -

22

23

24

25

```
 1                     C E R T I F I C A T E

 2

 3     STATE OF OHIO        :
                            :   SS
 4     COUNTY OF HAMILTON   :

 5              I, Wendy Scott, the undersigned, a duly

 6     qualified and commissioned notary public within

 7     and for the State of Ohio, do certify that before

 8     the giving of her deposition, COMMANDER SUZANNE

 9     CURMODE was by me first duly sworn to depose the

10     truth, the whole truth and nothing but the truth;

11     that the foregoing is the deposition given at

12     said time and place by COMMANDER SUZANNE CURMODE;

13     that I am neither a relative of nor employee of

14     any of the parties or their counsel, and have no

15     interest whatever in the result of the action.

16              IN WITNESS WHEREOF, I hereunto set my hand

17     and official seal of office at Cincinnati, Ohio,

18     this 9th day of October 2017.

19

20                      _____

21                      Wendy Scott
                        Notary Public - State of Ohio
22                      My commission expires September 3, 2022

23

24

25
```

124

```
 1              E R R A T A   S H E E T

 2        DEPOSITION OF:  COMMANDER SUZANNE CURMODE
                TAKEN:  SEPTEMBER 28, 2017
 3

 4   Please make the following corrections to my
     deposition transcript:
 5

 6   Page  Line Number           Correction Made

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24

25   _____    _____
     Witness Signature                  Date
```

**0**

**0** 21:2

**1**

**10** 30:12,13,16
**10:09** 61:4
**10:12** 61:5
**10:30** 62:23 80:9 105:17
**11/26/14** 47:2,5
**110** 23:8
**11:29** 122:9
**11:34** 122:10,20
**120** 8:14
**17** 7:1
**1984** 7:5
**1st** 58:16

**2**

**2** 20:23 21:2,14 28:2,6
  48:5,21 54:12,18,22 57:16
  83:17 116:16
**2000s** 24:15
**2001** 7:9
**2014** 8:2,3 26:10 87:12
**22** 61:15,18 77:15,16
**2756** 55:18

**3**

**3** 56:9 59:24 60:5,20,22
  61:8,19 77:15
**30** 106:13
**32** 61:19
**33** 21:5,9 46:22,23 57:8
  120:6

**4**

**40** 106:13
**44** 61:15 77:16
**45** 61:19

**7**

**784** 55:4
**790** 83:17

**A**

**A's** 52:7 53:13
**A.M.** 122:20
**ability** 5:13 13:25 59:8,17
  93:15,21 95:2

**able** 14:10 28:1 44:11 64:9
  94:7
**absolute** 102:16 107:23
  117:22 118:11 119:23
**academy** 10:24 120:6
**account** 35:16 112:16
**accurate** 18:21 71:17 73:9
  96:20 97:9 99:22 109:19
**act** 31:7 34:13,22
**acted** 41:16 42:22 45:8
**acting** 24:5 81:9
**action** 58:23 64:14
**actions** 16:7 27:16 31:17
  34:7 35:19 40:19 44:12
  54:8 63:5 74:9,11 89:10
  119:21
**activity** 14:21 16:18 104:7
  105:12
**actual** 62:12
**additional** 53:16 94:4,11
**adhere** 33:6
**ADJOURNED** 122:20
**admin** 7:23
**affairs** 9:7 11:15,20 15:16
  18:1,3,13,18,25 19:5,11
  20:3 23:22 43:4 44:2,4,11,
  16 47:15,16 49:1 92:22
  93:11,18,21,25 95:3,25
  96:4,6,25 97:8 98:11
  111:9 112:15,19 113:5,11,
  24 114:3,6,15 115:6,9,23
**affairs'** 94:22
**afoot** 14:21
**aggressiveness** 27:17
  35:20 118:9
**ago** 72:18 120:6
**agree** 77:22 78:10
**ahead** 89:24 90:3
**allegation** 92:5,15 93:14
  113:12
**alleged** 10:9 20:1 96:2
**alleges** 110:24
**alley** 68:9
**allow** 36:10
**allowed** 73:19
**Amendment** 27:4
**amiss** 100:25 101:8
**anonymous** 102:21
**answer** 4:21 9:22,23 12:8
  17:10 25:3,15,16 26:18
  32:12 33:18,23 36:17
  38:5,9 39:5 40:3 41:5
  62:21,24 63:7 65:22,24
  72:9 88:1 94:10 102:4
  105:22 109:1,11 118:13

**answered** 17:9 26:5 28:10
  29:9 33:3,11 34:9 39:21
  40:25 49:17 52:19 90:15
  98:8 106:11,22 107:12
  108:5 109:10 111:14
  118:3,17 119:11
**answering** 103:8
**answers** 13:15 22:25
**anybody** 6:2 72:4,25 75:15
  102:11,19 103:13,14,20
**appear** 48:5
**appears** 63:24
**apples** 58:4
**applicable** 87:1
**apply** 30:9 34:14
**approval** 19:18 95:13,14
**approximately** 7:6
**area** 25:18,20 94:19 97:25
  108:18 118:18
**areas** 7:21 24:25
**argue** 12:5
**arrest** 40:21 42:1,10,12
  49:7 81:25 82:2,23 83:2,4,
  5,6,18,23,24 84:2,6,10
  85:5,21 121:12
**arrested** 40:16 41:24
  42:18 56:20 84:14,17,18,
  20,23
**arrestee** 84:20
**arrests** 121:25
**articulable** 63:17
**asked** 17:9 22:19 26:5
  29:8 33:3,11 34:9 39:21
  40:24 49:16 53:6 62:1,15
  64:3 90:15 93:2,4 94:22
  100:21 104:19 106:15,22
  118:2,17 119:10
**asking** 6:8 8:21 13:4 14:7
  15:24 17:6 20:13 22:14
  26:8,9 29:2 32:4,25 34:4
  43:15,16 44:19,23 46:10,
  11 53:11,22 58:8 64:10,
  11,18 65:5 70:9 80:25
  83:22 84:15 106:19 107:6
  108:2,4,5 111:12 114:13
  115:20 119:3
**assess** 35:2,5
**assigned** 8:10 120:23
  121:8
**assignment** 7:20
**assistant** 114:15
**associated** 49:7
**assume** 53:25 54:4 68:13,
  17,22,24 69:1,4 76:3 89:2
**assuming** 47:17 62:23
  84:1 91:24

**assumption** 53:15
**at-scene** 112:12 113:1,14
  115:3,14 116:10
**attached** 21:23 22:1 40:10
  49:10 51:17 54:19 86:15
  90:16,17,19
**attachment** 51:16
**attachments** 87:2
**attempt** 63:24
**attorney** 6:1
**audio** 5:24 22:9 51:17
  61:16,20 62:9 76:13 77:19
**available** 22:10 82:11
  91:19 92:17
**Avenue** 55:18
**aware** 23:18 48:25

**B**

**B's** 52:8 53:14
**bachelor's** 6:22
**back** 5:6 22:23 39:23
  45:12 46:21 51:23,24
  52:6,7,12,23 53:12,13,16
  54:1 59:12 63:14 66:10
  73:5 80:12 83:8 85:19
  93:23 95:2 97:6 106:2
  114:7
**badgering** 106:10
**bantering** 52:23
**bar** 66:11 77:11,24
**base** 106:5,17 107:7
**based** 15:11,21 16:1,17
  26:1 27:16 42:1 56:10
  68:25 88:6 92:18 105:16
  111:19,25
**basically** 32:7 120:10
**basis** 13:14
**Bates** 55:1
**beginning** 57:19 114:7
**behavior** 68:25
**believe** 10:16 23:22 40:24
  44:23 69:4 84:19 90:14
  92:4 102:1 108:23
**beyond** 59:8 110:15
**big** 17:15 27:21 81:23
  106:24 107:17,18
**bit** 99:7
**black** 66:7 69:11,12 70:5,8
  78:5,6 79:5,6 87:25 101:5,
  17 102:22,25 103:1
**black-and-white** 37:25
  38:13 40:3
**black-and-whiting** 107:21
**Blair** 68:7 69:3,6

**Blair's** 69:21,25
**blanche** 38:5
**body** 87:8,12
**bother** 85:12
**bottom** 54:25
**BRATTON** 4:5 9:21 10:19
  11:12,19,25 12:6 13:5,17
  14:4 15:20 17:4,11 18:16
  21:7 23:17,25 24:12 25:5,
  11 26:7 27:23 28:4,23
  29:13 30:15 31:9,18 32:1,
  11,24 33:8,16 34:1,17
  35:6,14 36:6,19 37:2,21
  38:23 39:9 40:6 41:3
  42:17 43:15,21 44:19
  45:4,5,12,18 46:20 48:1
  49:19 53:9,19 54:12,16
  55:16 56:4 57:3 58:6,7,15,
  19 60:6,10,13,17,19,22,25
  61:2,6,17,21 62:7 63:9
  64:2,17,23 65:3 66:15,23
  67:25 68:16,20,23 69:24
  71:10 72:21 74:19 75:6
  76:8 77:6,14,20 78:9
  79:19 81:17,24 82:20
  83:21 84:16,25 85:8,22
  86:13 87:16 88:3 89:8,21
  90:23 91:11 92:9 98:6
  99:14 100:3 101:13 102:7
  103:6 104:11 105:3
  106:14 107:4 109:8
  111:13,24 115:19 117:8,9,
  24 118:23 119:24 120:12
  122:7,11
**break** 5:8,10 41:8 61:3
**broad** 65:21 119:5
**build** 72:14
**building** 63:15 69:8,10
  78:23,25 79:4
**bureau** 7:18,19,20 8:4 9:7
  13:11 44:11 47:15,16
  121:7
**Bureaus** 7:15
**burglary** 61:11

**C**

**C-u-r-m-o-d-e** 4:16
**call** 68:3 69:2,7 70:14
  72:18 77:25 104:8
**called** 65:13 67:1,6,7
  70:13 77:7,9,22
**caller** 79:25
**calling** 71:18
**calls** 63:2,3 66:6 72:13
  80:11,12 101:17 102:20
  115:23

**cam** 87:8,18,20 88:5
**cameras** 87:8
**cams** 87:12
**car** 36:8,10,11,12,16,21,22
  37:5,7,9,11 39:11,12,17
  40:13,14 41:22 69:7 70:16
  79:25 80:7 105:18 121:2
**career** 46:12
**carte** 38:5
**case** 11:14 12:19 13:12
  18:5 40:7 52:16 54:9
  64:11 66:4 83:3 99:6
**cases** 12:19 15:7 18:7
**certain** 9:8 21:22 26:17,18
  32:18 82:11 118:20
**chain** 9:5,7 17:24 18:2,6,
  12 19:2,5,12,14,20,23
  20:5,25 22:22,23 23:5 43:18,
  24,25 48:6,22 50:2 51:24
  52:17 58:1 59:18 92:13
  94:8,13,22 96:15 110:12
  111:2,19 115:10
**chain-of-command** 47:23
  57:25 62:5
**chains** 110:7
**change** 24:25 25:1 26:11,
  15 65:14 80:6 103:2
  105:25
**changed** 25:19 26:2,8
  72:18
**changes** 24:20 65:20 67:5
**characterization** 33:23
  66:14
**charge** 43:7 45:22,24
**charged** 45:1,2,20 46:3,17
  56:20
**charging** 42:22 45:16
**Cheatham** 117:7,10 120:6
**Cheatham's** 118:18
**check-boxes** 82:7
**chief** 20:21 97:1 112:25
  113:6 114:16 116:6
**chief's** 110:13
**circumstance** 34:21 37:4,8
  85:15 110:6
**circumstances** 9:15 16:22
  23:23 35:10,11,13,19
  36:15 37:1,14 40:2 56:13
  79:17 85:6 106:23
**circumstantial** 27:16
**citizen** 9:2 10:9 11:2,3
  13:8 14:1,16 15:2 18:13,
  24 20:4 31:3,21 36:21
  37:3,11 39:15,18 63:3
  73:24 74:9 91:12,17 92:4
  102:20 107:14 111:17

112:20
**citizens** 33:9
**City** 6:13
**clar** 100:22
**clarif** 94:15
**clarification** 52:1,20 53:4,
 8 59:11,16 74:18 94:16,17
 95:5 96:23 101:1,2,9,12
 114:25
**clarifications** 22:25
**clarify** 29:3 94:24 103:10
**clarifying** 49:14 94:21
**clear** 5:7 10:14 24:9 34:3
 48:15,17 68:6 77:4 83:12
 109:24 113:7
**clearer** 15:11 108:8
**clearly** 34:11 108:3 121:24
**clenching** 119:20
**closed** 77:24
**clothing** 63:12 70:18
**coat** 66:9 69:13 78:6 79:9
**collects** 86:9
**Columbus** 4:12 6:13,17
 23:10 24:14 107:13 119:1
**combative** 28:8
**come** 9:4,8 12:19 17:22
 18:10,11,12,14 19:9,10,11
 20:5 25:3 27:19 38:21
 39:10 43:23,24 44:7 54:7
 90:9,12 92:21 93:5,12
 98:3 105:23 110:5,6
 113:10
**comes** 19:18 24:22 41:14
 75:17 91:14 93:16 98:13
 99:9 116:22 120:9
**coming** 65:19 76:5 91:9
**command** 9:5,8 17:24
 18:3,6,12 19:3,6,12,14,20,
 23 20:5,25 22:22 23:6
 36:4,9 37:19,24 42:24
 43:18,25 48:6,22 50:2
 51:24 52:17 58:2 59:18
 92:13 94:8,13,22 110:8,12
 111:2,19 115:10 117:20
 119:7,9
**commander** 4:1,13,14
 6:25 7:9 8:2,3,9,12 9:9
 20:7 21:10 46:13 63:25
 64:5 75:25 102:17 104:20
 110:15 113:4 122:17
**commanders** 120:20
**commands** 36:2 37:16
 38:10,18 39:10,17,19
 40:17 42:2,15,20 45:9
 117:3

**commences** 116:11
**comment** 117:17
**community** 8:11 10:24
 121:20
**compared** 49:23 52:8
**comparing** 29:15
**compartmentalize** 119:5
**complains** 15:2
**complaint** 9:2 11:4 17:21,
 25 18:14,21,24 19:6,8
 20:4 49:1,5 88:6 92:4
 101:22 111:18 112:20
**complaints** 9:4,6
**complete** 41:11 72:14 86:4
 87:4 98:14
**completed** 58:2
**completely** 70:17 97:18
**compliance** 34:13 117:11
**compliant** 28:18 29:5,10
 37:4 95:25 119:6
**complicated** 70:25
**comply** 27:3 32:22 34:19
 109:24 117:20 118:15
 119:1,9 120:2
**complying** 39:2 117:3
 118:25
**concentrate** 5:13
**concern** 59:15
**concerns** 51:25 94:9
**conclusion** 21:20 54:8
 80:21 90:10
**conduct** 8:19 13:10 30:8
 55:7 121:4
**conducted** 48:24 96:20
 98:9 121:1
**conflicting** 38:18,22 42:20
 45:9 49:15 112:16
**conformance** 65:8
**confronted** 32:8
**confusion** 15:18
**connection** 62:3,4
**consensual** 105:15 109:20
**consent** 109:18
**consider** 15:25 17:7
**considered** 80:23
**constantly** 25:9
**constitution** 10:23 11:17
 12:2
**constitutional** 9:18 10:21
 11:5,23 26:20
**contact** 58:12 59:14
 108:19
**contain** 81:19
**contained** 89:2 98:19

**contains** 41:20 87:13
**continuum** 20:10,14
 34:15,19
**contribute** 105:2
**control** 28:7
**conversation** 73:12
**convoluted** 5:2
**correct** 8:6 10:21 12:12,
 16,20 15:22 20:23 21:15
 25:22 26:21 30:23 34:21
 41:17 44:4 52:3 73:16
 74:23 93:17 98:20 100:11
 112:4 120:15
**counsel** 6:10 64:3,9,10,11
 69:20
**counsel's** 68:25
**couple** 7:20 30:3,9
**course** 17:14 69:16 115:15
**court** 13:12 43:9 44:18
**courts** 15:14
**covered** 30:7
**crime** 27:18 35:21 43:6
 45:1 46:3 107:16 108:11,
 13,14 109:7,15,17
**criminal** 14:20 16:18
 45:22,24 49:22 104:7
 105:12
**cruiser** 87:8,18,20 88:4
 120:16,24 121:3
**Curmode** 4:1,10,14 21:11
 64:5 102:17 104:20
 122:17
**Curmode's** 63:25 75:25
**current** 7:20
**currently** 23:7

---

**D**

**Dale** 6:3
**dark** 62:23 102:21
**date** 47:1
**dates** 47:10
**day** 47:8,12
**de-escalation** 28:12,13,16
**deal** 18:8 59:19
**decide** 112:24
**decides** 27:19 85:5 87:14
**deciding** 35:16 64:13 65:8
**decision** 35:12 86:17,22
 89:13 90:5 114:14 116:4,7
**decision-maker** 20:8,15,
 16 21:1 64:6 95:16
**decision-making** 63:5
 64:13 100:7
**decisions** 13:12 15:15
 64:5,7,8

**deemed** 39:18 87:2,9
**defensive** 119:15
**definitely** 69:23
**degree** 6:22
**departing** 99:5
**department** 4:12 23:11
  24:13,14 25:13 33:20 34:5
  120:7
**departments** 7:14
**depend** 35:10
**depending** 51:14 52:9
  110:9
**depends** 8:17,22 9:15
  20:11 36:15,25 37:13 44:5
  53:6 82:5 85:15 87:22
  88:24 117:23 118:8
  119:19
**deposed** 4:3
**deposition** 4:18 5:5,18
  21:5 61:8 122:20
**depositions** 5:16 66:3
**deputy** 20:21 96:25 110:13
  112:25 113:6 114:16
  116:6
**describe** 117:1
**described** 61:25
**description** 61:24 62:14
  69:15 70:3 72:6 73:3 74:5
  98:24 103:16 105:18
**descriptions** 66:25 71:16
  84:12
**descriptor** 104:16
**desist** 27:13
**detail** 23:19 55:9 81:19
  82:25 113:10
**details** 36:17 82:9,10,12
  84:2 87:6
**detain** 73:13,19,21 91:21
  95:22
**detained** 73:8 91:18 92:14
**detaining** 16:9 93:6
**detention** 10:9 14:20,23
  15:3 16:11,12,15,16
  17:18,22 18:11 44:20
  92:21 95:1,24 96:3 100:16
  104:15,22
**detentions** 9:19 12:24 18:8
**determination** 16:25
  29:17 30:2 40:16,18 42:4,
  21 43:5 44:25 45:7,22
  46:1 58:22 59:1 63:15,18
  92:19 100:9 103:5 104:2,
  14 113:15 115:4,13
  116:12,18,23,24
**determinations** 87:10

**determine** 16:15 29:20
  35:7 41:15 73:3 74:8
  85:19 89:9 91:19
**determined** 43:8
**developed** 66:3
**differ** 85:3,7
**differed** 84:22
**difference** 83:9
**different** 7:12,21 8:12
  18:14,15 23:23 25:2,7,13
  30:3,9 40:2 44:7 65:23
  70:17,18 82:12 95:20,21
  103:9 108:3,18 110:7
  121:10 122:2,4
**differs** 85:11
**difficult** 62:21 63:7 72:19
  80:15 85:19 88:1 119:23
**direct** 33:15
**directive** 33:5
**directives** 30:8
**directly** 43:18
**directs** 9:23
**discrepancy** 51:20 71:15
**dispatch** 59:25 60:7 61:10,
  11,25 62:11,14 63:11,13
  65:11,18 66:6,12,14 70:4
  71:4 72:2 74:23 75:17,18
  76:22 77:7,21,22,25 78:1,
  10 79:12,21,23 80:5 84:21
  85:4,11,25 88:19,22 89:23
  90:7 91:3 94:7 95:3 97:19,
  21 101:17 102:3,12,13
  103:22,23,24 104:8,17
**dispatch's** 101:15
**dispatched** 68:4 88:20
  103:25 107:15
**dispel** 73:20
**displayed** 118:10
**disposition** 9:11
**dispute** 79:3 91:1,8,15,16,
  25 92:1,3,7,20 114:18
**disputing** 91:9 92:8
**distractions** 5:12
**division** 15:13 30:8
**divisional** 15:17
**document** 62:19
**documentation** 53:3
**documenting** 23:23
**documents** 5:17 23:19
  51:16
**doing** 13:24 25:9 27:14
  81:10 98:10 115:17
  119:19
**door** 36:22 39:11 40:13
  41:22

**drive** 102:24
**driving** 69:14 79:2
**drove** 79:3
**DT** 118:19 119:15
**duly** 4:2
**duties** 8:1,8 97:15

---

**E**

**e-mail** 52:12,19
**earlier** 93:1,4 105:14
**early** 7:9
**easier** 15:10
**Eckenrode** 50:5,6
**education** 6:21
**either** 109:24 116:16
**eliminated** 105:11
**encounter** 105:15 109:20
**enforcement** 6:15,16
**ensure** 34:20,25
**ensuring** 96:19
**entire** 47:7 53:11 56:8,12
  57:5 58:21,25 59:5 81:2,4
**entirety** 69:22
**entity** 115:9
**escalate** 28:18,21
**established** 58:1 75:15
  79:5 81:1
**event** 6:10 26:18
**evidence** 116:21
**evolve** 105:25
**exact** 26:14 44:23 99:2
  102:23
**exactly** 8:21 13:3 14:6
  29:2 45:15 53:21 66:20,21
  117:16 118:21 119:14
**EXAMINATION** 4:4
**examined** 4:3
**example** 36:5 83:13
**excessive** 20:2
**Excuse** 57:21 99:23
**exhibit** 21:5,9 30:12,13,16
  46:22 54:22 55:12 56:9
  57:8 59:24 60:5,20,22
  61:8,19 77:15 83:17
**exist** 29:11
**existed** 88:16
**exists** 35:8
**expect** 26:23 86:21 87:5,
  15 88:7,15 91:2
**expectations** 86:7,11
**expected** 82:15,25 85:9
**experience** 6:19 81:14
  99:21

experienced 24:22
experiencing 80:18
expertise 25:18 118:19
explain 7:3 60:3
extent 11:7
external 112:20
extra 86:19
extreme 71:1

---

**F**

---

face 58:10
face-to-face 52:18
faced 32:18
fact 68:13 71:9 72:20
   74:24 75:1,18 80:14,16
   100:20 102:18
factor 108:23
factors 27:18 35:15 80:22
   98:2 105:23 107:10
   117:23 118:11 119:20
facts 64:4,11 66:2 70:10,
   11 87:5 98:19 99:6
   100:10,16 114:19,20
false 69:1
far 12:24 75:25 86:8
   103:25
feel 22:13 25:2 85:16 94:1
   95:4,7 97:5 103:8 109:21
feels 115:7
fellow 31:4,21
felt 77:3
female 66:7
figure 109:25
file 48:11 114:8
filed 49:1,4
filing 47:21 48:8
final 20:8,15,16 21:1 64:6
   93:16 95:15
find 82:10
finish 5:9
first 37:24 82:4 112:23
   115:25
fluid 38:7 65:12 103:2
follow 26:20,22,25 31:25
   34:25 59:9 72:15
follow-up 22:11,15,21,23,
   25 49:20 53:16,24 62:1,15
   70:19 75:3,20 76:24 77:4,
   5 79:10 80:20,25 99:3
   100:18
followed 49:21 56:23
   57:18 70:21
following 39:18 40:17
   42:1,19,23 52:17 108:4

follows 4:3
force 5:21 7:19 20:1,2,8,9,
   10,11,23 21:2 23:4,10,19,
   24 24:4,17,21,22 26:21
   27:5,11,15 28:2 29:7,11,
   15,16,21 30:22 31:1,20
   32:21,22 33:4,7,15,21
   34:6,16,19,21,23 35:3,8,
   17 36:2 44:20 48:5,21
   54:18 56:11,14,21 57:10,
   16,20 59:1,19 62:5 64:16,
   20 111:23 114:5 115:2,13
   116:16,17
forever 104:6
forgot 102:6
form 9:20 10:12 13:2,9
   14:2 15:9 17:2,9 18:9
   23:15,21 24:10,23 25:8
   26:5 27:12 28:3,20 29:8
   31:5,13,23 32:10,20 35:4,
   9 36:3,13 37:18 38:19
   39:4,21 40:22 42:7 43:1
   44:14 53:5,17 55:11 56:1,
   24 57:22 58:14,18 62:2,16
   64:22 69:19 70:24,25 72:7
   74:14 75:4,23 76:25 77:12
   79:14 81:21 82:17 83:7
   84:2,13 85:2,13 86:10,25
   87:11,21 88:23 89:15
   90:13 91:5,23 97:22 99:5
   100:2,19 101:25 102:14
   104:5 105:7 106:7 111:4
   114:24 117:21 118:2,17
forms 83:16 87:1
forth 52:24
forward 21:10 47:14
   48:10
forwarded 47:4,11,13
   48:7
forwarding 48:9
found 21:13
four 7:7
Fourth 27:4
frame 26:14 67:8
frames 26:12 66:22
free 73:14
front 41:14 74:4
fully 29:5,10 119:6
further 10:5 54:1 122:11

---

**G**

---

garbled 68:3
gather 116:13
GB 55:1
GB784 55:3

gear 38:2
gender 103:25
general 70:9,20
generalities 87:24
get all 98:11
getting 31:20 103:11 106:9
give 21:8 36:1,5,8,9,17
   37:16 38:17 41:8 51:25
   83:13 93:24 94:23 115:23,
   24 117:19 118:1,14,25
   119:7,9 122:8
given 12:15 34:21 40:4,12
   52:21 53:8 78:18 80:4
   94:20 97:20 112:16
gives 114:19
giving 38:9 79:23 99:12
   105:22 107:24 120:1
go 5:6 6:9 9:6 16:4 19:20,
   23 20:20,21 22:22,24
   39:23 43:17,23,25 44:10
   45:12 46:21 52:7,12
   53:12,13 54:1 65:14 73:5
   83:8,17 85:19,25 88:21
   89:24 90:3 92:22 93:22,23
   94:7 95:2,25 96:3,25
   98:11 102:23 110:8,12
   111:16 112:15,19 113:6
   120:18,19
goes 17:25 18:17 19:13
   20:3 45:24 64:6,12 82:6
   114:11,14,15
going 11:6 12:5 30:19
   33:24 35:25 39:6,25 43:8
   50:7 52:19 57:23 61:1,7,
   14,18 63:22,23 64:21
   67:10,22 71:2,21,22 77:15
   80:12 81:14 91:22 94:23,
   24 96:23 101:6 102:24
   104:25 105:2 106:2
   108:12,13 116:20
Good 4:6
Gotcha 54:24
gotten 26:13
govern 30:6,8 31:17 32:21
   33:4,14,20
governing 24:25
governs 34:6
gray 66:9 78:6
ground 38:25
guess 7:13 9:3,25 10:7
   12:19 17:19 31:19 32:4,25
   34:4 53:2,10 71:11 74:20
   83:8,17 86:20 108:1
   111:14 118:13 120:14
guide 33:6 67:2 71:4,18,19
   72:12,13,14 89:6

**guilty** 43:6

## H

**hand** 41:25
**handcuff** 115:12
**handcuffed** 110:10,11,24
111:1,18 112:22,24 113:8
114:20,22 115:24 116:17
**handcuffing** 114:12
**handled** 9:14
**handles** 19:6
**happen** 9:1 38:16 52:2
65:20 67:5 80:13 86:18,19
88:12 99:17 105:1,24
**happened** 53:14 54:6
56:19 67:4 80:14 115:8
**happening** 38:4 63:2
116:14
**happens** 89:6 105:1
**hard** 66:20
**harm** 31:3
**harms** 31:21
**head** 66:8 69:12 78:7 79:8
80:6
**hear** 66:20 99:24
**heard** 66:7
**hearing** 78:19,21
**hey** 59:15 70:21 86:16
**hours** 61:15,18 77:15
**huh** 108:23
**hundred** 23:7
**hundred-and-some** 8:14
**hypothetical** 64:3 65:21
71:1 76:3 79:15 81:3
87:24 91:24 99:12 107:2
113:18
**hypothetically** 85:18

## I

**IA** 114:11
**IAB** 43:3 47:16,17 48:3,8,
9,10,22 50:7 60:15,21,23
**identification** 21:6 55:12
**identified** 55:13
**II** 57:11
**illegal** 92:21 96:2
**impair** 5:12
**importance** 33:1,19
**important** 34:18
**impossible** 62:24 80:15
101:25 102:4
**improper** 115:8
**in-person** 115:15

**in-service** 25:24
**inaccurate** 102:12
**incident** 6:2 50:8,16 55:8,
18 57:11 61:12 68:9 79:18
81:20 82:2,4,5,16,19 83:1,
5,10,12,14,23 88:5,10
**include** 86:4 87:14,18
88:7,8
**included** 65:17 82:15 84:8,
12 86:21 89:4
**includes** 87:1
**indicate** 110:21
**indicated** 115:11
**indicating** 104:6
**individual** 14:16 28:19
42:16 43:5 44:25 45:16
63:21 71:21 74:22 75:2,21
76:20 117:3
**information** 6:9 16:19
39:23 41:12,14,19 62:20
63:1 65:11,15,19 78:12
80:4 81:4 82:6 83:7 84:2,
8,22 86:8 87:13 89:3,11,
12,16 90:22 91:3,18 92:16
94:4,12,21 98:12 111:5
**inherent** 105:13
**initial** 66:12 79:20 92:6
102:1 111:10
**initially** 111:17,20
**initiate** 73:12
**injury** 57:12
**inside** 63:14
**instance** 53:3
**instances** 94:25 99:16
**instituted** 92:13
**interaction** 57:19,20
**internal** 8:25 9:7 10:16,17
11:8,14,15,20 15:15 17:23
18:1,3,13,17,25 19:5,10,
13 20:3 23:22 43:4,11,13,
16,18,22,24 44:1,2,3,4,11,
16 45:3 47:14,16 49:1
92:22 93:11,18,21,25
94:22 95:2,25 96:4,6,25
97:8 98:11 111:8 112:15,
19 113:4,11,23,24 114:2,
6,14 115:5,8,23
**interview** 49:11
**interviews** 96:7 115:15
**investigate** 9:17,25 11:21
20:6 64:19 76:21
**investigated** 15:4 93:13
**investigates** 19:11
**investigating** 15:16 73:23
82:22 87:3 91:6 100:14
104:22 115:2

**investigation** 6:5 8:17,23
10:1,4,5,8,12,18 11:3,9,16
19:16,18 21:22,23,25 22:7
42:9 43:12,14,16,17,23
44:5 45:3 46:9 47:9,18,24
48:25 49:10 51:1,2,5,13,
14,18,23 52:3 53:11,23
54:2 55:7 56:16,17 57:25
60:12,15,21 64:16 65:16
69:16 74:17 77:3 82:22,23
86:7,22,23 87:4 88:6
91:13,15 92:2,6,12,23
93:11 94:1 95:1,9,17,18,
22,24 96:13,19,22 97:16
98:9,19,21 99:19,20
100:15,25 109:24 111:6,9,
11,22 112:13 113:25
115:14,18 116:12,15,25
**investigation's** 47:22
**investigations** 8:16,18
10:16 11:2 16:10 44:16,17
93:5 95:21 96:25 97:8
112:20
**investigative** 14:19 15:12
16:19 90:21 109:23
**investigator** 86:8 88:7,21
91:2
**involved** 8:16 18:20 22:16
49:12 61:11,12 106:23
109:17 118:11 119:22
**involvement** 8:23
**involving** 6:3
**issue** 30:6 41:25 44:18
45:2 51:22 104:21
**items** 66:10 77:10,23

## J

**job** 23:14 24:2
**Johnson** 11:20
**joining** 6:16
**judge** 39:24 43:9
**judgement** 80:12
**judges** 15:14,19
**justice** 24:14 25:13 42:19
**justified** 116:8
**juvenile** 7:19

## K

**keep** 108:4
**kind** 4:22 8:18 13:12 14:9
28:6,9 67:1 72:22 79:24
81:22,23 88:2 92:7 99:20
107:23
**kinds** 72:18

**know** 4:21 5:3,6,9 11:10
12:11 13:15 22:5 23:9
25:12,17,21 26:6,14 29:1
31:11 42:11,12,15 48:13
50:1,9 51:7 67:7,21,23
68:14 72:9 76:20 78:15
79:16,24 80:8 83:15 88:16
89:19 90:7,17 91:8 92:7
95:9 97:23 98:4 108:7
112:2 113:7,9,17 114:8
115:20 117:16 118:5,21
119:17 120:4,15 121:19
**knowing** 39:6 81:15
**known** 39:24

**L**

**lack** 62:3 90:22
**lacking** 92:15 100:24
**law** 6:15,16 10:21 12:14
13:12 15:15,21 34:13
44:18
**lawful** 14:15,22 15:3 42:10
43:7
**lead** 92:3 108:23
**leading** 81:15
**leave** 73:15 109:18,21
**led** 83:1,2
**leeway** 97:20,23 98:4,5
**legal** 10:23 12:15,18,25
13:11 16:11,14,15,24 17:6
**legality** 17:7,13,14
**lengthy** 43:3,10 75:8
**letter** 116:22
**level** 9:9 20:14,20,23 21:1,
14 28:2,6 34:21 48:5,21
54:12,18 57:11,16 97:1,2
110:13,15,18 113:4 116:8,
16
**levels** 9:14 20:8 23:24
34:15
**liaison** 8:11
**lieutenant** 7:7,11 22:23
46:12 50:4 51:25 52:15,16
59:12,14 113:15
**lieutenants** 8:13
**light-skinned** 71:20 79:6
103:1
**lighting** 62:22
**lights** 68:8
**limited** 80:4 99:20
**limits** 13:7
**line** 21:10 54:10 103:24
104:16
**listen** 22:8 40:8 76:13,21
90:6 98:25

**listened** 61:22 62:9 77:17
**listening** 68:2,5
**literally** 75:1
**little** 23:7
**LLOYD** 9:20 10:11 11:6,
13,24 13:1,9 14:2 15:8
17:1,8 18:9 23:15,21
24:10,23 25:8 26:4 27:12
28:3,20 29:8 31:5,13,23
32:9,20 33:2,11,22 34:9
35:4,9 36:3,13,24 37:18
38:19 39:4,20 40:22 42:6,
25 43:20 44:13,22 45:10,
15 46:18 47:19 49:16
53:5,17 54:10,14 55:10,25
56:24 57:21 58:13,18
60:3,8,11,14,18,20,24
62:2,16 63:22 64:21 66:13
67:21 68:12,19,22 69:19
70:24 72:7 74:13 75:4,22
76:25 77:12 78:8 79:13
80:24 81:21 82:17 83:19
84:13,24 85:2,13 86:10,25
87:11,21 88:23 89:15
90:13 91:4,22 97:22 99:4,
23 100:2,19 101:24
102:14 104:4,18 105:7
106:7,21 109:6 111:4,21
114:23 117:7,21 118:2,16
119:10 122:15
**loaded** 79:25
**loading** 66:9 77:10,23
**location** 63:10 68:11 70:12
74:5 75:19 76:23 79:12
98:25 99:2 100:18 103:23
**logical** 87:7
**long** 5:2 6:12,24 65:1
69:25 72:18 102:4,9
117:19 118:25 119:4,7
120:11
**look** 5:20 11:2 16:3,23
17:3,14,17 24:8 30:11
35:18,24 40:8 52:7,12
53:12,13 56:2 58:20,21,25
59:5 65:9,17 71:3 74:16
76:17 77:3 88:13 89:1
90:16,19 92:6 93:23 94:5,
6 110:17
**looked** 5:15,16 46:15
62:10 88:9 95:10
**looking** 24:4 30:1 55:14
56:11 57:14,15,17 60:21
65:11 80:15,17 100:10
**looks** 47:1 55:15 116:20
**lot** 52:14 63:3 65:1 67:1
82:6 83:15 85:4,6 87:25

**loud** 4:21
**lower** 9:14

**M**

**mace** 20:17,23 21:14 28:6
54:12,15,18 57:11,16
58:10 59:1,8 110:8,11
111:23 112:3 113:2,16,20
114:4,5,12 116:16
**maced** 58:17,20 110:10,
24,25 111:1 112:22,23
114:20,22 115:25
**main** 27:25 30:6
**maintain** 114:10
**making** 29:16 63:16,18
85:20 87:9 89:13 111:17
**male** 70:5 102:22,25 103:1
**males** 66:7,9
**man** 69:11 78:5
**manual** 25:10
**Marie** 4:10
**marked** 21:5,8 59:24 61:8
120:16 121:3
**match** 61:24 62:13 70:23
72:5 73:2 74:5,6 103:15
**matched** 63:20 79:11
**matches** 74:6,24 75:1,18
76:22 98:23 100:17,23
101:4
**material** 15:13
**matter** 68:10 70:1,13,15
91:15
**mean** 28:15 29:18 35:5
36:4 37:8 38:11,21 46:6,8,
9 50:12 66:19 67:17 81:7
82:9,18 83:15 84:14 85:15
86:11 91:8 97:10,23 98:5
108:7 112:2
**means** 27:3
**medication** 5:12
**men** 78:5,6
**mentioned** 117:10
**military** 6:19,20
**minute** 61:3 122:8
**minutes** 61:15,19 77:16
**mischaracterization** 31:24
42:8 77:13 102:16 105:8
106:8
**mischaracterize** 63:25
**mischaracterizing** 10:17
43:13 106:16,19
**misconduct** 92:5
**missing** 93:20,22 95:4,8
96:22 97:5

**misstating** 43:12
**misunderstood** 34:2
**mixing** 58:3
**morning** 4:6,7
**mounted** 122:4
**move** 39:1,13,17 40:15
41:24 65:13
**moving** 39:16
**multi** 75:10
**multi-part** 105:22
**multiple** 38:9,10 42:7
**multiple-parts** 41:2

**N**

**name** 4:8,15 50:4 117:6
**narcotics** 7:18
**narrative** 41:20,21
**near** 75:19 76:23 79:12
98:24 99:2 100:18
**nearly** 37:8
**necessarily** 38:21 52:10
67:10 88:24 89:1 112:14,
18
**necessary** 20:2 22:12
34:23 87:3,9
**need** 5:8 6:10 31:16 34:20
35:2,7,18 58:25 59:10
85:12 90:7 94:11,16 96:7
103:3,4 109:23
**needed** 22:13,24 53:4
59:16 77:4
**needs** 110:5
**never** 48:11 71:16 94:20
115:23
**night** 62:23 71:20 80:9
102:21 105:17
**normal** 17:24 51:12
**notice** 70:22
**number** 55:1 57:11 68:3
70:17 88:10 99:15,16
100:4
**numbers** 23:13
**numerous** 100:21 102:17

**O**

**object** 11:7 63:22,23,24
64:22 91:23 100:22
**objection** 9:20,23 10:11
13:1,9 14:2 15:8 17:1,8
18:9 23:15,21 24:10,23
25:8 26:4 27:12 28:3,20
29:8 31:5,13,23 32:9,20
33:2,22 35:4,9 36:3,13,24
37:18 38:19 39:4,20

40:22,23 42:6,25 44:13
48:16 49:16 53:5,17
55:10,25 56:24 57:22
58:13,18 62:2,16 66:13
68:12 69:19,20 70:24 72:7
74:13 75:4,22 76:25 77:12
79:13 80:24 81:21 82:17
84:13,24 85:2,13 86:10,25
87:11,21 88:23 89:15
90:13 91:4 97:22 99:4
100:2,19 101:24 102:14
104:4 105:7 106:7 111:4
114:23 117:21 118:2,16
119:10
**observations** 115:16
**obstruction** 42:18,23
**obtain** 94:3
**obviously** 51:15 72:9
79:16
**occasion** 9:16 10:4 11:1
**occur** 100:6
**offers** 27:14
**officer** 7:6 9:17 11:21
14:16 18:7 19:2 20:1 24:4
27:19 28:1 31:4,22 32:5
35:16 36:10,20 37:19
38:24,25 39:2,12,19
40:12,14,17 41:16,22,23
42:22 45:8 52:7,8 53:13,
14,24 55:24 56:5 57:15
58:2,21 62:4,10 68:7,15
69:3,6,21,25 70:14 71:2
72:3 73:6,18 74:1,12
75:14,15 80:22 82:21 85:5
89:7,16 91:13 92:14 93:6
97:20 100:6 102:11
103:14,16,19 106:17
107:13 108:9 109:14
110:25 112:3,22,23
114:21 116:2 117:19
**officer's** 17:23 29:16 34:6
42:19 43:25 44:12 58:23
73:4 74:8 89:10 92:12
104:14 111:20,25 112:17
**officers** 8:11,14,16,19 9:18
10:20,23 12:10,15 13:6
16:1 20:9 22:15,19 23:3,
20 26:19,23 27:7 28:9,11,
13,17 29:6 30:22 32:18,22
33:6,10 34:7,13 35:2 36:1
37:16 38:9,12,17 45:20
49:12 54:15 56:23 62:18
63:4,17,19 67:2 69:17
71:18,22 72:1 75:20 78:2,
11,18 79:21 80:3,11 81:18
82:25 88:20 89:13 91:19
92:17 97:19,24 98:14
99:21 101:19 103:3,21

104:23 107:1,7 109:21,25
116:20 120:18 121:13,16,
21
**officers'** 40:19 49:22
51:20 54:8 57:17
**oftentimes** 35:12 102:20
**oh** 17:10 46:16,25 50:9
**Ohio** 6:23
**okay** 4:11,14,17,21,25
5:23 6:1,11,14 7:10,16,22,
24 8:1,5,8,15,18,20 9:10,
13,16 10:3,7 11:1,13
12:10,14,18 13:3,22
14:13,22 15:2,24 16:4,14,
20,23 17:5,17 18:2,5,17
19:8,13,17,22,25 20:7,12,
18,22,25 21:4,13,18,24
22:3,11,14,18 23:1,3,9,18
24:1,3,13,17,20 25:6 26:1,
16,19,23 27:7,24 28:11
29:14 30:5,11,19,21 31:2,
19 32:3,13 33:2,17 34:2,
18 35:2,15 36:1,20 37:3,
10,16 38:3,15 39:14 40:7,
11 41:19 44:6,9 45:19
46:5,21 47:7,13,17 48:2,7,
14,18,24 49:3,11 50:1,10,
18 51:8,11,19 52:2,5,22
53:2,10,21 54:7,21 55:6,
17,19,21 56:5,9,17 57:4
59:3,7,13,17,21,23 60:1,
18,24 61:9,13 63:10 66:1,
5,18,24 67:10,12,16 68:1,
17 72:1 73:14,17,23 76:9,
19 77:7,21 78:4,14,22
82:5,13 83:8 84:3,11,21
85:9,23 86:6,20 87:17
88:4,11,15,19 89:9,22
90:24 92:10 93:1,10,15,20
94:3,6,11,25 95:6 96:9,13
97:7,17 98:17,23 100:13
103:7 105:4,20 106:1
107:19 109:1 110:2,7,14,
16,20,23 111:14 112:6,10,
14,21 113:13 114:13
115:20 117:1,19,25
118:24 119:25 120:13,17,
21,25 121:5,11,15,17,23
122:1,6
**once** 11:7 19:14 98:25
**one's** 47:22
**one-way** 69:9
**ones** 30:3,9 82:11
**open** 36:22 40:13 91:14
**opened** 92:13
**opens** 39:11 41:22
**opportunity** 15:6 16:6

**opposed** 106:15
**opposite** 69:9 116:3
**orange** 66:8 78:7
**oranges** 58:4
**order** 38:22
**ordered** 122:14
**orders** 39:3 42:19
**original** 106:1
**out-of-force** 30:25
**out-of-policy** 30:25
**outside** 31:7 41:16 44:1
  48:21 73:6 74:9
**oversight** 97:2

---

**P**

**packet** 40:9 41:11,19 56:2,
  7,8,21 57:2,5,6 58:9,25
  59:5 63:16 76:2,6,10 81:2,
  4,13 89:17,18,19 90:21
  96:6 99:20 100:10,13,16
  101:7 113:17
**page** 54:25
**pants** 69:12 70:8 79:8
**paper** 53:12
**paragraph** 59:4
**parameters** 43:11
**parked** 78:22 79:3
**part** 23:14 24:2,7 27:21,25
  40:9 41:5 56:22 60:4,5,8,
  9,11 75:5 86:4 90:2,4
  91:10,25 99:24 104:9
  106:25 107:17 111:15
**participate** 13:18,22 25:21
**participated** 50:7
**particular** 43:6 44:21 46:3
  47:24 48:19,23 50:2,16
  51:2 54:5 79:17 88:25
  90:9,14 95:7 110:18
**particularly** 89:1
**parts** 65:2 75:12
**passenger** 61:24 62:13
  70:7 79:7,8
**passengers** 82:14
**patrol** 7:11,17,21,23
  120:13,19,20,22 121:8,9
**patrolling** 121:9
**pending** 6:6
**people** 30:24 31:20 70:16,
  17 73:1
**perceptions** 67:5 102:23
**period** 120:11
**permitted** 27:10 121:4
**person** 11:22 12:3 16:9
  29:7 36:10 39:13,15 40:16
  42:23 46:2,16 52:15

58:17,21 70:22 71:18
  73:7,14,20,21 74:4,25
  75:19 76:22 96:5 98:24
  108:19,24 109:15,16,17
  113:7 115:22 116:4,5
  117:20 119:6
**person's** 40:21 74:5 118:9
**personal** 6:9
**personally** 13:10 50:12,22
  52:14 120:4
**pertains** 86:2,3
**pertinence** 86:1
**pertinent** 85:16 89:3
**Phillips** 6:3 22:16 48:25
  50:8 55:20 61:12,23 62:12
  69:8,10,13,14 70:5 78:22
  79:5,9,12
**Phillips'** 49:7 56:14 62:13
  66:2 77:7
**phrase** 117:13 118:20
**phrased** 93:9
**phrasing** 14:9 99:25 118:5
  119:16
**physical** 29:6 116:21
**physically** 71:8
**pickup** 69:14
**piece** 53:12
**pieces** 103:5
**place** 68:10 70:16 84:19
**places** 7:12
**play** 27:19 56:9 59:23 60:2
  61:1,7,14,18 66:16,17
  67:13,15 70:6 77:15 98:3
  105:24
**played** 61:16,20 77:19
**plays** 63:5
**please** 4:8 30:12 45:13
**pluralizing** 62:18,19
**point** 8:15 51:21 64:25
  106:9 112:8
**police** 4:12,13 11:9,15
  15:14 23:10 24:14,21
  27:14 65:24 80:10 81:7
  107:13 119:1
**policies** 16:5 17:3,15,16
  24:8,24,25 26:22 30:1,17
  31:8,10,12,15 32:15,17,21
  33:1,4,13,14,15,19,20
  117:14
**policing** 38:1 99:8 101:16
  107:21
**policy** 15:17,21 16:3,4,8
  17:19 21:14 24:5 26:25
  29:15,24 30:7,18,23 31:7,
  24,25 32:5,10,23 33:6
  34:11,14,25 40:20 41:16

42:5,22 45:8 48:10 54:9,
  13 56:23 57:15,18 58:24
  59:2 64:15 65:9 73:6 74:9,
  11 89:10 93:7
**portion** 71:4
**position** 4:11
**positions** 7:10
**possible** 81:20
**possibly** 68:14
**potentially** 108:24
**premise** 91:5 102:15
**preparation** 5:17
**prerogative** 97:4
**presented** 57:2 59:5 65:15
  76:1,6
**presenting** 57:24 60:16
**presumably** 58:11
**previously** 59:24 61:8
**principles** 52:17
**printout** 55:15,23
**prior** 5:5 6:16 25:13 35:3,
  8 36:2 39:7 50:6
**prisoner** 57:12 116:17
**probably** 22:5 27:21 29:11
  64:25 95:24
**problem** 57:23 77:2
**process** 18:21 20:4 21:19
  45:25 51:12 85:20 90:5
  95:13
**promoted** 7:6,7
**pronounce** 50:4
**proper** 9:3 15:25 42:1
**properly** 34:14,22
**protect** 28:8,9 34:7
**protected** 33:10
**provided** 62:14 84:22
**provides** 97:1
**public** 34:8
**pull** 36:23 37:5
**pulling** 36:11
**purpose** 48:9
**purposes** 114:9
**pursuant** 26:17
**put** 47:10 78:12 85:4,10,
  16,17 88:21,22 99:21
  103:4 111:2 119:13,23
**puts** 97:25 114:21 116:2

---

**Q**

**question** 5:2,5,10 9:3 12:7
  13:16 22:21 32:13 34:5
  36:14,18 37:22 40:23,24
  41:1,2 44:9,21,24 45:6,11,
  13 52:13 53:10 59:7,10,18

62:1,6,15,21,25 63:8 64:4,
    18,22 65:2 67:11,22
    69:20,22 70:20,25 71:12
    72:8,23 74:14 78:8 80:19,
    20 85:14 86:21 89:22
    90:10,11,14 91:5,6,10,23
    98:7 99:5,25 100:20
    101:25 102:1,3,6,9,15
    103:9 104:5,10,18 106:12,
    15,17,20,21 107:5,11,12
    108:2,3 111:15 115:21
    118:24
**question's** 52:19
**questioning** 58:5
**questions** 22:12,15 42:7
    49:14 52:1 63:19 64:9
    65:1 69:17 74:17,21 75:3,
    8,20 76:24 79:10 80:21
    81:1,6,12 88:2 90:8
    105:11 122:12
**quick** 35:12

---

### R

**race** 63:12 82:13 84:20
    103:25 107:9
**races** 70:17
**radio** 55:15,17 59:24 60:6,
    23 61:10 62:11,20 63:1
    65:11,13,18 66:6,12 68:5
    70:4 71:4 72:13 78:19
    89:24 99:9
**radioed** 78:1,3,11
**random** 12:2
**ranks** 7:4
**Rarely** 76:4,5
**read** 10:1,3,4,8 45:13,14
    51:6,15 57:16 59:4 76:12
    97:16 98:25 99:24 100:1
**reading** 76:19 81:13
**really** 14:3 25:2 36:17
    65:1 67:23 68:4 83:12
    84:4,5 113:9 117:14,17
**realm** 94:18 109:22 110:2
**rear** 66:11 69:8,10 77:10,
    23 78:23 79:4
**reas** 104:1
**reason** 5:11 14:11,15
    25:19 26:11 29:11 31:8,14
    34:12 70:21 72:11 73:7,10
    74:1 76:4 107:14 108:9,
    12,16
**reasonable** 14:19 29:23
    53:15,25 54:3 63:17 73:18
    74:2,12 91:20 92:15,18
    104:3 105:5 106:5 109:15
    110:3

**reasonableness** 14:25
    16:17 27:21 29:17 104:14
    119:12,18 120:3,10
**reasonably** 105:19
**reasoning** 31:11
**reasons** 31:6
**recall** 24:13,16
**receive** 13:13 92:3
**received** 39:16 42:20 47:2,
    11 56:16
**receives** 70:14
**recess** 61:4 122:9
**recommend** 10:2 98:15,16
**recommendation** 9:12
    19:15 87:2,7 90:20 96:12,
    16,24
**recommendations** 51:16
**record** 4:9 5:7 30:14 34:3
    45:14 48:16 64:3 79:6
    100:1 106:14
**recording** 61:14,23 67:13
    68:6 78:21
**recruiting** 121:21
**Rector** 50:3
**redoing** 46:9
**refer** 51:23 88:9
**reference** 87:19,22
**referenced** 35:22
**referred** 117:16
**referring** 117:4,12
**regard** 98:18
**regarding** 16:8 17:22
**regular** 13:14 122:1
**reinvestigation** 46:6,8
**relates** 40:20
**relations** 121:20
**rely** 103:21
**remarks** 52:6
**remember** 5:4 6:7 22:14,
    17 23:2 26:12 46:19 49:2,
    3,4,5,8,9,18 52:4 54:5
    64:24 90:18 119:25 120:5
**remind** 4:23
**remiss** 97:15
**repeat** 65:5
**repeated** 80:25
**repeatedly** 81:5
**rephrase** 14:3 17:19
**report** 25:14 26:3 58:3
    60:9 76:12 81:18,19,22
    82:2,4,6,16,19 83:1,5,12,
    14,23 88:22 104:8 111:20
    112:1,4,17 114:22 116:3
**report's** 81:23

**reported** 63:12,13 108:11,
    13,14 109:7,17
**REPORTER** 122:13
**reports** 23:23 91:13
**representing** 69:21
**request** 96:16
**required** 26:19
**resistance** 27:15 32:19
**resisted** 58:17
**resistive** 28:7
**resolve** 94:14
**resolved** 47:22
**resource** 8:11 121:21
**respond** 97:24
**response** 7:19 8:4 25:1
    26:9 38:2 71:5 121:7,11
**responsibilities** 96:18
    121:10
**responsibility** 94:19,20
**responsible** 23:4,6 24:24
**rest** 20:20
**restate** 5:3
**review** 10:2,4 11:3 15:7
    16:7 19:19,24 21:19 22:7,
    8 23:13 24:3,7,14,21
    44:12 45:19,21 47:7 51:12
    54:17 55:8,23 56:8,12,15,
    21 57:1,6 88:17 91:3,14
    92:17 93:5,16,18,24
    96:11,15 97:3 98:10,14
    101:1,23 116:5,9
**reviewable** 45:17
**reviewed** 10:8 18:7 21:22,
    25 49:5 50:7,11,24 51:5
**reviewing** 23:4,6 29:14,23
    40:7 56:22,25 63:16 73:4
    81:2,3 91:12 95:1 97:14
    98:18,21 100:15
**ridiculous** 106:11
**right** 7:5 8:24 11:24 19:4
    21:4 29:22 35:1 40:4
    52:20 54:23 64:21 70:16
    72:22 73:22 76:16 77:3
    86:2 98:21,22 108:15
    109:7 112:5 113:18 122:7
**rights** 11:5 16:2
**rode** 121:5
**role** 64:1 75:25 81:1 93:3
    95:12,16 97:7 101:15
    102:3 107:18
**roles** 95:20
**room** 62:20 63:1
**rose** 7:4
**route** 111:1 115:6
**routine** 120:22

135

**routing** 21:21 22:2,4,5
    40:10 47:24 48:19 50:2,17
    51:5,15 52:5 56:10 57:7
    60:19 86:14,18 97:11
    110:17,21
**rule** 53:1 85:24 117:2,11,
    14 119:2
**rules** 31:16 38:1
**run** 37:13 55:15,17,23
    60:23 61:10 67:2 68:8
    71:5 72:14,15 86:3 88:21,
    25 89:6 97:25 118:10
**runs** 97:24 121:9

―――――――――
**S**
―――――――――

**save** 88:14
**saw** 71:8,15,23 72:17 77:2
    99:11 100:24 101:8
    102:22 107:1 108:17
    115:17
**saying** 18:23 36:15 37:6
    43:20 50:21 60:15 69:3
    73:25 74:2,10,12 78:17
    80:13 101:3 102:21
    113:10 118:20
**says** 21:10 38:25 39:1,11,
    12 40:15 41:24 47:4 53:12
    57:10 83:24 85:24 110:25
    112:23
**SCAT** 7:18
**scenario** 42:13
**scene** 62:22 65:20 67:4
    71:8,23,25 80:12,17 81:11
    103:3 104:23 115:16,24
    116:13,14,18 119:21
**school** 8:11 121:21
**score** 35:23
**se** 31:17
**second** 21:10 75:5
**second-guess** 71:7,13,22
    72:19 99:11 107:1
**seconds** 61:15,19 68:10,11
    69:7 70:2,13,15 77:16
    118:1,15 119:14 120:2,11
**section** 7:23
**see** 24:8 49:21 51:19,22
    72:17 76:20 80:1 81:9
    87:20 90:21 96:21,22
    102:25 121:17
**seeing** 60:4 63:4 71:3 80:6,
    17 113:17 115:11
**seek** 101:1
**seen** 54:20
**sees** 116:20
**send** 22:22 53:15 59:11
    97:5 113:4,23 114:6

**sends** 104:17
**sense** 113:3
**sent** 47:21
**separate** 49:1 115:9
**September** 8:2,3 26:10
    58:16
**serg** 52:15
**sergeant** 7:6,11 43:3 46:12
    50:3 65:16 117:7,10
    118:18,19 119:15 120:6
**sergeants** 8:13
**service** 10:24 25:10
**set** 31:16 52:25
**Seventeen** 7:1
**severity** 27:18
**sheet** 21:21 22:2 40:10
    47:25 48:19 50:3,17 51:5,
    15 52:5 56:10 57:7 86:15,
    18 97:11 110:17,22
**sheets** 22:4,5
**shirt** 102:25 103:1
**short** 101:19
**shorts** 66:8 78:7 101:18
**showed** 88:5
**side** 40:14 69:9 73:25
    78:25 79:4
**sign** 94:12 96:9 97:7,10
    98:15
**signature** 21:9 122:13
**signing** 97:11
**silly** 30:20
**simpler** 88:13
**simply** 34:10
**sirens** 68:8
**sitting** 74:20
**situation** 9:15 27:17 28:18
    29:21 32:8 38:2,4 42:16
    43:8 64:1 65:23 66:2 77:2
    79:11 98:1 105:2,10,13
    107:3 120:9
**situational** 117:23 118:7
**situations** 32:19 35:3
**size** 35:20
**skirt** 101:20
**slash** 57:12
**social** 6:23
**solely** 106:18 107:6,7,14,
    20
**somebody** 36:9,23 37:5
    39:11 58:10 76:7 99:2
    108:9,17 118:1
**someone's** 16:2,7 29:10
**something's** 65:8
**sorry** 21:24 29:19 34:2
    46:7 50:16,25 55:8 62:11

**sound** 30:20
**sounds** 111:7
**source** 104:7
**sources** 65:19
**South** 7:17
**space** 88:14
**speaks** 32:10
**specific** 45:6 64:10 66:1
    82:8 107:3,12
**specifically** 12:4 59:19
    74:24
**spectrum** 72:24 73:1,18
**spectrums** 73:24 74:3
**speculation** 63:23
**spell** 4:15
**sprayed** 58:10
**staff** 114:9
**standard** 16:24 27:4,8
**standards** 26:20
**start** 58:11 67:2
**started** 7:3 43:20
**starts** 55:1
**state** 4:8 6:23 118:9
**stated** 45:16 114:6
**statement** 18:22 53:13,14
    58:22,23 115:24
**statements** 49:15,24 51:20
    56:6 57:17 62:10,11
    116:13
**statistics** 23:9
**step** 36:8,9,11,15,22 37:11
**stop** 10:8 12:2,11 13:25
    14:10,16 15:3,25 17:18,22
    18:11 28:19 44:19 56:14
    63:18 64:16 69:18 72:3,
    11,25 74:1 75:15 79:20
    81:20 91:2,7,20 95:1,22,
    23 97:20 100:14,15
    102:11,19 103:13,14,16,
    20 104:2,14,22,24,25
    105:5,19,24 106:3,5,18,24
    107:13 108:9,10,16 109:3,
    13,23 113:2,3 114:3
    121:1,4
**stop's** 37:14
**stopped** 11:4,22 56:18,19
    63:11,21 73:7 74:3,10,22
    75:21 76:7,20,23 90:24
    91:17 92:14 108:16
**stopping** 13:8 16:8 70:22
    93:6
**stops** 9:18 10:21 12:24
    18:8 40:2 82:21 100:6
    101:19 109:14

**strategic**  7:19 8:4 121:6,11
**street**  12:3 14:17 69:9
  72:4,25 73:2,8,25 74:7,25
  75:2,16 76:7 79:2 99:17
  101:18,20 103:14,15
  120:14
**streets**  98:1 99:13
**style**  52:25
**subject**  45:3 50:17 57:10
  58:16,17
**subjects**  61:25
**subparts**  102:5
**Sullivant**  55:18
**summaries**  84:7,9
**summary**  83:18,25 84:1,
  10,11 86:5
**supervision**  97:2
**supervisor**  81:14 87:3,14,
  17 112:7,12 113:2,14
  115:1,3,14 116:10,19
**supervisor's**  65:16 112:12
**supervisory**  46:12
**supposed**  81:19 119:8
**Supreme**  13:12
**sure**  5:6 8:20 18:23 28:15
  29:1,18 30:19 33:17
  34:12,14 37:23 48:11,16
  55:14 64:24 66:20,21
  67:20 68:3,4 82:18 83:11
  84:4,5,15 91:10 93:3
  102:19 108:6 117:12,15
  118:4
**surrounding**  12:24 37:15
  56:13 85:6
**sus**  84:17 110:23
**suspect**  28:5,8,9,19 35:19,
  20 39:1,2,7 41:22,23,24
  42:20 45:20 63:10 67:14
  70:7 82:14 84:12 100:17
  110:9,23 112:9,16,21
  114:19 115:6,22 116:19
  118:14,25
**suspect's**  27:16 41:22
  70:12
**suspects**  62:12 63:14
  65:12 70:4 77:22 78:4
  84:14,18
**suspects'**  119:21
**suspicion**  14:19 63:17
  73:18 74:12 91:20 92:16,
  18 106:5 109:16 110:4
**suspicions**  73:20
**Suzanne**  4:1,10 21:11
  122:17
**sworn**  4:2 13:20 121:13

**system**  88:13

---

                    **T**

**tactics**  119:15
**take**  5:10 35:16 37:7,8
  51:11 61:3 63:6 72:14
  80:3 94:9 103:4 110:2
  114:9
**taken**  4:18 61:4 80:7 122:9
**talk**  6:6 16:11 50:21 52:14
  73:19 93:25 112:7,8
**talked**  6:2 95:11 120:3
**talking**  11:11 42:12 44:2,
  15,17 46:18 53:18 62:17
  76:3 79:15 82:1 83:3,4,6,
  11,15 87:23 107:2 113:18
**tape**  40:8 99:1
**tapes**  22:8
**Tasers**  26:13
**task**  7:19
**taught**  13:23,25 27:7
**teach**  10:20
**teaches**  117:15
**techniques**  28:14,16
**tell**  21:18 32:17 72:16 74:2
**telling**  68:17,24
**tells**  32:5 41:23
**term**  81:23 118:6 120:8,15
**terminology**  119:16
**testified**  62:4 68:7,15 69:4,
  6 100:5 104:21 105:9,14
  115:1 118:5
**testimony**  10:15 11:8,13,
  14,19 15:11 43:3,10 49:22
  52:8 69:22,25 105:8
  106:9,16
**Thank**  4:17 109:12
**thing**  13:13 14:24 17:15
  26:18 35:1 39:7 74:6 76:5
  79:11 86:19 99:1 100:17
  101:3 106:4 107:6 118:21
**things**  9:8 25:2 26:15
  35:23 40:1 44:7 48:12
  63:20 65:14,20 67:3 70:23
  80:6 82:7,15 87:25 103:2
  105:23,24,25 121:20,22
**think**  7:25 10:15 11:10
  15:10 24:2 28:25 35:11,
  12,23 46:16,23 48:15 54:3
  93:8,22 98:8 102:18 122:7
**Thirty-three**  6:14
**thorough**  86:24 96:20
**thought**  85:20 109:10
**threat**  35:8

**three**  7:8 40:25 51:20
  117:13 118:1,15 119:14
  120:1,10
**three-second**  117:2,11,13
  119:2 120:5
**throwing**  91:25
**time**  24:18 25:1 26:2,10,
  12,14 37:17,19,20,24
  38:10 39:10,12,24 66:21
  67:5,7,8 70:14 80:6 87:18
  102:5 109:16 111:19
  112:1 119:23 120:11,25
**times**  10:6 33:3 40:25
  52:14 63:3 67:1 75:24
  90:15 100:21 101:10
  102:17 104:19,21 106:13,
  22
**title**  116:15
**titles**  83:18
**today**  5:11,18 74:21
**told**  39:7 117:17 119:14
  120:4
**top**  57:7
**totality**  16:21 27:17 35:18,
  24 39:6,22 40:4 42:14
  65:9 71:3 77:1 81:8
  112:11
**tough**  36:14 39:5
**traffic**  121:1,4
**trained**  12:10,23 13:6
  25:23 28:13,17,21 29:6
  37:10 84:7 85:10 117:25
  118:14 119:8
**trainer**  117:5
**training**  10:22,24 12:1,14,
  15,18,25 13:11,20,24
  24:5,8 25:6,9,10,12,19,24
  26:1,3,11,13 28:12,25
  72:2 84:10,11 107:13
  120:1,9
**trainings**  12:23 13:19,23
  25:22
**transpire**  108:21
**trial**  4:22 6:10 49:22
**truck**  69:14 77:8
**true**  70:10,11
**trust**  101:11
**truth**  68:18,25
**try**  4:23 39:24
**trying**  90:4 101:15 103:9,
  18 109:11 121:17
**turn**  22:24 54:22 55:3
**turns**  82:23
**two**  39:16 51:20 66:7,9
  73:24 74:3 78:4

**type** 14:18,20,24 16:19
33:5 53:7 92:2 93:13
95:18 118:10
**types** 95:21
**typically** 9:6 53:7 89:17
90:6

---

**U**

**Uh-huh** 14:8 19:1 29:25
32:6,14 41:4,10,13 47:3
48:20 57:13 75:11 76:11,
15,18 78:24 79:1 82:24
90:25 96:14,17 99:18
100:8 104:12 113:21
114:17 116:1
**uh-huhs** 4:22
**uh-uhs** 4:22
**ultimately** 96:5 98:13
**unclear** 92:11 94:1
**unconstitutional** 10:10
**underlying** 105:12
**understand** 5:1 8:20 12:7,
9 13:3 14:6 32:2 33:18
41:1 45:23 65:7 71:11
74:22 81:7,8 90:4 93:1,3
98:10 99:15 101:14,15
102:2 107:8,9 119:13
**understanding** 108:2
119:4
**uniform** 122:1,3,4,5
**unit** 8:13
**units** 7:15 8:10,12 121:22
**University** 6:23
**unknown** 66:10 77:10,13,
23
**unnecessarily** 31:21
**updated** 12:19
**updates** 12:20 13:11,13
25:10
**use** 5:21 11:22 19:25 20:9,
23 21:14 23:4,10,19 24:3,
22 26:20 27:4,10,15 28:2,
6 29:6,11,14,16,20 30:17
33:20 34:6,20,23 35:17
44:20 48:5,21 54:15,18
56:11,14,20 57:10,16,20
59:1,8,19 62:5 64:15,19
90:12 110:8,11 111:23
113:2,16,20 114:4,5,11,12
115:2,12 116:16 117:2
118:6
**use-of-force** 30:7,18
31:10,11,14 32:5,15,17
33:1,19 42:9 44:15 49:24
57:24 58:3 60:9,11 87:9
88:5 111:6,10,21 112:4,17

114:21 116:3,11
**use-of-mace** 92:23 111:10
116:11
**uses** 20:17 21:2 30:25
32:21,22 33:4,7,15 64:7
89:16 112:3

---

**V**

**vague** 81:22
**vagueness** 74:14
**variable** 107:9
**variables** 67:8 72:19 80:10
81:15 98:2 99:16 100:5
105:10 119:22
**variety** 18:10
**various** 8:10 23:24 27:18
34:15 65:19 117:23
**vehicle** 66:10 69:15 77:10,
13,23
**version** 114:19,20
**vicinity** 72:5 101:21
103:17,23 104:15,24
105:4,6,16,19 106:3,6,18,
24 107:8,15,17 108:10,19
109:5,6,14
**video** 5:23 40:9 41:20,21
51:17 70:6 76:14 99:1
**videos** 49:6
**violated** 11:18 15:17 57:15
**violating** 16:1
**violation** 11:5 16:8

---

**W**

**waist** 80:8
**walking** 12:3 14:17 72:4,
25 73:8,25 75:16 101:18
**want** 14:11 17:10 30:22,24
31:7,20,25 33:17 34:3,22
35:15 41:5 48:16 66:16
83:20 87:20 91:18 92:16
93:22,23 95:3 102:2 112:8
122:13
**wanted** 73:15 88:17
**wants** 36:20
**wasn't** 48:2 67:10 71:25
72:16 77:9 120:7
**watch** 49:6 76:14 99:1
**way** 52:19 57:18 65:24
114:7
**ways** 18:10,15 44:8 103:9
108:3,18
**we'll** 5:6 6:9 16:4
**we're** 5:10 15:18 25:9
44:15,17 57:23 60:4,20

62:17 94:24 107:1,2
113:18 118:20 121:7,8,9
**we've** 10:15 11:7,13 15:11
26:13 30:3 43:2 75:14,23
79:5 81:1 105:14
**wearing** 80:8
**went** 52:6 102:4 104:5
110:17 112:25 120:5
**whatsoever** 70:19 72:6
73:10
**white** 66:7,9 69:11 70:7,8
78:5,6 79:7 87:25 101:5,
19,22 102:22
**witness** 4:2 64:12 67:19
106:15
**woman** 68:14 69:11 70:8
78:5,7 101:17,19,22
**word** 9:25 11:22 86:2 98:5
107:20
**words** 17:5
**work** 6:23 25:20 27:14
65:24 80:11
**worked** 7:17,18 48:12
**works** 23:5 65:25
**wouldn't** 19:8 86:19 92:25
95:23 108:15 111:9
**wrap** 66:8 78:7 79:8
**wraps** 80:7
**write** 81:18 84:5,6 112:4
**writing** 52:11
**written** 56:6 113:1
**wrong** 72:3 97:21 115:21
**wronged** 115:7
**wrote** 49:23

---

**Y**

**yeah** 17:12 50:20 55:14
59:11,20 65:4 67:23 73:13
75:7 82:18 84:19 90:1
103:11 111:7 113:19
121:13,19,20
**years** 6:14 7:1,7,8 16:10
26:14 120:6
**Yep** 47:6
**Yesterday** 117:5