Deposition of:

**Deputy Chief Kenneth Kuebler**

September 28, 2017

DALE PHILLIPS

v.

KAREN BLAIR, et al.

Case No. 2:16-CV-880



513-233-3000
877.233.4403
FAX: 513-233-2310
depo@elitereportingagency.com

www.elitereportingagency.com

```
 1              UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF OHIO

 3                    WESTERN DIVISION

 4

 5   _____
                                    )
 6   DALE PHILLIPS,                 )
                                    )
 7         Plaintiff,               )
                                    ) CASE NO.
 8               vs.                ) 2:16-CV-880
                                    )
 9   KAREN BLAIR, et al.,           )
                                    )
10         Defendants.              )
     _____)
11

12

13

14                         -
15      Deposition of:  DEPUTY CHIEF KENNETH KUEBLER

16      Pursuant to:    Notice

17      Date and Time:  Thursday, September 28, 2017
                        12:15 p.m.
18      Place:          Office of Columbus
                          City Attorney
19                        Richard C. Pfeiffer, Jr.
                        77 North Front Street
20                      Columbus, Ohio  43215

21      Reporter:       Wendy Haehnle
                        Notary Public - State
22                                    of Ohio

23

24

25
```

2

```
 1   APPEARANCES OF COUNSEL:

 2

 3          For the plaintiff:

 4               Janaya Trotter Bratton, Esq.
                      of
 5               Gerhardstein & Branch Co., LPA
                 432 Walnut Street
 6               Suite 400
                 Cincinnati, Ohio  45202
 7               513.621.9100
                 jtbratton@gbfirm.com
 8

 9

10          For the defendants:

11               Paula Jennings Lloyd, Esq.
                      and
12               Pamela J. Gordon, Esq.
                      of
13               Office of Columbus City Attorney
                   Richard C. Pfeiffer, Jr.
14               77 North Front Street
                 Columbus, Ohio  43215
15               614.645.0808
                 614.645.7385
16               pjlloyd@columbus.gov
                 pjgordon@columbus.gov
17

18

            Also Present:
19
                 Dale K. Phillips, II
20

21

22                    - - -

23

24

25
```

3

```
 1                     I N D E X

 2

 3   DEPUTY CHIEF KENNETH KUEBLER                PAGE

 4       EXAMINATION BY MS. BRATTON                4

 5

 6   EXHIBITS                      MARKED   REFERENCED

 7       PLAINTIFF'S EXHIBIT   2       -         13
         PLAINTIFF'S EXHIBIT   3       -         38
 8       PLAINTIFF'S EXHIBIT  10       -         17
         PLAINTIFF'S EXHIBIT  16       -         51
 9       PLAINTIFF'S EXHIBIT  18       -         30
         PLAINTIFF'S EXHIBIT  21       -         30
10       PLAINTIFF'S EXHIBIT  22       -         45
         PLAINTIFF'S EXHIBIT  28       -         65
11

12

13                       - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              DEPUTY CHIEF KENNETH KUEBLER
 2   a witness herein, having been duly sworn, was
 3   examined and deposed as follows:
 4                    EXAMINATION
 5   BY MS. BRATTON:
 6        Q.   Good afternoon.
 7        A.   Hi.
 8        Q.   Thank you for coming in early for us.
 9             Can you spell your last -- or could you
10   state your name for the record and spell your
11   last name?
12        A.   Name is Kenneth -- or Ken -- Kuebler.
13   Last name is spelled K-u-e-b-l-e-r.
14        Q.   Okay.  And your position with the
15   Columbus police department?
16        A.   I'm the deputy chief of police.
17        Q.   Okay.  And have you had your deposition
18   taken before?
19        A.   I have.
20        Q.   And so you know to answer out loud, ask
21   follow-up questions if you don't understand --
22        A.   Yes.
23        Q.   -- the question.
24             If something I say you remember later
25   and you want to supplement it, just let me know
```

1    and we'll go back.

2            If you need to take a break, just let

3    us know.  Okay?

4        A.   (Indicating.)

5        Q.   Is there any reason today that your

6    ability to concentrate would be hindered?

7        A.   No.

8        Q.   And have you looked at any documents in

9    preparation for your deposition today?

10       A.   No.

11       Q.   Did you speak to anyone other than your

12   attorney about your deposition today?

13       A.   No.

14       Q.   Okay.

15       A.   Clarify -- I notified my chief of

16   police I would be here today and unavailable.

17       Q.   Okay.  And did you look at any -- or

18   listen to any audio or video?

19       A.   No.

20       Q.   Okay.  And just as a formality, if we

21   need you for trial, we'll go through your

22   attorney.  So if you leave the employ of your

23   department, you just need to keep information

24   updated with the city attorney's office.

25       A.   Okay.

6

```
1          Q.   Okay.  And can you tell me your
2    trajectory to the rank of deputy chief within the
3    department?
4          A.   I was hired as a recruit.  I was in --
5    a police officer and then a sergeant and then a
6    lieutenant and then a commander, and now I'm
7    deputy chief.
8          Q.   Okay.  And was that all in patrol, or
9    did you work in different units?
10         A.   I have worked in patrol.  I have worked
11   in our research development unit.  I've worked in
12   our technical services bureau.
13         Q.   Okay.  And how long have you been in
14   your current position?
15         A.   The -- it will be five years in
16   October.
17         Q.   Okay.  And have you had any law
18   enforcement outside of City of Columbus?
19         A.   No.
20         Q.   Okay.  What about military
21   experience?
22         A.   No.
23         Q.   And education?
24         A.   Bachelor's, and master's will be
25   completed in December of this year.
```

1     Q.   In what --

2     A.   Which?

3     Q.   Your degree.

4     A.   Bachelor's is in criminal justice.

5     Q.   Okay.

6     A.   And master's is communications and

7 strategic leadership.

8     Q.   And what was -- your duties as deputy

9 chief as of September of 2014?

10    A.   I don't understand.

11    Q.   What does the deputy chief do?

12    A.   The deputy chief oversees a subdivision

13 of the division of police; in my case --

14 is patrol, south division.  I oversee the daily

15 operations of approximately 675 patrol officers

16 generally assigned to the southern half of the

17 City of Columbus.

18    Q.   Okay.  And how many deputy chiefs are

19 there?

20    A.   There are six.

21    Q.   Okay.  And that's cordoned off the

22 sections you were talking about?

23    A.   There are six subdivisions, correct.

24    Q.   Okay.  And is the next level up the

25 actual police chief?

1     A.   Chief of police, correct.

2     Q.   Okay.  And then -- so you and the five

3  other deputy chiefs report to the chief of

4  police?

5     A.   That is correct.

6     Q.   Who is?

7     A.   Kimberly Jacobs.

8     Q.   And then who does Chief Jacobs report

9  to?

10     A.   She reports to the public safety

11  director.

12     Q.   And who is the safety director?

13     A.   Ned Pettus.

14     Q.   Okay.  And do you know --

15     A.   Dr. Ned Pettus.

16     Q.   Do you know if Dr. Pettus was the

17  safety director in 2014?

18     A.   He was not.

19     Q.   Okay.  Who -- do you know who the

20  safety director was then?

21     A.   I don't recall the chronology of the

22  last three directors.

23     Q.   Okay.  There have been three in two

24  years?

25     A.   Yes.

1     Q.   Okay.  And who were they?  Do you just

2  remember their names, not their --

3     A.   Yes.

4     Q.   -- timeline of service?

5     A.   Mitchell Brown --

6     Q.   Okay.

7     A.   -- and then George Speaks, and now Ned

8  Pettus.

9     Q.   Okay.

10    A.   I don't know the dates of those terms.

11    Q.   Okay.  Thank you.

12        And then the safety director, who do

13  they report to?

14    A.   Safety director is appointed by the

15  mayor.

16    Q.   Okay.  And in your position as deputy

17  chief, what kind of -- bad question.

18        Do you investigate complaints about

19  your officers if there is a stop and arrest that

20  a citizen feels is against policy?

21    A.   I do not investigate those, no.

22    Q.   Okay.  What about use of force against

23  policy?

24    A.   I do not investigate those, no.

25    Q.   Okay.  Do you review investigations?

1      A.   Yes.

2      Q.   Okay.  And can you take me through what

3  your review process of an investigation is?

4      A.   Of which type of investigation?

5      Q.   Well, let's start with a stop and

6  detention.

7      A.   A stop and detention I do not review.

8      Q.   Okay.  So if a citizen makes a

9  complaint that an officer stopped me for no

10  reason, I wasn't doing anything, who would that

11  complaint go to?

12      A.    If they wish to file a formal citizen

13  complaint, it would go through the internal

14  affairs bureau.

15      Q.   Okay.  And if it goes to -- if they're

16  in your section, what would be the chain of

17  command for the review, whether or not the

18  officer's stop was within policy?

19      A.   Are we supposed to know if the internal

20  affairs bureau conducted an investigation?

21      Q.   Yes.

22      A.    Then the officer's sergeant, and then

23  lieutenant, and then commander, and then myself

24  would review that investigation.

25      Q.   Okay.  So there are times when you

1    would review a complaint having to deal with a

2    stop and detention?

3         A.   That's correct.

4         Q.   Okay.  And what about uses of force,

5    would those go through the same?

6         A.   We have eight levels of uses of force.

7         Q.   Okay.

8         A.   And some of those reach my level of

9    review and some do not.

10        Q.   Okay.  And which reach your level of

11   review?

12        A.   Those are level -- what we call level 3

13   or higher, a Taser or higher.

14        Q.   Okay.

15        A.   Additionally, an outside-of-policy use

16   of Mace --

17        Q.   Yes.

18        A.   -- or a use of Mace against a

19   handcuffed prisoner would arrive to me as well.

20        Q.   Okay.  And as deputy chief, are you the

21   final decision-maker on those investigations that

22   come to you for what we discussed, the stop and

23   detention and the use of force, 3 through -- what

24   was the level?

25        A.   8.

```
1        Q.    -- 3 through 8, and then Mace outside
2   of policy?
3        A.    Yes and no.
4        Q.    Okay.
5        A.    It is complicated, but yes and no.
6        Q.    Okay.  What's the no?
7        A.    I am the final decision-maker on
8   in-policy use of force.
9        Q.    Okay.
10       A.    I am not the final decision-maker on
11  outside use of force if it involves certain
12  levels of discipline, nor am I the final decider
13  on a use of firearms for which there's a
14  disagreement between the firearms review board
15  and the chain of command.
16       Q.    Okay.  If the ending result is Mace,
17  the level of force does not go beyond Mace, would
18  you be the final decision-maker?
19       A.    Is it within policy or not within
20  policy?  Has the chain found it within or not?
21       Q.    If the investigator found it within
22  policy.
23       A.    Against use -- against a handcuffed
24  prisoner or not?
25       Q.    Well, I guess, let me go back and ask
```

13

1    this question.  What if there's a dispute between

2    the prisoner saying they were handcuffed and

3    Maced, and an officer's use-of-force report

4    saying that they Maced after handcuffing?

5         A.   If the investigation reveals that the

6    suspect was handcuffed at the time of use of

7    Mace, it would arrive up to me.

8         Q.   Okay.  And if it found that it was --

9    that the suspect was not handcuffed prior to,

10   then it would go --

11        A.   The commander would be the

12   highest-level decision.

13        Q.   Okay.  All right.  If you could, in

14   this exhibit book, turn to Exhibit 2, please.

15   And the second page is going to be -- looking at

16   numbers at the bottom -- GB766.

17        A.   Okay.

18        Q.   Would you be the final decision-maker

19   in this investigation; Subject, finding and

20   recommendations for IAB database, number,

21   201409-0040?

22        A.   Yes.

23        Q.   Okay.  And do you know if Chief Jacobs

24   received this case?

25        A.   I do not know.

1      Q.   Okay.  Do you know the statistics of

2  the use of force in the Columbus police

3  department?

4      A.   I do not, not specifically, no.

5      Q.   Okay.  Do you know where that

6  information would be kept?

7      A.   In the internal affairs bureau.

8      Q.   Okay.  Are you aware --

9      A.   Some of that information is available

10  from our annual report as well.

11      Q.   Okay.  And do you know whether that's

12  broken down by the level of force?

13      A.   Yes.

14      Q.   Okay.  And when you review the use of

15  force, you're looking at whether or not an

16  officer acted within policy?

17      A.   Yes.

18      Q.   Okay.  And as part of your review, do

19  you look to make sure that the policies are clear

20  as they can be to the officer?

21         MS. LLOYD:  Objection as to form.

22      A.   Can you repeat?

23  BY MS. BRATTON:

24      Q.   Uh-huh.

25         When you're looking at the policy that

1    an officer may or may not have violated, you're

2    making that determination in your review, do you

3    look to make sure that the policies are as clear

4    as they can be?

5              MS. LLOYD:  Objection.

6              THE WITNESS:  Should I answer it?

7              MS. LLOYD:  Yeah.

8         A.   Not at the time, no.

9    BY MS. BRATTON:

10        Q.   Okay.  And then, just for future

11   reference, for objections, unless your attorney

12   tells you specifically, don't answer the

13   question, you can answer.  We're just making a

14   record.

15        A.   Okay.

16        Q.   Okay.  Do you recall a Department of

17   Justice review of the Columbus police department

18   in the 2000s?

19        A.   Vaguely.

20        Q.   Okay.  And do you still participate in

21   training?

22        A.   Yes.

23        Q.   Okay.  And have there been any changes

24   to your training from the time that the

25   investigation -- the Department of Justice

1   investigation came out to September of 2014?

2         MS. LLOYD:  Objection as to form.

3   A.   Yes.

4  BY MS. BRATTON:

5     Q.   Okay.  And what were those changes?

6         MS. LLOYD:  Objection.

7     A.   I can't -- I can't label them all for

8  you.  There are many -- we train on hundreds, if

9  not thousands, of topics.  And those -- those

10  trainings change --

11  BY MS. BRATTON:

12     Q.   Okay.

13     A.   -- regularly.

14     Q.   So you don't know whether or not they

15  were as a result of the Department of Justice?

16     A.   I do not know.

17     Q.   Okay.  And you expect your officers

18  to -- to use force that is within policy?

19     A.   Yes.

20     Q.   Okay.  And also to make stops and

21  detentions that are also within policy?

22     A.   Yes.

23     Q.   Okay.  And are the officers taught what

24  the -- what they have to have so that they can

25  make a stop and detention?

1      A.    What do you mean by have?

2      Q.    I knew that question was coming.

3            Are officers taught that they have to

4      have reasonable suspicion to stop and detain?

5      A.    Yes.

6      Q.    Okay.  And when you all are in

7      training, are you given examples about what

8      reasonable suspicion is or is not?

9      A.    Yes.

10     Q.    Okay.  And when is an officer permitted

11     to use level 2 force?

12     A.    When it's reasonable.

13     Q.    Okay.  And when you are reviewing a

14     level 2 use of force, what do you consider in

15     making a reasonableness determination?

16           MS. LLOYD:  Objection as to form.

17     A.    I would consider the policy, the

18     training, and Graham versus Connor.

19     BY MS. BRATTON:

20     Q.    Okay.  And the policy you're referring

21     to, would that be Exhibit 10?

22           Go to Exhibit 10.

23     A.    That is use-of-force policy as it

24     existed in 2014, it appears.

25     Q.    Okay.  So would this have been the

1   policy in place September of 2014?

2       A.   I believe so.

3       Q.   Okay.  And do you want officers -- this

4   may sound like a funny question.

5            But do you want officers using policy

6   outside of the division directive?

7            MS. LLOYD:  Objection as to form.

8       A.   I don't understand that question.

9   BY MS. BRATTON:

10      Q.   The use-of-force division directive --

11  it's number 3.25 -- tells officers when and how

12  to use force; is that correct?

13           MS. LLOYD:  Again, I'll just object,

14       that the policy speaks for itself as to what

15       it says.

16      A.   Yeah.  I'll answer no, it does not

17  speak when and how to use force.

18  BY MS. BRATTON:

19      Q.   What does it speak to?

20      A.   It speaks to the policy of use of

21  force.  But how use of force is used is a

22  training -- is also covered in training in other

23  ways.

24      Q.   Okay.  So maybe I need to explain my

25  how.  My how would be how force is used as far as

1   what the force is; so chemical spray or Taser

2   or -- I don't want to call it a real gun -- a

3   firearm.

4           It tells in what situations you are

5   supposed to escalate the level of force?

6           A.   No, it does not.

7           Q.   Okay.  If you could, turn to GB2384.

8           A.   (Witness complies.)

9           Q.   And go down to B, where it says, Deadly

10  Force.  Sworn personnel may use deadly force when

11  the involved personnel have reason to believe

12  their response is an objectively -- objectively

13  reasonable to protect themselves or others from

14  the imminent threat of death or serious physical

15  harm.

16          MS. LLOYD:  What's the question?

17          MS. BRATTON:  Well, if I could get to

18      it.

19  BY MS. BRATTON:

20      Q.   So is this asking -- or I'm sorry -- is

21  this stating when officers can use deadly

22  force?

23          MS. LLOYD:  Again, I'm going to object.

24      It says what it says.

25  BY MS. BRATTON:

1          Q.    You can answer.

2          A.    The language says, when the involved

3    personnel, and it goes on from there.

4          Q.    Okay.  So --

5          A.    The word when appears in that --

6          Q.    Okay.

7          A.    -- paragraph, correct.

8          Q.    Okay.  Should your officers give

9    commands one at a time?

10              MS. LLOYD:  Objection as to form.

11         A.    Should they give commands one at a

12   time?

13              I'm -- I'm confused by the question.

14   BY MS. BRATTON:

15         Q.    Are you all taught to give commands one

16   at a time?

17              MS. LLOYD:  Objection as to form.

18         A.    Individually or -- I'm -- I'm confused.

19              I can -- I can only say one thing at a

20   time.  I'm not capable of making more -- two

21   things at one time.  So --

22   BY MS. BRATTON:

23         Q.    So I guess what I'm asking is a double,

24   so, get out of the car, get on the ground, or,

25   get out of the car, suspect gets out of the car;

1   get on the ground, suspect gets on the ground;

2   put your hands behind your back, put your hands

3   behind your back.

4            So those are three separate commands.

5            Are you taught to say that all at once

6   or give a command, have suspect comply, give

7   another command, have suspect comply?

8            MS. LLOYD:  Again, I'm going to object

9        as to form.

10       A.   We give commands in multiple ways.

11  BY MS. BRATTON:

12       Q.   Okay.  So there's -- you're not taught

13  to allow a suspect to comply before giving a

14  second command?

15           MS. LLOYD:  Objection as to form.

16       A.   We will often, actually, give more than

17  one command at once.

18  BY MS. BRATTON:

19       Q.   Okay.  And what about how you all are

20  taught about multiple officers giving commands at

21  the same time?

22           MS. LLOYD:  Objection as to form.

23       A.   Can you clarify it, please?

24  BY MS. BRATTON:

25       Q.   Yes.

1            So you and a fellow officer are on

2    scene, and there are -- they're giving a

3    command -- the other officer is giving a command.

4            Are you all taught that one person

5    who's on scene is the person to be giving the

6    commands?

7       A.   That's practical but not always

8    possible.

9       Q.   Okay.  And what are you all taught

10   about -- what are the officers taught about

11   giving conflicting commands?

12           MS. LLOYD:  Objection as to form.

13      A.   We would attempt to avoid giving

14   conflicting commands --

15   BY MS. BRATTON:

16      Q.   Okay.

17      A.   -- if possible.

18      Q.   Okay.  And if a conflicting command was

19   given and the subject of the command -- citizen,

20   suspect -- only followed one of the officers'

21   commands, would you deem that suspect to not have

22   followed commands?

23           MS. LLOYD:  Objection.  Calls for

24       speculation and hypothetical.

25      A.   It's probably a hypothetical.  I --

1     there are too many possible -- possibilities that

2     I wouldn't be able to directly answer that.

3     BY MS. BRATTON:

4         Q.   Okay.  If a suspect -- if one -- if a

5     suspect is in a car -- or I'll withdraw that.

6              Someone is walking down the street, and

7     one officer says, get on the ground, the other

8     officer says, don't move, and the person doesn't

9     move.

10             Would you consider the suspect to not

11    have followed commands because they didn't get on

12    the ground?

13             MS. LLOYD:  Objection.  Calls for

14         speculation and hypothetical.

15        A.   It's too -- I can't answer because

16    there's too many variables to answer that

17    specifically.

18    BY MS. BRATTON:

19        Q.   What would you need to answer that

20    question?

21        A.   I would need to know whether the

22    suspect heard it.  What was the suspect's

23    actions?  What were the suspect's other expressed

24    behaviors?

25             There's a -- there are -- there are an

24

1    innumerable number of things that would change

2    that.

3        Q.    Okay.  A suspect is walking down the

4    street -- and if you get this to review, and the

5    facts in front of you, in the packet that you

6    have, are, a suspect is walking down the street.

7    Two officers are in close proximity.  The suspect

8    has reported that they heard someone say -- or

9    the officers say, get on the ground, one of the

10   officers say, don't move.  The suspect reports

11   that they're scared to move because one of the

12   officers has told them, don't move, so they don't

13   move.

14         Would you deem that suspect, based on

15   those facts that would be in your packet, to have

16   not complied with the commands of the officer who

17   told him to get on the ground?

18         MS. LLOYD:  Again, objection as to the

19     form and the long and complicated nature of

20     that question.  And also, it's speculation

21     and generality.

22       A.   It's not an evaluation I would make,

23   because it's not what I evaluate.  I evaluate

24   officers' policy adherence.

25   BY MS. BRATTON:

1      Q.   Okay.  So is there not a policy about

2   giving conflicting statements?

3           MS. LLOYD:  Objection.

4      A.   No, there is not.

5   BY MS. BRATTON:

6      Q.   And what about training on providing

7   conflicting statements?

8           MS. LLOYD:  Objection as to form.

9      A.   I don't recall specifically.

10  BY MS. BRATTON:

11     Q.   Okay.  What would you look to if you

12  were -- if there was an allegation of a suspect

13  getting conflicting statements, and you were

14  doing any type of review to see if it was within

15  policy or not, what would you go to to find out

16  whether or not their actions were within --

17          MS. LLOYD:  Objection.

18  BY MS. BRATTON:

19     Q.   -- policy or training?

20          MS. LLOYD:  Objection as to form.

21     A.   Whether their behavior was

22  reasonable.

23  BY MS. BRATTON:

24     Q.   Okay.  Do you all have a training

25  manual?

1          A.   A training manual?  No.

2          Q.   Okay.  So when you go to trainings are

3     you given materials, or is it just what you can

4     glean in that -- in the classroom?

5               MS. LLOYD:  Objection as to form of

6          that question.

7          A.   It depends.

8     BY MS. BRATTON:

9          Q.   Okay.  So some classes you get

10    take-home materials and some classes you don't?

11         A.   Yes.

12         Q.   Okay.  Excuse me.

13              If you could, go back to Exhibit 2,

14    GB766.

15         A.   (Witness complies.)

16         Q.   And is that your signature, the

17    second-to-the-last, where it says, DC Kuebler

18    signature?

19         A.   Yes.

20         Q.   Okay.  And so you were the final

21    decision-maker in this investigation, correct?

22         A.   Yes.

23         Q.   And when it says, Forwarded 3/2 of '15,

24    was that when you closed the investigate -- or

25    made the recommendation or closed it out, or is

1    that when it was forwarded it to you?

2        A.   That's when I -- that's when I

3    completed my review and forwarded it out.

4        Q.   Okay.  And can you tell me what you did

5    in the review of this case?

6        A.   I read -- reviewed the investigation.

7    I reviewed the comments from the chain of

8    command.

9        Q.   Okay.  Would you have watched the

10   cruiser cam that was with it?

11       A.   I don't remember.

12       Q.   Okay.  Do you usually watch cruiser cam

13   if it's included in the packet?

14       A.   It depends.

15       Q.   On what?

16       A.   On whether or not I believe it's

17   necessary to review it or not.

18       Q.   Okay.  And what would be a situation

19   where you wouldn't feel it was necessary to

20   review if there was a video of the incident?

21            MS. LLOYD:  Objection as to form.

22       A.   Perhaps if it was sufficiently

23   summarized.

24   BY MS. BRATTON:

25       Q.   Okay.  Would you look to see if there

1    was a difference in the citizen who was

2    complaining's version of the story and the

3    officer's version of the story?

4          A.    Sometimes.

5          Q.    Okay.  And if there was a conflict,

6    what would make you not look at the video?

7                MS. LLOYD:  Objection as to form.

8          A.    There may be additional evidence that

9    is sufficient to render -- to make that

10   not necessary.

11   BY MS. BRATTON:

12         Q.    Okay.  And would you listen to

13   dispatch?

14         A.    Sometimes.

15         Q.    Okay.  Do you remember if you listened

16   to dispatch in this case?

17         A.    I do not remember.

18         Q.    Okay.  Did you ask any follow-up

19   questions in this case?

20         A.    Not that I recall.

21         Q.    Okay.  Did you interview or talk to any

22   of the officers, yourself, in this case?

23         A.    Not that I recall.

24         Q.    Okay.  And can you tell me how you came

25   to the conclusion that the officers' actions were

1    within policy?

2         A.   I don't remember this case, so I don't

3    recall how I came to that conclusion.

4         Q.   Okay.  If you go to the first page of

5    the -- go back one page -- I'm sorry -- first

6    page of Exhibit 2, where it says, other materials

7    noticed; these would be all of the items that

8    would be forwarded to you; is that correct?

9         A.   That's correct.

10        Q.   Okay.  Do you review the citizen's

11   complaint when you review the -- when you review

12   the -- I guess, do you call it a packet?

13        A.   Yeah, that's fine.

14        Q.   Okay.  When you review the packet, do

15   you review the citizen's complaint?

16        A.   Yes.

17        Q.   Okay.  And do you match the complaint

18   against what the officer's version of the story

19   is?

20        A.   I don't understand the question.

21        Q.   Do you look at what the complainant

22   says happened and what the officer says

23   happened?

24        A.   Yes.

25        Q.   Okay.  And if there is a discrepancy

30

1   between the two, how do you resolve that?

2       A.   I look at additional information,

3   additional evidence.

4       Q.   Okay.  And did you notice any

5   inconsistencies in the evidence in this case?

6       A.   I do not remember this case.

7       Q.   Okay.  I am going to play for you what

8   has been marked as Exhibit 18.

9            (Off the record.)

10  BY MS. BRATTON:

11      Q.   Here we go.  I'm sorry.  We have two

12  disks of interviews.

13           Okay.  I'm going to play for you what's

14  been marked previously as Exhibit 21, which is

15  the initial complaint of Mr. Dale Phillips.

16           (Audio was played.)

17  BY MS. BRATTON:

18      Q.   I'm going to fast-forward a little bit.

19  There's a --

20           MS. LLOYD:  We won't -- okay.

21  BY MS. BRATTON:

22      Q.   There's a lapse.  He's on hold for

23  about five minutes; unless you want to listen to

24  five minutes of dead air.

25           MS. LLOYD:  Uh-uh.

```
 1              (Audio was played.)
 2   BY MS. BRATTON:
 3       Q.   I'll stop it at 16 minutes and
 4   25 seconds.
 5              So you would have listened to -- if
 6   that was the only complaint that --
 7              MS. LLOYD:  Could we -- because I
 8         think -- does it go on beyond that, or is
 9         that the end of it, when you stopped it?
10              MS. BRATTON:  No, it goes on.  If you
11         want --
12              MS. LLOYD:  Okay.  I don't know if it's
13         more --
14              MS. BRATTON:  It goes on.  It's
15         background information about his address and
16         when somebody will contact him back.  If you
17         want to hear the rest of it --
18              MS. LLOYD:  I don't -- I didn't know
19         what it was.
20   BY MS. BRATTON:
21       Q.   If that was the only communication that
22   the department had with Mr. Phillips, would you
23   have listened to that in the course of your
24   investigation?
25       A.   Not necessarily.
```

32

1    Q.   Okay.  When would be a time when you
2    would not listen to the complainant's report?
3        A.   It's fairly frequently that I do not.
4        Q.   Okay.  What do you, then, base the
5    complaint off of?
6        A.   I don't make that decision.  I don't
7    base the complaints.  Internal affairs reduces
8    the complaint to writing.  I don't do that.
9        Q.   Okay.  You review whether or not
10   internal affairs -- you review internal affairs'
11   investigations, correct?
12       A.   Yes.
13       Q.   Okay.  And so if it is not a thorough
14   investigation, then you can ask for additional
15   information?
16       A.   Yes.
17       Q.   You can go out and interview or talk to
18   people yourself, correct?
19       A.   No, I cannot.
20       Q.   Okay.  So if you are missing
21   information, what would you do so that you could
22   obtain that information to make that decision
23   about whether or not you agree with the
24   recommendation from internal?
25       A.   I can request additional investigation

1    if I believe it's necessary.

2        Q.   Okay.  And if part of internal's

3    decision in the investigation is based off of the

4    complainant's report, would you review the

5    complainant's report, in whatever form, audio,

6    written?

7             MS. LLOYD:  Objection as to form.

8        A.   I'm -- you said, if internal's.  Is

9    that internal affairs?

10   BY MS. BRATTON:

11       Q.   Yes.

12       A.   I do not listen to every complainant's

13   audio recording.

14       Q.   Even if the audio recording is

15   researched in the complaint -- I'm sorry -- in

16   the internal affairs report?

17       A.   Again, I do not listen to every

18   complainant's intake call, no.

19       Q.   Okay.  And what would be a situation

20   where you would not listen to an intake call?

21       A.   If I don't believe it's necessary.

22       Q.   And why wouldn't an intake call be

23   necessary to listen to?

24            MS. LLOYD:  Objection as to form.

25       A.   Because we pay people to summarize

1    things for me.  I don't have the time to review,

2    listen to everything.  And so that is what the

3    internal affairs investigator's responsibility

4    is, to summarize it.

5    BY MS. BRATTON:

6         Q.   Okay.  And so from that audio, from

7    Mr. Phillips' audio, Mr. Phillips stated that he

8    was stopped for no reason.

9              Did you hear that?

10        A.   I believe so.  I don't remember that

11   that was his exact words.

12        Q.   Okay.

13        A.   I don't recall.

14             MS. LLOYD:  If we could just object at

15        this point.  The video -- or the audio

16        speaks for itself.  So whatever is on there

17        is on there.

18             And we have listened to several things.

19        We listened to -- his statement went on for

20        several minutes.

21             MS. BRATTON:  I'm going to play the

22        tape.  I'll start it at 2 minutes and

23        10 seconds.

24             (Audio was played.)

25   BY MS. BRATTON:

1          Q.   Did you hear, on the call, Mr. Phillips

2     said that, they stopped me for no reason?

3          A.   Yes.

4          Q.   Okay.  And then Mr. Phillips also

5     described use of force against him?

6          A.   Yes.

7          Q.   Okay.  If you turn to Exhibit 2,

8     page -- starting at GB769, it looks like the only

9     allegation against Officer Blair was use of

10    force; is that correct?

11         A.   That's correct.

12         Q.   And the only allegation against

13    Officer Cazan was use of force?

14         A.   That's correct.

15         Q.   And on the next page, GB770, the only

16    allegation against Officer McClain was use of

17    force?

18         A.   Yes.

19         Q.   And Officer Groves, the only allegation

20    was use of force?

21         A.   Yes.

22         Q.   And so then Mr. Phillips' claim of

23    being stopped for no reason was not

24    investigated --

25         A.   I do not know.

1        Q.   -- as part of this packet that you

2   investigated?

3        A.   I did not investigate it, no.

4        Q.   Okay.  Should it have been made a part

5   of this investigation?

6             MS. LLOYD:  Again, we've had testimony

7             on this numerous times.  This officer has

8             already testified he doesn't recall the

9             details here.  But we've had testimony from

10            IAB already in the record explaining

11            Mr. Phillips was charged, and his -- the

12            charge of obstructing -- of obstruction of

13            official business is proceeding through the

14            court system.

15   BY MS. BRATTON:

16        Q.   I'm not asking about Mr. Phillips'

17   obstruction of official business charge.

18             I am asking about Mr. Phillips'

19   accusation in -- or his complaint, his internal

20   affairs complaint, that said that he was stopped

21   for no reason, and then he detailed the use of

22   force.

23             So Mr. Phillips made two complaints

24   here.  We've already established that only one of

25   those, the use of force, was investigated.

1           My question is, should internal affairs

2    have investigated Mr. Phillips' claim of being

3    stopped for no reason?

4           MS. LLOYD:  And the testimony has been

5       that the deputy chief has no recollection of

6       this.  He says he doesn't know what they

7       investigated.

8           MS. BRATTON:  For the record, if

9       Counsel could stop directing testimony of

10      the witness.

11          MS. LLOYD:  I'm not directing.  I'm

12      telling you what he has just testified to.

13   BY MS. BRATTON:

14      Q.   I'm asking you, should internal affairs

15   have included all of the claims that -- or all of

16   Mr. Phillips' complaints, which were two?

17      A.   Not necessarily.

18      Q.   Okay.  And why shouldn't internal

19   affairs investigate a complaint?

20      A.   Their SOP would have referenced the

21   reasons why they would not investigate

22   complaints.  There are a multitude of reasons why

23   they would not.

24      Q.   Who's SOP?  I'm sorry.

25      A.   Internal affairs.

1        Q.    Okay.  And you said their -- did you

2   say their SOP?

3        A.    Uh-huh.

4        Q.    What is an SOP?  I'm sorry.

5        A.    Standard operating procedures.

6        Q.    Okay.  And you signed -- you're the

7   final person to sign off on an investigation,

8   correct --

9        A.    Not necessarily.

10       Q.    -- or this investigation?

11       A.    Yes.

12       Q.    Okay.  And when you signed off on it,

13  did you sign off on what you thought was a

14  complete and thorough investigation?

15       A.    I do not recall this investigation, so

16  I do not recall my thinking -- my feelings about

17  it.

18       Q.    Okay.  I am going to play what's been

19  marked as deposition (sic) Exhibit 3.  It is

20  the -- the radio dispatch of the call for the

21  incident involving Mr. Phillips.  I will first

22  play 22 hours, 44 minutes, and 22 seconds.

23            (Audio was played.)

24  BY MS. BRATTON:

25       Q.    And I'm going to play Exhibit 3 at

1    22 minutes -- I'm sorry -- 22 hours, 44 minutes,

2    and 32 seconds.

3              (Audio was played.)

4    BY MS. BRATTON:

5         Q.   What is the use of dispatch in law

6    enforcement?

7              MS. LLOYD:  Objection as to form.

8         A.   I'm sorry?

9    BY MS. BRATTON:

10        Q.   What do you all use dispatch for?

11        A.   Could you describe what you mean by

12   dispatch?

13        Q.   Yeah.  So the call that we just heard

14   from the dispatcher to a police officer -- or to

15   police officers, what do police officers use

16   dispatch for?

17             MS. LLOYD:  Objection as to form.

18        A.   They use it for many things.

19   BY MS. BRATTON:

20        Q.   They -- do they use it to get the

21   description of a suspect?

22        A.   Yes.

23        Q.   Location?

24        A.   Yes.

25        Q.   Possible means of transportation that a

 1   suspect is in?

 2        A.   Yes.

 3        Q.   Okay.  And -- and in this case, do you

 4   remember what Mr. Phillips and his passenger's

 5   race --

 6        A.   I do not.

 7        Q.   -- were?

 8             Okay.  Mr. Phillips is an

 9   African-American male, and Mr. Phillips'

10   passenger was a white woman.

11             Based on the dispatch that you just

12   heard, do they match the description that

13   dispatch called in?

14        A.   I do not recall.

15             Do you want to play it again for me?

16        Q.   Okay.

17        A.   I wasn't aware this would be a --

18             (Audio was played.)

19   BY MS. BRATTON:

20        Q.   Based on the radio dispatch --

21   Mr. Phillips and his passenger -- Mr. Phillips is

22   African American, his passenger was a white

23   woman.

24             Do they match the description of the

25   suspects that dispatch put out?

```
 1              MS. LLOYD:  Objection as to form on
 2         that question.
 3         A.   I can't answer that.
 4              The -- I assume that's Mr. Phillips to
 5    your left?
 6    BY MS. BRATTON:
 7         Q.   Yes.
 8         A.   Mr. Phillips -- and I -- I would say --
 9    I would not identify him as a black male.  His
10    skin color is no darker than mine.  And so that
11    description, at night, I think is very difficult
12    to determine at night, whether, to your point, he
13    matched it or not.
14         Q.   Okay.  What about a dark-skinned black
15    woman and a white woman?
16         A.   What's the question?
17         Q.   If the caller said a female black with
18    an orange head wrap and shorts, and the
19    individual who was detained is a white woman with
20    black pants and nothing on her head, does --
21    would she match the description?
22         A.   I do not know.
23         Q.   Okay.
24         A.   Suspects can change clothing, and I
25    don't know what this person you're referencing
```

42

1    looks like.  I don't know.

2        Q.   Okay.  If one person is white and one

3    person is black, is that the same description?

4        A.   Yes, it can be.

5        Q.   Okay.  So if a -- if dispatch calls in,

6    two white women are running from a bar, your

7    officers can stop every black woman they see?

8             MS. LLOYD:  Objection as to form.

9        A.   Could you repeat the question?

10   BY MS. BRATTON:

11       Q.   Yes.

12            If dispatch calls in, on street A two

13   white women just robbed a bar, and black women

14   are walking up and down the street, because

15   dispatch -- I guess, black and white women can be

16   the same, your officers, if they're on the

17   street, can stop any black woman on the street,

18   even though the description was for two white

19   women?

20            MS. LLOYD:  Objection as to the form of

21       that question and the extreme hypothetical.

22       A.   The hypothetical doesn't contain enough

23   information to answer that.

24   BY MS. BRATTON:

25       Q.   Well, you just said that a white person

 1    and a black person can be the same.  So what

 2    would be the situation where, if dispatch called

 3    out for a white woman, that your officers could

 4    stop a black woman?

 5              MS. LLOYD:  Again, objection as to form

 6         and isolating one factor into a hypothetical

 7         that doesn't make sense.

 8         A.   I wouldn't be able to answer that

 9    question.

10              MS. BRATTON:  Okay.  Again, for the

11         record, Counsel is directing the witness.

12    BY MS. BRATTON:

13         Q.   So --

14              MS. LLOYD:  For the record, I'm trying

15         to suggest that you ask questions in a more

16         direct format that makes sense.

17              MS. BRATTON:  I don't know how much

18         more direct you can get when you're asking

19         somebody, if dispatch calls out that a white

20         person is running down a street, and black

21         women -- a white woman is running down the

22         street and black women are running down the

23         same street, that they can stop every single

24         black woman.

25    BY MS. BRATTON:

1          Q.    So the question, I guess, would be, is

2    dispatch irrelevant when police are looking for a

3    suspect?

4               MS. LLOYD:  Again, objection as to the

5          form of that question, which combines

6          several different questions.

7          A.    Dispatch is not irrelevant.

8    BY MS. BRATTON:

9          Q.    Okay.  So when can officers disregard

10   completely a description in -- from dispatch --

11              MS. LLOYD:  Objection.

12   BY MS. BRATTON:

13         Q.    -- and stop anybody?

14              MS. LLOYD:  Objection as to the form of

15         that question.

16         A.    Description of race is not a

17   particularly discernable characteristic at night,

18   in the dark.

19              In this room right here, I don't

20   believe it's particularly descriptive.

21   BY MS. BRATTON:

22         Q.    Okay.  What about if, altogether, race,

23   location, and clothing don't match?

24         A.    It's a hypothetical.  And it would be

25   not enough facts in that --

1          Q.    Okay.

2          A.    -- to determine.

3          Q.    Okay.  I'll give you the facts of this

4    case.

5               The -- dispatch -- and I can play it

6    again -- specifically said that they were loading

7    items in through the back door, and then again,

8    when there was clarification, through the rear of

9    the building.  Mr. Phillips was on the side of

10   the building.

11              Officer Blair, who was one of the

12   responding officers, responded within seconds,

13   she said.

14              The street that Mr. Phillips was on is

15   a one-way street.

16              The alley that the back door is on --

17   actually, let me --

18              MS. LLOYD:  The back door is not on an

19       alley.

20   BY MS. BRATTON:

21        Q.    If you could, turn to Exhibit 22.

22        A.    (Witness complies.)

23        Q.    Okay.  Mr. Phillips was on the street

24   by where you see that red door.  So he's on the

25   street going down the correct path that the

1    street goes on, the direct one-way that the

2    street goes on.

3          MS. LLOYD:  Again, I have to -- to the

4          extent that you are representing these are

5          the facts of record, I can interject and say

6          those aren't the facts of record, but I'm

7          obviously not going to interject on the

8          facts into your question.

9          MS. BRATTON:  Well, for the record, no

10          one has testified that Mr. Phillips was

11          parked or driving the wrong way on the

12          one-way street.

13          MS. LLOYD:  But there has been

14          testimony as to whether he was stopped or

15          driving.

16          MS. BRATTON:  And I, in my example, did

17          not give whether he was stopped or

18          driving --

19          MS. LLOYD:  You said the word moving.

20          MS. BRATTON:  -- said was on the

21          street.

22          No, I didn't.  I said on the street.

23    BY MS. BRATTON:

24    Q.    And this is the building that is -- was

25    alleged to be burglarized.

1          And there has been testimony that there
2  is a door in the back of the building.
3          MS. LLOYD:  There was also testimony
4      there is a door right where he was parked.
5          MS. BRATTON:  Correct, which is why I
6      said, Mr. Phillips, on the street, by the
7      store.
8  BY MS. BRATTON:
9      Q.   And so there are -- there is a side
10  door to this building and there is a back door to
11  that building.
12          Dispatch says, back door.  Mr. Phillips
13  is on the street, side door.
14          Would you agree that, out of
15  everything, the back door and the side door are
16  two different things?
17      A.   No, I would not.
18      Q.   Okay.  So then a back door and a side
19  door can be the same thing.  A white suspect and
20  a black suspect can be the same.
21          And what about clothing, someone
22  wearing an orange head wrap and shorts, and then
23  when you pull the car over seconds later, someone
24  having on black pants?
25          MS. LLOYD:  There is no testimony

1           that -- that the officer who pulled the

2           truck over could see the passenger below the

3           waist.  That is testimony on record.

4       A.   And I don't believe you asked me a

5   question.

6   BY MS. BRATTON:

7       Q.   Yes.  If -- is there a difference

8   between a woman with an orange head wrap and

9   shorts and a woman with black pants on?

10      A.    Perhaps.

11      Q.    Okay.  What -- what is the ambiguity?

12      A.    People change clothing.  People can

13  change clothing.

14      Q.    In a matter --

15      A.    Clothing can be described inaccurately

16  by people who call us.

17      Q.    Okay.

18      A.    And often that is the case.

19      Q.    So that -- that's my question about the

20  role of dispatch.

21           Because here, the individuals who were

22  stopped, the clothing doesn't match.  The

23  individuals who were stopped, the race doesn't

24  match.  The individuals who were stopped, the

25  location of the vehicle doesn't match.

1          So what, then -- everything that

2    dispatch has communicated has been -- is

3    irrelevant then?

4          MS. LLOYD:  Again, I'm going to object

5        as to Counsel's attempt to characterize the

6        testimony to date and also to characterize

7        dispatch.

8    BY MS. BRATTON:

9        Q.  My question is, what is the role of

10   dispatch if everything that dispatch called

11   matches -- does not match the person who is

12   stopped?

13         MS. LLOYD:  And, again, objection as to

14       calling a -- calling for a hypothetical.

15       A.  I object to the premise that -- you

16   have not demonstrated to me that they don't

17   match.

18   BY MS. BRATTON:

19       Q.  Okay.  So before we get into that, can

20   we agree that dispatch said, two male whites

21   with -- one with a gray coat?

22       A.  Yes.

23       Q.  Can we agree that dispatch said, one

24   female, black, with an orange wrap around her

25   head, wearing shorts?

1        A.   Yes.

2        Q.   Can we agree that dispatch said, the

3   suspects are carrying items out of the back

4   door?

5        A.   Yes.

6        Q.   And then when she clarified it, she

7   said the rear of the building?

8        A.   Yes.

9        Q.   And that the suspect -- or I'm sorry --

10  that the caller can't see the vehicle?

11       A.   I don't recall.

12       Q.   Okay.

13            (Audio was played.)

14  BY MS. BRATTON:

15       Q.   Can we agree that dispatch said, the

16  caller can't see the items that they're loading

17  the vehicle in -- or can't see the vehicle that

18  they're loading the items into?

19       A.   Yes.

20       Q.   Okay.  And then at 22 hours,

21  45 minutes, and 32 seconds, I'm going to replay.

22            (Audio was played.)

23  BY MS. BRATTON:

24       Q.   And from 0 to 2 seconds, dispatch just

25  said, caller says they're all back inside?

1      A.   Yes.

2      Q.   Okay.  I am playing Exhibit 3 at

3  22 hours, 48 minutes, and 25 seconds.

4          (Audio was played.)

5  BY MS. BRATTON:

6      Q.   And would you agree that 9 -- well,

7  Officer 9191 is Officer Jean Byrne, and that

8  Officer 9191 said that it was a female, white?

9      A.   That's two questions.  I'm sorry.

10     Q.   I'm sorry.

11     A.   You asked me if 9191 was Jean Byrne,

12  and then --

13     Q.   No.  I'm sorry.  I'm telling you

14  9191 is Jean Byrne --

15     A.   Okay.

16     Q.   -- in case I, instead of calling her by

17  her badge number, I call her Officer Byrne down

18  the line.

19          Office Byrne said that it was a female,

20  white?

21     A.   Yes.

22     Q.   Okay.  And I'm going to play the

23  cruiser camera, which has previously been marked

24  as Exhibit 16.

25          (Video was played.)

52

1     BY MS. BRATTON:

2          Q.    And were you able to see the white

3     woman who Officer Byrne described as running off,

4     in the dispatch, on the video?

5          A.    I see her a little bit, but I wouldn't

6     hazard a guess to her race.

7          Q.    Okay.  Officer Byrne said she was

8     white; is that correct?

9          A.    That's what Officer Byrne said.

10         Q.    Okay.  And did you recognize her to

11    have on black pants in this video?

12         A.    Yes.

13         Q.    Okay.  Okay.  Would you agree that,

14    from what you saw on tape, the black pants and

15    what Officer Byrne said was a white woman, so a

16    white woman with black pants, does not match the

17    description of a female, black, with an orange

18    wrap around her head and shorts?

19         A.    No, I would not.

20         Q.    You -- you would say that they're

21    different; is that correct?

22         A.    I'm saying that they could be the

23    same.

24         Q.    Okay.  And in this investigation, did

25    you -- or I'm sorry -- in this review, did you --

53

1    did they investigate that?

2          A.    I do not recall.

3          Q.    Did you ask follow-up questions about

4    it?

5          A.    I don't believe so.

6          Q.    Okay.  And what about a male, white,

7    with a gray coat?  Did you ask follow-up

8    questions about whether there was a gray coat

9    found in Mr. Phillips' car?

10         A.    I don't believe I did.

11         Q.    Okay.  Did you ask questions about the

12   number of suspects, being Mr. Phillips and a

13   woman, as opposed to the three that the caller

14   reported?

15         A.    Not that I recall.

16         Q.    Did you ask any follow-up questions

17   about the location of Mr. Phillips' vehicle as

18   opposed to the location that dispatch gave?

19         A.    Not that I recall.

20         Q.    Could you have?

21         A.    Could I have, meaning, am I possibly

22   incorrect, or could I as in, am I allowed to do

23   that?

24         Q.    No; possibly incorrect.

25               So are you saying that you don't

54

1    remember or --

2         A.   I don't remember asking that.  There's

3    no indication in my notes that I did.

4         Q.   Okay.  So then would it be -- in your

5    determination, there were -- or there was no

6    investigation in the chain of command that you --

7    the investigation that you reviewed in this

8    particular chain of command, which is Exhibit 2,

9    GB766 --

10        A.   I'm sorry.  What's the question?

11        Q.   -- that no one -- oh, I'm sorry -- just

12   in this chain of command, that Mr. Phillips'

13   complaint of being stopped for no reason was not

14   investigated?

15            MS. LLOYD:  Again, I'm going to object

16       to the form of that question.

17            This was a lengthy investigation.

18            What is your question to him?

19   BY MS. BRATTON:

20        Q.   Did you not hear my question?

21        A.   I -- I don't understand it.

22        Q.   Okay.  Did anyone in this chain of

23   command, going to you, signing off on it,

24   investigate and make a decision about whether or

25   not Mr. Phillips was stopped for no reason?

1      A.   I don't remember what's all included in

2  this investigation.

3      Q.   Okay.  We can take a minute, if you

4  want to look at it.

5           This was given to me as the

6  investigation with those videos.  And I can play

7  all of them, if you want, so we can get the

8  entire investigation.

9      A.   It is 70 pages long.

10     Q.   This is all that I have.

11     A.   So you want me to read it and then

12 answer you?

13     Q.   Yes.  I mean, if you don't remember, I

14 do.

15     A.   I don't remember.

16     Q.   Okay.  Yes, if you could, review it.

17          MS. LLOYD:  What is question that he's

18     reviewing?

19          MS. BRATTON:  Well, he doesn't remember

20     anything about the investigation, and I'm

21     asking about the investigation --

22          MS. LLOYD:  What specifically are you

23     asking?

24 BY MS. BRATTON:

25     Q.   Would this refresh your memory, if you

1    looked at the investigation?

2        A.    You asked one question, whether -- I'm

3    sorry.  Would you repeat the question?

4        Q.    Yes.

5             Would reviewing your inves -- this

6    investigative packet refresh your memory about

7    how you came to the conclusion that Mr. -- that

8    the stop and use of force against Mr. Phillips

9    was within policy?

10       A.    That is not the question you just asked

11   me.

12       Q.    No, I'm asking you that now.  I'm

13   sorry.

14       A.    No, it would not help me do that.

15       Q.    Okay.  So what would help you determine

16   what you based your decision off of?

17       A.    Nothing.  That was three years ago.  I

18   don't remember how I made a decision three years

19   ago.

20             Since then, I'm sitting in front of you

21   and watching different videos.  I see the

22   individual that brought the complaint in front of

23   me.  The facts have changed.

24             So I don't remember how I came to that

25   conclusion three years ago.

1      Q.   So the video would be the same as three

2   years ago, correct?

3      A.   Correct.

4      Q.   Okay.  Dispatch would be the same as

5   three years ago?

6      A.   Correct.

7      Q.   Okay.  Every single piece of paper in

8   here would be the same as three years ago?

9      A.   Correct.

10      Q.   Okay.  So --

11      A.   However, my review would be different

12   today than it was three years ago.

13      Q.   Okay.  I'm just asking you how you came

14   to this conclusion.

15      A.   And I don't recall.

16      Q.   Okay.  So if we had a trial in this

17   matter, and you were asked to support your

18   investigation, your answer would be, you don't

19   remember?

20      A.   That's a different question.

21      Q.   Okay.  Well, could you support your

22   review?

23      A.   From three years ago?

24      Q.   Yes.

25           MS. LLOYD:  He's just said he doesn't

58

1        recall.

2        A.   No, I don't recall how I did it three

3   years ago.

4   BY MS. BRATTON:

5        Q.   Okay.  So that -- that is my -- that is

6   my question.  I want to make sure for the

7   record -- because this may go to trial.  And so

8   if we're in trial, I don't want to be surprised

9   if your attorneys or the attorneys for the City

10  ask you, so tell me about your investigation,

11  then all of a sudden, you know everything about

12  it.

13          So my question to you is -- is that,

14  you don't, at this point, remember any --

15  anything about how you came to the conclusion

16  that the officers were within policy?

17       A.   That is correct, I do not remember how

18  I came to a conclusion three years ago.

19       Q.   Okay.  And so going through just the

20  facts of the case, that -- okay.

21          Sitting here today, is it fair to say

22  that you don't remember whether or not you

23  listened to any of the tapes or recordings in

24  this case?

25       A.   I do not remember.

1      Q.   Okay.  Sitting here today, do you

2  remember whether you read all of the officers'

3  statements?

4      A.   I do not remember.

5      Q.   Okay.  Sitting here today, do you

6  remember whether or not you compared any officer

7  statements to any of the complaint?

8      A.   I do not remember.

9      Q.   Okay.  Sitting here today, do you

10  remember whether -- if there were any

11  inconsistencies in the officers' account of the

12  incident that you followed up on, on those

13  inconsistencies?

14      A.   I think it's -- I -- it feels like

15  there's multiple questions in there.

16           I did not follow up on any

17  inconsistencies that I'm aware of.

18      Q.   Okay.  Do you remember whether you

19  found inconsistencies to follow up on?

20      A.   I do not remember.

21      Q.   Okay.  Do you remember if you read any

22  of the packet, any of the documents in the

23  packet?

24      A.   Yes.

25      Q.   And which documents?

1      A.   I don't remember.

2      Q.   Okay.  So you don't remember if you

3 read all of them or some of them?

4      A.   I don't remember.

5      Q.   Okay.  I am going to play what has been

6 marked as Exhibit 21.  And I'm going to play

7 Officer Byrne's interview.

8             And that's B-y-r-n-e.

9             (Audio was played.)

10 BY MS. BRATTON:

11     Q.   I'm going to stop at 2 minutes and

12 52 seconds.

13            Did -- and I can repeat it.

14            But did you hear Officer Byrne inform

15 the IAB investigator that they got a call that

16 the truck was involved in a 10-8?

17     A.   I don't recall if that was the exact

18 same language, but that was the gist of it.

19     Q.   Okay.  And after hearing the dispatch,

20 Mr. Phillips' truck was not described in

21 dispatch; is that correct?

22     A.   That's correct.

23     Q.   Okay.  So then that's -- well -- and,

24 in fact, dispatch said that they can't see the

25 vehicle; is that correct?

1         A.   I believe so.

2         Q.   And did you follow up on that

3    inconsistency in Officer Byrne's statement?

4              MS. LLOYD:  I'm going to object to the

5         extent that you've characterized that as an

6         inconsistency.

7    BY MS. BRATTON:

8         Q.   Do you -- based on your job of

9    reviewing facts in an investigation, if a

10   dispatch says that they can't see a vehicle, and

11   an officer says that the vehicle they stopped is

12   the vehicle described, is that an inconsistency?

13        A.   Not necessarily.

14        Q.   Why wouldn't it be an inconsistency?

15        A.   Can you repeat the question again?

16        Q.   Yes.

17             So if dispatch says, can't see the

18   vehicle, and your officer reports that dispatch

19   gave you a specific vehicle, gave you a truck, is

20   that an inconsistency in what dispatch reported

21   and what the officer reported?

22        A.   It's a word-for-word inconsistency,

23   yes.

24        Q.   Okay.  And did you follow up on that

25   inconsistency?

1              MS. LLOYD:  Again, objection as to form

2         as to whether or not that's inconsistent

3         with the facts in this case.

4         A.   I believe I've said it before, I don't

5    recall following up with anything on the case.

6    BY MS. BRATTON:

7         Q.   Okay.  And I am going to play, on

8    Exhibit 21 -- what has previously been marked

9    Exhibit 21, Officer Blair's interview.

10             MS. LLOYD:  Is that the same --

11             MS. BRATTON:  No.  We played Officer

12        Byrne's -- Exhibit 21 is the complete disk

13        of internal affairs recordings.

14             (Audio was played.)

15   BY MS. BRATTON:

16        Q.   I'm going to stop at 12 minutes and

17   11 seconds.

18             Was there any follow-up as to the

19   officers being unable to see or Officer Blair not

20   being able to see what was going on and almost

21   handcuffing Officer Groves?

22        A.   What -- I don't know.

23        Q.   Okay.

24        A.   There's a whole bunch of additional

25   interviews, I suspect, after this.  I don't know

1    if that was followed up on after that.  I don't

2    know.  I haven't heard that entire interview.

3         Q.   Okay.  I can play the rest of it.  I --

4    but what I'm asking is, in your investigation --

5    in your review of the investigation, do you

6    remember any follow-up regarding

7    Officer Groves -- Officer Blair almost

8    handcuffing Officer Groves?

9         A.   I don't remember any.

10        Q.   And is that something that you would

11   want to know when you're conducting an

12   investigation?

13        MS. LLOYD:  Again, objection as to

14   form.

15        A.   Not necessarily.

16   BY MS. BRATTON:

17        Q.   Okay.  So would you want to know, in an

18   investigation where the accusation is that a

19   suspect is -- is resisting and not allowing their

20   arms to be controlled by officers, whether or not

21   it was actually their arms flailing or one of the

22   officers' arms flailing?

23        MS. LLOYD:  Again, objection as to form

24   and the hypothetical nature of that

25   question.

64

1        A.    I don't know how to answer that without

2   more details or some clarification.

3   BY MS. BRATTON:

4        Q.    Yes.

5              So Officer Blair, in her IAB interview,

6   said that there was a melee of officers.

7              Did you hear that?

8        A.    Uh-huh.   Yes.

9        Q.    That they all had on white shirts and

10  Mr. Phillips had on a white shirt.

11       A.    I don't recall that, but --

12             (Audio was played.)

13  BY MS. BRATTON:

14       Q.    Okay.   Did you hear that Mr. Phillips

15  had on a white shirt?

16       A.    Yes.

17       Q.    Okay.   And that Officer Blair almost

18  handcuffed Officer Groves?

19       A.    Yes.

20       Q.    Okay.   And did you hear Officer Blair

21  say that Officer Groves had Mr. Phillips' left

22  arm and she had his right arm?

23       A.    Yes.

24       Q.    Okay.   And if you would, go to --

25             MS. BRATTON:   Did we bring Exhibit 28?

1           THE REPORTER:  (Indicating.)

2   BY MS. BRATTON:

3           Q.   This has previously been marked as

4   Exhibit 28.  It is the transcript of Mr. -- or of

5   Officer Groves' internal affairs interview.

6           A.   Okay.

7           Q.   And it's page 10, starting at line 6,

8   Officer Groves says that Chad -- who is Officer

9   Cazan -- had Mr. Phillips's left arm and that he

10  had Mr. Phillips' right arm.

11          Is that accurate?

12          A.   Yes.

13          Q.   Okay.  And so in a review, based on

14  what Officer Blair has said as far as the melee

15  and confusing Officer Groves' arm -- almost

16  handcuffing Officer Groves' arm, would you have

17  wanted to know how the officers determined that

18  it was actually Mr. Phillips who they were

19  struggling with?

20          MS. LLOYD:  Objection as to form.

21          A.   Are you -- is the assumption that I

22  knew that information at the time, or is this

23  hypothetical?

24  BY MS. BRATTON:

25          Q.   No.  I'm saying if, in your review

1      of -- well, maybe you -- okay.

2          A.   I don't know how --

3          Q.   Maybe you didn't know if you -- okay.

4      So you don't know if you reviewed what Officer

5      Blair said happened?

6          A.   Correct.

7          Q.   Okay.

8          A.   I know I didn't have a transcript from

9      Elite transcribing.

10         Q.   Okay.  But the IAB interviews, you

11     would have had access to, correct?

12         A.   Correct.

13         Q.   Okay.  And those would have been

14     conducted prior to your final signing-off on

15     it?

16         A.   Correct.

17         Q.   Okay.  And reviewing an investigation,

18     would you have expected the investigators to have

19     investigated or figured out how they came to the

20     determination that it was actually Mr. Phillips

21     who was the person resisting on the ground?

22         A.   Not necessarily.

23         Q.   Okay.

24         A.   Not to the specific -- specificity of

25     your question.

1       Q.    Would you have wanted them to

2   investigate whether or not Mr. Phillips was

3   resisting at all on the ground?

4       A.    The investigation, I believe, was --

5   allegation was that they used force.

6       Q.    Yes.

7       A.    And that's what I would expect the

8   investigator would investigate.

9       Q.    Okay.  So can they use force on someone

10  who is complying and not resisting?

11      A.    That's a specific question.  I can't

12  answer based on how you would review a force

13  application.

14      Q.    When you -- can an officer Mace a

15  citizen who is complying with their orders and

16  not resisting them?

17      A.    Yes.

18      Q.    And what would be a situation where you

19  could Mace a compliant person who is not

20  resisting an officer?

21      A.    There are -- for example, you could

22  have someone who is blocking access to an

23  emergency, who are doing things that are not

24  specifically resistive, but are causing harm or

25  injury to others because of their actions.

68

1      Q.   Okay.  And if someone would be blocking

2  a -- in an emergency, would you expect the

3  officer to say, get out of the way?

4      A.   Not necessarily.

5      Q.   Okay.  So then, just to be clear, your

6  officers don't have to give any warning, they can

7  just Mace someone or give a command?

8           MS. LLOYD:  Objection as to form.

9      A.   That's not what I said.

10 BY MS. BRATTON:

11     Q.   Okay.  So the question -- one of the

12 examples you gave was someone in an emergency,

13 blocking traffic, you can use Mace on them.

14          So my question is, does an officer have

15 to say, get out of the way, or can an officer

16 just walk up and Mace them in the face?

17          MS. LLOYD:  Objection as to form of the

18      question and as to the hypothetical that's

19      not related to this case.

20     A.   It doesn't assume all the

21 possibilities. I can't answer that question.

22 BY MS. BRATTON:

23     Q.   Okay.  I'm trying to figure out when

24 you would approve an investigation or exonerate

25 an officer who Maced a person, a citizen, who was

69

1    fully compliant and who was not resisting.

2              MS. LLOYD:  Objection.  Calls for a

3         hypothetical.

4         A.   You changed your presupposition.

5    That's -- you -- you're changing it every time.

6    BY MS. BRATTON:

7         Q.   Yes.  Well, that's the question I'm

8    asking now.

9         A.   I don't have enough details to make a

10   decision.

11        Q.   Okay.  So I just want to be clear for

12   the record that Columbus police are permitted to

13   Mace a fully compliant citizen who is not

14   resisting.

15             MS. LLOYD:  Objection as to form of

16   that, or as to your statement as to the

17   Columbus police.

18        A.   That is not what I said, for the

19   record.

20   BY MS. BRATTON:

21        Q.   Okay.  Are Columbus police able to Mace

22   a fully compliant, nonresisting citizen?

23        A.   Your definitions of compliant, your

24   definitions of resisting, et cetera, make that

25   question un -- unanswerable.

70

1      Q.   Okay.   The definition of not resisting

2    is, they're not running away from an officer,

3    they're not kicking, they're not punching,

4    they're not flailing.   They are asking, what do

5    you want me to do.

6           The definition of fully compliant is,

7    the officer gives them a command and they follow

8    the command.   They're doing what the officer is

9    telling them to do when the officer gives

10   commands, and they're asking the officer, what do

11   you want me to do.

12          And the officer is in no harm and no

13   citizens are in harm.

14          Are they permitted to Mace an

15   individual?

16          MS. LLOYD:   Again, I'm going to object

17       to this hypothetical.

18          And what is the basis for the use of

19       Mace?

20       A.   If it is reasonable, yes.

21   BY MS. BRATTON:

22       Q.   Okay.   And in that situation, why would

23   it be reasonable to Mace a fully compliant,

24   nonfighting, nonflight suspect -- or ind --

25   citizen?

1          MS. LLOYD:  Objection as to it's a

2     hypothetical.

3     A.   It's a hypothetical.  With additional

4     facts, it would make it reasonable.

5     BY MS. BRATTON:

6     Q.   Okay.  You get packets and you review

7     packets of information, correct?

8     A.   Correct.

9     Q.   And you base your decision off of the

10    information that are in the packets, correct?

11    A.   Correct.

12    Q.   And so if you get a packet and

13    everything in it is condensed down to three

14    paragraphs, like in Mr. Phillips' investigation,

15    recommendation of findings -- and it's condensed

16    into three paragraphs, and those paragraphs say

17    the person was complying and the person was not

18    resisting and the officer Maced them, what

19    additional information, then, would you need to

20    either sustain the allegation or to exonerate the

21    officer?

22    A.   I've never seen such an

23    investigation.

24    Q.   Okay.  So what I'm saying is, in

25    that -- in that instance, based on Columbus

1    police use-of-force policy with Mace, in that

2    situation, if an individual was complying and an

3    individual was not resisting and those facts were

4    before you in a recommendation of finding,

5    then would --

6              MS. LLOYD:  Of finding what?

7    BY MS. BRATTON:

8        Q.    Investigator's recommendation of

9    finding, so I'm assuming that you all find that

10   it was -- an allegation was exonerated,

11   sustained, or you couldn't make a determination.

12             Are those the three findings that you

13   all have?

14       A.    No.

15       Q.    What are the findings that you all

16   have?

17       A.    I would likely reference the directive

18   specifically, but there are more than that.

19       Q.    Okay.  Do you know what directive those

20   are in?

21       A.    It would be in the complaint

22   directive.

23       Q.    If you could, go to Exhibit 2, GB782.

24       A.    (Witness complies.)

25       Q.    And it looks like halfway down -- well,

1    actually, let me see.  The below listed items are

2    included in this investigation, and the

3    investigator, Sergeant Johnson, says that a copy

4    of the wagon's arbitrator video footage is

5    available, or included; is that correct?

6         A.   Yes.

7         Q.   A copy of the CAD is included, correct?

8         A.   Yes.

9         Q.   A copy of Officer Blair's Premier One

10   report and U-10-100 is included?

11             MS. LLOYD:  Are you saying, is that

12        what's on this page?

13             We'll stipulate that what's on the page

14        is on the page.

15   BY MS. BRATTON:

16        Q.   Would you agree that that's included?

17        A.   Yes.

18        Q.   Okay.  Sergeant Rector's administrative

19   packet is included?

20        A.   That's what it states.

21        Q.   And photographs are included,

22   correct?

23        A.   I don't know if photographs were

24   included.

25        Q.   Okay, does it say on here that

1    photographs, pages 34 through 36, are included in

2    this investigation?

3         A.   Yes, it says that.

4         Q.   Okay.  And then the investigator made a

5    recommendation of findings on one allegation; is

6    that correct?

7         A.   Yes.

8         Q.   Okay.  And the officers involved that

9    the investigator were -- was looking at, the use

10   of force, was Blair, Cazan, McClain, and Groves,

11   right?

12        A.   Yes.

13        Q.   Okay.  And the first line, Mr. Phillips

14   has stated that the force used on him was

15   unnecessary, including being Maced.

16             When you are reviewing a use of force,

17   what do you expect the investigator to have

18   included in a report for you to make that

19   determination?

20        A.   A sufficient amount of facts to prove

21   or disprove the allegation.

22        Q.   And do you review all of those facts?

23        A.   I review the packet I'm forwarded.

24        Q.   Okay.  But you've already said you

25   won't review parts of the packet, you don't

1   always review all of it?

2          A.    That's correct.

3          Q.    Okay.  So how do you, then, know that

4   you are looking at all of the pertinent

5   information to make a decision that force was

6   necessary or unnecessary?

7                MS. LLOYD:  Again, objection as to form

8          of that question, as to the qualification

9          necessary or unnecessary, which is not the

10         accurate terminology.

11  BY MS. BRATTON:

12         Q.    Okay.  Did you change Mr. Johns -- or

13  Sergeant Johnson's wording when he said

14  Mr. Phillips stated that the force used on him

15  was unnecessary, including being Maced?

16               MS. LLOYD:  Mr. -- that's the

17         complaint.

18         A.    I'm sorry.  Did I change what?

19               I didn't change anything, no.

20  BY MS. BRATTON:

21         Q.    Did you -- the second sentence,

22  Mr. Phillips admitted he was not following

23  instructions when he was asked to step away

24  from his vehicle -- we listened to Mr. --

25  Mr. Phillips' complaint.

1              Where in -- or do you remember

2    Mr. Phillips saying that he did not follow the

3    officer's instructions to step away from his

4    vehicle?

5         A.   I don't remember.

6         Q.   Okay.  Do you want me to -- I'll play

7    it again.  This is Exhibit 21, Dale Phillips'

8    complaint.

9         A.   Can I state, I don't know what --

10             (Audio was played.)

11        A.   -- you're referencing to.  I don't know

12   that this is referencing this audio call.

13   BY MS. BRATTON:

14        Q.   Okay.  Mr. Phillips made one complaint,

15   which is the audio.  So if there was something

16   else Mr. Phillips said, do you know -- or any

17   other complaints that were based on the

18   investigator's recommendations of finding should

19   have been included in the packet?

20        A.   Not necessarily.

21        Q.   Okay.  So what instance would the

22   investigator put a finding and not have any

23   documentation to support it?

24        A.   I'm sorry.  What?

25        Q.   If the investigator makes a finding of

1    fact, should there be a document, a video, a

2    recording to -- that the investigator based that

3    fact on?

4          A.    Not necessarily.

5          Q.    Okay.  So then where would the fact

6    come from?

7          A.    Perhaps a one-on-one conversation that

8    was not recorded, perhaps a discussion with

9    somebody else, who may have stated to somebody

10   else.

11         Q.    So IAB does not have to record all

12   their conversations?

13         A.    Not necessarily.

14         Q.    Is that policy?

15         A.    I don't oversee internal affairs.

16         Q.    Okay.

17         A.    I don't -- I'm unfamiliar with their

18   SOP.

19         Q.    Okay.  So then are you not sure whether

20   or not they have to record all of their

21   interactions, or are you saying they don't have

22   to?

23         A.    I don't know.

24         Q.    Okay.

25         A.    But I do know that oftentimes things

1    break, and recordings that you think you made

2    don't necessarily get made.  So it's certainly

3    possible that a discussion occurs and it's not

4    recorded.

5              Also, you're referencing exclusively

6    that Sergeant Johnson -- I don't know what

7    Mr. Phillips said to the investigating supervisor

8    that night.

9         Q.   Okay.  When the investigating

10   supervisor takes a statement from an arrestee, is

11   that supposed to be -- is the statement to be

12   recorded anywhere?

13        A.   No.

14        Q.   Okay.  The second paragraph of -- same

15   page, when the officers arrived, a vehicle with

16   occupants that matched the description of the

17   suspects was seen pulling away from the vehicle

18   (sic).

19             And we've already talked about the

20   differences in clothing and race, correct?

21        A.   Yes, we've discussed that.

22        Q.   Okay.  And where it says, Mr. Phillips

23   began to resist.  The officer used force that was

24   reasonable to gain control of Mr. Phillips.

25   Would you expect internal affairs, in their

1    investigation that you sign off on, to have

2    investigated Mr. Phillips' version of what

3    happened and the officers' version of what

4    happened?

5        A.   Not necessarily.

6        Q.   Okay.  And at what -- what would

7    warrant the complete -- or what would warrant not

8    considering Mr. Phillips' statement?

9        A.   His refusal to talk to the

10   investigators.

11       Q.   Okay.  If Mr. Phillips gave a statement

12   to the investigators, would you expect them to at

13   least listen to the statement that was given?

14       A.   To the intake call?

15       Q.   Yes.

16       A.   Perhaps.

17       Q.   Okay.  And what would be a situation

18   when they -- you would not expect them --

19       A.   I don't oversee internal affairs.  I

20   can imagine myself, but I don't oversee internal

21   affairs, to know what their specific policies

22   are.

23       Q.   Okay.  If internal affairs does not do

24   a thorough investigation, then how can you review

25   and recommended that an officer be exonerated or

1    that they -- that is's sustained or the plethora

2    of findings that the department can have?

3              MS. LLOYD:  Objection as to form and --

4         well, objection as to form.

5         A.   Could you repeat the question, please?

6    BY MS. BRATTON:

7         Q.   Yes.

8              You -- if you -- if internal affairs

9    does not do a thorough investigation, how can you

10   make a recommendation on -- or a finding -- a

11   recommendation for a finding?

12        A.   I would make my recommendation based on

13   a thorough investigation --

14        Q.   Okay.

15        A.   -- to my satisfaction.

16        Q.   Okay.  And so you, then, are satisfied

17   if internal affairs does not consider what the

18   arrestee or suspect says?

19             MS. LLOYD:  Objection as to the form of

20        that question.

21             And, again, we're into a realm of

22        hypotheticals here and speculation.

23        A.   It's a hypothetical.  I'm not able to

24   answer.

25             MS. BRATTON:  For the record, every

1          time that Counsel objects to a hypothetical,

2          the witness then responds, it is a

3          hypothetical, and that they can't answer.

4               MS. LLOYD:  Why don't we stick to this

5          case and ask some direct questions?

6               MS. BRATTON:  Why don't you ask the

7          questions that you want to ask when it's

8          your turn and allow me to answer -- and ask

9          mine?

10              MS. LLOYD:  We've been extremely

11     patient with this line of questioning all

12     day.

13              MS. BRATTON:  Well, I think that it

14         is -- if an investigation exonerates an

15         officer in a use-of-force accusation, that

16         it is not crazy to want to know how the

17         officer came to that conclusion.

18              MS. LLOYD:  And we have the entire

19         investigation here.  And as you know, you

20         have already deposed the investigating IAB

21         sergeant.

22              MS. BRATTON:  Yes.  And there are one,

23         two, three, four, five -- six people who

24         make a decision as to --

25              MS. LLOYD:  Well, let's ask about the

82

1  six then.

2          MS. BRATTON:  -- the reasonableness.

3          So I can ask someone who is a

4          decision-maker on, presumably --

5  BY MS. BRATTON:

6      Q.   How many use-of-force investigations

7  have you reviewed and made recommendations on?

8      A.   Hundreds.

9      Q.   Okay.  So you've made hundreds of

10 decisions?

11     A.   Correct.

12     Q.   Okay.  So in your hundreds of

13 decisions, would you expect an investigator to at

14 least listen to the complainant's version of what

15 happened?

16     A.   Not every use-of-force investiator --

17 investigation comes through internal affairs.

18     Q.   Okay.  If it comes through internal

19 affairs and -- Mr. Phillips and came through

20 internal affairs.  Mr. Phillips made a call.

21 Mr. Phillips' call was recorded.  Mr. Phillips

22 was detailed in what his version of events were.

23          Would you have expected them, the

24 investigator, to listen to Mr. Phillips' call?

25     A.   I would expect the investigator to

83

1    contact Mr. Phillips and get his version of the

2    events, yes.

3         Q.   Okay.  And if Mr. Phillips' attorney

4    said, you've already given a statement, don't

5    talk to them again, would you expect them to go

6    off of what they have?

7         A.   Perhaps.  I -- that call isn't useful

8    to an investigator.  That call contains almost no

9    facts.

10        Q.   So -- okay.  So it's your testimony

11   that Mr. Phillips' call contains almost no facts

12   about his version of what happened to him?

13        A.   As you compare it to the hours of the

14   following investigation with the officers that

15   were available, I would say that it's quite

16   distinguishable.

17        Q.   Okay.  All right.  If you could, look

18   through Exhibit 2 -- well, no.  I'm sorry.

19             If the officers -- if IAB conducted

20   multiple interviews of the officers, those

21   interviews would be recorded, correct?

22        A.   Correct.

23        Q.   Okay.  So then if we asked for all the

24   interviews and we only got these interviews, it's

25   a safe assumption that these are the only

84

1    interviews that internal affairs conducted in

2    this case?

3        A.   That's a fair assumption.

4        Q.   Okay.  And so if some of those

5    interviews are each of one officer, and there was

6    one intake call with Mr. Phillips, what would

7    make Mr. Phillips' call, with his facts,

8    irrelevant from the facts that are presented by

9    the other officers?

10           MS. LLOYD:  Again, I have to object as

11    to form.

12           There's been no testimony here that

13       Mr. Phillips' call was irrelevant.

14       A.   I wouldn't consider his call

15    irrelevant.

16    BY MS. BRATTON:

17       Q.   Okay.  So then if his call was

18    relevant, then you would expect them to listen to

19    it?

20           MS. LLOYD:  Again, objection as to

21       form.

22           Who are them?

23    BY MS. BRATTON:

24       Q.   You would expect internal affairs to

25    listen to it?

85

1          A.    I don't operate internal affairs.  They

2     don't report to me, ma'am.

3          Q.    Okay.  Would you consider listening to

4     Mr. Phillips' call to be a thorough

5     investigation?

6          A.    No.  I would not consider listening to

7     one call a thorough investigation, no.

8          Q.    Would your consider listening to

9     Mr. Phillips' call along with all of the other

10    calls to be a thorough investigation?

11         A.    Not necessarily.

12         Q.    Okay.  Would you consider the exclusion

13    of Mr. Phillips's to not be a thorough

14    investigation?

15              MS. LLOYD:  Again, I have to object as

16         to form and as to this hypothetical

17         exclusion of Mr. Phillips.

18         A.    It -- I -- I don't know if that -- did

19    that occur?  I don't know if this occurred, if

20    it's a hypothetical.  I can't answer that.  I

21    don't know.

22    BY MS. BRATTON:

23         Q.    Okay.  Well, I didn't conduct the

24    investigation, so I don't know either.  I don't

25    know whether or not.

1           But you signed off on it.  So I'm

2    asking you, on an investigation that you signed

3    off on, you are the final person to make a

4    decision about whether the officers did the right

5    thing or not -- in an investigation that you sign

6    off on, would -- and you said that you only sign

7    off on thorough investigations.

8           So would you not consider it to be a

9    thorough investigation if the investigator did

10   not listen to Mr. Phillips' version of the

11   story?

12        A.   Ma'am --

13        MS. LLOYD:  This is a hypo -- I have to

14        object as to a hypothetical.

15        Where are you demonstrating to this

16        deponent that someone did not listen to a

17        tape?

18        A.   I'm having a hard time hearing between

19   accusations, assertions, and questions.  I don't

20   understand what I'm being asked.

21   BY MS. BRATTON:

22        Q.   Okay.  Would you expect for an

23   investigator conducting an investigation to

24   listen to the facts that are presented by the

25   person making the complaint?

87

```
 1        A.   Ma'am, with all due respect, would you,

 2   establishes a hypothetical.

 3             I don't know.

 4        Q.   Okay.  Well, in this case, you don't

 5   know whether or not the internal affairs officer

 6   listened to Mr. Phillips' tape, correct?

 7             MS. LLOYD:  Again, I have to object.

 8             The record doesn't reflect he's had an

 9        opportunity to look through the entire

10        investigation.

11             MS. BRATTON:  I have offered the

12        opportunity to look through it.  Do you --

13        let's take a break, please, so we can look

14        through it.  Let's -- we can take a

15        10, 15-minute -- however long you need to

16        look through the investigation.

17             MS. LLOYD:  And then what is the

18   question?

19             MS. BRATTON:  I'll ask questions once

20        he refreshes his memory.

21             (A recess was taken from 2:42 to 3:17.)

22   BY MS. BRATTON:

23        Q.   Based on your review, do you know

24   whether the internal affairs officer listened to

25   Mr. Phillips' tape?
```

1          A.   I don't know.

2          Q.   Okay.  Based on your review -- if you

3     can, turn to GB774; still in Exhibit 2.

4          A.   (Witness complies.)

5          Q.   Third paragraph down, under Sergeant

6     Lowell Rector.

7          A.   Okay.

8          Q.   Sergeant Rector stated, once the

9     burglary scene was secured he attempted to speak

10    with Mr. Phillips.  Sergeant Rector stated Mr.

11    Phillips told him that he was a former Ohio

12    trooper, and he was not going to speak unless he

13    had a lawyer present.

14               Is that what -- this is -- the

15    investigative summary states from Sergeant Lowell

16    Rector?

17               MS. LLOYD:  Again, we can stipulate

18    that what's written on the page is what's on

19    the page.

20    BY MS. BRATTON:

21         Q.   You can answer if that's what the

22    investigative summary says.

23         A.   What's written on the page is what's

24    written on the page.

25         Q.   Okay.  So -- so then that's a yes?

1          MS. LLOYD:  Yes to what?

2      A.   What was the question?

3  BY MS. BRATTON:

4      Q.   That the investigative summary states

5  that Sergeant Lowell Rector said the -- the

6  sentence that I read.

7      A.   I'll need you to reread it.  I --

8      Q.   Sergeant Rector stated, once the

9  burglary scene was secured, he attempted to

10  speak with Mr. Phillips.  Sergeant Rector stated

11  Mr. Phillips told him that he was a former Ohio

12  trooper, and he was not going to speak unless he

13  had a lawyer present.

14          Does the investigative summary -- is

15  that an accurate depiction of what the

16  investigative summary says on GB774?

17      A.   That it an accurate reading of what it

18  says.

19      Q.   Okay.  And so then would you agree --

20  on page GB782 -- that Mr. Phillips' admission did

21  not come from Sergeant Lowell Rector, the

22  admission that Sergeant Johnson states, when he

23  says Mr. Phillips admitted he was not following

24  instructions when asked to step away from the

25  vehicle?

1          Would you agree that, based on Sergeant

2     Rector's statement, that that statement was not

3     given to Sergeant Rector?

4          A.   There exists circumstances where that

5     could have still been overheard by Sergeant

6     Rector, so I can't answer that in the

7     affirmative.

8          Q.   Okay.  And based on your review, did

9     you see in this packet where Sergeant Rector made

10    that statement to the investigator?

11         A.   No.

12         Q.   Okay.  Did you see anywhere in the

13    packet where Mr. Phillips admitted he was not

14    following instructions when he was asked to step

15    away from his vehicle?

16         A.   I'd like to re -- rehear his intake

17    interview.

18         Q.   Okay.

19              (Audio was played.)

20    BY MS. BRATTON:

21         Q.   I'm sorry.  I should have -- I'm

22    replaying Exhibit 21, which is Mr. Phillips' IAB

23    interview -- phone interview.

24              (Audio was played.)

25         A.   Can we stop a second?

91

1  BY MS. BRATTON:

2      Q.   Yes.

3      A.   He's returning his call.  Is the other

4  call available?

5          MR. PHILLIPS:  There was no other

6      call.

7          THE WITNESS:  He says he's returning

8      your call.

9          MR. PHILLIPS:  I called --

10 BY MS. BRATTON:

11     Q.   Mr. -- Mr. Phillips called a --

12         MS. BRATTON:  Is that about the

13     complaint line?

14         MR. PHILLIPS:  The voicemail, yeah.

15 BY MS. BRATTON:

16     Q.   -- like a voicemail line.

17     A.   Is that recording available?

18     Q.   I don't believe it was included.  Oh,

19 here it is.

20         (Audio was played.)

21 BY MS. BRATTON:

22     Q.   These are the only phone calls that

23 were given.  The other two are voicemails for

24 Mr. Phillips.  So the only phone call that the

25 department gave me was what they contained in the

92

1    IAB report.

2            So I'll play Mr. Phillips' intake call.

3            (Audio was played.)

4    BY MS. BRATTON:

5        Q.    In that call, did you hear Mr. Phillips

6    admit that he was not following instructions?

7        A.    Not to those words, no.

8        Q.    And, in fact, Mr. Phillips stated that

9    when Officer Blair wanted him to stop, he stopped

10   and stayed stopped, correct?

11       A.    Again, from memory -- I don't remember

12   those exact words.

13       Q.    Okay.  Do you remember that he stayed

14   stopped, he didn't drive off from her?

15       A.    Correct.

16       Q.    Okay.  And that Officer Blair told him

17   to turn the truck off, and he turned his truck

18   off?

19       A.    Correct.

20       Q.    That Officer Blair asked for his

21   license, he gave her his license?

22       A.    Not directly.

23       Q.    He didn't give her his license?

24       A.    Not directly.  There was a

25   back-and-forth, back-and-forth before he finally

1    provided his license.  At first, he said he did

2    not have it.

3         Q.   He said that he said that, or did

4    Officer Blair say that?

5         A.   Officer Blair.

6         Q.   Okay.  I'm asking what -- from Off --

7    from Mr. Phillips' version.

8         A.   You took notes, I didn't.  So I'm --

9         Q.   Okay.

10        A.   -- I am unable to answer that

11   specifically.

12        Q.   Okay.  But, just to be clear, what you

13   just said, that he said he didn't have his

14   license, that was Officer Blair's version, not

15   Mr. Phillips'?

16        A.   Again, I don't recall Mr. Phillips'

17   word for word.  I recall Officer Blair reporting

18   that.

19        Q.   Okay.  And Mr. Phillips saying that he

20   got out of the truck, he was hesitant, but he

21   went ahead and stepped out, do you remember that

22   from the tape that was just played?

23        A.   Generally, yes.

24        Q.   Okay.  And that he said, I never

25   resisted, I was letting them do what they wanted.

1      A.    That sounds like a direct quote that

2  you wrote down.  I don't recall that.

3      Q.    Okay.  Do you recall hearing him say, I

4  never resisted?

5      A.    I don't recall that.

6            (Audio was played.)

7  BY MS. BRATTON:

8      Q.    Okay.  Did you hear, on the tape,

9  Mr. Phillips say, I never resisted, I was trying

10  to let them do what they wanted?

11      A.    Yes.

12      Q.    Okay.  And so -- well, you've already

13  answered that there was no direct admission.

14            And according to policy, can officers

15  stop someone for the sole reason that they're in

16  the vicinity of a reported crime?

17      A.    Policy does not say that, no.

18      Q.    Okay.  And based on your review, did

19  you have any follow-up questions regarding why

20  Mr. Phillips was stopped after dispatch told them

21  that everyone was back inside in the building --

22  told the officers everyone was back inside the

23  building?

24      A.    I belive I answered that I had no

25  follow-up questions.

1          Q.   And if you know that an officer has

2     a -- well, let me ask this.

3               Do you know whether any of the

4     officers, Blair, Cazan, McClain, or Groves, have

5     not been completely forthcoming in prior

6     investigations?

7               MS. LLOYD:  Objection as to the form of

8          that question.

9          A.   There's at least a double negative in

10    that.  Could you repeat it for me?

11    BY MS. BRATTON:

12         Q.   Do you know whether Blair, McClain,

13    Cazan, or Groves have not been completely

14    forthcoming in prior investigations?

15              MS. LLOYD:  Objection as to form.

16         A.   That's -- I -- I still can't follow the

17    question.  I'm sorry.

18    BY MS. BRATTON:

19         Q.   Okay.  When you conduct an

20    investigation on an officer, do you ever --

21         A.   I don't conduct investigations on

22    officers.

23         Q.   I'm sorry.  When you review the

24    investigation --

25         A.   Okay.

1      Q.   -- and you review officers' statements,

2   do you look to see whether or not an officer has

3   not been completely forthcoming in prior

4   investigations?

5      A.   That -- I don't understand that.  I --

6   officers are investigated for hundreds of

7   previous things.  I do not review all those

8   investigations when reviewing this investigation.

9           You saw -- so I don't review their

10   investigations from before to then judge them

11   based on those.

12           So I guess the answer is no.

13      Q.   Okay.  So not to judge -- well,

14   withdraw that.

15           And can you describe the three-second

16   rule used in compliance?

17      A.   I'm not familiar with the three-second

18   rule.

19      Q.   Okay.  What is you training in regard

20   to how long you should give a citizen the -- to

21   comply with a command?

22           MS. LLOYD:  Objection as to form.

23      A.   We don't list an amount of time.

24   BY MS. BRATTON:

25      Q.   Okay.  Is there some factor that you

1    all are supposed to consider?

2         A.    You should consider whether the person

3    is responding to those requests or that order.

4         Q.    Okay.

5              MS. BRATTON:  I think I'm done.  If you

6         could just give me two minutes.

7              (A recess was taken from 3:47 to 3:49.)

8              MS. BRATTON:  I don't have anything

9         further.  Thank you.

10             THE REPORTER:  Signature?

11             MS. LLOYD:  Yes.

12             I would like the same order that I had

13        yesterday.

14

15                          _____

16                          DEPUTY CHIEF KENNETH KUEBLER

17                               - - -

18             DEPOSITION ADJOURNED AT 3:51 P.M.

19                               - - -

20

21

22

23

24

25

```
 1                C E R T I F I C A T E

 2

 3    STATE OF OHIO        :
                           :  SS
 4    COUNTY OF HAMILTON   :

 5              I, Wendy Scott, the undersigned, a duly

 6    qualified and commissioned notary public within

 7    and for the State of Ohio, do certify that before

 8    the giving of his deposition, DEPUTY CHIEF

 9    KENNETH KUEBLER was by me first duly sworn to

10    depose the truth, the whole truth and nothing but

11    the truth; that the foregoing is the deposition

12    given at said time and place by DEPUTY CHIEF

13    KENNETH KUEBLER; that I am neither a relative of

14    nor employee of any of the parties or their

15    counsel, and have no interest whatever in the

16    result of the action.

17         IN WITNESS WHEREOF, I hereunto set my hand

18    and official seal of office at Cincinnati, Ohio,

19    this 9th day of October 2017.

20

21                _____

22                Wendy Scott
                  Notary Public - State of Ohio
23                My commission expires September 3, 2022

24

25
```

99

1          E R R A T A   S H E E T

2      DEPOSITION OF:  DEPUTY CHIEF KENNETH KUEBLER
            TAKEN:  SEPTEMBER 28, 2017
3

4   Please make the following corrections to my
    deposition transcript:
5

6   Page  Line Number              Correction Made

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24

    _____   _____
25  Witness Signature                 Date

**0**

**0** 50:24

**1**

**10** 17:21,22 34:23 65:7
87:15
**10-8** 60:16
**11** 62:17
**12** 62:16
**15** 26:23
**15-minute** 87:15
**16** 31:3 51:24
**18** 30:8

**2**

**2** 13:14 17:11,14 26:13
29:6 34:22 35:7 50:24
54:8 60:11 72:23 83:18
88:3
**2000s** 15:18
**2014** 7:9 8:17 16:1 17:24
18:1
**201409-0040** 13:21
**21** 30:14 60:6 62:8,9,12
76:7 90:22
**22** 38:22 39:1 45:21 50:20
51:3
**25** 31:4 51:3
**28** 64:25 65:4
**2:42** 87:21

**3**

**3** 11:12,23 12:1 38:19,25
51:2
**3.25** 18:11
**3/2** 26:23
**32** 39:2 50:21
**34** 74:1
**36** 74:1
**3:17** 87:21
**3:47** 97:7
**3:49** 97:7
**3:51** 97:18

**4**

**44** 38:22 39:1
**45** 50:21
**48** 51:3

**5**

**52** 60:12

**6**

**6** 65:7
**675** 7:15

**7**

**70** 55:9

**8**

**8** 11:25 12:1

**9**

**9** 51:6
**9191** 51:7,8,11,14

**A**

**ability** 5:6
**able** 23:2 43:8 52:2 62:20
69:21 80:23
**access** 66:11 67:22
**account** 59:11
**accurate** 65:11 75:10
89:15,17
**accusation** 36:19 63:18
81:15
**accusations** 86:19
**acted** 14:16
**actions** 23:23 25:16 28:25
67:25
**actual** 7:25
**additional** 28:8 30:2,3
32:14,25 62:24 71:3,19
**Additionally** 11:15
**address** 31:15
**adherence** 24:24
**ADJOURNED** 97:18
**administrative** 73:18
**admission** 89:20,22 94:13
**admit** 92:6
**admitted** 75:22 89:23
90:13
**affairs** 10:14,20 14:7 32:7,
10 33:9,16 34:3 36:20
37:1,14,19,25 62:13 65:5
77:15 78:25 79:19,21,23
80:8,17 82:17,19,20 84:1,
24 85:1 87:5,24

**affairs'** 32:10
**affirmative** 90:7
**African** 40:22
**African-american** 40:9
**afternoon** 4:6
**ago** 56:17,19,25 57:2,5,8,
12,23 58:3,18
**agree** 32:23 47:14 49:20,
23 50:2,15 51:6 52:13
73:16 89:19 90:1
**ahead** 93:21
**air** 30:24
**allegation** 25:12 35:9,12,
16,19 67:5 71:20 72:10
74:5,21
**alleged** 46:25
**alley** 45:16,19
**allow** 21:13 81:8
**allowed** 53:22
**allowing** 63:19
**altogether** 44:22
**ambiguity** 48:11
**American** 40:22
**amount** 74:20 96:23
**annual** 14:10
**answer** 4:20 15:6,12,13
18:16 20:1 23:2,15,16,19
41:3 42:23 43:8 55:12
57:18 64:1 67:12 68:21
80:24 81:3,8 85:20 88:21
90:6 93:10 96:12
**answered** 94:13,24
**anybody** 44:13
**appears** 17:24 20:5
**application** 67:13
**appointed** 9:14
**approve** 68:24
**approximately** 7:15
**arbitrator** 73:4
**arm** 64:22 65:9,10,15,16
**arms** 63:20,21,22
**arrest** 9:19
**arrestee** 78:10 80:18
**arrive** 11:19 13:7
**arrived** 78:15
**asked** 48:4 51:11 56:2,10
57:17 75:23 83:23 86:20
89:24 90:14 92:20
**asking** 19:20 20:23 36:16,
18 37:14 43:18 54:2
55:21,23 56:12 57:13 63:4
69:8 70:4,10 86:2 93:6
**assertions** 86:19
**assigned** 7:16

**assume** 41:4 68:20
**assuming** 72:9
**assumption** 65:21 83:25 84:3
**attempt** 22:13 49:5
**attempted** 88:9 89:9
**attorney** 5:12,22 15:11 83:3
**attorney's** 5:24
**attorneys** 58:9
**audio** 5:18 30:16 31:1 33:5,13,14 34:6,7,15,24 38:23 39:3 40:18 50:13,22 51:4 60:9 62:14 64:12 76:10,12,15 90:19,24 91:20 92:3 94:6
**available** 14:9 73:5 83:15 91:4,17
**avoid** 22:13
**aware** 14:8 40:17 59:17

**B**

**B-y-r-n-e** 60:8
**Bachelor's** 6:24 7:4
**back** 5:1 12:25 21:2,3 26:13 29:5 31:16 45:7,16, 18 47:2,10,12,15,18 50:3, 25 94:21,22
**back-and-forth** 92:25
**background** 31:15
**bad** 9:17
**badge** 51:17
**bar** 42:6,13
**base** 32:4,7 71:9
**based** 24:14 33:3 40:11,20 56:16 61:8 65:13 67:12 71:25 76:17 77:2 80:12 87:23 88:2 90:1,8 94:18 96:11
**basis** 70:18
**began** 78:23
**behavior** 25:21
**behaviors** 23:24
**believe** 18:2 19:11 27:16 33:1,21 34:10 44:20 48:4 53:5,10 61:1 62:4 67:4 91:18
**belive** 94:24
**beyond** 12:17 31:8
**bit** 30:18 52:5
**black** 41:9,14,17,20 42:3, 7,13,15,17 43:1,4,20,22, 24 47:20,24 48:9 49:24 52:11,14,16,17

**Blair** 35:9 45:11 62:19 63:7 64:5,17,20 65:14 66:5 74:10 92:9,16,20 93:4,5,17 95:4,12
**Blair's** 62:9 73:9 93:14
**blocking** 67:22 68:1,13
**board** 12:14
**book** 13:14
**bottom** 13:16
**BRATTON** 4:5 14:23 15:9 16:4,11 17:19 18:9,18 19:17,19,25 20:14,22 21:11,18,24 22:15 23:3,18 24:25 25:5,10,18,23 26:8 27:24 28:11 30:10,17,21 31:2,10,14,20 33:10 34:5, 21,25 36:15 37:8,13 38:24 39:4,9,19 40:19 41:6 42:10,24 43:10,12,17,25 44:8,12,21 45:20 46:9,16, 20,23 47:5,8 48:6 49:8,18 50:14,23 51:5 52:1 54:19 55:19,24 58:4 60:10 61:7 62:6,11,15 63:16 64:3,13, 25 65:2,24 68:10,22 69:6, 20 70:21 71:5 72:7 73:15 75:11,20 76:13 80:6,25 81:6,13,22 82:2,5 84:16, 23 85:22 86:21 87:11,19, 22 88:20 89:3 90:20 91:1, 10,12,15,21 92:4 94:7 95:11,18 96:24 97:5,8
**break** 5:2 78:1 87:13
**bring** 64:25
**broken** 14:12
**brought** 56:22
**Brown** 9:5
**building** 45:9,10 46:24 47:2,10,11 50:7 94:21,23
**bunch** 62:24
**bureau** 6:12 10:14,20 14:7
**burglarized** 46:25
**burglary** 88:9 89:9
**business** 36:13,17
**Byrne** 51:7,11,14,17,19 52:3,7,9,15 60:14
**Byrne's** 60:7 61:3 62:12

**C**

**CAD** 73:7
**call** 11:12 19:2 29:12 33:18,20,22 35:1 38:20 39:13 48:16 51:17 60:15 76:12 79:14 82:20,21,24 83:7,8,11 84:6,7,13,14,17 85:4,7,9 91:3,4,6,8,24

92:2,5
**called** 40:13 43:2 49:10 91:9,11
**caller** 41:17 50:10,16,25 53:13
**calling** 49:14 51:16
**calls** 22:23 23:13 42:5,12 43:19 69:2 85:10 91:22
**cam** 27:10,12
**camera** 51:23
**capable** 20:20
**car** 20:24,25 23:5 47:23 53:9
**carrying** 50:3
**case** 7:13 13:24 27:5 28:16,19,22 29:2 30:5,6 40:3 45:4 48:18 51:16 58:20,24 62:3,5 68:19 81:5 84:2 87:4
**causing** 67:24
**Cazan** 35:13 65:9 74:10 95:4,13
**certain** 12:11
**certainly** 78:2
**cetera** 69:24
**Chad** 65:8
**chain** 10:16 12:15,20 27:7 54:6,8,12,22
**change** 16:10 24:1 41:24 48:12,13 75:12,18,19
**changed** 56:23 69:4
**changes** 15:23 16:5
**changing** 69:5
**characteristic** 44:17
**characterize** 49:5,6
**characterized** 61:5
**charge** 36:12,17
**charged** 36:11
**chemical** 19:1
**chief** 4:1,16 5:15 6:2,7 7:9, 11,12,25 8:1,3,8 9:17 11:20 13:23 37:5 97:15
**chiefs** 7:18 8:3
**chronology** 8:21
**circumstances** 90:4
**citizen** 9:20 10:8,12 22:19 28:1 67:15 68:25 69:13,22 70:25 96:20
**citizen's** 29:10,15
**citizens** 70:13
**city** 5:24 6:18 7:17 58:9
**claim** 35:22 37:2
**claims** 37:15
**clarification** 45:8 64:2

**clarified** 50:6
**clarify** 5:15 21:23
**classes** 26:9,10
**classroom** 26:4
**clear** 14:19 15:3 68:5
  69:11 93:12
**close** 24:7
**closed** 26:24,25
**clothing** 41:24 44:23 47:21
  48:12,13,15,22 78:20
**coat** 49:21 53:7,8
**color** 41:10
**Columbus** 4:15 6:18 7:17
  14:2 15:17 69:12,17,21
  71:25
**combines** 44:5
**come** 11:22 77:6 89:21
**comes** 82:17,18
**coming** 4:8 17:2
**command** 10:17 12:15
  21:6,7,14,17 22:3,18,19
  27:8 54:6,8,12,23 68:7
  70:7,8 96:21
**commander** 6:6 10:23
  13:11
**commands** 20:9,11,15
  21:4,10,20 22:6,11,14,21,
  22 23:11 24:16 70:10
**comments** 27:7
**communicated** 49:2
**communication** 31:21
**communications** 7:6
**compare** 83:13
**compared** 59:6
**complainant** 29:21
**complainant's** 32:2 33:4,
  5,12,18 82:14
**complaining's** 28:2
**complaint** 10:9,11,13 11:1
  29:11,15,17 30:15 31:6
  32:5,8 33:15 36:19,20
  37:19 54:13 56:22 59:7
  72:21 75:17,25 76:8,14
  86:25 91:13
**complaints** 9:18 32:7
  36:23 37:16,22 76:17
**complete** 38:14 62:12 79:7
**completed** 6:25 27:3
**completely** 44:10 95:5,13
  96:3
**compliance** 96:16
**compliant** 67:19 69:1,13,
  22,23 70:6,23
**complicated** 12:5 24:19

**complied** 24:16
**complies** 19:8 26:15 45:22
  72:24 88:4
**comply** 21:6,7,13 96:21
**complying** 67:10,15 71:17
  72:2
**concentrate** 5:6
**conclusion** 28:25 29:3
  56:7,25 57:14 58:15,18
  81:17
**condensed** 71:13,15
**conduct** 85:23 95:19,21
**conducted** 10:20 66:14
  83:19 84:1
**conducting** 63:11 86:23
**conflict** 28:5
**conflicting** 22:11,14,18
  25:2,7,13
**confused** 20:13,18
**confusing** 65:15
**Connor** 17:18
**consider** 17:14,17 23:10
  80:17 84:14 85:3,6,8,12
  86:8 97:1,2
**considering** 79:8
**contact** 31:16 83:1
**contain** 42:22
**contained** 91:25
**contains** 83:8,11
**control** 78:24
**controlled** 63:20
**conversation** 77:7
**conversations** 77:12
**copy** 73:3,7,9
**cordoned** 7:21
**correct** 7:23 8:1,5 11:3
  18:12 20:7 26:21 29:8,9
  32:11,18 35:10,11,14 38:8
  45:25 47:5 52:8,21 57:2,3,
  6,9 58:17 60:21,22,25
  66:6,11,12,16 71:7,8,10,
  11 73:5,7,22 74:6 75:2
  78:20 82:11 83:21,22 87:6
  92:10,15,19
**Counsel** 37:9 43:11 81:1
**Counsel's** 49:5
**course** 31:23
**court** 36:14
**covered** 18:22
**crazy** 81:16
**crime** 94:16
**criminal** 7:4
**cruiser** 27:10,12 51:23
**current** 6:14

         **D**

**daily** 7:14
**Dale** 30:15 76:7
**dark** 44:18
**dark-skinned** 41:14
**darker** 41:10
**database** 13:20
**date** 49:6
**dates** 9:10
**day** 81:12
**DC** 26:17
**dead** 30:24
**deadly** 19:9,10,21
**deal** 11:1
**death** 19:14
**December** 6:25
**decider** 12:12
**decision** 13:12 32:6,22
  33:3 54:24 56:16,18 69:10
  71:9 75:5 81:24 86:4
**decision-maker** 11:21
  12:7,10,18 13:18 26:21
  82:4
**decisions** 82:10,13
**deem** 22:21 24:14
**definition** 70:1,6
**definitions** 69:23,24
**degree** 7:3
**demonstrated** 49:16
**demonstrating** 86:15
**department** 4:15 5:23 6:3
  14:3 15:16,17,25 16:15
  31:22 80:2 91:25
**depends** 26:7 27:14
**depiction** 89:15
**deponent** 86:16
**deposed** 4:3 81:20
**deposition** 4:17 5:9,12
  38:19 97:18
**deputy** 4:1,16 6:2,7 7:8,11,
  12,18 8:3 9:16 11:20 37:5
  97:15
**describe** 39:11 96:15
**described** 35:5 48:15 52:3
  60:20 61:12
**description** 39:21 40:12,
  24 41:11,21 42:3,18
  44:10,16 52:17 78:16
**descriptive** 44:20
**detailed** 36:21 82:22
**details** 36:9 64:2 69:9
**detain** 17:4

**detained** 41:19
**detention** 10:6,7 11:2,23
  16:25
**detentions** 16:21
**determination** 15:2 17:15
  54:5 66:20 72:11 74:19
**determine** 41:12 45:2
  56:15
**determined** 65:17
**development** 6:11
**difference** 28:1 48:7
**differences** 78:20
**different** 6:9 44:6 47:16
  52:21 56:21 57:11,20
**difficult** 41:11
**direct** 43:16,18 46:1 81:5
  94:1,13
**directing** 37:9,11 43:11
**directive** 18:6,10 72:17,19,
  22
**directly** 23:2 92:22,24
**director** 8:11,12,17,20
  9:12,14
**directors** 8:22
**disagreement** 12:14
**discernable** 44:17
**discipline** 12:12
**discrepancy** 29:25
**discussed** 11:22 78:21
**discussion** 77:8 78:3
**disk** 62:12
**disks** 30:12
**dispatch** 28:13,16 38:20
  39:5,10,12,16 40:11,13,
  20,25 42:5,12,15 43:2,19
  44:2,7,10 45:5 47:12
  48:20 49:2,7,10,20,23
  50:2,15,24 52:4 53:18
  57:4 60:19,21,24 61:10,
  17,18,20 94:20
**dispatcher** 39:14
**disprove** 74:21
**dispute** 13:1
**disregard** 44:9
**distinguishable** 83:16
**division** 7:13,14 18:6,10
**document** 77:1
**documentation** 76:23
**documents** 5:8 59:22,25
**doing** 10:10 25:14 67:23
  70:8
**door** 45:7,16,18,24 47:2,4,
  10,12,13,15,18,19 50:4
**double** 20:23 95:9

**Dr** 8:15,16
**drive** 92:14
**driving** 46:11,15,18
**due** 87:1
**duly** 4:2
**duties** 7:8

─────────────
           **E**
─────────────

**early** 4:8
**education** 6:23
**eight** 11:6
**either** 71:20 85:24
**Elite** 66:9
**emergency** 67:23 68:2,12
**employ** 5:22
**enforcement** 6:18 39:6
**entire** 55:8 63:2 81:18
  87:9
**escalate** 19:5
**established** 36:24
**establishes** 87:2
**et** 69:24
**evaluate** 24:23
**evaluation** 24:22
**events** 82:22 83:2
**evidence** 28:8 30:3,5
**exact** 34:11 60:17 92:12
**EXAMINATION** 4:4
**examined** 4:3
**example** 46:16 67:21
**examples** 17:7 68:12
**exclusion** 85:12,17
**exclusively** 78:5
**Excuse** 26:12
**exhibit** 13:14 17:21,22
  26:13 29:6 30:8,14 35:7
  38:19,25 45:21 51:2,24
  54:8 60:6 62:8,9,12 64:25
  65:4 72:23 76:7 83:18
  88:3 90:22
**existed** 17:24
**exists** 90:4
**exonerate** 68:24 71:20
**exonerated** 72:10 79:25
**exonerates** 81:14
**expect** 16:17 67:7 68:2
  74:17 78:25 79:12,18
  82:13,25 83:5 84:18,24
  86:22
**expected** 66:18 82:23
**experience** 6:21
**explain** 18:24
**explaining** 36:10

**expressed** 23:23
**extent** 46:4 61:5
**extreme** 42:21
**extremely** 81:10

─────────────
           **F**
─────────────

**face** 68:16
**fact** 60:24 77:1,3,5 92:8
**factor** 43:6 96:25
**facts** 24:5,15 44:25 45:3
  46:5,6,8 56:23 58:20 61:9
  62:3 71:4 72:3 74:20,22
  83:9,11 84:7,8 86:24
**fair** 58:21 84:3
**fairly** 32:3
**familiar** 96:17
**far** 18:25 65:14
**fast-forward** 30:18
**feel** 27:19
**feelings** 38:16
**feels** 9:20 59:14
**fellow** 22:1
**female** 41:17 49:24 51:8,
  19 52:17
**figure** 68:23
**figured** 66:19
**file** 10:12
**final** 11:21 12:7,10,12,18
  13:18 26:20 38:7 66:14
  86:3
**finally** 92:25
**find** 25:15 72:9
**finding** 13:19 72:4,6,9
  76:18,22,25 80:10,11
**findings** 71:15 72:12,15
  74:5 80:2
**fine** 29:13
**firearm** 19:3
**firearms** 12:13,14
**first** 29:4,5 38:21 74:13
  93:1
**five** 6:15 8:2 30:23,24
  81:23
**flailing** 63:21,22 70:4
**follow** 59:16,19 61:2,24
  70:7 76:2 95:16
**follow-up** 4:21 28:18 53:3,
  7,16 62:18 63:6 94:19,25
**followed** 22:20,22 23:11
  59:12 63:1
**following** 62:5 75:22 83:14
  89:23 90:14 92:6
**follows** 4:3

**footage** 73:4
**force** 9:22 11:4,6,23 12:8, 11,17 14:2,12,15 16:18 17:11,14 18:12,17,21,25 19:1,5,10,22 35:5,10,13, 17,20 36:22,25 56:8 67:5, 9,12 74:10,14,16 75:5,14 78:23
**form** 14:21 16:2 17:16 18:7 20:10,17 21:9,15,22 22:12 24:19 25:8,20 26:5 27:21 28:7 33:5,7,24 39:7, 17 41:1 42:8,20 43:5 44:5, 14 54:16 62:1 63:14,23 65:20 68:8,17 69:15 75:7 80:3,4,19 84:11,21 85:16 95:7,15 96:22
**formal** 10:12
**formality** 5:20
**format** 43:16
**former** 88:11 89:11
**forthcoming** 95:5,14 96:3
**forwarded** 26:23 27:1,3 29:8 74:23
**found** 12:20,21 13:8 53:9 59:19
**four** 81:23
**frequently** 32:3
**front** 24:5 56:20,22
**fully** 69:1,13,22 70:6,23
**funny** 18:4
**further** 97:9
**future** 15:10

### G

**gain** 78:24
**GB2384** 19:7
**GB766** 13:16 26:14 54:9
**GB769** 35:8
**GB770** 35:15
**GB774** 88:3 89:16
**GB782** 72:23 89:20
**generality** 24:21
**generally** 7:16 93:23
**George** 9:7
**getting** 25:13
**gist** 60:18
**give** 20:8,11,15 21:6,10,16 45:3 46:17 68:6,7 92:23 96:20 97:6
**given** 17:7 22:19 26:3 55:5 79:13 83:4 90:3 91:23
**gives** 70:7,9
**giving** 21:13,20 22:2,3,5, 11,13 25:2

**glean** 26:4
**go** 5:1,21 10:11,13 11:5 12:17,25 13:10 17:22 19:9 25:15 26:2,13 29:4,5 30:11 31:8 32:17 58:7 64:24 72:23 83:5
**goes** 10:15 20:3 31:10,14 46:1,2
**going** 13:15 19:23 21:8 30:7,13,18 34:21 38:18,25 45:25 46:7 49:4 50:21 51:22 54:15,23 58:19 60:5,6,11 61:4 62:7,16,20 70:16 88:12 89:12
**Good** 4:6
**Graham** 17:18
**gray** 49:21 53:7,8
**ground** 20:24 21:1 23:7,12 24:9,17 66:21 67:3
**Groves** 35:19 62:21 63:7,8 64:18,21 65:8 74:10 95:4, 13
**Groves'** 65:5,15,16
**guess** 12:25 20:23 29:12 42:15 44:1 52:6 96:12
**gun** 19:2

### H

**half** 7:16
**halfway** 72:25
**handcuffed** 11:19 12:23 13:2,6,9 64:18
**handcuffing** 13:4 62:21 63:8 65:16
**hands** 21:2
**happened** 29:22,23 66:5 79:3,4 82:15 83:12
**hard** 86:18
**harm** 19:15 67:24 70:12, 13
**hazard** 52:6
**head** 41:18,20 47:22 48:8 49:25 52:18
**hear** 31:17 34:9 35:1 54:20 60:14 64:7,14,20 92:5 94:8
**heard** 23:22 24:8 39:13 40:12 63:2
**hearing** 60:19 86:18 94:3
**help** 56:14,15
**hesitant** 93:20
**Hi** 4:7
**higher** 11:13
**highest-level** 13:12

**hindered** 5:6
**hired** 6:4
**hold** 30:22
**hours** 38:22 39:1 50:20 51:3 83:13
**hundreds** 16:8 82:8,9,12 96:6
**hypo** 86:13
**hypothetical** 22:24,25 23:14 42:21,22 43:6 44:24 49:14 63:24 65:23 68:18 69:3 70:17 71:2,3 80:23 81:1,3 85:16,20 86:14 87:2
**hypotheticals** 80:22

### I

**IAB** 13:20 36:10 60:15 64:5 66:10 77:11 81:20 83:19 90:22 92:1
**identify** 41:9
**imagine** 79:20
**imminent** 19:14
**in-policy** 12:8
**inaccurately** 48:15
**incident** 27:20 38:21 59:12
**included** 27:13 37:15 55:1 73:2,5,7,10,16,19,21,24 74:1,18 76:19 91:18
**including** 74:15 75:15
**inconsistencies** 30:5 59:11,13,17,19
**inconsistency** 61:3,6,12, 14,20,22,25
**inconsistent** 62:2
**incorrect** 53:22,24
**ind** 70:24
**Indicating** 5:4 65:1
**indication** 54:3
**individual** 41:19 56:22 70:15 72:2,3
**Individually** 20:18
**individuals** 48:21,23,24
**inform** 60:14
**information** 5:23 14:6,9 30:2 31:15 32:15,21,22 42:23 65:22 71:7,10,19 75:5
**initial** 30:15
**injury** 67:25
**innumerable** 24:1
**inside** 50:25 94:21,22
**instance** 71:25 76:21
**instructions** 75:23 76:3 89:24 90:14 92:6

**intake** 33:18,20,22 79:14
84:6 90:16 92:2
**interactions** 77:21
**interject** 46:5,7
**internal** 10:13,19 14:7
32:7,10,24 33:9,16 34:3
36:19 37:1,14,18,25 62:13
65:5 77:15 78:25 79:19,
20,23 80:8,17 82:17,18,20
84:1,24 85:1 87:5,24
**internal's** 33:2,8
**interview** 28:21 32:17
60:7 62:9 63:2 64:5 65:5
90:17,23
**interviews** 30:12 62:25
66:10 83:20,21,24 84:1,5
**inves** 56:5
**investiator** 82:16
**investigate** 9:18,21,24
26:24 36:3 37:19,21 53:1
54:24 67:2,8
**investigated** 35:24 36:2,25
37:2,7 54:14 66:19 79:2
96:6
**investigating** 78:7,9 81:20
**investigation** 10:3,4,20,24
13:5,19 15:25 16:1 26:21
27:6 31:24 32:14,25 33:3
36:5 38:7,10,14,15 52:24
54:6,7,17 55:2,6,8,20,21
56:1 57:18 58:10 61:9
63:4,5,12,18 66:17 67:4
68:24 71:14,23 73:2 74:2
79:1,24 80:9,13 81:14,19
82:17 83:14 85:5,7,10,14,
24 86:2,5,9,23 87:10,16
95:20,24 96:8
**investigations** 9:25 11:21
32:11 82:6 86:7 95:6,14,
21 96:4,8,10
**investigative** 56:6 88:15,
22 89:4,14,16
**investigator** 12:21 60:15
67:8 73:3 74:4,9,17 76:22,
25 77:2 82:13,24,25 83:8
86:9,23 90:10
**investigator's** 34:3 72:8
76:18
**investigators** 66:18 79:10,
12
**involved** 19:11 20:2 60:16
74:8
**involves** 12:11
**involving** 38:21
**irrelevant** 44:2,7 49:3
84:8,13,15

**is's** 80:1
**isolating** 43:6
**items** 29:7 45:7 50:3,16,18
73:1

---

### J

**Jacobs** 8:7,8 13:23
**Jean** 51:7,11,14
**job** 61:8
**Johns** 75:12
**Johnson** 73:3 78:6 89:22
**Johnson's** 75:13
**judge** 96:10,13
**justice** 7:4 15:17,25 16:15

---

### K

**K-u-e-b-l-e-r** 4:13
**keep** 5:23
**Ken** 4:12
**Kenneth** 4:1,12 97:15
**kept** 14:6
**kicking** 70:3
**Kimberly** 8:7
**kind** 9:17
**knew** 17:2 65:22
**know** 4:20,25 5:3 8:14,16,
19 9:10 10:19 13:23,25
14:1,5,11 16:14,16 23:21
31:12,18 35:25 37:6
41:22,25 42:1 43:17 58:11
62:22,25 63:2,11,17 64:1
65:17 66:2,3,4,8 72:19
73:23 75:3 76:9,11,16
77:23,25 78:6 79:21
81:16,19 85:18,19,21,24,
25 87:3,5,23 88:1 95:1,3,
12
**Kuebler** 4:1,12 26:17
97:15

---

### L

**label** 16:7
**language** 20:2 60:18
**lapse** 30:22
**law** 6:17 39:5
**lawyer** 88:13 89:13
**leadership** 7:7
**leave** 5:22
**left** 41:5 64:21 65:9
**lengthy** 54:17
**let's** 10:5 81:25 87:13,14
**letting** 93:25

**level** 7:24 11:8,10,12,24
12:17 14:12 17:11,14 19:5
**levels** 11:6 12:12
**license** 92:21,23 93:1,14
**lieutenant** 6:6 10:23
**line** 51:18 65:7 74:13
81:11 91:13,16
**list** 96:23
**listed** 73:1
**listen** 5:18 28:12 30:23
32:2 33:12,17,20,23 34:2
79:13 82:14,24 84:18,25
86:10,16,24
**listened** 28:15 31:5,23
34:18,19 58:23 75:24
87:6,24
**listening** 85:3,6,8
**little** 30:18 52:5
**LLOYD** 14:21 15:5,7
16:2,6 17:16 18:7,13
19:16,23 20:10,17 21:8,
15,22 22:12,23 23:13
24:18 25:3,8,17,20 26:5
27:21 28:7 30:20,25 31:7,
12,18 33:7,24 34:14 36:6
37:4,11 39:7,17 41:1 42:8,
20 43:5,14 44:4,11,14
45:18 46:3,13,19 47:3,25
49:4,13 54:15 55:17,22
57:25 61:4 62:1,10 63:13,
23 65:20 68:8,17 69:2,15
70:16 71:1 72:6 73:11
75:7,16 80:3,19 81:4,10,
18,25 84:10,20 85:15
86:13 87:7,17 88:17 89:1
95:7,15 96:22 97:11
**loading** 45:6 50:16,18
**location** 39:23 44:23 48:25
53:17,18
**long** 6:13 24:19 55:9 87:15
96:20
**look** 5:17 14:19 15:3 25:11
27:25 28:6 29:21 30:2
55:4 83:17 87:9,12,13,16
96:2
**looked** 5:8 56:1
**looking** 13:15 14:15,25
44:2 74:9 75:4
**looks** 35:8 42:1 72:25
**loud** 4:20
**Lowell** 88:6,15 89:5,21

---

### M

**ma'am** 85:2 86:12 87:1
**Mace** 11:16,18 12:1,16,17
13:7 67:14,19 68:7,13,16

69:13,21 70:14,19,23 72:1
**Maced** 13:3,4 68:25 71:18
74:15 75:15
**making** 15:2,13 17:15
20:20 86:25
**male** 40:9 41:9 49:20 53:6
**manual** 25:25 26:1
**marked** 30:8,14 38:19
51:23 60:6 62:8 65:3
**master's** 6:24 7:6
**match** 29:17 40:12,24
41:21 44:23 48:22,24,25
49:11,17 52:16
**matched** 41:13 78:16
**matches** 49:11
**materials** 26:3,10 29:6
**matter** 48:14 57:17
**mayor** 9:15
**Mcclain** 35:16 74:10 95:4,
12
**mean** 17:1 39:11 55:13
**meaning** 53:21
**means** 39:25
**melee** 64:6 65:14
**memory** 55:25 56:6 87:20
92:11
**military** 6:20
**mine** 41:10 81:9
**minute** 55:3
**minutes** 30:23,24 31:3
34:20,22 38:22 39:1 50:21
51:3 60:11 62:16 97:6
**missing** 32:20
**Mitchell** 9:5
**move** 23:8,9 24:10,11,12,
13
**moving** 46:19
**multiple** 21:10,20 59:15
83:20
**multitude** 37:22

**N**

**name** 4:10,11,12,13
**names** 9:2
**nature** 24:19 63:24
**necessarily** 31:25 37:17
38:9 61:13 63:15 66:22
68:4 76:20 77:4,13 78:2
79:5 85:11
**necessary** 27:17,19 28:10
33:1,21,23 75:6,9
**Ned** 8:13,15 9:7
**need** 5:2,21,23 18:24
23:19,21 71:19 87:15 89:7

**negative** 95:9
**never** 71:22 93:24 94:4,9
**night** 41:11,12 44:17 78:8
**nonfighting** 70:24
**nonflight** 70:24
**nonresisting** 69:22
**notes** 54:3 93:8
**notice** 30:4
**noticed** 29:7
**notified** 5:15
**number** 13:20 18:11 24:1
51:17 53:12
**numbers** 13:16
**numerous** 36:7

**O**

**object** 18:13 19:23 21:8
34:14 49:4,15 54:15 61:4
70:16 84:10 85:15 86:14
87:7
**objection** 14:21 15:5 16:2,
6 17:16 18:7 20:10,17
21:15,22 22:12,23 23:13
24:18 25:3,8,17,20 26:5
27:21 28:7 33:7,24 39:7,
17 41:1 42:8,20 43:5 44:4,
11,14 49:13 62:1 63:13,23
65:20 68:8,17 69:2,15
71:1 75:7 80:3,4,19 84:20
95:7,15 96:22
**objections** 15:11
**objectively** 19:12
**objects** 81:1
**obstructing** 36:12
**obstruction** 36:12,17
**obtain** 32:22
**obviously** 46:7
**occupants** 78:16
**occur** 85:19
**occurred** 85:19
**occurs** 78:3
**October** 6:16
**offered** 87:11
**office** 5:24 51:19
**officer** 6:5 10:9 14:16,20
15:1 17:10 22:1,3 23:7,8
24:16 29:22 35:9,13,16,19
36:7 39:14 45:11 48:1
51:7,8,17 52:3,7,9,15 59:6
60:7,14 61:3,11,18,21
62:9,11,19,21 63:7,8 64:5,
17,18,20,21 65:5,8,14,15,
16 66:4 67:14,20 68:3,14,
15,25 70:2,7,8,9,10,12
71:18,21 73:9 78:23 79:25

81:15,17 84:5 87:5,24
92:9,16,20 93:4,5,14,17
95:1,20 96:2
**officer's** 10:18,22 13:3
28:3 29:18 76:3
**officers** 7:15 9:19 16:17,23
17:3 18:3,5,11 19:21 20:8
21:20 22:10 24:7,9,10,12
28:22 39:15 42:7,16 43:3
44:9 45:12 58:16 62:19
63:20 64:6 65:17 68:6
74:8 78:15 83:14,19,20
84:9 86:4 94:14,22 95:4,
22 96:6
**officers'** 22:20 24:24
28:25 59:2,11 63:22 79:3
96:1
**official** 36:13,17
**oftentimes** 77:25
**oh** 54:11 91:18
**Ohio** 88:11 89:11
**okay** 4:14,17 5:3,14,17,20,
25 6:1,8,13,17,20 7:5,18,
21,24 8:2,14,19,23 9:1,6,
9,11,16,22,25 10:2,8,15,
25 11:4,7,10,14,20 12:4,6,
9,16 13:8,13,17,23 14:1,5,
8,11,14,18 15:10,15,16,
20,23 16:5,12,17,20,23
17:6,10,13,20,25 18:3,24
19:7 20:4,6,8 21:12,19
22:9,16,18 23:4 24:3 25:1,
11,24 26:2,9,12,20 27:4,9,
12,18,25 28:5,12,15,18,
21,24 29:4,10,14,17,25
30:4,7,13,20 31:12 32:1,4,
9,13,20 33:2,19 34:6,12
35:4,7 36:4 37:18 38:1,6,
12,18 40:3,8,16 41:14,23
42:2,5 43:10 44:9,22 45:1,
3,23 47:18 48:11,17 49:19
50:12,20 51:2,15,22 52:7,
10,13,24 53:6,11 54:4,22
55:3,16 56:15 57:4,7,10,
13,16,21 58:5,19,20 59:1,
5,9,18,21 60:2,5,19,23
61:24 62:7,23 63:3,17
64:14,17,20,24 65:6,13
66:1,3,7,10,13,17,23 67:9
68:1,5,11,23 69:11,21
70:1,22 71:6,24 72:19
73:18,25 74:4,8,13,24
75:3,12 76:6,14,21 77:5,
16,19,24 78:9,14,22 79:6,
11,17,23 80:14,16 82:9,
12,18 83:3,10,17,23 84:4,
17 85:3,12,23 86:22 87:4
88:2,7,25 89:19 90:8,12,

18 92:13,16 93:6,9,12,19,
  24 94:3,8,12,18 95:19,25
  96:13,19,25 97:4
**once**  21:5,17 87:19 88:8
  89:8
**one-on-one**  77:7
**one-way**  45:15 46:1,12
**operate**  85:1
**operating**  38:5
**operations**  7:15
**opportunity**  87:9,12
**opposed**  53:13,18
**orange**  41:18 47:22 48:8
  49:24 52:17
**order**  97:3,12
**orders**  67:15
**outside**  6:18 12:1,11 18:6
**outside-of-policy**  11:15
**overheard**  82:4
**oversee**  7:14 77:15 79:19,
  20
**oversees**  7:12

—————————
**P**
—————————

**P.M.**  97:18
**packet**  24:5,15 27:13
  29:12,14 36:1 56:6 59:22,
  23 71:12 73:19 74:23,25
  76:19 90:9,13
**packets**  71:6,7,10
**page**  13:15 29:4,5,6 35:8,
  15 65:7 73:12,13,14 78:15
  88:18,19,23,24 89:20
**pages**  55:9 74:1
**pants**  41:20 47:24 48:9
  52:11,14,16
**paper**  57:7
**paragraph**  20:7 78:14
  88:5
**paragraphs**  71:14,16
**parked**  46:11 47:4
**part**  14:18 33:2 36:1,4
**participate**  15:20
**particular**  54:8
**particularly**  44:17,20
**parts**  74:25
**passenger**  40:10,21,22
  48:2
**passenger's**  40:4
**path**  45:25
**patient**  81:11
**patrol**  6:8,10 7:14,15
**pay**  33:25

**people**  32:18 33:25 48:12,
  16 81:23
**permitted**  17:10 69:12
  70:14
**person**  22:4,5 23:8 38:7
  41:25 42:2,3,25 43:1,20
  49:11 66:21 67:19 68:25
  71:17 86:3,25 97:2
**personnel**  19:10,11 20:3
**pertinent**  75:4
**Pettus**  8:13,15,16 9:8
**Phillips**  30:15 31:22 34:7
  35:1,4 36:11,23 38:21
  40:4,8,21 41:4,8 45:9,14,
  23 46:10 47:6,12 53:12
  54:25 56:8 64:10,14 65:18
  66:20 67:2 74:13 75:14,22
  76:2,14,16 78:7,22,24
  79:11 82:19,20,21 83:1
  84:6 85:17 88:10,11
  89:10,11,23 90:13 91:5,9,
  11,14,24 92:5,8 93:19
  94:9,20
**Phillips'**  34:7 35:22 36:16,
  18 37:2,16 40:9 53:9,17
  54:12 60:20 64:21 65:10
  71:14 75:25 76:7 79:2,8
  82:21,24 83:3,11 84:7,13
  85:4,9 86:10 87:6,25
  89:20 90:22 92:2 93:7,15,
  16
**Phillips's**  65:9 85:13
**phone**  90:23 91:22,24
**photographs**  73:21,23
  74:1
**physical**  19:14
**piece**  57:7
**place**  18:1
**play**  30:7,13 34:21 38:18,
  22,25 40:15 45:5 51:22
  55:6 60:5,6 62:7 63:3 76:6
  92:2
**played**  30:16 31:1 34:24
  38:23 39:3 40:18 50:13,22
  51:4,25 60:9 62:11,14
  64:12 76:10 90:19,24
  91:20 92:3 93:22 94:6
**playing**  51:2
**please**  13:14 21:23 80:5
  87:13
**plethora**  80:1
**point**  34:15 41:12 58:14
**police**  4:15,16 5:16 6:5
  7:13,25 8:1,4 14:2 15:17
  39:14,15 44:2 69:12,17,21
  72:1

**policies**  14:19 15:3 79:21
**policy**  9:20,23 10:18 12:2,
  19,20,22 14:16,25 16:18,
  21 17:17,20,23 18:1,5,14,
  20 24:24 25:1,15,19 29:1
  56:9 58:16 72:1 77:14
  94:14,17
**position**  4:14 6:14 9:16
**possibilities**  23:1 68:21
**possible**  22:8,17 23:1
  39:25 78:3
**possibly**  53:21,24
**practical**  22:7
**Premier**  73:9
**premise**  49:15
**preparation**  5:9
**present**  88:13 89:13
**presented**  84:8 86:24
**presumably**  82:4
**presupposition**  69:4
**previous**  96:7
**previously**  30:14 51:23
  62:8 65:3
**prior**  13:9 66:14 95:5,14
  96:3
**prisoner**  11:19 12:24 13:2
**probably**  22:25
**procedures**  38:5
**proceeding**  36:13
**process**  10:3
**protect**  19:13
**prove**  74:20
**provided**  93:1
**providing**  25:6
**proximity**  24:7
**public**  8:10
**pull**  47:23
**pulled**  48:1
**pulling**  78:17
**punching**  70:3
**put**  21:2 40:25 76:22

—————————
**Q**
—————————

**qualification**  75:8
**question**  4:23 9:17 13:1
  15:13 17:2 18:4,8 19:16
  20:13 23:20 24:20 26:6
  29:20 37:1 41:2,16 42:9,
  21 43:9 44:1,5,15 46:8
  48:5,19 49:9 54:10,16,18,
  20 55:17 56:2,3,10 57:20
  58:6,13 61:15 63:25 66:25
  67:11 68:11,14,18,21
  69:7,25 75:8 80:5,20
  87:18 89:2 95:8,17

108

**questioning** 81:11
**questions** 4:21 28:19
    43:15 44:6 51:9 53:3,8,11,
    16 59:15 81:5,7 86:19
    87:19 94:19,25
**quite** 83:15
**quote** 94:1

---

**R**

**race** 40:5 44:16,22 48:23
    52:6 78:20
**radio** 38:20 40:20
**rank** 6:2
**reach** 11:8,10
**read** 27:6 55:11 59:2,21
    60:3 89:6
**reading** 89:17
**real** 19:2
**realm** 80:21
**rear** 45:8 50:7
**reason** 5:5 10:10 19:11
    34:8 35:2,23 36:21 37:3
    54:13,25 94:15
**reasonable** 17:4,8,12
    19:13 25:22 70:20,23 71:4
    78:24
**reasonableness** 17:15 82:2
**reasons** 37:21,22
**recall** 8:21 15:16 25:9
    28:20,23 29:3 34:13 36:8
    38:15,16 40:14 50:11
    53:2,15,19 57:15 58:1,2
    60:17 62:5 64:11 93:16,17
    94:2,3,5
**received** 13:24
**recess** 87:21 97:7
**recognize** 52:10
**recollection** 37:5
**recommendation** 26:25
    32:24 71:15 72:4,8 74:5
    80:10,11,12
**recommendations** 13:20
    76:18 82:7
**recommended** 79:25
**record** 4:10 15:14 30:9
    36:10 37:8 43:11,14 46:5,
    6,9 48:3 58:7 69:12,19
    77:11,20 80:25 87:8
**recorded** 77:8 78:4,12
    82:21 83:21
**recording** 33:13,14 77:2
    91:17
**recordings** 58:23 62:13
    78:1

**recruit** 6:4
**Rector** 88:6,8,10,16 89:5,
    8,10,21 90:3,6,9
**Rector's** 73:18 90:2
**red** 45:24
**reduces** 32:7
**reference** 15:11 72:17
**referenced** 37:20
**referencing** 41:25 76:11,
    12 78:5
**referring** 17:20
**reflect** 87:8
**refresh** 55:25 56:6
**refreshes** 87:20
**refusal** 79:9
**regard** 96:19
**regarding** 63:6 94:19
**regularly** 16:13
**rehear** 90:16
**related** 68:19
**relevant** 84:18
**remember** 4:24 9:2 27:11
    28:15,17 29:2 30:6 34:10
    40:4 54:1,2 55:1,13,15,19
    56:18,24 57:19 58:14,17,
    22,25 59:2,4,6,8,10,18,20,
    21 60:1,2,4 63:6,9 76:1,5
    92:11,13 93:21
**render** 28:9
**repeat** 14:22 42:9 56:3
    60:13 61:15 80:5 95:10
**replay** 50:21
**replaying** 90:22
**report** 8:3,8 9:13 13:3
    14:10 32:2 33:4,5,16
    73:10 74:18 85:2 92:1
**reported** 24:8 53:14
    61:20,21 94:16
**REPORTER** 65:1 97:10
**reporting** 93:17
**reports** 8:10 24:10 61:18
**representing** 46:4
**request** 32:25
**requests** 97:3
**reread** 89:7
**research** 6:11
**researched** 33:15
**resist** 78:23
**resisted** 93:25 94:4,9
**resisting** 63:19 66:21 67:3,
    10,16,20 69:1,14,24 70:1
    71:18 72:3
**resistive** 67:24
**resolve** 30:1

**respect** 87:1
**responded** 45:12
**responding** 45:12 97:3
**responds** 81:2
**response** 19:12
**responsibility** 34:3
**rest** 31:17 63:3
**result** 12:16 16:15
**returning** 91:3,7
**reveals** 13:5
**review** 9:25 10:3,7,17,24
    11:1,9,11 12:14 14:14,18
    15:2,17 24:4 25:14 27:3,5,
    17,20 29:10,11,14,15
    32:9,10 33:4 34:1 52:25
    55:16 57:11,22 63:5
    65:13,25 67:12 71:6
    74:22,23,25 75:1 79:24
    87:23 88:2 90:8 94:18
    95:23 96:1,7,9
**reviewed** 27:6,7 54:7 66:4
    82:7
**reviewing** 17:13 55:18
    56:5 61:9 66:17 74:16
    96:8
**right** 13:13 44:19 47:4
    64:22 65:10 74:11 83:17
    86:4
**robbed** 42:13
**role** 48:20 49:9
**room** 44:19
**rule** 96:16,18
**running** 42:6 43:20,21,22
    52:3 70:2

---

**S**

**safe** 83:25
**safety** 8:10,12,17,20 9:12,
    14
**satisfaction** 80:15
**satisfied** 80:16
**saw** 52:14 96:9
**saying** 13:2,4 52:22 53:25
    65:25 71:24 73:11 76:2
    77:21 93:19
**says** 18:15 19:9,24 20:2
    23:7,8 26:17,23 29:6,22
    37:6 47:12 50:25 61:10,
    11,17 65:8 73:3 74:3
    78:22 80:18 88:22 89:16,
    18,23 91:7
**scared** 24:11
**scene** 22:2,5 88:9 89:9
**second** 13:15 21:14 75:21
    78:14 90:25

**second-to-the-last** 26:17
**seconds** 31:4 34:23 38:22
  39:2 45:12 47:23 50:21,24
  51:3 60:12 62:17
**section** 10:16
**sections** 7:22
**secured** 88:9 89:9
**see** 25:14 27:25 42:7 45:24
  48:2 50:10,16,17 52:2,5
  56:21 60:24 61:10,17
  62:19,20 73:1 90:9,12
  96:2
**seen** 71:22 78:17
**sense** 43:7,16
**sentence** 75:21 89:6
**separate** 21:4
**September** 7:9 16:1 18:1
**sergeant** 6:5 10:22 73:3,18
  75:13 78:6 81:21 88:5,8,
  10,15 89:5,8,10,21,22
  90:1,3,5,9
**serious** 19:14
**service** 9:4
**services** 6:12
**shirt** 64:10,15
**shirts** 64:9
**shorts** 41:18 47:22 48:9
  49:25 52:18
**sic** 38:19 78:18
**side** 45:9 47:9,13,15,18
**sign** 38:7,13 79:1 86:5,6
**signature** 26:16,18 97:10
**signed** 38:6,12 86:1,2
**signing** 54:23
**signing-off** 66:14
**single** 43:23 57:7
**sitting** 56:20 58:21 59:1,5,
  9
**situation** 27:18 33:19 43:2
  67:18 70:22 72:2 79:17
**situations** 19:4
**six** 7:20,23 81:23 82:1
**skin** 41:10
**sole** 94:15
**somebody** 31:16 43:19
  77:9
**SOP** 37:20,24 38:2,4 77:18
**sorry** 19:20 29:5 30:11
  33:15 37:24 38:4 39:1,8
  50:9 51:9,10,13 52:25
  54:10,11 56:3,13 75:18
  76:24 83:18 90:21 95:17,
  23
**sound** 18:4

**sounds** 94:1
**south** 7:14
**southern** 7:16
**speak** 5:11 18:17,19 88:9,
  12 89:10,12
**speaks** 9:7 18:14,20 34:16
**specific** 61:19 66:24 67:11
  79:21
**specifically** 14:4 15:12
  23:17 25:9 45:6 55:22
  67:24 72:18 93:11
**specificity** 66:24
**speculation** 22:24 23:14
  24:20 80:22
**spell** 4:9,10
**spelled** 4:13
**spray** 19:1
**Standard** 38:5
**start** 10:5 34:22
**starting** 35:8 65:7
**state** 4:10 76:9
**stated** 34:7 74:14 75:14
  77:9 88:8,10 89:8,10 92:8
**statement** 34:19 61:3
  69:16 78:10,11 79:8,11,13
  83:4 90:2,10
**statements** 25:2,7,13 59:3,
  7 96:1
**states** 73:20 88:15 89:4,22
**stating** 19:21
**statistics** 14:1
**stayed** 92:10,13
**step** 75:23 76:3 89:24
  90:14
**stepped** 93:21
**stick** 81:4
**stipulate** 73:13 88:17
**stop** 9:19 10:5,7,18 11:2,
  22 16:25 17:4 31:3 37:9
  42:7,17 43:4,23 44:13
  56:8 60:11 62:16 90:25
  92:9 94:15
**stopped** 10:9 31:9 34:8
  35:2,23 36:20 37:3 46:14,
  17 48:22,23,24 49:12
  54:13,25 61:11 92:9,10,14
  94:20
**stops** 16:20
**store** 47:7
**story** 28:2,3 29:18 86:11
**strategic** 7:7
**street** 23:6 24:4,6 42:12,
  14,17 43:20,22,23 45:14,
  15,23,25 46:1,2,12,21,22
  47:6,13

**struggling** 65:19
**subdivision** 7:12
**subdivisions** 7:23
**subject** 13:19 22:19
**sudden** 58:11
**sufficient** 28:9 74:20
**sufficiently** 27:22
**suggest** 43:15
**summarize** 33:25 34:4
**summarized** 27:23
**summary** 88:15,22 89:4,
  14,16
**supervisor** 78:7,10
**supplement** 4:25
**support** 57:17,21 76:23
**supposed** 10:19 19:5
  78:11 97:1
**sure** 14:19 15:3 58:6 77:19
**surprised** 58:8
**suspect** 13:6,9 20:25 21:1,
  6,7,13 22:20,21 23:4,5,10,
  22 24:3,6,7,10,14 25:12
  39:21 40:1 44:3 47:19,20
  50:9 62:25 63:19 70:24
  80:18
**suspect's** 23:22,23
**suspects** 40:25 41:24 50:3
  53:12 78:17
**suspicion** 17:4,8
**sustain** 71:20
**sustained** 72:11 80:1
**sworn** 4:2 19:10
**system** 36:14

————————————————
                **T**
————————————————

**take** 5:2 10:2 55:3 87:13,
  14
**take-home** 26:10
**taken** 4:18 87:21 97:7
**takes** 78:10
**talk** 28:21 32:17 79:9 83:5
**talked** 78:19
**talking** 7:22
**tape** 34:22 52:14 86:17
  87:6,25 93:22 94:8
**tapes** 58:23
**Taser** 11:13 19:1
**taught** 16:23 17:3 20:15
  21:5,12,20 22:4,9,10
**technical** 6:12
**tell** 6:1 27:4 28:24 58:10
**telling** 37:12 51:13 70:9
**tells** 15:12 18:11 19:4

110

terminology 75:10
terms 9:10
testified 36:8 37:12 46:10
testimony 36:6,9 37:4,9
46:14 47:1,3,25 48:3 49:6
83:10 84:12
Thank 4:8 9:11 97:9
thing 20:19 47:19 86:5
things 20:21 24:1 34:1,18
39:18 47:16 67:23 77:25
96:7
think 31:8 41:11 59:14
78:1 81:13 97:5
thinking 38:16
Third 88:5
thorough 32:13 38:14
79:24 80:9,13 85:4,7,10,
13 86:7,9
thought 38:13
thousands 16:9
threat 19:14
three 8:22,23 21:4 53:13
56:17,18,25 57:1,5,8,12,
23 58:2,18 71:13,16 72:12
81:23
three-second 96:15,17
time 13:6 15:8,24 20:9,12,
16,20,21 21:21 32:1 34:1
65:22 69:5 81:1 86:18
96:23
timeline 9:4
times 10:25 36:7
today 5:5,9,12,16 57:12
58:21 59:1,5,9
told 24:12,17 88:11 89:11
92:16 94:20,22
topics 16:9
traffic 68:13
train 16:8
training 15:21,24 17:7,18
18:22 25:6,19,24 26:1
96:19
trainings 16:10 26:2
trajectory 6:2
transcribing 66:9
transcript 65:4 66:8
transportation 39:25
trial 5:21 57:16 58:7,8
trooper 88:12 89:12
truck 48:2 60:16,20 61:19
92:17 93:20
trying 43:14 68:23 94:9
turn 13:14 19:7 35:7 45:21
81:8 88:3 92:17

turned 92:17
two 8:23 20:20 24:7 30:1,
11 36:23 37:16 42:6,12,18
47:16 49:20 51:9 81:23
91:23 97:6
type 10:4 25:14

**U**

U-10-100 73:10
Uh-huh 14:24 38:3 64:8
Uh-uh 30:25
un 69:25
unable 62:19 93:10
unanswerable 69:25
unavailable 5:16
understand 4:21 7:10 18:8
29:20 54:21 86:20 96:5
unfamiliar 77:17
unit 6:11
units 6:9
unnecessary 74:15 75:6,9,
15
updated 5:24
use 9:22 11:15,18,23 12:8,
11,13,23 13:6 14:2,14
16:18 17:11,14 18:12,17,
20,21 19:10,21 35:5,9,13,
16,20 36:21,25 39:5,10,
15,18,20 56:8 67:9 68:13
70:18 74:9,16
use-of-force 13:3 17:23
18:10 72:1 81:15 82:6,16
useful 83:7
uses 11:4,6
usually 27:12

**V**

Vaguely 15:19
variables 23:16
vehicle 48:25 50:10,17
53:17 60:25 61:10,11,12,
18,19 75:24 76:4 78:15,17
89:25 90:15
version 28:2,3 29:18 79:2,
3 82:14,22 83:1,12 86:10
93:7,14
versus 17:18
vicinity 94:16
video 5:18 27:20 28:6
34:15 51:25 52:4,11 57:1
73:4 77:1
videos 55:6 56:21
violated 15:1

voicemail 91:14,16
voicemails 91:23

**W**

wagon's 73:4
waist 48:3
walk 68:16
walking 23:6 24:3,6 42:14
want 4:25 18:3,5 19:2
30:23 31:11,17 40:15
55:4,7,11 58:6,8 63:11,17
69:11 70:5,11 76:6 81:7,
16
wanted 65:17 67:1 92:9
93:25 94:10
warning 68:6
warrant 79:7
wasn't 10:10 40:17
watch 27:12
watched 27:9
watching 56:21
way 46:11 68:3,15
ways 18:23 21:10
we'll 5:1,21 73:13
we're 15:13 58:8 80:21
we've 36:6,9,24 78:19,21
81:10
wearing 47:22 49:25
went 34:19 93:21
white 40:10,22 41:15,19
42:2,6,13,15,18,25 43:3,
19,21 47:19 51:8,20 52:2,
8,15,16 53:6 64:9,10,15
whites 49:20
wish 10:12
withdraw 23:5 96:14
witness 4:2 15:6 19:8
26:15 37:10 43:11 45:22
72:24 81:2 88:4 91:7
woman 40:10,23 41:15,19
42:7,17 43:3,4,21,24 48:8,
9 52:3,15,16 53:13
women 42:6,13,15,19
43:21,22
word 20:5 46:19 93:17
word-for-word 61:22
wording 75:13
words 34:11 92:7,12
work 6:9
worked 6:10,11
wouldn't 23:2 27:19 33:22
43:8 52:5 61:14 84:14
wrap 41:18 47:22 48:8
49:24 52:18

111

**writing**  32:8
**written**  33:6 88:18,23,24
**wrong**  46:11
**wrote**  94:2

---

### Y

---

**yeah**  15:7 18:16 29:13
  39:13 91:14
**year**  6:25
**years**  6:15 8:24 56:17,18,
  25 57:2,5,8,12,23 58:3,18
**yesterday**  97:13